# EXHIBIT 1

RICHARD S. COHEN
ATTORNEY GENERAL



STEPHEN L. DIAMOND
JOHN S. GLEASON
JOHN M. R. PATERSON
ROBERT J. STOLT
DEPUTY ATTORNEYS GENERAL

# STATE OF MAINE

## DEPARTMENT OF THE ATTORNEY GENERAL

### AUGUSTA, MAINE 04333

January 7, 1980

Honorable Howard M. Trotzky
Maine State Senate
State House
Augusta, Maine   04333

Dear Senator Trotzky:

  This will respond to your request for an opinion on the following question:

> "Does L.D. 691, Chapter 431, Public Law 1979, violate the First Amendment of the U.S. Constitution inasmuch as it allows individuals in school administrative districts to attend privately operated religious schools at public expense?"

Your question raises a broader issue, namely, whether public funds may be used to pay the tuition of children attending religiously operated elementary and secondary schools. In order to properly respond to your question, it is necessary to set out the pertinent statutory provisions in some detail.

### The Statutory Framework

  At the present time there are several statutes which authorize school officials, in appropriate circumstances, to pay the tuition of students who attend privately operated elementary and secondary schools. Section 1 of Chapter 431 of the Public Laws of 1979 enacted a new section 213-A to Title 20 of the Maine Revised Statutes which mandates that each school administrative district maintain both an elementary and a secondary school for its pupils. 20 M.R.S.A. §213-A (2)(D)(1965-1979 Supp.) provides, however, that

> "...a district may meet the requirement of providing a secondary school facility by contracting...with a private academy for all or part of its pupils for a term of from 2 years to 10 years."

20 M.R.S.A. §912 (1965-1979 Supp.) authorizes each school administrative unit to contract with another administrative unit for elementary school privileges. In the event that an administrative unit does not maintain an elementary school and does not contract for elementary school privileges, it "may pay tuition for any student who resides with a parent or legal guardian in that administrative unit and who attends an approved elementary school." 20 M.R.S.A. §912 (1965-1979 Supp.).

Section 1289 of Title 20, as amended by P.L. 1979, c.431, §4, permits any administrative unit which does not maintain a secondary school to authorize its local school committee to enter into contracts with the trustees of an approved private academy for secular educational services. Any contract entered into pursuant to 20 M.R.S.A. §1289 may run from one to five years. Section 1289 further provides that in those instances where an administrative unit has entered into a contract with a private academy, a joint committee may be established consisting of "a mutually agreed upon number of members of the school committee or board of directors of each contracting administrative unit chosen from their own membership and an equal number of trustees of the academy." The responsibilities and powers of the joint committee are set out in 20 M.R.S.A. §1289 (1965-1979 Supp.) and include the authority to select and employ the teachers at the academy, to fix their salaries, to arrange the course of study and "to supervise the instruction and to formulate and enforce proper regulations pertaining to other educational activities of the school." Finally, with respect to the financial arrangements pertaining to a contract made pursuant to 20 M.R.S.A. §1289, the tuition liability of the contracting administrative unit is the same as if the unit maintained an approved secondary school.

In the event that an administrative unit does not maintain an approved secondary school and does not contract for secondary school privileges, a student who resides within the unit "may attend any approved secondary school to which he may gain admission." 20 M.R.S.A. §1291 (1965-1979 Supp.) as amended by P.L. 1979, c.431, §5. Additionally, 20 M.R.S.A. §1291 permits a student to attend "some other approved secondary school to which he may gain admission for the purpose of studying an occupational course, a mathematics or science course or a foreign language course where the secondary school within his administrative unit does not offer a sufficient number of those courses."[1]

---

1. 20 M.R.S.A. §1291 (1965-1979 Supp). provides in pertinent part:

"Any youth whose parent or legal guardian maintains a home for his family in an administrative unit that maintains, or contracts for school privileges in, an approved secondary school which offers less than 2 approved occupational courses of study, and who has met the qualifications

Finally, 20 M.R.S.A. §1454 provides that "[a]ny youth whose parent or legal guardian maintains a home for his family in the unorganized territory of this State and who may be judged by the commissioner qualified to enter an approved secondary school may attend any such school in the State to which he may gain entrance...."

To summarize the statutory provisions in question, 20 M.R.S.A. §213-A (1965-1979 Supp.) permits a school administrative district, which does not maintain a secondary school facility, to contract with a private academy to provide secondary school privileges for its pupils. 20 M.R.S.A. §912 (1965-1979 Supp.) authorizes a school administrative unit, which does not maintain an approved elementary school and does not contract with another unit for such services, to pay a student's tuition for attendance at "an approved elementary school." 20 M.R.S.A. §1289 (1965-1979 Supp.) authorizes a school administrative unit, which does not maintain an approved secondary school, to contract with a private academy to provide for the schooling of all or some of its pupils. 20 M.R.S.A. §1291 (1965-1979 Supp.) permits a student to attend any approved secondary school to which he may gain admission in the event that his school administrative unit does not support, maintain or contract for secondary schooling for its pupils. Additionally, 20 M.R.S.A. §1291 permits a student, in appropriate circumstances, to attend an approved secondary school to which he may gain admission for the purpose of studying an occupational course, a mathematics or science course or a foreign language course. Finally, 20 M.R.S.A. §1454 (1965-1979 Supp.) permits, in certain circumstances, a student from the unorganized territory to attend an approved secondary school, to which he may gain admission, at State expense.

