# EXHIBIT 6

```
 1              UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MAINE
 2

 3                      Civil Action No. 18-cv-00327 DBH

 4

 5

 6

 7    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

 8    DAVID and AMY CARSON, et al.,

 9       Plaintiffs,

10       vs

11    ROBERT G. HASSON, JR., in his official capacity as
      Commissioner of the Maine Department of Education,
12
         Defendant.
13
      *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
14

15    DEPONENT:  JUDITH E. GILLIS

16

17
      Taken before Debra J. Fusco, a Notary Public in and
18    for the State of Maine, at the Office of the
      Attorney General, Cross State Office Building, 6th
19    Floor, Sewall Street, Augusta, Maine, on November
      20, 2018, beginning at 11:00 a.m., pursuant to
20    notice given.

21

22

23

24

25
```

```
 1      APPEARANCES:

 2      CHRISTOPHER TAUB, AAG
        SARAH FORSTER, AAG
 3      DEPARTMENT OF ATTORNEY GENERAL
        6 State House Station
 4      Augusta, ME 04333-0006
        (207)626-8800
 5      christopher.taub@maine.gov
        sarah.forster@maine.gov
 6      Attorney for the Defendant

 7

 8      TIM KELLER, ESQUIRE
        INSTITUTE FOR JUSTICE
 9      398 S. Mill Avenue, Suite 301
        Tempe, AZ 85281
10      (480)557-8300
        tkeller@ij.org
11      Attorney for the Plaintiffs

12      LEA PATTERSON, ESQUIRE
        FIRST LIBERTY
13      2001 West Plano Parkway, Suite 1600
        Plano, TX 75075
14      (972)941-4444
        lepatterson@firstliberty.org
15      Attorney for the Plaintiffs

16

17      MICHAEL K. WHITEHEAD, ESQUIRE (Via Telephone)
        THE WHITEHEAD FIRM, LLC
18      229 SE Douglas St, Ste 210
        Lee's Summit, MO 64063
19      (816)210-4449
        mike@thewhiteheadfirm.com
20      Attorney for the Plaintiffs

21

22

23

24

25
```

I N D E X

DEPONENT:

     JUDITH E. GILLIS

   EXAMINATION BY MR. TAUB         4

   EXAMINATION BY MS. FORSTER    NONE

   EXAMINATION BY MR. KELLER     NONE

   EXAMINATION BY MS. PATTERSON   NONE

   EXAMINATION BY MR. WHITEHEAD   NONE




E X H I B I T S


                                        Page
Exhibit 1   Notice of Deposition      7

Exhibit 2   E-mail chain             25

1      (This deposition was taken before Debra J. Fusco,

2   Notary Public, at the Office of the Attorney General,

3   Cross State Office Building, 6th Floor, Sewall Street,

4   Augusta, Maine, on November 20, 2018, beginning at 11:00

5   a.m.)

6      (The deponent was administered the oath by the Notary

7   Public.)

8      **JUDITH E. GILLIS**, after having been duly sworn by the

9   Notary Public, was deposed and testified as follows:

10                     EXAMINATION

11   BY MR. TAUB:

12      Q.   Good morning, Mrs. Gillis.

13      A.   Good morning.

14      Q.   My name is Chris Taub, and we met just briefly

15   before the deposition.  I'm an Assistant Attorney

16   General for the State of Maine, and I'm representing

17   Commissioner Hasson in a lawsuit that you and your

18   husband and a couple of other families have brought.

19   And you understand that you are here to have your

20   deposition taken in that lawsuit, correct?

21      A.   Yes.

22      Q.   And I think before we go further, and maybe this

23   is a question for your attorneys --

24               MR. TAUB:  -- but it's my understanding that

25   what we've agreed to do is that we are taking the

1    deposition of one spouse for each family, and that the

2    other spouse or child will not submit an affidavit in

3    the case.  In other words, what the spouse says in the

4    deposition today is gonna be sort of the official

5    statement of that family; is that fair?

6                  MR. KELLER:  Yes, that is fair.  That is our

7    agreement.

8                  MR. TAUB:  Okay, great.

9    Q.  Could you just state your address for the record,

10   please?

11   A.  I live at 143 Center Drive in Orrington, Maine.

12   Q.  Have you ever had your deposition taken before?

13   A.  No.

14   Q.  Okay.  So I'm just gonna give you a little bit of

15   an explanation, and your attorneys may have already

16   described this to you, but essentially this is just a

17   process by which Sarah and I can get information from

18   you.  And so I'm gonna ask you a series of questions,

19   and all of my questions are gonna be transcribed and

20   written down, and all of your answers are gonna be

21   written down, and so there's a couple of things that

22   will just make the process go a little bit more

23   smoothly.  One of them is that you will often know my

24   question before I can quite finish asking it.  You'll

25   know how my question's gonna end and so you'll start to

1    answer my question.  If you could just pause for a

2    moment to let me finish my question, it will just make

3    it easier for her to get the question and the answer,

4    okay?

5       A.  (Nodding.)

6       Q.  And the other thing that's important to do, and

7    we both will probably forget this from time to time, is

8    that you have to answer verbally because it's difficult

9    for the court reporter to transcribe a shake of the head

10    or a nod of the head or an uh-huh or an un-un.  So, if

11    possible, if you could answer questions with a yes or a

12    no or whatever is appropriate, and I'll try to remind

13    you if you forget, okay?

14       A.  Okay.

15       Q.  All right.  Sometimes my questions might not make

16    sense and if that happens and you don't understand my

17    question, please just tell me and I'll try to rephrase

18    the question for you.  If you need to take a break at

19    any point -- I don't think this is gonna be a very long

20    deposition, but if you need to take a break at any

21    point, just let me know and we can take a break.  This

22    isn't an endurance test by any means.  And I think --

23    unless you have any questions, I think we're ready to

24    start.  Does everything make sense so far?

25       A.  Yes.

```
 1      Q.  Okay.  I'm gonna start by asking -- why don't we
 2   just have this marked as Exhibit 1.
 3                 (Exhibit 1 was marked.)
 4      Q.  I'm gonna show you what's been marked as Exhibit
 5   1, and I'm just gonna ask you if you've seen this
 6   document before?
 7      A.  I have seen it.
 8      Q.  Okay.  So you'll see the title of the document is
 9   Notice of Deposition of Judy Gillis.  Do you see that?
10      A.  Yes.
11      Q.  And so essentially this is just the official
12   document that attorneys use to notify people of the
13   deposition.  I would like to ask you to turn to the very
14   last page which is labeled Exhibit A.  Do you see there
15   it identifies certain documents that we asked you to
16   bring to the deposition?
17      A.  Yes.
18      Q.  So you will see that this asked you to bring
19   certain documents with you to the deposition?
20      A.  Yes, I see that it says that.
21      Q.  Did you bring any documents with you?
22      A.  I do not have any.
23      Q.  Okay.  Did you make an effort to look for the
24   documents that were listed on the exhibit?
25      A.  I never had any such documents.
```

1    Q.  Okay.  So when you saw this, this Exhibit A, you

2    could tell right away that you wouldn't have had any

3    documents that were responsive?

4    A.  Correct.

5    Q.  Okay.  I want to ask a little bit about your

6    family and so could you tell me your husband's name?

7    A.  Alan.

8    Q.  Okay.  And he has the same last name as you?

9    A.  Yes.

10   Q.  Okay.  And do you have any children?

11   A.  We have four children.

12        MR. TAUB:  Tim, are we gonna use initials

13   for children or could we use first names or --

14        MR. KELLER:  We've been using initials

15   simply because of the local rule but --

16        MR. TAUB:  I just don't know how confusing

17   it's gonna be to use --

18        MR. KELLER:  It's not my preference.  We've

19   been identifying the kids based on the language in the

20   local rules.

21        MR. TAUB:  All right, why don't we stick

22   with that.

23   BY MR. TAUB:

24   Q.  Beginning with the youngest child, can you give

25   me the initials of your four children?

```
1    A.   I.G., A.G., C.G. and K.G.

2    Q.   How old is I.G.?

3    A.   Sixteen.

4    Q.   Is that a boy or a girl?

5    A.   Girl.

6    Q.   How old is A.G.?

7    A.   Twenty-nine.

8    Q.   A boy or a girl?

9    A.   A boy.

10   Q.   How old is C.G.?

11   A.   Thirty-one.

12   Q.   A boy or a girl?

13   A.   Girl.

14   Q.   And how old is K.G.?

15   A.   Thirty-three.

16   Q.   A boy or a girl?

17   A.   Girl.

18   Q.   And I guess since the last three children are all

19   above the age of 18, can you just give me their first

20   names?  So A.G.'s first name is what?

21   A.   Alan, Jr.

22   Q.   And C.G.'s first name?

23   A.   Courtney.

24   Q.   And K.G.'s first name?

25   A.   Kristin.
```

1    Q.   Is that with a --

2    A.   I on the end.

3    Q.   Okay.  And so is I.G. the only child that

4  currently lives in your household?

5    A.   Yes.

6    Q.   All right.  And is Alan the father of Alan,

7  Courtney and Kristin?

8    A.   Yes.

9    Q.   Where did you attend high school?

10   A.   Central High.

11   Q.   And where is that located?

12   A.   In East Corinth, Maine.

13   Q.   What year did you graduate?

14   A.   1983.

15   Q.   And did you go on to any kind of postsecondary

16  schools?

17   A.   Yes.

18   Q.   Where did you go after you graduated from high

19  school?