Before addressing your specific question regarding the constitutional issue, it is necessary to determine whether the statutory provisions referred to above apply to religiously operated elementary and secondary schools or whether the statutory authority of school administrative districts and units to enter into contracts with and pay the tuition of students at non-public schools is limited to private non-religious elementary and secondary schools.

---

1. Con't
for admission to the high school in his town, may elect to attend some other approved secondary school to which he may gain admission for the purpose of studying an occupational course not offered or contracted for by the administrative unit of his legal residence. Any youth whose parent or legal guardian maintains a home for his family in an admininstrative unit that maintains, or contracts for school privileges in, an approved secondary school, and who has met the qualifications for admission to the high school in his unit, may elect to attend some other approved secondary school in the State to which he may gain admission for the purpose of studying or of completing at least a 2-year course in mathematics or science when such courses are not offered or contracted for by the administrative unit of his legal residence or a foreign language when the unit where he resides offers less than 2 approved foreign language courses,..."

It is a well-established principle that the courts will avoid addressing questions raising constitutional issues unless it is impossible to do so. See, e.g., Johnson v. Maine Wetlands Control Board, Me., 250 A.2d 825, 827 (1969); State v. Good, Me., 308 A.2d 576, 579 (1973); Morris v. Goss, 147 Me. 87, 93, 83 A.2d 556 (1951). While the judiciary has both the duty and the power to invalidate unconstitutional legislation, State v. Butler, 105 Me. 91, 73 A.560 (1909), it has an equally important responsibility to exercise that power with caution and "only when there are no rational doubts which may be resolved in favor of the constitutionality of the statute...." Crommett v. City of Portland, 150 Me. 217, 231, 107 A.2d 841 (1954) quoting State v. Vahlsing, 147 Me. 417, 430, 88 A.2d 144 (1952). As stated by former Chief Justice Dufresne, "[t]he cardinal principle of statutory construction is to save, not to destroy." State v. Davenport, Me., 326 A.2d 1, 6 (1974).

With respect to any legislative enactment, there is a strong presumption of constitutionality. State v. S.S. Kresge, Inc., Me., 364 A.2d 868, 872 (1976). In construing legislation, the duty of the court is to determine whether the provisions of the statute "are susceptible of a reasonable interpretation which would satisfy constitutional requirements." Portland Pipe Line Corp. v. Environmental Improvement Commission, Me., 307 A.2d 1, 15 (1973), app. dismissed, 414 U.S. 1035 (1973). If at all possible a statute should be construed, in a reasonable manner, so as to avoid rendering it unconstitutional. State v. Fitanides, Me., 373 A.2d 915, 920-21 (1977). Where a statute is reasonably susceptible of two interpretations, the court is bound to adopt that interpretation which sustains the statute's constitutionality. See Portland Pipe Line Corp. v. Environment Improvement Commission, supra; In re Stubbs, 141 Me. 143, 147, 39 A.2d 853 (1944).

With respect to sections 213-A, 912, 1289, 1291 and 1454 of Title 20, the statutes are all silent as to whether school administrative units and districts are authorized to pay the tuition of students attending religiously operated elementary and secondary schools. Each statute in question authorizes, in appropriate cases, either a school administrative unit or district to enter into contracts with and pay the tuition for students at privately operated elementary and secondary schools. One interpretation of these statutes is that administrative units and districts may contract with any private elementary or secondary school, including religiously operated ones. On the other hand, an equally reasonable interpretation of these statutory provisions is that the authority of administrative units and districts to enter into such contracts is limited to private, non-sectarian elementary and secondary schools.

In view of the doctrine that statutes should be construed, if reasonably possible, so as to avoid rendering them unconstitutional, it is now necessary to consider whether the practice of using public funds to pay tuition for students attending religiously

operated elementary and secondary schools is constitutionally permissible.[2]

## The Establishment Clause

The First Amendment to the United States Constitution[3] provides in relevant part:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...."

Article I, §3 of the Maine Constitution contains a similar prohibition.[4]

---

2. It is our understanding that as of October 1, 1979, 46 pupils were attending religiously operated elementary schools and 289 pupils were attending religiously operated secondary schools at public expense pursuant to 20 M.R.S.A. §§213-A, 912, 1289, 1291 or 1454 (1965-1979 Supp.).

3. The provisions of the First Amendment have been made binding on the states through the Fourteenth Amendment. See Murdock v. Pennsylvania, 319 U.S. 106 (1943).