20   A.   I went to Freed-Hardeman University.

21   Q.   Where is that?

22   A.   That's in Henderson, Tennessee.

23   Q.   And did you graduate from there?

24   A.   I did not.

25   Q.   How many years did you complete there?

1    A.  One year.

2    Q.  Okay.  And have you had any other kind of formal

3  education other than the one year of college?

4    A.  No.

5    Q.  Okay.  Where did Mr. Gillis, your husband, go to

6  high school?

7    A.  Brewer High.

8    Q.  Do you remember what year he graduated?

9    A.  '83.

10    Q.  And did he go on -- after high school, did he go

11  on to college?

12    A.  Yes.

13    Q.  Where did he go?

14    A.  It was part of the University of Maine, the

15  campus in Bangor.  I'm not sure what they called it at

16  the time.

17    Q.  Okay, but he went to college through the

18  University of Maine system?

19    A.  Yes.

20    Q.  And did he graduate from college?

21    A.  Yes.

22    Q.  And do you remember what year he graduated?

23    A.  I'm not sure what year he graduated.

24    Q.  After he graduated from college, did he go on to

25  any other kind of college or graduate programs?

1      A.   No.

2      Q.   Okay.  Do you have employment outside of the

3    house?

4      A.   I do not.

5      Q.   Okay.  Say in the last 10 years, have you had

6    employment?

7      A.   Outside the house?

8      Q.   Yes.

9      A.   Yes.

10      Q.   Okay.  What was the last job that you held?

11      A.   My most recent job was I worked at Home Goods.  I

12    worked there for about nine months.

13      Q.   Okay.  And Home Goods is a retail store?

14      A.   Yes.

15      Q.   And when did you stop working there?

16      A.   Approximately a year and a half ago.

17      Q.   Okay.  What does your husband do for work?

18      A.   He's a game warden.

19      Q.   And does he have a particular territory or

20    jurisdiction that he patrols or is sort of assigned to?

21      A.   He's a sergeant so he oversees seven wardens and

22    their districts.

23      Q.   Okay.  Is there a particular office that he works

24    out of?  Like, for example, does he work in the Augusta

25    office or --

1    A.   He works in the Bangor office.

2    Q.   In the Bangor office, okay.  Do you belong to a

3  church?

4    A.   I do.

5    Q.   What church do you belong do?

6    A.   I attend Crosspoint Church in Bangor, Maine.

7    Q.   Does your husband also attend that church?

8    A.   Yes.

9    Q.   What about I.G.?  Does she attend that church?

10    A.   Yes.

11    Q.   How long have you attended Crosspoint Church?

12    A.   I think approximately four years.

13    Q.   What denomination is Crosspoint Church?

14    A.   Christian.

15    Q.   And I'm not sure if I'm gonna ask this question

16  correctly, but my understanding is that there are

17  different kinds of Christian churches.  Does Crosspoint

18  have a particular doctrine or set of beliefs that might

19  distinguish it from other Christian churches?  And I'm

20  sorry if that doesn't make sense the way I'm asking it.

21    A.   Prior to being called Crosspoint Church it was

22  called Bangor Baptist.  So I would say they affiliate

23  closely with the Baptist doctrine.

24    Q.   Thank you, that makes sense.  Is Crosspoint

25  Church affiliated with any kind of school, say

1    kindergarten through 12th grade, any sort of elementary,

2    preschool or high school?

3        A.   Yes.

4        Q.   And what's the name of the school that it's

5    affiliated with?

6        A.   Bangor Christian.

7        Q.   Okay.  And does I.G. currently attend Bangor

8    Christian?

9        A.   She does.

10       Q.   How long has she attended Bangor Christian?

11       A.   She started there the fourth quarter of her

12   freshman year.  She is now a junior.

13       Q.   So she began there towards the end of her

14   freshman year, and she's now sort of halfway through her

15   junior year?

16       A.   Correct.

17       Q.   Okay.  What school did she go to for the first

18   three quarters of her freshman year?

19       A.   She went to Hampden Academy in Hampden, Maine.

20       Q.   Where did she go for eighth grade?

21       A.   Center Drive School in Orrington.

22       Q.   Is Center Drive School, is that a public school?

23       A.   It is.

24       Q.   Okay.  What grade levels is it?

25       A.   That's Pre-k through 8th grade.

1    Q.   And did I.G. attend center drive school for Pre-k

2    through 8th grade?

3    A.   She did.

4    Q.   Okay.  So other than Center Drive School and

5    Hampden Academy and Bangor Christian, has I.G. attended

6    any other schools?

7    A.   She attended a preschool called -- I can't

8    remember the name of it.

9    Q.   That's okay.  Other than that preschool, Center

10   Drive School, Hampden Academy and Bangor Christian, has

11   I.G. attended any other schools?

12   A.   No others.

13   Q.   Okay.  Why did I.G. transfer from Hampden Academy

14   to Bangor Christian in her freshman year?

15   A.   She was not thriving well at Hampden Academy.

16   Q.   By not thriving well, do you mean academically,

17   socially, both?

18   A.   She was doing well academically.  She was being

19   bullied and ostracized by a large portion of her grade

20   level.

21   Q.   Not that kids need a reason, obviously, but was

22   there some characteristic about her that the other

23   children sort of seized upon to bully and ostracize her?

24   A.   Yes.

25   Q.   And what was it?

1        A.   Her Christian beliefs.

2        Q.   Did you have any interactions with the

3   administration at Hampden Academy to address the

4   bullying and ostracizing that was going on?

5        A.   We did not because nobody physically touched her

6   or did anything illegal.  They just made it clear that

7   they were unhappy with her as in they didn't want to sit

8   with her or --

9        Q.   So as far as you know, she was never physically

10  assaulted?

11       A.   As far as I know, she was not.

12       Q.   Okay.  Would kids at the school say mean things

13  to her?

14       A.   She had a close friend from elementary school

15  that identified as lesbian.  She knew Isabel was

16  Christian so she said if you're my friend, you have to

17  approve.  And she said, I don't agree that it's right

18  but you're my friend and I love you, and I don't want it

19  to affect our relationship, but her friend went and told

20  everyone that Isabel was completely in the wrong and

21  that no one should talk to her.

22            MR. TAUB:  Okay.  We sort of lapsed into

23  using her first name, but it is what it is --

24            MS. GILLIS:  Oh, sorry.

25

1          MR. TAUB:  It is what it is --

2          MR. KELLER:  It's fine.

3          MR. TAUB:  I think we can always go through

4     the transcript and replace it.  But it is much easier to

5     use the first names.  As long as we've gone down that

6     road, why don't we continue and then we can always talk

7     about --

8          MR. KELLER:  That's fine.

9     BY MR. TAUB:

10     Q.  Is it Isabel or Isabella?

11     A.  Her legal name is Isabella.

12     Q.  So the episode with her friend, was that sort of

13     the beginning of the problems that she started to have

14     at Hampden Academy?

15     A.  It was the beginning of her really being unhappy

16     there.  She had difficulty from the beginning because

17     she is a fairly introverted and shy person, and Hampden

18     Academy is a very large school.

19     Q.  Your other three children, Alan, Courtney and

20     Kristin, did any of them attend Bangor Christian?

21     A.  They did not.

22     Q.  Where did Alan go to high school?

23     A.  Alan went to Brewer High School in Brewer, Maine.

24     Q.  And what about Courtney?

25     A.  Courtney attended John Bapst Memorial in Bangor,

1   Maine.

2       Q.   And Kristin?

3       A.   John Bapst memorial in Bangor, Maine.

4       Q.   Okay.  So I'm assuming that during Isabella's

5   freshman year at Hampden Academy, you and your husband

6   and she had some discussions about how to address the

7   situation?

8       A.   Yes.

9       Q.   And at some point, was a decision made to explore

10  the possibility of her going to a different school?

11      A.   Yes.

12      Q.   Other than Bangor Christian, did you discuss

13  other schools that she might want to attend?

14      A.   We discussed John Bapst Memorial, and she did not

15  want to attend there.

16      Q.   Did she tell you why she did not want to attend

17  John Bapst?

18      A.   Because she wanted to go to Bangor Christian.

19      Q.   Did she tell you why she wanted to go to Bangor

20  Christian?

21      A.   She wanted to be in an environment where her peer

22  group would share her values and her beliefs.

23      Q.   Okay.  This is gonna be a stupid question, I

24  always get this wrong, but John Bapst Memorial, is that

25  a religious school or a nonreligious school?

```
 1     A.  It is no longer religious.  It was formed as a
 2  religious school.  It became nonreligious in 1980 when
 3  the state would no longer pay tuition to it unless they
 4  became non-Christian.
 5     Q.  Okay.  So during Isabel's freshman year, at that
 6  point, John Bapst was a nonreligious school?
 7     A.  Correct.
 8     Q.  And if Isabella decided that she did want to go
 9  to John Bapst, would that have been okay with you and
10  your husband?
11     A.  It would have been.
12     Q.  And were there any other Christian schools that
13  Isabella considered besides Bangor Christian?
14     A.  No.
15     Q.  Is that because Bangor Christian was the school
16  that was affiliated with your church so she was
17  generally familiar with it?
18     A.  For us, it was because it was the only Christian
19  school that was accredited.
20     Q.  Okay.  And when you say, accredited, what do you
21  mean by that?
22     A.  Schools can either be accredited through the
23  state or not.  My feeling was if it wasn't accredited, I
24  couldn't be sure of the academic standards.
25     Q.  So you would prefer that she went to an
```

1  accredited school?