4. Article I, §3, Me. Const., provides:

> "All men have a natural and unalienable right to worship Almighty God according to the dictates of their consciences, and no one shall be hurt, molested or restrained in his person, liberty or estate for worshipping God in the manner and season most agreeable to the dictates of his own conscience, nor for his religious professions or sentiments, provided he does not disturb the public peace, nor obstruct others in their religious worship; --and all persons demeaning themselves peaceably, as good members of the State, shall be equally under the protection of the laws, and no subordination nor preference of any one sect or denomination to another shall ever be established by law, nor shall any religious test be required as a qualification for any office or trust, under this State; and all religious societies in this State, whether incorporate or unincorporate, shall at all times have the exclusive right of electing their public teachers, and contracting with them for their support and maintenance."

The Maine Law Court has held that the prohibitions in Article I, §3 are "no more stringent" than those embodied in the First and Fourteenth Amendments to the United States Constitution. Squires v. City of Augusta, 155 Me. 141, 164, 153 A.2d 80, 88 (1959).

Any analysis of the First Amendment's "Establishment Clause" and its interrelationship with state attempts to provide public aid, either directly or indirectly, to religiously operated schools, must necessarily begin with the United States Supreme Court decision in Everson v. Board of Education, 330 U.S. 1 (1947). In Everson, the Court upheld a New Jersey statute authorizing reimbursement to parents for the costs of transporting their children to school. The statute also permitted reimbursement for transportation expenses to parents whose children attended parochial schools. In arriving at its decision, the Court recognized the inherent tension between the "Establishment Clause" and the "Free Exercise Clause" of the First Amendment. As stated by the Court:

> "New Jersey cannot consistently with the 'establishment of religion' clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church. On the other hand, other language of the amendment commands that New Jersey cannot hamper its citizens in the free exercise of their own religion."

Id. at 16.

Acknowledging that the "establishment clause" was intended to erect "'a wall of separation between church and State,'" the Court concluded that providing bus transportation to all children, including those attending religious schools, did not offend any constitutional principle embodied in the First Amendment. Id. at 16 quoting Reynolds v. United States, 98 U.S. 145, 164. In essence, the Court concluded that providing transportation to all school children did not have either the purpose or effect of promoting or establishing religion.[5]

In Abington School District v. Schempp, 374 U.S. 203, 222 (1963) the Supreme Court attempted to formulate a general rule regarding establishment clause cases.[6] The Court stated:

> "The test may be stated as follows: what are the purpose and primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion."

---

5. The constitutionality of using public money to provide transportation to children attending religious schools was recently reaffirmed in Cromwell Property Owners Association v. Toffolon, ___ F.Supp. ___, (D.Conn., Docket No.Civil H-78-475, Filed August 31, 1979).

6. Abington School District v. Schempp, supra involved Bible reading in public schools. See also Engel v. Vitale, 370 U.S.

Applying the test announced in Schempp, the Court in Board of Education v. Allen, 392 U.S. 238 (1967) upheld a New York statute authorizing the loan of approved secular textbooks to all school children, including those attending parochial schools. While the Court recognized that textbooks are significantly different from school buses, the Court also noted that "each book loaned must be approved by the public school authorities; only secular books may receive approval." 392 U.S. at 244-45.

In its landmark decision in Lemon v. Kurtzman, 403 U.S. 602 (1971)(hereinafter referred to as Lemon I), the United States Supreme Court added a third and possibly a fourth criterion to the "purpose and effect" test it had adopted and followed in Schempp and Allen. In Lemon I, the Court held that in order for a statute to survive a challenge that it is unconstitutional because it authorizes state aid to religiously affiliated schools, not only must it have a secular legislative purpose and a primary or principal effect which neither advances nor inhibits religion, it must also not foster an excessive governmental entanglement with religion. Additionally, the Court suggested that issues involving the use of public money to aid religious schools carry the potential for political divisiveness in local communities. This danger of political divisiveness, the Court added, is at odds with the fundamental principle that church and State remain separate.

The analysis formulated in Lemon I has been utilized by the Court in all of the subsequent cases raising establishment clause challenges. In evaluating a challenged statute, it should be emphasized that the First and Fourteenth Amendments prohibit laws "'respecting an establishment of religion' even though its consequence is not to promote a 'state religion.'" Committee For Public Education v. Nyquist, 413 U.S. 756, 771 (1972). On the other hand, "not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon religious institutions is, for that reason alone constitutionally invalid." Id.

An examination of each of the tests articulated in Lemon I follows.