2     A.  Yes.

3     Q.  And so if she had indicated that she wanted to go

4  to a Christian school that was not accredited, would you

5  and your husband have had some concerns about that?

6     A.  Some concerns.

7     Q.  Not necessarily to the level where you would have

8  said no, but you would have preferred for her to go to

9  an accredited school; is that fair?

10    A.  That's fair.

11    Q.  Okay.  When Isabella was a freshman at Hampden

12 Academy, did she have friends that attended Bangor

13 Christian School?

14    A.  She did.

15    Q.  Okay.  And so I'm assuming from the fact that

16 Alan, Courtney and Kristin went to public schools and

17 that Kristin -- I mean that Isabella originally went to

18 public schools, that there's nothing in your religion

19 that requires you to have your children attend a

20 religious school?

21    A.  Correct.

22    Q.  Okay.  And if Isabella was not being bullied and

23 was happy at Hampden Academy, would and your husband

24 have been okay with her continuing there through

25 graduation?

1    A.  We would have been.

2    Q.  What was the application process for -- so once

3    the decision was made that Isabella wanted to go to

4    Bangor Christian School, what was the application

5    process?

6    A.  You fill out an application, and I can't remember

7    everything on it.  Once you send that in, you meet with

8    the principal and have a discussion about school rules,

9    codes, your expectation to obey those rules and codes,

10   that it's a privilege to attend there, not a right, and

11   that you would have to leave if you were not gonna

12   follow their codes and their rules at the school.

13   Q.  Is there any academic testing that's done before

14   they make a decision about whether to -- well, in

15   Isabella's case, did they do any academic testing ever

16   before making a decision to admit her?

17   A.  No.

18   Q.  Okay.  How many -- so Isabella is currently a

19   sophomore at Bangor Christian?

20   A.  A junior.

21   Q.  A junior, I'm sorry.  How many students are in

22   the junior class, if you know?

23   A.  I believe it's around 30.

24   Q.  And does Bangor Christian charge tuition to

25   students who attend there?

1    A.   Yes.

2    Q.   And what do you pay for Isabella's tuition each

3   year at Bangor Christian?

4    A.   I believe this year as $4,950.  That's very close

5   if not completely accurate.

6    Q.   Okay, and that's for the year?

7    A.   For the year.

8    Q.   And was it approximately that last year as well?

9    A.   Yes, it was approximately that for all high

10   school students.  Elementary grades are not that -- are

11   a little less.

12    Q.   And the $4,950, is that the amount that Bangor

13   Christian charges, the amount that you pay or both?

14    A.   That is the amount they charge, that is the

15   amount we pay.  We got no scholarship or financial aid.

16    Q.   Okay.  Does Crosspoint Church make financial aid

17   or scholarships available to students who want to attend

18   Bangor Christian?

19    A.   I don't believe Crosspoint Church does.  I have

20   the understanding that the school itself offers some

21   financial aid to qualifying families.

22    Q.   Okay.  And have you and your husband applied for

23   financial aid?

24    A.   We have not.

25    Q.   And is that because you didn't think you would

1  qualify for it?

2      A.  Correct.

3      Q.  Okay.  Once you and your husband and Isabella

4  decided that Bangor Christian was the school that she

5  wanted to go to, did you have any discussions with your

6  public school officials about whether or not public

7  money could be used to pay for her tuition at Bangor

8  Christian?

9      A.  We did not.

10     Q.  Why not?

11     A.  We already knew, for a fact, that that was not

12  permissible.

13     Q.  Okay.  I may have asked this already but has

14  Isabella been happy at Bangor Christian?

15     A.  She is happy there.

16     Q.  Okay.  Does Bangor Christian require students who

17  attend there to attend religious ceremonies?  And maybe

18  ceremony is the wrong word.  In other words, do children

19  who attend Bangor Christian, do they routinely go to a

20  chapel service or some sort of religious service?

21     A.  I believe the high school students have chapel

22  either once or twice a week.

23     Q.  And are the high school students required to

24  attend chapel?

25     A.  I would assume, yes.  I don't know that for a

1  fact.

2      Q.   Okay.  Do you know sort of generally what occurs

3  during chapel?

4      A.   Chapel is led by the students.  They sing, they

5  sometimes have someone give a short talk, they bring up

6  prayer requests for the community or families and pray

7  about that, and that's about the sum of chapel.

8      Q.   Do you know whether there are any non-Christian

9  students at Bangor Christian?

10     A.   I do not know for a fact, but I believe there

11  are.

12     Q.   What's the basis for your belief?

13     A.   Isabel had a friend in 9th -- when she started in

14  9th grade, she was -- one of her friends, I had the

15  impression that his family was not Christian and that he

16  was not Christian.  That he did not attend church or --

17  outside of going to school there.

18     Q.   Okay.  When your family and Isabella was applying

19  to go Bangor Christian, did Bangor Christian ask you to

20  demonstrate in any way anything about your religious

21  beliefs?  And that was probably a terrible question so

22  let me ask if you understand what I'm asking.

23     A.   (No response.)

24     Q.   Do you want me to start over?

25     A.   Yeah, you can ask it again.

1    Q.  Did Bangor Christian, during the application

2    process, did they ask you to provide information

3    regarding whether or not you were a Christian?

4    A.  I don't recall.

5    Q.  Okay.  Was there an application form that you

6    filled out?

7    A.  Yes.

8    Q.  Okay.  And you don't have a copy of that form any

9    longer as far as you know?

10   A.  I don't.

11   Q.  Okay.  I'm gonna show you what's marked as

12   Exhibit 2.

13              (Exhibit 2 was marked.)

14   Q.  I'll just give you a minute to look it over.

15   It's an e-mail chain.  It starts on the bottom with an

16   e-mail from Tim Keller.  Then above that is an e-mail

17   from Dr. Benjamin.  Let me know when you've had a chance

18   to take a look at it.

19   A.  (Complying.)

20   Q.  Have you seen this before?  Maybe not this exact

21   copy of it, but have you seen these e-mails before?

22   A.  I recall reading the e-mail when it came out.

23   Q.  Okay.  And is your understanding that the top

24   e-mail, the one from Dr. Benjamin, that was an e-mail

25   that he sent to all families who had students who

1  attended Bangor Christian?

2      A.  I believe so.

3      Q.  So you and your husband received this e-mail; is

4  that right?

5      A.  Yes.

6      Q.  Was it as a result of this e-mail that you ended

7  up being a plaintiff in this lawsuit?

8      A.  Yes.

9      Q.  So, in other words, once you got this e-mail, did

10  you, in some way, contact Attorney Keller and indicate

11  that you might be interested in assisting with the

12  lawsuit?

13      A.  Yes.

14      Q.  Okay.  In addition to academics at Bangor

15  Christian -- in other words, Bangor Christian offers

16  academic classes, correct?  It teaches math and science

17  and English and history and all that stuff, correct?

18      A.  Correct.

19      Q.  Does it also provide instruction -- and, again,

20  I'm not sure I'm gonna have the term right, but does it

21  also provide instruction in essentially how to live your

22  life as a Christian?

23      A.  They have a Bible class where they study actually

24  the Bible.  Instruction on how to life your life as a

25  Christian is kind of an underlying part of the school.

1    Q.  Okay.  Do they teach children that they should

2  accept Jesus Christ as their savior?

3    A.  They teach that that is part of becoming a

4  Christian.  They don't tell anyone they should.

5    Q.  Okay, but they teach students that to become a

6  Christian, that's something that they need to do?

7    A.  Yes.

8    Q.  Do they teach children that the Bible is the word

9  of God?

10    A.  Yes.

11    Q.  Do they teach children that what is written in

12  the Bible, at least if you're a Christian, that you need

13  to follow what is written in the Bible?

14    A.  Yes.

15    Q.  Do they teach children who attend Bangor

16  Christian that they should attempt to model their lives

17  in accordance with what's written in the Bible?

18    A.  Yes.

19    Q.  Do you know whether they require students to

20  memorize portions of the Bible?

21    A.  I don't know for sure outside of sometimes in

22  Bible class they might have a verse that they memorize.

23    Q.  Okay.  Obviously since you're here today, you and

24  your husband believe that it would be appropriate for

25  tax money to be used to send Isabella to a Christian

1   school; is that fair to say?

2      A.   Yes.

3      Q.   Would you feel the same way about a Jewish child

4   or a Muslim child, that it would be appropriate for tax

5   money to be used to send, for example, a Muslim child to

6   a Muslim school?

7      A.   If that school was accredited.

8      Q.   Okay.

9            MR. TAUB:  I'll take a quick break and let

10  me confer with Sarah and then we'll come right back.

11           MR. KELLER:  Sure.

12           MR. TAUB:  All right, thanks.

13           (Off the record.)

14           MR. TAUB:  I have no further questions.

15  (Whereupon, the above-named deposition was concluded at

16  11:38 a.m.)

17  (The deponent does not waive reading and signing.)

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3      I, Debra J. Fusco, a Notary Public in and for the

 4  State of Maine, hereby certify that on the 20th day of

 5  November, 2018, personally appeared before me the

 6  within-named deponent who was sworn to testify to the

 7  truth, the whole truth, and nothing but the truth in the

 8  aforementioned cause of action and that the foregoing is

 9  a true and accurate record as taken by me by means of

10  computer-aided machine shorthand.