### The "Purpose" Test

The "purpose" test enunciated by the United States Supreme Court is perhaps the easiest to apply. Pursuant to this standard, the Court attempts to ascertain the purpose which the legislative enactment was designed to achieve. In most cases involving state aid to religious schools, it is clear, one way or the other, what purpose the statute was intended to serve. In the most recent cases the Court has had no need to use the "purpose" test since it has been clear that a particular statute had a secular purpose, i.e., providing for the education of all school children. However, in some relatively early decisions the Court did strike down state statutes because their purposes were to promote religious activity. See, e.g., Epperson v. Arkansas, 393 U.S. 97 (1969)(statute prohibiting the teaching in public schools of the theory of evolution); Engle v. Vitale, 370 U.S. 421 (1962)(statute requiring

prayer reading in public schools); Abington School District v. Schempp, 374 U.S. 203 (1963)(statute requiring Bible reading in public schools); McCollum v. Board of Education, 333 U.S. 203 (1948)(statute authorizing "release time" from public education for religious instruction in public school buildings). Compare Zorach v. Clauson, 343 U.S. 306 (1952) in which the Court upheld the constitutionality of a statute authorizing "release time" from public education for religious instruction off public school premises.

It is fair to say that with respect to cases involving public aid, in varying forms, to religious educational institutions, the Court has rarely used the "purpose" test to invalidate a state statute.

## The "Primary or Principal Effect" Test

The "primary effect" test formulated by the United States Supreme Court to evaluate statutes claimed to be violative of the Establishment Clause is, perhaps, the most difficult test to understand and apply. In many cases, its contours overlap with those of the "entanglement" test. Nevertheless, it is fair to say that those cases which have discussed and applied the "primary effect" test have emphasized a common element. That element is that the educational institutions receiving public aid were pervasively religious, such that it would be impossible to identify public aid as being used for purely secular purposes. The pervasively religious atmosphere at such institutions has led the Court to conclude that public aid for purely secular functions cannot be distinguished from the sectarian function performed by the religious institution and therefore has a primary effect of aiding and/or promoting that religious atmosphere. A few examples may clarify the "primary effect" rationale.

In Hunt v. McNair, 413 U.S. 734 (1973) the Court considered a South Carolina statute which was designed to assist higher education institutions in constructing, financing and re-financing building projects through revenue bonds. The law was designed to benefit all institutions of higher education, including those operated by religious groups. The advantage of the statute was that the college or university would borrow money at low interest and would not have to pay income tax on that interest. The law was challenged on First Amendment grounds when a Baptist College attempted to apply for benefits under it. In speaking of the "primary effect" test, the Court observed:

> "Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting."

Id. at 743.

In Hunt, the Court found no evidence that the college was pervasively religious and therefore held that the law, as applied in this case, did not have a primary effect of advancing religion.

Similar results were reached in Roemer v. Maryland Public Works Board, 426 U.S. 736 (1976) and Tilton v. Richardson, 403 U.S. 672 (1970). In Roemer, a state statute authorized the payment of public funds to "any private institution of higher learning within the State of Maryland." The act specifically provided that the funds could not be used for sectarian purposes and an auditing procedure was established to ensure that this provision of the act was not violated. Moreover, funds were not available to institutions which awarded only "seminarian or theological" degrees. In rejecting a claim that the primary effect of the law advanced religion, the Court noted that while the religiously operated colleges had some aspects of sectarian influence, they were not pervasively sectarian. The Court was not persuaded that the institutions in question were so permeated with religion that their sectarian aspects could not be separated from their secular functions.

Similarly, in Tilton the Court upheld the constitutionality of Title I of the Higher Education Facilities Act of 1963 (20 U.S.C. §§711-721). This Act provided federal grants for the construction of buildings and facilities used exclusively for secular educational purposes. The Act was challenged when several catholic colleges applied for construction grants. The Court rejected the "primary effect" argument "that religion so permeates the secular education provided by church-related colleges and universities that their religious and secular educational functions are in fact inseparable." 403 U.S. at 680.

On the other hand, there are several cases in which the Supreme Court has employed the "primary effect" rationale to strike down statutes providing aid to sectarian educational institutions. For example, in Meek v. Pittenger, 421 U.S. 349 (1975) the Court struck down a portion of a Pennsylvania statute which authorized private elementary and secondary schools, including religious ones, to receive instructional material and equipment. Although the instructional material and equipment was secular in nature, the Court invalidated the statute because its primary effect advanced religion in view of "the predominantly religious character of the schools benefitting from the Act." Id. at 364. The Court stated:

> "...faced with the substantial amounts of direct support authorized by [the] Act..., it would simply ignore reality to separate secular educational functions from the predominantly religious role performed by many of Pennsylvania's church-related elementary and secondary schools and then characterize [the] Act...as channelling aid to the secular without providing direct aid to the sectarian. Even though earmarked for secular purposes, 'when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious

mission,' state aid has the impermissible primary effect of advancing religion." Id. at 365-66 quoting Hunt v. McNair, 413 U.S. at 743.