11

12      I further certify that I am a disinterested person in

13  the event or outcome of the aforementioned cause of

14  action.

15

16      IN WITNESS WHEREOF, I have hereunto set my hand this

17  4th day of December, 2018.

18

19                       _____

20                       Debra J. Fusco

21                       Court Reporter/Notary Public

22

23  My Commission expires:  February 23, 2023

24

25
```

```
 1      ALLEY & MORRISETTE REPORTING SERVICE

 2              1203 Augusta Road

 3              Belgrade, ME 04917

 4

 5                                    December 4, 2018

 6   Judith E. Gillis

 7   c/o Tim Keller, Esq.

 8   398 S. Mill Avenue, Suite 301

 9   Tempe, AZ 85281

10

11   RE:  Carson, et al, vs. Commissioner of the Maine DOE

12   Enclosed please find a copy of your deposition taken in

13   the above-mentioned action.  Also enclosed is the

14   original signature page and a sheet for corrections.

15

16   Please read the copy of the deposition and sign the

17   original signature page before a Notary Public.  If

18   there are any corrections you wish to make, they should

19   be made on the enclosed correction sheet.  Do not mark

20   on the deposition.

21

22   Please return the signed original signature page and

23   correction sheet to Alley & Morrisette at the above

24   address within 30 days.

25   Thank you.
```

1    THE ORIGINAL DEPOSITION OF JUDITH E. GILLIS SHOULD

2    INCLUDE THE FOLLOWING CORRECTIONS:

3

4

5

6    Page    Line     Change from this  To this

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   TO BE COMPLETED BY THE DEPONENT:

 2

 3      I, _____, have read the foregoing

 4   pages and have noted any stenographic errors of my

 5   testimony together with their respective corrections and

 6   the reasons therefore on the following Errata Sheet.

 7

 8              (SIGNATURE)_____

 9                 (DATE)_____

10              * * * * * * * * * * * * * * *

11   TO BE COMPLETED BY THE NOTARY PUBLIC/ATTORNEY

12      I, _____, a Notary Public/Attorney in

13   and for the State of Maine, hereby acknowledge that the

14   above-named deponent personally appeared before me and

15   affixed his/her signature as his/her own true act and

16   deed.

17

18              (SIGNATURE)_____

19                 (DATE)_____

20

21   TITLE:  Carson, et al, vs. Commissioner of the Maine DOE

22   DEPOSITION OF:  Judith E. Gillis

23   DATE OF DEPOSITION:  November 20, 2018

24   NOTICING PARTY:  Christopher Taub, Esq.

25   REPORTER:  Debra J. Fusco
```

Alley & Morrisette Reporting 207-495-3900

**$4,950** [2] - 22:4, 12
**'83** [1] - 11:9
**04333-0006** [1] - 2:4
**04917** [1] - 30:3
**1** [4] - 3:12; 7:2, 5
**10** [1] - 12:5
**11:00** [2] - 1:19; 4:4
**11:38** [1] - 28:16
**1203** [1] - 30:2
**12th** [1] - 14:1
**143** [1] - 5:11
**1600** [1] - 2:13
**18** [1] - 9:19
**18-cv-00327** [1] - 1:3
**1980** [1] - 19:2
**1983** [1] - 10:14
**2** [3] - 3:13; 25:12
**20** [3] - 1:19; 4:4;
32:23
**2001** [1] - 2:13
**2018** [6] - 1:19; 4:4;
29:5, 17; 30:5; 32:23
**2023** [1] - 29:23
**207)626-8800** [1] -
2:4
**20th** [1] - 29:4
**210** [1] - 2:17
**229** [1] - 2:17
**23** [1] - 29:23
**25** [1] - 3:13
**30** [2] - 21:23; 30:24
**301** [2] - 2:8; 30:8
**398** [2] - 2:8; 30:8
**4** [2] - 3:3; 30:5
**480)557-8300** [1] -
2:9
**4th** [1] - 29:17
**6** [1] - 2:3
**64063** [1] - 2:18
**6th** [2] - 1:18; 4:3
**7** [1] - 3:12
**75075** [1] - 2:13
**816)210-4449** [1] -
2:18
**85281** [2] - 2:9; 30:9
**8th** [2] - 14:25; 15:2
**972)941-4444** [1] -
2:14
**9th** [2] - 24:13
**A.G** [2] - 9:1, 6
**A.G.'s** [1] - 9:20
**a.m** [3] - 1:19; 4:5;
28:16
**AAG** [2] - 2:2
**above-mentioned**
[1] - 30:13
**above-named** [2] -
28:15; 32:14
**academic** [4] -
19:24; 21:13, 15;
26:16

**academically** [2] -
15:16, 18
**academics** [1] -
26:14
**Academy** [11] -
14:19; 15:5, 10, 13,
15; 16:3; 17:14, 18;
18:5; 20:12, 23
**accept** [1] - 27:2
**accordance** [1] -
27:17
**accredited** [8] -
19:19, 22-23; 20:1, 4,
9; 28:7
**accurate** [2] - 22:5;
29:9
**acknowledge** [1] -
32:13
**act** [1] - 32:15
**Action** [1] - 1:3
**action** [2] - 29:8, 14;
30:13
**addition** [1] - 26:14
**address** [4] - 5:9;
16:3; 18:6; 30:24
**administered** [1] -
4:6
**administration** [1] -
16:3
**admit** [1] - 21:16
**affect** [1] - 16:19
**affidavit** [1] - 5:2
**affiliate** [1] - 13:22
**affiliated** [3] - 13:25;
14:5; 19:16
**affixed** [1] - 32:15
**aforementioned** [2] -
29:8, 13
**age** [1] - 9:19
**ago** [1] - 12:16
**agree** [1] - 16:17
**agreed** [1] - 4:25
**agreement** [1] - 5:7
**aid** [4] - 22:15, 21, 23
**aided** [1] - 29:10
**al** [3] - 1:8; 30:11;
32:21
**Alan** [8] - 8:7; 9:21;
10:6; 17:19, 22-23;
20:16
**Alley** [1] - 30:23
**ALLEY** [1] - 30:1
**amount** [4] - 22:12
**AMY** [1] - 1:8
**answer** [4] - 6:1, 3,
8, 11
**answers** [1] - 5:20
**APPEARANCES** [1] -
2:1
**appeared** [2] - 29:5;
32:14

**application** [5] -
21:2, 4, 6; 25:1, 5
**applied** [1] - 22:22
**applying** [1] - 24:18
**appropriate** [3] -
6:12; 27:24; 28:4
**approve** [1] - 16:17
**assaulted** [1] - 16:10
**assigned** [1] - 12:20
**Assistant** [1] - 4:15
**assisting** [1] - 26:11
**assume** [1] - 23:25
**assuming** [2] - 18:4;
20:15
**attempt** [1] - 27:16
**attend** [20] - 10:9;
13:6, 9; 14:7; 15:1;
17:20; 18:13, 15-16;
20:19; 21:10, 25;
22:17; 23:17, 19, 24;
24:16; 27:15
**attended** [8] - 13:11;
14:10; 15:5, 7, 11;
17:25; 20:12; 26:1
**Attorney** [8] - 1:18;
2:6, 10, 15, 19; 4:2,
15; 26:10
**ATTORNEY** [1] - 2:3
**attorneys** [3] - 4:23;
5:15; 7:12
**Augusta** [5] - 1:19;
2:4; 4:4; 12:24; 30:2
**available** [1] - 22:17
**Avenue** [2] - 2:8;
30:8
**AZ** [2] - 2:9; 30:9
**Bangor** [39] - 11:15;
13:1, 6, 22; 14:6, 10;
15:5, 10, 14; 17:20,
25; 18:3, 12, 18-19;
19:13, 15; 20:12;
21:4, 19, 24; 22:3, 12,
18; 23:4, 7, 14, 16,
19; 24:9, 19; 25:1;
26:1, 14-15; 27:15
**Bapst** [7] - 17:25;
18:3, 14, 17, 24; 19:6,
9
**Baptist** [2] - 13:22
**based** [1] - 8:19
**basis** [1] - 24:12
**BE** [2] - 32:1, 11
**became** [2] - 19:2, 4
**become** [1] - 27:5
**becoming** [1] - 27:3
**began** [1] - 14:13
**beginning** [6] - 1:19;
4:4; 8:24; 17:13, 15
**Belgrade** [1] - 30:3
**belief** [1] - 24:12
**beliefs** [4] - 13:18;

16:1; 18:22; 24:21
**belong** [2] - 13:2, 5
**Benjamin** [2] - 25:17,
24
**Bible** [8] - 26:23;
27:8, 12-13, 17, 20,
22
**bit** [3] - 5:14, 22; 8:5
**bottom** [1] - 25:15
**boy** [5] - 9:4, 8-9, 12,
16
**break** [4] - 6:18,
20-21; 28:9
**Brewer** [3] - 11:7;
17:23
**briefly** [1] - 4:14
**bring** [4] - 7:16, 18,
21; 24:5
**brought** [1] - 4:18
**Building** [2] - 1:18;
4:3
**bullied** [1] - 15:19;
20:22
**bully** [1] - 15:23
**bullying** [1] - 16:4
**BY** [10] - 3:3-7; 4:11;
8:23; 17:9; 32:1, 11
**C.G** [2] - 9:1, 10
**C.G.'s** [1] - 9:22
**c/o** [1] - 30:7
**campus** [1] - 11:15
**capacity** [1] - 1:11
**Carson** [2] - 30:11;
32:21
**CARSON** [1] - 1:8
**case** [2] - 5:3; 21:15
**center** [2] - 14:21;
15:1
**Center** [4] - 5:11;
14:22; 15:4, 9
**central** [1] - 10:10
**ceremonies** [1] -
23:17
**ceremony** [1] - 23:18
**certain** [2] - 7:15, 19
**certify** [2] - 29:4, 12
**chain** [2] - 3:13;
25:15
**chance** [1] - 25:17
**Change** [1] - 31:6
**chapel** [6] - 23:20,
24; 24:3, 7
**characteristic** [1] -
15:22
**charge** [2] - 21:24;
22:14
**charges** [2] - 22:13
**child** [6] - 5:2; 8:24;
10:3; 28:3
**children** [13] - 8:10,
13, 25; 9:18; 15:23;