Once again, a similar result was reached in Wolman v. Walter, 433 U.S. 229 (1977) in which the Court struck down a portion of a state statute which authorized payment to private religious elementary and secondary schools for field trip supervision. Using the "primary effect" rationale as well as the "entanglement" test, the Court concluded that it was simply impossible to separate the secular functions performed by the schools from their sectarian ones.[7]

In Committee For Public Education v. Nyquist, 413 U.S. 756 (1972) and Levitt v. Committee For Public Education, 413 U.S. 472 (1972) the Court invalidated two New York statutes on the ground that their primary effect advanced religion. In Nyquist, the statute authorized direct payments to private elementary and secondary schools, including religious ones, for "maintenance and repair" of school buildings. The statute also authorized tuition reimbursements and a tax break directly to parents who sent their children to non-public schools.[8] The Court concluded that the secular and sectarian purposes of the religious schools were so intertwined that there was no practical way to keep them separate. With respect to the "maintenance and repair" provisions of the statute, the Court stated:

> "No attempt is made to restrict payments to those expenditures related to the upkeep of facilities used exclusively for secular purposes, nor do we think it possible within the context of these religion-oriented institutions to impose such restrictions... Absent appropriate restrictions on expenditures..., it simply cannot be denied that this section has a primary effect that advances religion in that it subsidizes directly the religious activities of sectarian elementary and secondary schools." 413 U.S. at 774.

With respect to the tuition reimbursement section of the act, the Court concluded that it, too, had a primary effect that advanced religion. The Court first observed that a direct payment of money to the school would be invalid under the establishment clause. The Court was unimpressed with the argument that the statute was saved because the reimbursements were made to the parents not to the schools. "By reimbursing parents for a portion of their tuition bill, the State seeks to relieve their financial burdens sufficiently to assure that they continue to have

---

7. It should also be noted that the Wolman Court invalidated a portion of the statute which authorized pupils, or their parents, in religious schools to receive secular instructional material and equipment. In Meek, the material and equipment was given directly to the schools. The Court did not consider this distinction to be relevant for First Amendment purposes.

8. In striking down the "tax benefits" portion of the New York statute, the Court distinguished its ruling in Walz v. Tax Commissi

the option to send their children to religion-oriented schools ...[T]he effect of the aid is unmistakably to provide desired financial support for non-public, sectarian institutions."[9] Id. at 783. The decision in Nyquist was followed in Sloan v. Lemon, 413 U.S. 825 (1973) in which the Court struck down a Pennsylvania statute authorizing tuition reimbursements to parents who sent their children to non-public sectarian schools.

Finally, in Levitt v. Committee For Public Education, supra, the Court struck down a New York statute which authorized direct money grants to non-public elementary and secondary schools to perform "testing and recordkeeping" which was required by state law. Using the "primary effect" test, the Court ruled that the statute "constitutes an impermissible aid to religion; this is so because the aid that will be devoted to secular functions is not identifiable and separable from aid to sectarian activities." 413 U.S. at 480.

As is apparent from the foregoing, the focus of the "primary effect" test is upon the character of the religious institutions involved. Where the institution is dedicated to the inculcation of religious beliefs, state aid to that institution presents a serious risk of having a primary effect of advancing religion simply by virtue of the fact that it is practically impossible to isolate secular functions or purposes from the overriding role of the sectarian school to promote the tenets of such religious beliefs. This explains why state aid to sectarian colleges and universities has generally been upheld while state aid to sectarian elementary and secondary schools is more likely to be viewed as violating the primary effect test. The United States Supreme Court has acknowledged that there are "significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools." Tilton v. Richardson, 403 U.S. at 685; Committee For Public Education v. Nyquist, 413 U.S. at 777 n.32; Hunt v. McNair, 413 U.S. at 734. There tends to be a considerable amount of academic freedom at church-related colleges and universities and the Court has taken notice of the fact that, generally, such institutions of higher learning do not have a pervasive religious atmosphere. Moreover, church-related colleges and universities usually do not have as their principal function the indoctrination of religious beliefs. Finally, the age of college students is a factor supporting the Supreme Court's view that public funds will not be used to influence one's

---

8. Con't

397 U.S. 664 (1969) which upheld the constitutionality of property tax exemptions to religious organizations for properties used solely for religious worship.

9. The Court rejected the contention that tuition reimbursements were, for First Amendment purposes, different from direct tuition payments.

religious beliefs. Accordingly, it is much easier in the college setting to separate the school's secular functions from its religious mission.

The same cannot be said for church-related elementary and secondary schools. Such schools exist for the very purpose of teaching and promoting the tenets of a particular religious faith. The process of education at religiously operated elementary and secondary schools is inextricably bound to the task of indoctrinating pupils in the principles of their faith. That task or mission permeates the entire educational curriculum and is directed at an age group which is particularly susceptible to religious indoctrination. It is this pervasiveness of religious purpose which is at the heart of the "primary effect" test.

### The "Entanglement" Test

The "entanglement" test appears to have first surfaced in the Supreme Court's decision in Lemon v. Kurtzman, 403 U.S. 602 (1971). In applying the "entanglement" test, the Court listed the following factors to be considered: (a) the character and purposes of the institution receiving state aid, i.e., college or elementary or secondary school; (b) the nature of the aid provided (e.g., one lump sum payment or annual grants); (c) the resulting relationship between the sectarian institution and the government. The statutes at issue in Lemon I involved a Rhode Island law which provided for a direct 15%. reimbursement to teachers in non-public elementary and secondary schools, and a Pennsylvania law giving a limited reimbursement to non-public elementary and secondary schools for teachers salaries, text-books and instructional materials. Obviously, the salary reimbursements went only to teachers in purely secular subjects.