17:19; 20:19; 23:18;
27:1, 8, 11, 15
**Chris** [1] - 4:14
**Christ** [1] - 27:2
**Christian** [51] -
13:14, 17, 19; 14:6, 8,
10; 15:5, 10, 14; 16:1,
16; 17:20; 18:12, 18,
20; 19:4, 12-13, 15,
18; 20:4, 13; 21:4, 19,
24; 22:3, 13, 18; 23:4,
8, 14, 16, 19; 24:8,
15-16, 19; 25:1, 3;
26:1, 15, 22, 25; 27:4,
6, 12, 16, 25
**CHRISTOPHER** [1] -
2:2
**Christopher** [1] -
32:24
**christopher.taub@**
**maine.gov** [1] - 2:5
**church** [8] - 13:3, 5,
7, 9; 19:16; 24:16
**Church** [7] - 13:6,
11, 13, 21, 25; 22:16,
19
**churches** [2] - 13:17,
19
**Civil** [1] - 1:3
**class** [3] - 21:22;
26:23; 27:22
**classes** [1] - 26:16
**clear** [1] - 16:6
**close** [2] - 16:14;
22:4
**closely** [1] - 13:23
**codes** [3] - 21:9, 12
**college** [6] - 11:3,
11, 17, 20, 24
**Commission** [1] -
29:23
**Commissioner** [4] -
1:11; 4:17; 30:11;
32:21
**community** [1] - 24:6
**complete** [1] - 10:25
**COMPLETED** [2] -
32:1, 11
**completely** [2] -
16:20; 22:5
**complying** [1] -
25:19
**computer** [1] - 29:10
**computer-aided** [1] -
29:10
**concerns** [2] - 20:5
**concluded** [1] -
28:15
**confer** [1] - 28:10
**confusing** [1] - 8:16
**considered** [1] -

19:13
**contact** [1] - 26:10
**continue** [1] - 17:6
**continuing** [1] -
20:24
**copy** [4] - 25:8, 21;
30:12, 16
**Corinth** [1] - 10:12
**correct** [9] - 4:20;
8:4; 14:16; 19:7;
20:21; 23:2; 26:16
**correction** [2] -
30:19, 23
**corrections** [3] -
30:14, 18; 32:5
**CORRECTIONS** [1] -
31:2
**correctly** [1] - 13:16
**couple** [2] - 4:18;
5:21
**court** [1] - 6:9
**Court** [1] - 29:21
**COURT** [1] - 1:1
**Courtney** [6] - 9:23;
10:7; 17:19, 24-25;
20:16
**Cross** [2] - 1:18; 4:3
**Crosspoint** [8] -
13:6, 11, 13, 17, 21,
24; 22:16, 19
**DATE** [3] - 32:9, 19,
23
**DAVID** [1] - 1:8
**days** [1] - 30:24
**DBH** [1] - 1:3
**Debra** [5] - 1:17; 4:1;
29:3, 20; 32:25
**December** [2] -
29:17; 30:5
**decided** [2] - 19:8;
23:4
**decision** [4] - 18:9;
21:3, 14, 16
**deed** [1] - 32:16
**Defendant** [2] - 1:12;
2:6
**demonstrate** [1] -
24:20
**denomination** [1] -
13:13
**Department** [1] -
1:11
**DEPARTMENT** [1] -
2:3
**deponent** [4] - 4:6;
28:17; 29:6; 32:14
**DEPONENT** [3] -
1:15; 3:1; 32:1
**deposed** [1] - 4:9
**DEPOSITION** [3] -
31:1; 32:22

**Deposition** [2] -
3:12; 7:9
**deposition** [14] - 4:1,
15, 20; 5:1, 4, 12;
6:20; 7:13, 16, 19;
28:15; 30:12, 16, 20
**described** [1] - 5:16
**different** [2] - 13:17;
18:10
**difficult** [1] - 6:8
**difficulty** [1] - 17:16
**discuss** [1] - 18:12
**discussed** [1] -
18:14
**discussion** [1] - 21:8
**discussions** [2] -
18:6; 23:5
**disinterested** [1] -
29:12
**distinguish** [1] -
13:19
**DISTRICT** [2] - 1:1
**districts** [1] - 12:22
**doctrine** [2] - 13:18,
23
**document** [3] - 7:6,
8, 12
**documents** [6] -
7:15, 19, 21, 24-25;
8:3
**DOE** [2] - 30:11;
32:21
**done** [1] - 21:13
**Douglas** [1] - 2:17
**down** [3] - 5:20; 17:5
**Dr** [2] - 25:17, 24
**Drive** [5] - 5:11;
14:21; 15:4, 10
**drive** [1] - 15:1
**duly** [1] - 4:8
**during** [4] - 18:4;
19:5; 24:3; 25:1
**e-mail** [9] - 25:15,
22, 24; 26:3, 6, 9
**E-mail** [1] - 3:13
**e-mails** [1] - 25:21
**easier** [2] - 6:3; 17:4
**East** [1] - 10:12
**Education** [1] - 1:11
**education** [1] - 11:3
**effort** [1] - 7:23
**eighth** [1] - 14:20
**either** [2] - 19:22;
23:22
**elementary** [3] -
14:1; 16:14; 22:10
**employment** [2] -
12:2, 6
**Enclosed** [1] - 30:12
**enclosed** [2] - 30:13,
19

**end** [3] - 5:25; 10:2;
14:13
**ended** [1] - 26:6
**endurance** [1] - 6:22
**English** [1] - 26:17
**environment** [1] -
18:21
**episode** [1] - 17:12
**Errata** [1] - 32:6
**errors** [1] - 32:4
**Esq** [2] - 30:7; 32:24
**ESQUIRE** [3] - 2:7,
12, 16
**essentially** [3] -
5:16; 7:11; 26:21
**et** [3] - 1:8; 30:11;
32:21
**event** [1] - 29:13
**exact** [1] - 25:20
**eXAMINATION** [1] -
4:10
**EXAMINATION** [5] -
3:3
**example** [1] - 12:24;
28:5
**exhibit** [1] - 7:24
**Exhibit** [9] - 3:12;
7:2-4, 14; 8:1; 25:12
**expectation** [1] -
21:9
**expires** [1] - 29:23
**explanation** [1] -
5:15
**explore** [1] - 18:9
**fact** [4] - 20:15;
23:11; 24:1, 10
**fair** [5] - 5:5; 20:9;
28:1
**fairly** [1] - 17:17
**familiar** [1] - 19:17
**families** [4] - 4:18;
22:21; 24:6; 25:25
**family** [5] - 5:1, 5;
8:6; 24:15, 18
**far** [4] - 6:24; 16:9,
11; 25:9
**father** [1] - 10:6
**February** [1] - 29:23
**fill** [1] - 21:6
**filled** [1] - 25:6
**financial** [4] - 22:15,
21, 23
**fine** [2] - 17:2, 8
**finish** [2] - 5:24; 6:2
**FIRM** [1] - 2:17
**first** [8] - 8:13; 9:19,
22, 24; 14:17; 16:23;
17:5
**FIRST** [1] - 2:12
**Floor** [2] - 1:19; 4:3
**follow** [2] - 21:12;

27:13
**FOLLOWING** [1] -
31:2
**following** [1] - 32:6
**follows** [1] - 4:9
**FOR** [2] - 1:1; 2:8
**foregoing** [2] - 29:8;
32:3
**forget** [2] - 6:7, 13
**form** [2] - 25:5, 8
**formal** [1] - 11:2
**formed** [1] - 19:1
**FORSTER** [2] - 2:2;
3:4
**four** [3] - 8:11, 25;
13:12
**fourth** [1] - 14:11
**Freed** [1] - 10:20
**Freed-Hardeman**
[1] - 10:20
**freshman** [7] - 14:12,
14, 18; 15:14; 18:5;
19:5; 20:11
**friend** [6] - 16:14, 16,
18-19; 17:12; 24:13
**friends** [2] - 20:12;
24:14
**Fusco** [5] - 1:17; 4:1;
29:3, 20; 32:25
**game** [1] - 12:18
**GENERAL** [1] - 2:3
**General** [3] - 1:18;
4:2, 16
**generally** [2] - 19:17;
24:2
**Gillis** [5] - 4:12; 7:9;
11:5; 30:6; 32:22
**GILLIS** [1] - 1:15;
3:2; 4:8; 16:24; 31:1
**girl** [7] - 9:4, 8,
12-13, 16
**given** [1] - 1:20
**God** [1] - 27:9
**gonna** [17] - 5:4, 14,
18-20, 25; 6:19; 7:1,
4-5; 8:12, 17; 13:15;
18:23; 21:11; 25:11;
26:20
**Goods** [2] - 12:11,
13
**grade** [7] - 14:1, 20,
24-25; 15:2, 19; 24:14
**grades** [1] - 22:10
**graduate** [4] - 10:13,
23; 11:20, 25
**graduated** [5] -
10:18; 11:8, 22
**graduation** [1] -
20:25
**great** [1] - 5:8
**group** [1] - 18:22