The Court took notice of the distinct possibility that a teacher in a non-public school will have difficulty in preventing his religious beliefs from "seeping" into his course of instruction.

> "We...recognize that a dedicated religious person, teaching in a school affiliated with his or her faith and operated to inculcate its tenets, will inevitably experience great difficulty in remaining religiously neutral. Doctrines and faith are not inculcated or advanced by neutrals. With the best of intentions such a teacher would find it hard to make a total separation between secular teaching and religious doctrine."

Id. at 618-619.

In order to assure that non-public school teachers, who have received salary reimbursements, are abiding by the First Amendment and are not preaching religious doctrines in the classroom, the state would have to engage in "[a] comprehensive, discriminating and continuing...surveillance." "Unlike a book, a teacher cannot be inspected once so as to determine the extent... of his or her personal beliefs and subjective acceptance of the limitations imposed by the First Amendment. These prophylactic contacts will involve excessive and enduring entanglement between state and church." Id. at 619. The Court in Lemon I emphasized

that the state must be "certain" that "subsidized teachers do not inculcate religion." Id. See also Meek v. Pittenger, 421 U.S. 349, 370-71. To be "certain" that non-public school teachers are not using the classroom to instill religious beliefs, there would have to be almost constant monitoring of church-related schools. It is this monitoring or surveillance by the government which entangles it, to an excessive degree, with the church.

The "entanglement" test is usually applied in situations where the so-called "human factor" is involved; e.g., classroom teachers and other professionals providing diagnostic tests and therapeutic services. See Meek v. Pittenger, supra; Wolman v. Walter, 433 U.S. 229 (1977). It is these types of activities which require the most surveillance. Moreover, these activities tend to be funded on a continuous basis, rather than on a lump sum basis, thereby adding to the government's entanglement with church-sponsored schools.

### The "Political Divisiveness" Test

In Lemon I the Court also referred to the "potential for political divisiveness" which statutory programs providing for aid to church-related schools are likely to generate. It is unclear whether the "political divisiveness" language in the Court's opinion was intended to be an independent test under the Establishment Clause or whether it is part of the "entanglement" test. In any event, it has been referred to by the Court in Lemon I, Roemer and Nyquist. The underlying premise of the "political divisiveness" factor is that state aid to church-related schools is likely to engender very strong political views about the propriety of using public money to aid church-related schools. This is particularly true with respect to elementary and secondary school education since it is an important issue of local concern. The Court emphasized that political divisiveness and debate along religious lines was one of the principal evils which the First Amendment was intended to eliminate. Finally, the Court noted that the potential for political differences along religious lines is more likely to occur where the state aid is of a continuing nature.

### Analysis

Having set forth the criteria by which a statutory enactment will be measured in order to determine whether it offends the First Amendment's Establishment Clause, it is now possible to examine the practice of contracting with sectarian elementary and secondary schools in light of these criteria.[10]

---

10. Implicit in this statement is the question of what is meant by the term "sectarian". As used in this opinion, the term "sectarian" refers to those institutions which are characterized by a pervasively religious atmosphere and whose dominant purpose is the promotion of religious beliefs. This issue is discussed in greater detail in a later section of this opinion.

1. The "Purpose" Test

Initially, there would appear to be no difficulty in concluding that the practice of contracting with sectarian schools for educational services has a secular purpose. The underlying purpose of such a practice would appear to be the general education of all elementary and high school students. This purpose is certainly secular in nature and would not violate the "purpose" test under the First Amendment. See, e.g., Sloan v. Lemon, 413 U.S. 825, 829-30 (1973); Committee for Public Education & Religious Liberty v. Nyquist, 413 U.S. at 773; Lemon v. Kurtzman, 403 U.S. 602 (1971).

2. The "Primary Effect" Test

The application of the "primary effect" test to the practice of contracting for educational services with religiously operated elementary and secondary schools, presents a much thornier question. In applying the "primary effect" test to the various forms of statutory aid which have been reviewed by the United States Supreme Court, the critical factor which has emerged is the character of the institutions which receive public funds. See, e.g., Wolman v. Walter, 433 U.S. 229 (1977); Roemer v. Maryland Public Works Board, 426 U.S. 736 (1976); Meek v. Pittenger, 421 U.S. 349 (1974). Where an institution is characterized by a pervasively religious atmosphere, the receipt of public funds by that institution, either directly or indirectly, presents a significant risk that the primary effect of such state aid will be to advance religion in contravention of the Establishment Clause of the First Amendment.