**guess** [1] - 9:18
**half** [1] - 12:16
**halfway** [1] - 14:14
**Hampden** [12] -
14:19; 15:5, 10, 13,
15; 16:3; 17:14, 17;
18:5; 20:11, 23
**hand** [1] - 29:16
**happy** [3] - 20:23;
23:14
**Hardeman** [1] -
10:20
**HASSON** [1] - 1:11
**Hasson** [1] - 4:17
**head** [2] - 6:9
**held** [1] - 12:10
**Henderson** [1] -
10:22
**hereby** [2] - 29:4;
32:13
**hereunto** [1] - 29:16
**high** [9] - 10:9, 18;
11:6, 10; 14:2; 17:22;
22:9; 23:21, 23
**High** [3] - 10:10;
11:7; 17:23
**his/her** [2] - 32:15
**history** [1] - 26:17
**Home** [2] - 12:11, 13
**House** [1] - 2:3
**house** [2] - 12:3, 7
**household** [1] - 10:4
**husband** [12] - 4:18;
11:5; 12:17; 13:7;
18:5; 19:10; 20:5, 23;
22:22; 23:3; 26:3;
27:24
**husband's** [1] - 8:6
**I.G** [9] - 9:1; 10:3;
13:9; 14:7; 15:1, 5,
11, 13
**identified** [1] - 16:15
**identifies** [1] - 7:15
**identifying** [1] - 8:19
**illegal** [1] - 16:6
**important** [1] - 6:6
**impression** [1] -
24:15
**IN** [1] - 29:16
**INCLUDE** [1] - 31:2
**indicate** [1] - 26:10
**indicated** [1] - 20:3
**information** [2] -
5:17; 25:2
**initials** [3] - 8:12, 14,
25
**INSTITUTE** [1] - 2:8
**instruction** [3] -
26:19, 21, 24
**interactions** [1] -
16:2

**interested** [1] - 26:11
**introverted** [1] - 17:17
**Isabel** [4] - 16:15, 20; 17:10; 24:13
**Isabel's** [1] - 19:5
**Isabella** [13] - 17:10; 19:8, 13; 20:11, 17, 22; 21:3, 18; 23:3, 14; 24:18; 27:25
**Isabella's** [3] - 18:4; 21:15; 22:2
**itself** [1] - 22:20
**Jesus** [1] - 27:2
**Jewish** [1] - 28:3
**job** [2] - 12:10
**John** [7] - 17:25; 18:3, 14, 17, 24; 19:6, 9
**JR** [1] - 1:11
**Jr** [1] - 9:21
**Judith** [2] - 30:6; 32:22
**JUDITH** [4] - 1:15; 3:2; 4:8; 31:1
**Judy** [1] - 7:9
**junior** [5] - 14:12, 15; 21:20
**jurisdiction** [1] - 12:20
**JUSTICE** [1] - 2:8
**K.G** [2] - 9:1, 14
**K.G.'s** [1] - 9:24
**Keller** [3] - 25:16; 26:10; 30:7
**KELLER** [8] - 2:7; 3:5; 5:6; 8:14, 18; 17:2, 8; 28:11
**kids** [3] - 8:19; 15:21; 16:12
**kind** [5] - 10:15; 11:2, 25; 13:25; 26:25
**kindergarten** [1] - 14:1
**kinds** [1] - 13:17
**Kristin** [6] - 9:25; 10:7; 17:20; 18:2; 20:16
**labeled** [1] - 7:14
**language** [1] - 8:19
**lapsed** [1] - 16:22
**large** [2] - 15:19; 17:18
**last** [6] - 7:14; 8:8; 9:18; 12:5, 10; 22:8
**lawsuit** [4] - 4:17, 20; 26:7, 12
**LEA** [1] - 2:12
**least** [1] - 27:12
**leave** [1] - 21:11
**led** [1] - 24:4

**Lee's** [1] - 2:18
**legal** [1] - 17:11
**lepatterson@ firstliberty.org** [1] - 2:14
**lesbian** [1] - 16:15
**less** [1] - 22:11
**level** [2] - 15:20; 20:7
**levels** [1] - 14:24
**LIBERTY** [1] - 2:12
**life** [3] - 26:22, 24
**Line** [1] - 31:6
**listed** [1] - 7:24
**live** [2] - 5:11; 26:21
**lives** [2] - 10:4; 27:16
**LLC** [1] - 2:17
**local** [2] - 8:15, 20
**located** [1] - 10:11
**look** [3] - 7:23; 25:14, 18
**love** [1] - 16:18
**machine** [1] - 29:10
**mail** [10] - 3:13; 25:15, 22, 24; 26:3, 6, 9
**mails** [1] - 25:21
**MAINE** [1] - 1:1
**Maine** [18] - 1:11, 18-19; 4:4, 16; 5:11; 10:12; 11:14, 18; 13:6; 14:19; 17:23; 18:1, 3; 29:4; 30:11; 32:13, 21
**mark** [1] - 30:19
**marked** [5] - 7:2-4; 25:11, 13
**math** [1] - 26:16
**ME** [2] - 2:4; 30:3
**mean** [4] - 15:16; 16:12; 19:21; 20:17
**means** [2] - 6:22; 29:9
**meet** [1] - 21:7
**Memorial** [3] - 17:25; 18:14, 24
**memorial** [1] - 18:3
**memorize** [2] - 27:20, 22
**mentioned** [1] - 30:13
**met** [1] - 4:14
**MICHAEL** [1] - 2:16
**might** [5] - 6:15; 13:18; 18:13; 26:11; 27:22
**mike@ thewhiteheadfirm. com** [1] - 2:19
**Mill** [2] - 2:8; 30:8
**minute** [1] - 25:14
**MO** [1] - 2:18

**model** [1] - 27:16
**moment** [1] - 6:2
**money** [3] - 23:7; 27:25; 28:5
**months** [1] - 12:12
**morning** [2] - 4:12
**MORRISETTE** [1] - 30:1
**Morrisette** [1] - 30:23
**most** [1] - 12:11
**MR** [23] - 3:3, 5, 7; 4:11, 24; 5:6, 8; 8:12, 14, 16, 18, 21, 23; 16:22; 17:1-3, 8-9; 28:9, 11-12, 14
**MS** [3] - 3:4, 6; 16:24
**Muslim** [3] - 28:4
**named** [10] - 4:14; 8:6, 8; 9:20, 22, 24; 14:4; 15:8; 16:23; 17:11
**named** [3] - 28:15; 29:6; 32:14
**names** [3] - 8:13; 9:20; 17:5
**necessarily** [1] - 20:7
**need** [5] - 6:18, 20; 15:21; 27:6, 12
**never** [2] - 7:25; 16:9
**nine** [2] - 9:7; 12:12
**nobody** [1] - 16:5
**non** [2] - 19:4; 24:8
**non-Christian** [2] - 19:4; 24:8
**NONE** [4] - 3:4
**nonreligious** [3] - 18:25; 19:2, 6
**Notary** [7] - 1:17; 4:2, 6, 9; 29:3; 30:17; 32:12
**NOTARY** [1] - 32:11
**noted** [1] - 32:4
**nothing** [2] - 20:18; 29:7
**Notice** [2] - 3:12; 7:9
**notice** [1] - 1:20
**NOTICING** [1] - 32:24
**notify** [1] - 7:12
**November** [4] - 1:19; 4:4; 29:5; 32:23
**oath** [1] - 4:6
**obey** [1] - 21:9
**obviously** [2] - 15:21; 27:23
**occurs** [1] - 24:2
**OF** [5] - 1:1; 2:3; 31:1; 32:22
**offers** [2] - 22:20; 26:15
**Office** [4] - 1:18; 4:2

**office** [4] - 12:23, 25; 13:1
**official** [3] - 1:11; 5:4; 7:11
**officials** [1] - 23:6
**often** [1] - 5:23
**old** [4] - 9:2, 6, 10, 14
**once** [5] - 21:2, 7; 23:3, 22; 26:9
**one** [8] - 5:1, 23; 9:11; 11:1, 3; 16:21; 24:14; 25:24
**original** [3] - 30:14, 17, 22
**ORIGINAL** [1] - 31:1
**originally** [1] - 20:17
**Orrington** [2] - 5:11; 14:21
**ostracize** [1] - 15:23
**ostracized** [1] - 15:19
**ostracizing** [1] - 16:4
**outcome** [1] - 29:13
**outside** [4] - 12:2, 7; 24:17; 27:21
**oversees** [1] - 12:21
**own** [2] - 32:15
**page** [4] - 7:14; 30:14, 17, 22
**Page** [2] - 3:12; 31:6
**pages** [1] - 32:4
**Parkway** [1] - 2:13
**part** [3] - 11:14; 26:25; 27:3
**particular** [2] - 12:19, 23; 13:18
**PARTY** [1] - 32:24
**patrols** [1] - 12:20
**PATTERSON** [2] - 2:12; 3:6
**pause** [1] - 6:1
**pay** [5] - 19:3; 22:2, 13, 15; 23:7
**peer** [1] - 18:21
**people** [1] - 7:12
**permissible** [1] - 23:12
**person** [2] - 17:17; 29:12
**personally** [2] - 29:5; 32:14
**physically** [2] - 16:5, 9
**plaintiff** [1] - 26:7
**Plaintiffs** [4] - 1:9; 2:10, 15, 19
**Plano** [2] - 2:13
**point** [4] - 6:19, 21; 18:9; 19:6
**portion** [1] - 15:19