Assuming that a contract is made with a sectarian school for educational services, the effect of such a contract will be to expend public funds to send students to a religiously operated elementary or secondary school. While it is contemplated that such a contract would involve only secular educational services, it would seem highly unlikely that the school's secular functions could be separated from its predominantly religious purpose. It is difficult to imagine how the practice of contracting for educational services with religious schools differs from the tuition reimbursement program invalidated by the United States Supreme Court in Committee for Public Education v. Nyquist, supra. Indeed, the effect of such a contract is to make a direct payment of public money to a sectarian school for the purpose of providing educational services to elementary and high school students. In striking down a New York statute which attempted to provide tuition reimbursement to parents who sent their children to non-public sectarian schools, the United States Supreme Court stated:

> "There can be no question that these grants could not, consistently with the Establishment Clause, be given directly to sectarian schools... ."

Committee for Public Education v. Nyquist, 413 U.S. at 780.

In view of the foregoing, it is our conclusion that the practice of contracting with and paying the tuition of students at sectarian elementary and secondary schools has a primary effect which advances religion and, therefore, violates the Establishment Clause of the First Amendment.

3. The "Entanglement" Test

The practice fares no better under the "entanglement" test adopted by the United States Supreme Court in Lemon v. Kurtzman, 403 U.S. 602 (1971). In those instances where elementary and secondary students attend sectarian schools at public expense, the state would have to engage in a program of constant surveillance in order to be "certain" that non-public school teachers were not allowing religious instruction to "seep" into the secular educational curriculum. It is such excessive surveillance which entangles the state in the affairs of church-related schools such that the First Amendment is violated. Once again, the fact is that public funds would be expended to send children to a sectarian school and there would be no effective means of assuring that the wall of separation between church and state had not been breached. Accordingly it is our conclusion that the practice of contracting with sectarian schools for the purchase of educational services results in excessive entanglement between the state and such sectarian schools and therefore violates the First Amendment's Establishment Clause.

4. The "Political Divisiveness" Test

Finally, the practice in question, when applied to sectarian elementary and secondary schools, could very well engender the type of political divisiveness along religious lines which the Supreme Court has indicated the First Amendment seeks to avoid. Members of a local community tend to divide sharply on religious issues and it is easy to envision a situation in which members of a local community differ widely on whether public money should be expended to send students to religiously operated elementary and secondary schools. Such political divisiveness could be exacerbated by the fact that the duration of some contracts with sectarian schools could extend over a period of years.

Based upon the decisions of the United States Supreme Court, as examined above, it is our conclusion that the practice of paying the tuition of students attending sectarian elementary and secondary schools violates the Establishment Clause of the First Amendment to the United States Constitution.

### State Court Decisions

As additional support for our conclusion, it should be observed that the Justices of the Maine Supreme Court have issued an opinion on proposed legislation which would have authorized the making of contracts with sectarian schools for secular educational services. In 1970 the 104th Legislature considered enacting L.D. 1751 (H.P. 1394) being "An Act Creating the Nonpublic Elementary Education Assistance Act". This proposed Act would have permitted administrative units "to contract and pay for secular education service." The use of this contractual authority was limited to situations where the local school committee had determined that the closing of a non-public school would have an adverse impact on the local tax rate or on classroom space in the public school system. In view of the possibility that the

proposed Act implicated First Amendment concerns, the Legislature requested an advisory opinion from the Justices of the Supreme Judicial Court. In <u>Opinion of the Justices</u>, Me., 261 A.2d 58 (1970), the Justices responded with four of them concluding that the proposed legislation violated the Establishment Clause and two of them reaching the opposite result.[11]

Mr. Chief Justice Williamson and Justices Marden and Weatherbee were of the opinion that the proposed Act ran afoul of both the "purpose" and the "primary effect" tests.

> "Budgets for the secular instruction may be technically separable from the budget of the entire operation of the [sectarian] schools, but the institution is an inseparable whole, which is strengthened in its institutional purpose when it is strengthened in any of its departments by outside financial assistance."

261 A.2d at 67.

Mr. Justice Webber reached a similar conclusion in a separate answer in which he stated that "my concern is that what in the legislative proposal is termed a contract for secular educational service will be viewed as in reality a method for providing public aid to a sectarian school in support of all of its purposes." 261 A.2d at 69.

Former Chief Justice Dufresne and Mr. Justice Pomeroy were of the view that the proposed Act did not offend the First Amendment. Both Justices relied heavily on the lower court's decision in <u>Lemon v. Kurtzman</u> which was later reversed by the United States Supreme Court. In view of the decision in <u>Lemon I</u>, and later Supreme Court cases, it is probable that the opinions of Justices Dufresne and Pomeroy would be different today.

While there are many differences between the proposed Act examined by the Supreme Judicial Court in <u>Opinion of the Justices</u>, <u>supra</u>, and the practice now under consideration, they both involved contracts with sectarian schools for secular educational services. Based upon the Justices <u>Opinion</u> and the Supreme Court's decisions in <u>Lemon v. Kurtzman</u> and <u>Committee for Public Education v. Nyquist</u>, there would appear to be a strong likelihood that the Law Court, if given the opportunity, would invalidate the practice of contracting for educational services with sectarian elementary and secondary schools.