**portions** [1] - 27:20
**possibility** [1] - 18:10
**possible** [1] - 6:11
**postsecondary** [1] - 10:15
**pray** [1] - 24:6
**prayer** [1] - 24:6
**Pre** [2] - 14:25; 15:1
**Pre-k** [2] - 14:25; 15:1
**prefer** [1] - 19:25
**preference** [1] - 8:18
**preferred** [1] - 20:8
**preschool** [3] - 14:2; 15:7, 9
**principal** [1] - 21:8
**privilege** [1] - 21:10
**problems** [1] - 17:13
**process** [5] - 5:17, 22; 21:2, 5; 25:2
**programs** [1] - 11:25
**provide** [5] - 25:2; 26:19, 21
**public** [4] - 14:22; 20:16, 18; 23:6
**Public** [7] - 1:17; 4:2, 7, 9; 29:3, 21; 30:17
**PUBLIC/ ATTORNEY** [1] - 32:11
**Public/Attorney** [1] - 32:12
**pursuant** [1] - 1:19
**qualify** [1] - 23:1
**qualifying** [1] - 22:21
**quarter** [1] - 14:11
**quarters** [1] - 14:18
**question's** [1] - 5:25
**questions** [5] - 5:18; 6:11, 15, 23; 28:14
**quick** [1] - 28:9
**quite** [1] - 5:24
**RE** [1] - 30:11
**read** [2] - 30:16; 32:3
**reading** [2] - 25:22; 28:17
**ready** [1] - 6:23
**really** [1] - 17:15
**reason** [1] - 15:21
**reasons** [1] - 32:6
**received** [1] - 26:3
**recent** [1] - 12:11
**record** [3] - 5:9; 28:13; 29:9
**regarding** [1] - 25:3
**relationship** [1] - 16:19
**religion** [1] - 20:18
**religious** [7] - 18:25; 19:1; 20:20; 23:17,

20; 24:20

**remember** [4] - 11:8, 22; 15:8; 21:6

**remind** [1] - 6:12

**rephrase** [1] - 6:17

**replace** [1] - 17:4

**REPORTER** [1] - 32:25

**reporter** [1] - 6:9

**Reporter/Notary** [1] - 29:21

**REPORTING** [1] - 30:1

**representing** [1] - 4:16

**requests** [1] - 24:6

**require** [2] - 23:16; 27:19

**required** [1] - 23:23

**requires** [1] - 20:19

**respective** [1] - 32:5

**response** [1] - 24:23

**responsive** [1] - 8:3

**result** [1] - 26:6

**retail** [1] - 12:13

**return** [1] - 30:22

**road** [1] - 17:6

**Road** [1] - 30:2

**ROBERT** [1] - 1:11

**routinely** [1] - 23:19

**rule** [1] - 8:15

**rules** [4] - 8:20; 21:8, 12

**SARAH** [1] - 2:2

**Sarah** [2] - 5:17; 28:10

**sarah.forster@ maine.gov** [1] - 2:5

**savior** [1] - 27:2

**saw** [1] - 8:1

**scholarship** [1] - 22:15

**scholarships** [1] - 22:17

**School** [7] - 14:21; 15:4, 10; 17:23; 20:13; 21:4

**school** [38] - 10:9, 19; 11:6, 10; 13:25; 14:2, 4, 17, 22; 15:1; 16:12, 14; 17:18, 22; 18:10, 25; 19:2, 6, 15, 19; 20:1, 4, 9, 20; 21:8, 12; 22:10, 20; 23:4, 6, 21, 23; 24:17; 26:25; 28:1, 6

**schools** [8] - 10:16; 15:6, 11; 18:13; 19:12, 22; 20:16, 18

**science** [1] - 26:16

**SE** [1] - 2:17

**see** [5] - 7:8, 14, 18, 20

**seized** [1] - 15:23

**send** [3] - 21:7; 27:25; 28:5

**sense** [4] - 6:16, 24; 13:20, 24

**sent** [1] - 25:25

**sergeant** [1] - 12:21

**series** [1] - 5:18

**SERVICE** [1] - 30:1

**service** [2] - 23:20

**set** [2] - 13:18; 29:16

**seven** [1] - 12:21

**Sewall** [2] - 1:19; 4:3

**shake** [1] - 6:9

**share** [1] - 18:22

**sheet** [3] - 30:14, 19, 23

**Sheet** [1] - 32:6

**short** [1] - 24:5

**shorthand** [1] - 29:10

**SHOULD** [1] - 31:1

**show** [2] - 7:4; 25:11

**shy** [1] - 17:17

**sign** [1] - 30:16

**signature** [4] - 30:14, 17, 22; 32:15

**SIGNATURE** [2] - 32:8, 18

**signed** [1] - 30:22

**signing** [1] - 28:17

**simply** [1] - 8:15

**sing** [1] - 24:4

**sit** [1] - 16:7

**situation** [1] - 18:7

**sixteen** [1] - 9:3

**smoothly** [1] - 5:23

**socially** [1] - 15:17

**someone** [1] - 24:5

**sometimes** [3] - 6:15; 24:5; 27:21

**sophomore** [1] - 21:19

**sorry** [3] - 13:20; 16:24; 21:21

**sort** [9] - 5:4; 12:20; 14:1, 14; 15:23; 16:22; 17:12; 23:20; 24:2

**spouse** [3] - 5:1

**St** [1] - 2:17

**standards** [1] - 19:24

**start** [4] - 5:25; 6:24; 7:1; 24:24

**started** [3] - 14:11; 17:13; 24:13

**starts** [1] - 25:15

**State** [7] - 1:18; 2:3; 4:3, 16; 29:4; 32:13

**state** [3] - 5:9; 19:3, 23

**statement** [1] - 5:5

**STATES** [1] - 1:1

**Station** [1] - 2:3

**Ste** [1] - 2:17

**stenographic** [1] - 32:4

**stick** [1] - 8:21

**stop** [1] - 12:15

**store** [1] - 12:13

**Street** [2] - 1:19; 4:3

**students** [12] - 21:21, 25; 22:10, 17; 23:16, 21, 23; 24:4, 9; 25:25; 27:5, 19

**study** [1] - 26:23

**stuff** [1] - 26:17

**stupid** [1] - 18:23

**submit** [1] - 5:2

**Suite** [3] - 2:8, 13; 30:8

**sum** [1] - 24:7

**Summit** [1] - 2:18

**sworn** [2] - 4:8; 29:6

**system** [1] - 11:18

**TAUB** [16] - 2:2; 3:3; 4:11, 24; 5:8; 8:12, 16, 21, 23; 16:22; 17:1, 3, 9; 28:9, 12, 14

**Taub** [2] - 4:14;
32:24

**tax** [2] - 27:25; 28:4

**teach** [6] - 27:1, 3, 5, 8, 11, 15

**teaches** [1] - 26:16

**Telephone** [1] - 2:16

**Tempe** [2] - 2:9; 30:9

**Tennessee** [1] - 10:22

**term** [1] - 26:20

**terrible** [1] - 24:21

**territory** [1] - 12:19

**test** [1] - 6:22

**testified** [1] - 4:9

**testify** [1] - 29:6

**testimony** [1] - 32:5

**testing** [2] - 21:13, 15

**THE** [6] - 1:1; 2:17; 31:1; 32:1, 11

**therefore** [1] - 32:6

**thirty** [2] - 9:11, 15

**thirty-one** [1] - 9:11

**thirty-three** [1] - 9:15

**three** [4] - 9:15, 18; 14:18; 17:19

**thriving** [1] - 15:15

**TIM** [1] - 2:7

**Tim** [2] - 8:12; 25:16;

30:7

**title** [1] - 7:8

**TITLE** [1] - 32:21

**tkeller@ij.org** [1] - 2:10

**TO** [2] - 32:1, 11

**today** [2] - 5:4; 27:23

**together** [1] - 32:5

**top** [1] - 25:23

**touched** [1] - 16:5

**towards** [1] - 14:13

**transcribe** [1] - 6:9

**transcribed** [1] - 5:19

**transcript** [1] - 17:4

**transfer** [1] - 15:13

**true** [2] - 29:9; 32:15

**truth** [3] - 29:7

**try** [2] - 6:12, 17

**tuition** [4] - 19:3; 21:24; 22:2; 23:7

**turn** [1] - 7:13

**twenty** [1] - 9:7

**twenty-nine** [1] - 9:7

**twice** [1] - 23:22

**TX** [1] - 2:13

**un-un** [1] - 6:10

**underlying** [1] - 26:25

**unhappy** [2] - 16:7; 17:15

**UNITED** [1] - 1:1

**University** [3] - 10:20; 11:14, 18

**unless** [2] - 6:23; 19:3

**up** [2] - 24:5; 26:7

**values** [1] - 18:22

**verbally** [1] - 6:8

**verse** [1] - 27:22

**Via** [1] - 2:16

**vs** [3] - 1:10; 30:11; 32:21

**waive** [1] - 28:17

**warden** [1] - 12:18

**wardens** [1] - 12:21

**week** [1] - 23:22

**West** [1] - 2:13

**WHEREOF** [1] - 29:16

**WHITEHEAD** [3] - 2:16; 3:7

**whole** [1] - 29:7

**wish** [1] - 30:18

**within-named** [1] - 29:6

**WITNESS** [1] - 29:16

**word** [2] - 23:18; 27:8

**words** [4] - 5:3; 23:18; 26:9, 15

**works** [2] - 12:23; 13:1

**written** [5] - 5:20; 27:11, 13, 17

**year** [19] - 10:13; 11:1, 3, 8, 22-23; 12:16; 14:12, 14-15, 18; 15:14; 18:5; 19:5; 22:3, 6

**years** [4] - 10:25; 12:5; 13:12

**youngest** [1] - 8:24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

DAVID and AMY CARSON, et al.,          )
                                       )
Plaintiffs,                            )
                                       )
        v.                             )          Civil Action No. 18-cv-00327 DBH
                                       )
ROBERT G. HASSON, JR., in his          )
official capacity as Commissioner of   )
the Maine Department of Education,     )
                                       )
Defendant.                             )