---

11. It should be noted that the <u>Opinion</u> was issued while <u>Lemon v. Kurtzman</u> was pending before the United States Supreme Court. Consequently, the Justices did not have the benefit of a clear application of the "entanglement" test. All of the Justices appeared to have recognized the importance of the <u>Lemon</u> case. In fact, Mr. Chief Justice Williamson was of the opinion that <u>Lemon</u> would be totally dispositive of the issue.

Finally, courts in other jurisdictions have uniformly held that statutes authorizing contracts with sectarian schools for secular educational services offend the Establishment Clause of the First Amendment. See, e.g., John v. Sanders, 319 F.Supp. 421, 430 (D.Conn.), aff'd, 403 U.S. 955 (1970); Opinion of the Justices, 357 Mass. 836, 258 N.E.2d 779 (1970); In Re Proposal C, 384 Mich. 390, 185 N.W.2d 9 (1971); Swart v. South Burlington Town School District, Vt., 167 A.2d 514 (1961).

## Conclusion

The following will summarize our conclusions regarding the constitutionality of the practice of using public funds to contract with and pay for the tuition of students at sectarian elementary and secondary schools. We conclude: that the practice has a secular purpose and does not offend the First Amendment on that ground; that the practice has a primary effect which advances religion and violates the Establishment Clause of the First Amendment on that ground; that the practice produces excessive entanglement between the State and sectarian schools, and, consequently, violates the First Amendment on that ground. Finally, we note that the practice carries the potential for generating political divisiveness along religious lines and may violate the First Amendment on that basis also.

As discussed previously,[12] it is a fundamental canon of statutory construction that legislation is to be interpreted, if possible, so as to avoid rendering it unconstitutional. Where a statute is susceptible of two interpretations, the courts are bound to adopt that interpretation which sustains the statute's constitutionality. In view of our conclusion that the practice of contracting with sectarian elementary and secondary schools for educational services offends the First Amendment, it is now necessary to determine whether sections 213-A, 912, 1289, 1291 or 1454 of Title 20 authorize school administrative units or districts to engage in such a practice. Each statute authorizes administrative units or districts or the Commissioner of Education, in limited situations, to pay the tuition for students at a private academy or at some other approved elementary or secondary school. None of the statutes explicitly include or exclude sectarian schools from their operation. To interpret the statutes as permitting school administrative units and districts to contract with sectarian schools for educational services would render them at least partially unconstitutional. On the other hand, an interpretation that the legislation does not authorize such a practice is a reasonable construction of the statutes and is consistent with the favored rule that statutory enactments should be construed, whenever possible, so as to uphold their constitutional validity.

In light of our conclusion that the practice of contracting with and paying the tuition for students at sectarian elementary and secondary schools is unconstitutional, we interpret 20 M.R.S.A.

---

12. See pages 3-5 supra.

§§213-A, 912, 1289, 1291 and 1454 (1965-1979 Supp.) as not authorizing such a practice.[13] As so interpreted, it is our conclusion that sections 213-A, 912, 1289, 1291 and 1454 of Title 20 do not violate the First Amendment.

## Application of Opinion

During the course of this opinion, we have repeatedly referred to "sectarian" elementary and secondary schools and have concluded that the practice of using public funds to send students to such schools is unconstitutional. As used in this opinion and in the decisions of the United States Supreme Court, the term "sectarian" refers to those institutions which are characterized by a pervasively religious atmosphere and whose dominant purpose is the promotion of religious beliefs. The question of whether a particular school is pervasively religious in nature is a factual one and must be determined on an individual basis. See, e.g., Weiss v. Bruno, 82 Wash.2d 199, 409 P.2d 973, 979-89 (1973). It is, of course, conceivable that there may exist elementary and secondary schools which are religiously affiliated to a nominal degree only and are not necessarily characterized by a pervasively religious atmosphere. Within the context of this opinion, however, it is simply not possible to examine each religiously affiliated school to determine whether it is pervasively sectarian for First Amendment purposes.[14]

I hope this information is helpful to you. Please feel free to call upon me if I can be of further assistance.

Sincerely,

RICHARD S. COHEN
Attorney General

---

13. Even assuming that the statutes are interpreted as permitting school administrative units and districts to contract with sectarian schools, our conclusion that the practice is unconstitutional would remain unchanged. Moreover, any provision of the statutes deemed violative of the First Amendment would be severable from other statutory provisions. See 1 M.R.S.A. §71(8)(1979) which provides:

> "The provisions of the statutes are severable. The provisions of any session law are severable. If any provision of the statutes or of a session law is invalid, or if the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or application."

14. The United States Supreme Court has had no difficulty in concluding that those institutions which might be described as typical "parochial" or "religious" schools are pervasively sectarian. As noted above, however, there may be situations where a school is only nominally affiliated with a religious organization, and such nominal affiliation may be insufficient to characterize the school as a pervasively sectarian institution.