## NOTICE OF DEPOSITION OF JUDY GILLIS

Please take notice that on Tuesday, November 20, 2018 at 11:00 a.m., at the Office of the

Attorney General, Cross State Office Building, 6th Floor, Sewall Street, Augusta, Maine 04333,

counsel for the defendant, Robert G. Hasson, Jr., Commissioner of the Maine Department of

Education will take the deposition of Judy Gillis, upon oral examination, pursuant to the Federal

Rules of Civil Procedure.

The deposition will be taken before a notary public or some other officer authorized by

law to administer oaths, and will be recorded by means of a stenotype machine.

The deponent or her attorney must also bring with her to the deposition the following

documents: see attached Exhibit A.

The deposition will continue from day to day until completed. You are invited to attend

and cross-examine.



DATED at Augusta, Maine, this 5th day of November, 2018.

JANET T. MILLS
Attorney General


/s/ Sarah A. Forster
SARAH A. FORSTER
CHRISTOPHER C. TAUB
Assistant Attorneys General
Office of the Attorney General
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
**sarah.forster@maine.gov**
**christopher.c.taub@maine.gov**

2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 5th day of November, 2018, I caused the original of this

document to be served by electronic mail and first class mail upon lead counsel for the Plaintiffs:

> TIMOTHY D. KELLER, ESQ.
> Institute for Justice
> 398 S. Mill Avenue
> Suite 301
> Tempe, AZ 85281
> tkeller@ij.org

All other counsel of record will receive this document by electronic mail:

> ARIF PANJU, ESQ.
> apanju@ij.org
>
> JEFFREY T. EDWARDS, ESQ.
> jedwards@preti.com
>
> JONATHAN R. WHITEHEAD, ESQ.
> jon@whiteheadlawllc.com
>
> LEA PATTERSON, ESQ.
> lepatterson@firstliberty.org
>
> MICHAEL K. WHITEHEAD, ESQ.
> mike@thewhiteheadfirm.com
>
> ALEX LUCHENITSER, ESQ.
> luchenitser@au.org
>
> SARAH GOETZ, ESQ.
> goetz@au.org
>
> ZACHARY L. HEIDEN, ESQ.
> zheiden@aclumaine.org

To my knowledge, there are no non-registered parties or attorneys participating in this case.

Dated: November 5, 2018                    /s/ Sarah A. Forster
                                           SARAH A. FORSTER
                                           Assistant Attorney General
                                           Office of the Attorney General
                                           6 State House Station
                                           Augusta, ME 04333-0006
                                           Tel. (207) 626-8866
                                           sarah.forster@maine.gov

4

Exhibit A

Any documents reflecting communications between Plaintiffs and the Department of Education, their school administrative unit, and/or Bangor Christian Schools or Temple Academy relating to: their school administrative unit's school choice policies, procedures, and available school choice options; the availability of public funds for tuition purposes at Bangor Christian Schools or Temple Academy; and, this lawsuit.

**Amy Carson**

| | |
|---|---|
| **From:** | Jeffrey Benjamin <jbenjamin@bangorchristian.org> |
| **Sent:** | Thursday, May 24, 2018 11:58 AM |
| **To:** | Jeff Benjamin |
| **Subject:** | Tuition Assistance from "Tuitioning" Towns |

Dear Parents;

**The purpose of this e-mail is to alert you to an appealing possibility that could result in you obtaining tuition assistance from your town school district.** If you live in a town that allows families to choose your children's high school (or, in a few cases, possibly junior high school or elementary school), keep reading.

Maine prohibits towns from making tuition payments on behalf of students attending "approved" religious schools, such as Bangor Christian Schools. A recent decision by the U.S. Supreme Court, though, calls Maine's religious exclusion into question. **A non-profit law firm, the Institute for Justice, wants to challenge the exclusion of families choosing religious schools from Maine's Tuitioning system.**

The Institute for Justice is looking for families to represent in such a challenge. More details about this proposed lawsuit are discussed below in the note from one of their senior attorneys, Tim Keller. The Institute for Justice represents its clients free of charge and has successfully represented parents in two school choice cases at the U.S. Supreme Court, as well as in a number of state courts.

My role is simply to introduce you to Mr. Keller and his law firm. His note below provides a brief explanation of what they are trying to do, and links to his organization's website for you to investigate the firm, if you are interested. Mr. Keller also provides his office and cell phone numbers and his e-mail address if you want to discuss this with him further. Mr. Keller would be glad to answer any questions you might have. If you would prefer that I release your name and contact information directly to Mr. Keller and permit him to follow up with you, I would be happy to do that as well.

Take care and God bless,

Jeff

---
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Dr. Jeffrey Benjamin, Headmaster
Bangor Christian Schools
1476 Broadway, Bangor ME, 04401
ph: (207) 947-7356 (ext 352)
cell: (207) 949-3446
fx:  (207) 262-9528
email: jbenjamin@bangorchristian.org

DEPOSITION
EXHIBIT
2
6.11.18
PENGAD 800-631-6989
11-20-18

Email from Tim Keller:

Dear Bangor Christian School Families:

My name is Tim Keller and I am an attorney at the Institute for Justice (IJ), a public interest law firm based in Arlington, Virginia. While we are headquartered in Virginia, I work out of IJ's Arizona office. I lead IJ's educational choice team. My colleagues and I typically defend programs that provide families with additional educational options from legal attack, but we occasionally file lawsuits against state governments when educational choice programs exclude, or discriminate against, parents who would like to choose religious schools for their children. We propose filing such a lawsuit in Maine.

IJ is considering filing a lawsuit challenging Maine's exclusion of parents who select approved religious schools for their children from Maine's Tuitioning program, under which parents from "Tuitioning towns" are allowed to select approved private schools

PLS000001

and have their school district pay the tuition to the private school of the parents' choice. Currently, Maine does not allow school districts to pay tuition on behalf of students who attend approved private religious schools, such as Bangor Christian School. In IJ's view, discrimination that is based upon the religious nature of the approved school violates several provisions of the U.S. Constitution (such as protections of free exercise of religion and equal protection of the laws). What the exclusion of religious schools means for families who reside in Tuitioning towns and who choose approved religious schools is that they are denied tuition payments on behalf of their children, while families who choose approved non-religious private schools (such as John Bapst Memorial High School) are granted tuition payments for their children.

IJ is looking for parents who would be willing to challenge the exclusion of religious schools from Maine's Tuitioning program as unconstitutional. IJ would represent parents on a *pro bono* basis, meaning that, win or lose, the representation would be completely free of charge. The only parents who can challenge the religious exclusion are (1) parents from Tuitioning towns who are already sending their student to an approved religious school (and who are thus denied tuition payments); or (2) parents from Tuitioning towns who would send their children to an approved religious school but who cannot afford to pay the tuition out-of-pocket. Those of you receiving this e-mail most likely fall into the first category, but if you know families who fall into the second category, I would appreciate it if you would forward this information to them.

We have every reason to be hopeful that a challenge of this nature can be successful. Just last year, the U.S. Supreme Court decided a case named *Trinity Lutheran Church v. Comer*, in which the Court held that the Free Exercise Clause of the First Amendment to the U.S. Constitution required the State of Missouri to allow a church to receive a state-funded grant to resurface its preschool playground. A victory in Maine could also help set a nationwide precedent that would protect the rights of other families to choose religious schools as part of similar programs that permit families to freely and independently choose the school that best meets their children's needs.

If you would be willing to speak with me, or my colleague Bert Gall, with whom I'm working to develop this case, please e-mail me at tkeller@ij.org or call me in my Arizona office at 480-557-8300 or on my cell phone at 480-250-7149. I will be out of the office between May 26 and June 4. Between those dates, Mr. Gall can be reached at bgall@ij.org or in our Texas office at 512-480-5936. I always like to meet my clients in person, so I would, of course, fly to Maine to meet with you before we filed the case.

Thank you for taking the time to read this e-mail and, if I've piqued your interest, I look forward to speaking with you in the near future!

Very Sincerely,

Tim Keller, Senior Attorney
Institute for Justice
Office: 480-557-8300
Cell: 480-250-7149
e-mail: tkeller@ij.org

Additional Institute for Justice contact:
Bert Gall, Senior Attorney
Office: 512-480-5936
e-mail: bgall@ij.org"

PLS000002