# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

DAVID and AMY CARSON, et al.,    )
                                 )
Plaintiffs,                      )
                                 )
           v.                    )        Civil Action No. 18-cv-00327 DBH
                                 )
A. PENDER MAKIN, in her          )
official capacity as Commissioner of   )
the Maine Department of Education,   )
                                 )
Defendant.                       )

## JOINT STIPULATED FACTS

Solely for purposes of resolution of the parties' cross-motions for summary judgment, the plaintiffs and defendant stipulate to each of the following facts:[1]

### *Facts About Publicly Funded Education in Maine*

1.    Pursuant to 20-A M.R.S.A. § 2(1), "[i]t is the intent of the Legislature that every person within the age limitations prescribed by state statues shall be provided an opportunity to receive the benefits of a free public education."  Doc. No. 8, PageID# 38 (Ans. ¶ 16).

2.    Pursuant to 20-A M.R.S.A. § 2(2), "[i]t is the intent of the Legislature that the control and management of the public schools shall be vested in the legislative and governing bodies of local school administrative units, as long as those units are in compliance with appropriate state statutes."  Doc. No. 8, PageID# 38 – 39 (Ans. ¶ 17).

3.    Pursuant to 20-A M.R.S.A. § 1(26), school administrative unit ("SAU") means a state-approved unit of school administration.

---

[1] By stipulating to these facts, the parties do not concede that the facts are relevant or material, and the parties reserve the right to dispute the relevance and/or materiality of any stipulated fact. The parties also reserve the right to supplement the record when they file their motions and opposition briefs.

4.    There are 260 SAUs in Maine.

5.    Pursuant to 20-A M.R.S.A. § 1001(8), SAUs "shall either operate programs in
      kindergarten and grades one to 12 or otherwise provide for students to participate in those
      grades as authorized elsewhere in this Title." Doc. No. 8, PageID# 39 (Ans. ¶ 18).

6.    Of the 260 SAUs, 143 do not operate a secondary school, including the SAUs that serve
      the towns in which Plaintiffs reside: Glenburn, Orrington, and Palermo. Doc. No. 8,
      PageID# 39 (Ans. ¶ 19).

7.    Pursuant to 20-A M.R.S.A. § 5204(4), an SAU "that neither maintains a secondary school
      nor contracts for secondary school privileges pursuant to chapter 115 shall pay the tuition,
      in accordance with chapter 219, at the public school or the approved private school of the
      parent's choice at which the student is accepted."  Doc. No. 8, PageID# 39 (Ans. ¶ 20).

8.    Pursuant to the plain language of 20-A M.R.S.A. § 5204(4), SAUs may not pay tuition to
      a private school unless the school is selected by the resident student's parents. Doc. No. 8,
      PageID# 39 (Ans. ¶ 20).

9.    The SAUs that serve the towns in which Plaintiffs reside do not contract for secondary
      school privileges with any particular public or private secondary school for the education
      of their resident secondary students.  Doc. No. 8, PageID# 41 (Ans. ¶ 25).

10.   The SAUs that serve the towns in which Plaintiffs reside are obligated to pay up to the
      legal tuition rate, established pursuant to 20-A M.R.S.A. § 5805 and 20-A M.R.S.A. §
      5806, to the public or private school approved for tuition purposes selected by the resident
      secondary student's parents.  Doc. No. 8, PageID# 41 (Ans. ¶ 27).

11.   20-A M.R.S.A. § 5001-A(3)(A)(1)(b) permits the Department of Education to recognize
      private schools as providing equivalent instruction for purposes of meeting the

requirements of compulsory school attendance under 20-A M.R.S.A. § 5001-A.  Doc. No. 8, PageID# 43 (Ans. ¶ 39).

12. 20-A M.R.S.A. § 2901 lays out the requirements for a private school to operate as an approved private school for meeting the requirement of compulsory school attendance under 20-A M.R.S.A. § 5001-A(3)(A)(1)(a).  Doc. No. 8, PageID# 40 – 41 (Ans. ¶ 22).

13. 20-A M.R.S.A. § 2951 contains the requirements for a private school to be approved to receive public funds for tuition purposes when resident secondary student's parents select an approved school.  Doc. No. 8, PageID# 39 – 40 (Ans. ¶ 21).

14. 20-A M.R.S.A. § 2951(2) states, in pertinent part, that "[a] private school may be approved for the receipt of funds for tuition purposes only if it:…[i]s a nonsectarian school in accordance with the First Amendment of the United States Constitution."  Doc. No. 8, PageID# 41 (Ans. ¶ 24).

15. Exhibit 2 to the Stipulated Record (Doc. No. 24-2, PageID# 164 – 167) contains a true and accurate copy of the Department's 2018-2019 Annual School Approval Report for private schools.

16. SAUs are not allowed to pay tuition to a private school that is not approved for the receipt of public funds for tuition purposes pursuant to 20-A M.R.S.A. § 2951.  Doc. No. 8, PageID# 41 (Ans. ¶ 24).

17. The Defendant Commissioner of Education is responsible for enforcing the requirements of 20-A M.R.S.A. § 2951. Doc. No. 8, PageID# 37 (Ans. ¶ 3).

18. Prior to 1980, some sectarian schools received public funds for tuition purposes when resident secondary students' parents selected those sectarian schools.  Doc. No. 8, PageID# 44 (Ans. ¶ 42)

19.   In 1979-1980, 211 students received funding from the State of Maine for tuition to
sectarian secondary schools that were selected by the students' parents.  Stipulated Record
("SR"), Ex. 4 (Doc. 24-4, PageID# 227 (RFA 1)).

20.   In 2017-18, nearly 180,000 students in grades K-12 were educated at public expense.

21.   Of these, 4,546 secondary students (grades 9-12) attended a private school approved for
tuition purposes.  SR, Ex. 2 (Doc. No. 24-2, PageID# 206 (D000043)).

22.   Over 95% of those 4,546 secondary students attended a handful of private schools
colloquially referred to as the "town academies" or the "Big 11."

23.   Over the past five school years, families in Glenburn chose to send their secondary school
students to twelve nearby public and private high schools, with the majority going to
Bangor High School (public), John Bapst Memorial High School (which, despite its name,
is non-sectarian and private), and Orono High School (public).  SR, Ex. 2 (Doc. No. 24-2,
PageID# 212 (D000049)).

24.   Over the past five school years, families in Orrington chose to send their secondary school
students to nine nearby public and private high schools, with the majority going to Brewer
High School (public) and John Bapst Memorial High School (private).  SR, Ex. 2, (Doc.
No. 24-2, PageID# 212 (D000049)).

25.   Over the past five school years, families in RSU 12/Palermo[2] chose to send their
secondary school students to eleven nearby public and private high schools, with the
majority going to Erskine Academy (private).  SR, Ex. 2 (Doc. No. 24-2, PageID# 212
(D000049)).

---

[2] A regional school unit ("RSU") is a type of SAU in which two or more municipalities combine to pool
their educational resources to educate students.

*Facts About the Plaintiffs*

26.   David and Amy Carson are a married couple who reside in Glenburn, Maine.  SR, Ex. 5
      (Doc. No. 24-5, PageID# 237 (Carson 7:8 – 12)).

27.   The Carsons' daughter, O.C.,[3] is a high-school sophomore at Bangor Christian Schools
      ("BCS").  SR, Ex. 5, Doc. No. 24-5, PageID# 243 (Carson 13:12 – 17)).

28.   BCS is the only school O.C. has ever attended.  SR, Ex. 5 (Doc. No. 24-5, PageID# 243 –
      244 (Carson 13:10 – 14:8)).

29.   The Carsons send O.C. to BCS because the school's Christian worldview aligns with their
      sincerely held religious beliefs and because of the school's high academic standards.  Doc.
      No. 1, PageID# 2 (Compl. ¶ 7).

30.   The Carsons pay the tuition for O.C. to BCS.  Doc. No. 1, PageID# 10 (Compl. ¶ 49).

31.   David Carson is a member of Crosspoint Church in Bangor, Maine.  SR, Ex. 5 (Doc. No.
      24-5, PageID# 240 (Carson 10:19 – 22)).

32.   David Carson attends church services at Crosspoint Church twice a year, and his wife,
      Amy, never attends church services at Crosspoint Church.  SR, Ex. 5 (Doc. No. 24-5,
      PageID# 241 – 242 (Carson 11:21 – 12:6)).

33.   The reason David Carson does not attend church very frequently is the passing of a
      daughter when he and Amy were younger.  SR, Ex. 5 (Doc. No. 24-5, PageID# 243
      (Carson 13:3 – 9)).

34.   O.C. attends weekly youth group services at Crosspoint Church.  SR, Ex. 5 (Doc. No. 24-
      5, PageID# 242 – 243 (Carson 12:7 – 12; 13:2)).

35.   The Carsons and O.C. consider themselves born-again Christians.  SR, Ex. 5 (Doc. No.
      24-5, PageID# 244 (Carson 14:15 – 20)).

36.    The Carsons' religion does not require them to send their daughter, O.C., to a Christian school and does not prevent them from sending her to a public school.  SR, Ex. 5 (Doc. No. 24-5, PageID# 244 – 255 (Carson 14:24 – 15:5)).

37.    The Carsons both attended and graduated from BCS.  SR, Ex. 5 (Doc. No. 24-5, PageID# 238 – 239 (Carson 8:3 – 6; 9:22 – 25)).

38.    The Carsons believe that BCS teaches students what it means to be a Christian, that the Bible represents the Word of God, that students should conform their behavior to what is said in the Bible, and that in order to be Christian students must accept Jesus Christ as their savior.  SR, Ex. 5 (Doc. No. 24-5, PageID# 245 (Carson 15:9 – 25)).

39.    The Carsons see as a benefit the fact that BCS teaches Christian values.  SR, Ex. 5 (Doc. No. 24-5, PageID# 246 (Carson 16:1 – 5)).

40.    The Carsons believe that BCS is helping their daughter, O.C., become a better Christian. SR, Ex. 5 (Doc. No. 24-5, PageID# 246 (Carson 16:8 – 10)).

41.    The closest public school to the Carsons is Bangor High and the Carsons believe that Bangor High provides a good education.  SR, Ex. 5 (Doc. No. 24-5, PageID# 247 – 248 (Carson 17:23 – 18:6)).

42.    Alan and Judith Gillis are a married couple who reside in Orrington, Maine.  SR, Ex. 6 (Doc. No. 24-6, PageID# 267; 270 (Gillis 5:9 – 11; 8:4 – 7)).

43.    The Gillises' youngest daughter, I.G., is a high-school junior at BCS.  SR, Ex. 6 (Doc. No. 24-6, PageID# 276 (Gillis 14:7 – 12)).

---

[3] Plaintiffs' minor children are identified by their initials pursuant to Local Rule 5.2(a)(3).

44.    The Gillises send I.G. to BCS because the school's Christian worldview aligns with their sincerely held religious beliefs and because of the school's high academic standards.  Doc. No. 1, PageID# 2 – 3 (Compl. ¶ 8).

45.    The Gilleses pay the tuition for I.G. to attend BCS.  SR, Ex. 6 (Doc. No. 24-6, PageID# 284 (Gillis 22:2 – 5)).

46.    I.G. does not receive any financial aid or scholarships to help offset the cost of tuition. SR, Ex. 6 (Doc. No. 24-6, PageID# 284 – 285 (Gillis 22:16 – 23:2)).

47.    The Gillesses and I.G. attend Crosspoint Church in Bangor, Maine.  SR, Ex. 6 (Doc. No. 24-6, PageID# 275 (Gillis 13:5 – 10)).

48.    The Gillises' daughter, I.G., did not begin attending BCS until the 4th quarter of her freshman year.  SR, Ex. 6 (Doc. No. 24-6, PageID# 276 (Gillis 14:7 – 12)).

49.    Before starting at BCS, the Gillises' daughter, I.G., attended public schools.  SR, Ex. 6 (Doc. No. 24-6, PageID# 276 – 277 (Gillis 14:17 – 15:12)).

50.    One motivating factor in the Gillises' decision to transfer I.G. from her public school to BCS was that I.G. was being bullied in her public school because of her Christian beliefs. SR, Ex. 6 (Doc. No. 24-6, PageID# 277 – 278 (Gillis 15:13 – 16:1)).

51.    The Gillises' three other children all attended public high schools.  SR, Ex. 6 (Doc. No. 24-6, PageID# 279 – 280 (Gillis 17:19 – 18:3)).

52.    Nothing in the Gillises' religion requires them to send their children to a religious school. SR, Ex. 6 (Doc. No. 24-6, PageID# 282 (Gillis 20:15 – 21)).

53.    The Gillises believe that BCS provides instruction on how to live one's life as a Christian, and in their opinion that is an underlying part of the school.  SR, Ex. 6 (Doc. No. 24-6, PageID# 288 (Gillis 26:19 – 25)).

54.   The Gillises believe that BCS teaches children that to become Christians they must accept Jesus Christ as their savior.  SR, Ex. 6 (Doc. No. 24-6, PageID# 289 (Gillis 27:1 – 7)).

55.   The Gillises believe that BCS teaches children that the Bible is the Word of God, that Christians need to follow what is written in the Bible, and that children who attend BCS should model their lives in accordance with what is written in the Bible.  SR, Ex. 6 (Doc. No. 24-6, PageID# 289 (Gillis 27:8 – 18)).

56.   The Gillises believe that non-Christian students attend BCS.  SR, Ex. 6 (Doc. No. 24-6, PageID# 286 (Gillis 24:8 – 11)).

57.   The Gillises' belief that non-Christian students attend BCS is based on their impression that one of I.G.'s friends at BCS does not attend church and that the friend and his family are not Christian.  SR, Ex. 6 (Doc. No. 24-6, PageID# 286 (Gillis 24:12 – 17)).

58.   Troy and Angela Nelson are a married couple who reside in Palermo, Maine.  SR, Ex. 7 (Doc. No. 24-7, PageID# 310; 312 (Nelson 4:13; 6:17 – 19)).

59.   The Nelsons attend Central Church in China, Maine.  SR, Ex. 7 (Doc. No. 24-7, Page ID# 314 (Nelson 8:13 – 20)).

60.   The Nelsons' daughter, A.N., is currently a high-school sophomore who attends Erskine Academy, a secular private school.  Doc. No. 1, PageID# 3 (Compl. ¶ 9).

61.   The Nelsons do not dispute the quality of secular education their daughter receives at Erskine – believing it provides a good quality education.  SR, Ex. 7 (Doc. No. 24-7, PageID# 325 (Nelson 19:10 – 18)).

62.   The Nelsons send their seventh-grade son, R.N., to Temple Academy because they believe it offers him a great education that aligns with their sincerely held religious beliefs.  Doc.

No. 1, PageID# 3 (Compl. ¶ 9); SR, Ex. 7 (Doc. No. 24-7, PageID# 308; 314 – 315 (Nelson  2:14 – 16; 8:13 – 9:17)).

63.    The Nelsons pay the tuition for R.N. to attend Temple Academy and also perform 50 hours of volunteer work each year for Temple Academy.  SR, Ex. 7 (Doc. No. 24-7, PageID# 321 (Nelson 15:16 – 22)).

64.    The Nelsons and R.N. do not receive any financial aid to offset the cost of tuition.  SR, Ex. 7 (Doc. No. 24-7, PageID# 322 (Nelson 16:9 – 16)).

65.    The Nelsons would like to send their daughter, A.N., to Temple Academy, because of the quality of education and the discipline, but cannot afford the cost of tuition for both of their children.  SR, Ex. 7 (Doc. No. 24-7, PageID# 326 (Nelson 20:10 – 15)); Doc. No. 1, PageID# 3 (Compl. ¶ 9).

66.    But for the sectarian exclusion codified at 20-A M.R.S.A. § 2951(2), Plaintiffs would have asked their respective SAUs to pay the tuition to their respective sectarian schools. Doc. No. 1, PageID# 10 (Compl. ¶ 46).

67.    It would be futile for Plaintiffs to request that their SAUs pay tuition to BCS or Temple Academy because both schools qualify as sectarian pursuant to 20-A M.R.S.A. § 2951(2). SR, Ex. 4 (Doc. No. 24-4, PageID# 228 (RFA 4 & 5)).

### *Facts Relating to Bangor Christian Schools*

68.    BCS is a sectarian school for purposes of 20-A M.R.S.A. § 2951(2) and thus cannot be approved for tuition purposes.  SR, Ex. 4 (Doc. No. 24-4, PageID# 228 (RFA 4)).

69.    BCS was founded in 1970 as a ministry of the Bangor Baptist Church (now Crosspoint Church).  SR, Ex. 11 (Doc. No. 24-11, PageID# 420 (BDS000068); SR, Ex. 12 (Doc. No. 24-12, PageID# 465 (BDS000013)).

70.    BCS "is now into its fifth decade of training young men and women to serve the Lord."
       SR, Ex. 12 (Doc. No. 24-12, PageID# 465 (BDS000013)).

71.    Members of Crosspoint Church do not receive a discount on tuition to BCS.  SR, Ex. 8
       (Doc. No. 24-8, PageID# 374 (Benjamin 33:4 – 6)).

72.    BCS is accredited by the New England Association of Schools and Colleges ("NEASC").
       SR, Ex. 8 (Doc. No. 24-8, PageID# 377 (Benjamin 36:11 – 21)).

73.    The Department of Education considers BCS a "private school approved for attendance
       purposes" pursuant to 20A M.R.S.A. §§ 5001-A(3)(A)(1)(a) and 2901 based, in part, on
       BCS being accredited by NEASC.  Doc. No. 8, PageID# 42 (Ans. ¶ 32).

74.    Exhibit 15 to the Stipulated Record (Doc. No. 24-15) is a true and accurate copy of BCS'
       Application for Admission.

75.    Exhibit 12 to the Stipulated Record (Doc. No. 24-12) is a true and accurate copy of BCS'
       Student Handbook.

76.    The Head of School of BCS reports to Crosspoint Church's Senior Pastor and Deacon
       Board.  SR, Ex. 8 (Doc. No. 24-8, PageID# 349 – 350 (Benjamin 8:24 – 9:1)).

77.    The Deacon Board approves BCS' tuition and the budget.  SR, Ex. 8 (Doc. No. 24-8,
       PageID# 374 (Benjamin 33:1 – 3)).

78.    Only men are eligible to serve on the Deacon Board.  SR, Ex. 8 (Doc. No. 24-8, PageID#
       385 – 386 (Benjamin 44:17 – 45:3)).

79.    BCS believes that God has ordained distinct and separate spiritual functions for men and
       women, and the husband is to be the leader of the home and men are to be the leaders of
       the church.  SR, Ex. 12 (Doc. No. 24-12, PageID# 469 (BDS000017)).

80. BCS' Head of School's employment agreement is with Crosspoint Church.  SR, Ex. 8 (Doc. No. 24-8, PageID# 350 (Benjamin 9:7 – 8)).

81. BSC' Head of School is also the Connections Pastor for Crosspoint Church.  SR, Ex. 8 (Doc. No. 24-8, PageID# 351 (Benjamin 10:4 – 8)).

82. BCS has an Advisory Board with no policymaking authority – its role is to advise BCS' administration.  SR, Ex. 8 (Doc. 24-8, PageID# 352 (Benjamin 11:1 – 12).

83. Exhibit 11 to the Stipulated Record (Doc. No. 24-11) is a true and accurate copy of BCS' Faculty Manual.

84. BCS' admissions policy states that it admits students of any race, color, or national or ethnic origin, but it is silent with respect to whether it discriminates on the basis of gender, gender-identity, sexual orientation, or religion.  SR, Ex. 11 (Doc. No. 24-11, PageID# 432 (BDS000080)).

85. BCS' mission "is to assist families in educating the whole child by encouraging spiritual maturity and academic excellence in a supportive environment" and the Bible is BCS' "final authority in all matters."  SR, Ex. 8 (Doc. No. 24-8, PageID# 365 (Benjamin 24:3 – 6)).

86. Prior to admitting any student, BCS officials meet with the student and his or her family to explain BCS' mission and goal of instilling a Biblical worldview in BCS' students in order to try and determine if the school is a good fit for the student.  SR, Ex. 8 (Doc. No. 24-8, PageID# 365 – 366 (Benjamin 24:3 – 18; 25:13 – 17)).

87. BCS does not require students to profess to be born-again Christians as a condition of admission.  SR, Ex. 8, (Doc. No. 24-8, PageID# 365 – 366 (Benjamin 24:25 – 25:1)).

88.   BCS is willing to consider admitting students from any religious background or faith so long as they are willing to support BCS' philosophy of Christian education and conduct. SR, Ex. 8 (Doc. No. 24-8, PageID# 370 (Benjamin 29:6 – 16)).

89.   BCS believes that a student who is homosexual or identifies as a gender other than on his or her original birth certificate would not be able to sign the agreement governing codes of conduct that BCS requires as a condition of admission.  SR, Ex. 8 (Doc. No. 24-8, PageID# 370 – 371 (Benjamin 29:25 – 30:15)).

90.   At BCS, presenting oneself as a gender other than the one listed on his or her original birth certificate, whether done on the school grounds or off school grounds, "may lead to immediate suspension and probable expulsion."  SR, Ex. 12 (Doc. No. 24-12, PageID# 485 (BDS000033)).

91.   If a student presented himself or herself as a gender other than that on his or her original birth certificate, and refused to stop presenting himself or herself as a gender other than that on said birth certificate after conversations and counseling with school staff, the student would not be allowed to continue attending BCS – just as a student who insisted on drinking every weekend would not be allowed to continue attending the school.  SR, Ex. 16 (Doc. No. 24-16, PageID# 542 (Boone 23:1 – 21)).

92.   If a student was openly gay and regularly communicated that fact in the school environment to his or her classmates, "that would fall under an immoral activity" under BCS' Statement of Faith and if "there was no change in the student's position" after counseling the student would not be allowed to continue attending BCS.  SR, Ex. 16 (Doc. No. 24-16, PageID# 542 – 543 (Boone 23:22 – 24:14)).

93.   An openly gay student who regularly communicated that fact in the school environment to his or her classmates would receive counseling, but if the student was "entrenched in this is who I am, I think that it is right and good" the student would not be allowed to continue attending BCS because "it clearly goes against [BCS'] Biblical beliefs" – even if the student was celibate and did not engage in homosexual acts.  SR, Ex. 16 (Doc. No. 24-16, PageID# 543 – 544 (Boone 24:20 – 25:11)).

94.   BCS may require the withdrawal at any time of a student "who, in the opinion of the school, does not fit into the spirit of the institution, regardless of whether or not he/she conforms to the specific rules and regulations of Bangor Christian Schools."  SR, Ex. 12 (Doc. No. 24-12, PageID# 504 – 505 (BDS000052 – 53)).

95.   Among the objectives of BCS are to teach students to be good Christians, to promote Christian values, and to develop Christian leadership.  SR, Ex. 16 (Doc. No. 24-16, PageID# 528 (Boone 9:7 – 14)).

96.   Among BCS' other educational objectives are to 1) "lead each unsaved student to trust Christ as his/her personal savior and then to follow Christ as Lord of his/her life"; 2) "develop within each student a Christian world view and Christian philosophy of life"; 3) "prepare each student for the important position in life of spiritual leadership in school, home, church, community, state, nation, and the world"; 4) "provide each student opportunities for developing skills necessary for their future careers"; 5) "teach each student the thinking skills that will enable him/her to meet intellectual challenges"; and 6) "provide each student opportunities to develop an understanding of and appreciation for the arts as well as contributing to them."  SR, Ex. 12 (Doc. No. 24-12, PageID# 470 (BDS000018)).

97.    Students at BCS "will be placed on academic probation for the next grading period when at the end of a nine week grading period they have earned: A. An overall grade average below 75%.  B. An F in any course. C. A grade below 75% in Bible."  SR, Ex. 12 (Doc. No. 24-12, PageID# 478 (BDS000026)).

98.    Bible is singled out because from BCS' perspective, "that is the primary thing in our school."  SR, Ex. 16 (Doc. No. 24-16, PageID# 528 (Boone 9:24)).

99.    BCS believes there are a lot of reasons for families to want to send their children to BCS, but from BCS' perspective, the main reason parents send their children to BCS is to develop a biblical worldview.  SR, Ex. 8 (Doc. No. 24-8, PageID# 367 (Benjamin 26:7 – 13)).

100.    BCS believes that another reason for families to want to send their children to BCS is the school's strong academics.  SR, Ex. 8 (Doc. No. 24-8, PageID# 367 (Benjamin 26:9 – 15)).

101.    BCS does not believe there is any way to separate the religious instruction from the academic instruction at BCS.  From BCS' perspective, religious instruction is completely intertwined and there is no way for a student to succeed if he or she is resistant to the sectarian instruction.  SR, Ex. 16 (Doc. No. 24-16, PageID# 539 (Boone 20:13 – 21)).

102.    BCS teaches children that the husband is the leader of the household.  SR, Ex. 16 (Doc. No. 24-16, PageID# 526 – 528 (Boone 7:19 – 9:1)).

103.    At BCS, attending chapel is mandatory.  SR, Ex. 16 (Doc. No. 24-16, PageID# 544 (Boone 25:15 – 16)).

104.    BCS teaches students they should spread Christianity in the world.  SR, Ex. 16 (Doc. No. 24-16, PageID# 544 (Boone 25:17 – 23)).

105.   Exhibit 17 to the Stipulated Record (Doc. No. 24-17) is a true and accurate copy of BCS'
       Bible Class Curriculum for Grades 1-8.

106.   Exhibit 18 to the Stipulated Record (Doc. No. 24-18) is a true and accurate copy of BCS'
       Bible Class Curriculum for High School.

107.   Exhibit 19 to the Stipulated Record (Doc. No. 24-19) is a true and accurate copy of BCS'
       Earth Sciences Curriculum.

108.   Exhibit 20 to the Stipulated Record (Doc. No. 24-20) is a true and accurate copy of BCS'
       Fourth Grade Social Studies Curriculum.

109.   Exhibit 21 to the Stipulated Record (Doc. No. 24-21) is a true and accurate copy of BCS'
       Fifth Grade Social Studies Curriculum.

110.   Exhibit 22 to the Stipulated Record (Doc. No. 24-22) is a true and accurate copy of BCS'
       Ninth Grade Social Studies Curriculum.

111.   Exhibit 23 to the Stipulated Record (Doc. No. 24-23) is a true and accurate copy of BCS'
       Tenth Grade Government Curriculum.

112.   One of the objectives for students in the fourth-grade social studies class at BCS is to
       "[r]ecognize that God has ordained evangelism."  SR, Ex. 20 (Doc. No. 24-20, PageID#
       645 (BDS000742)).

113.   Other objectives for students in the fourth-grade social studies class at BCS include, *inter
       alia*, being able to "[i]dentify and label the continents and oceans on a map"; "[i]dentify
       American Indians as the only true Native Americans"; "[r]ecognize that the heritage of the
       United States has been shaped by people who have emigrated from many parts of the
       world"; and to "[e]xamine [the] process of entering the United States through Ellis
       Island."  SR, Ex. 20 (Doc. No. 24-20, PageID# 643 – 644 (BDS000740 – 41)).

114.   One of the objectives for students in the fifth-grade social studies class at BCS is to "[r]ecognize God as Creator of the world."  SR, Ex. 21 (Doc. No. 24-21, PageID# 655 (BDS000751)).

115.   Other objectives for students in the fifth-grade social studies class at BCS include, *inter alia*, being able to "[r]ecognize and tell time in different time zones"; "[m]easure distances using map scales"; [s]ummarize [the] events that led up to [the] United States to enter [World] [W]ar [I]"; and to [e]xamine the dictatorships of Stalin, Mussolini, Hitler and Hirohito."  SR, Ex. 21 (Doc. No. 24-21, PageID# 655 – 662 (BDS000751 – 58)).

116.   One of the objectives for students in the ninth-grade social studies class at BCS is to "[r]efute the teachings of the Islamic religion with the truth of God's Word."  SR, Ex. 22 (Doc. No. 24-22, PageID# 669 (BDS000788)).

117.   Other objectives for students in the ninth-grade social studies class at BCS include, *inter alia*, being able to "[o]utline the major periods in Greek history"; [c]ontrast Roman civilization with Greek civilization"; "[l]ist important events in the life of Muhammad and the early history of Islam"; and "[i]dentify the cultural contributions of the Byzantine and Islamic civilizations."  SR, Ex. 22 (Doc. No. 24-22, PageID# 668 – 669 (BDS000787 – 88)).

118.   One of the objectives for students in the tenth-grade government class at BCS is to "[d]etermine a Christian framework for determining and executing foreign policy."  SR, Ex. 23 (Doc. No. 24-23, PageID# 683 (BDS 000812)).

119.   Other objectives for students in the tenth-grade government class at BCS include, *inter alia*, being able to "[e]xplain why government is necessary"; "[e]xplain a citizen's obligations to the government"; "[e]xplain the original purpose of education in American

16

colonies"; and "[d]istinguish between a republic and democracy."  SR, Ex. 23 (Doc. No. 24-23, PageID# 675 (BDS000804)).

120. One of the objectives for students in the earth science class at BCS is to "[e]xplain how special layers in the atmosphere are evidence of God's good design."  SR, Ex. 19 (Doc. No. 24-19, PageID# 631 (BDS001142)).

121. Other objectives for students in the earth science class at BCS include, *inter alia*, being able to "[d]escribe how people can affect the atmosphere"; "[s]ubdivide the atmosphere and describe the structure and function of each layer"; [e]xplain how each layer of the atmosphere benefits humans and other living creatures" and "[l]abel and distinguish between evaporation, vaporization, sublimation, condensation, freezing and melting."  SR, Ex. 19 (Doc. No. 24-19, PageID# 630 – 631 (BDS001142)).

122. Exhibit 10 to the Stipulated Record (Doc. No. 24-10) is a true and accurate copy of BCS' Teacher Contract.

123. To be a teacher at BCS, one must affirm that "he/she is a 'Born Again' Christian who knows the Lord Jesus Christ as Savior."  SR, Ex. 10 (Doc. No. 24-10, PageID# 410 – 411 (BDS000059 – 61)).

124. Every employee of BCS "[m]ust be born again" and "[m]ust be an active, tithing member of a Bible believing church."  SR, Ex. 11 (Doc. No. 24-11, PageID# 424 (BDS000072)).

125. BCS will not hire teachers who identify as a gender other than on their original birth certificate or admit such students.  SR, Ex. 8 (Doc. No. 24-8, PageID# 358 (Benjamin 17:2 – 21)).

126. BCS will not hire homosexual teachers.  SR, Ex. 8 (Doc. No. 24-8, PageID# 357; 386 (Benjamin 16:11 – 19; 45:4 – 17)).

127. If BCS did not have to make any changes in how it operates, it would consider accepting public funds for tuition purposes. SR, Ex. 8 (Doc. No. 24-8, PageID# 359; 380; 386 – 387 (Benjamin 18:18 – 25.; 39:10 – 17; 45:22 – 46:3)).

128. There is no way to predict whether Crosspoint Church's Deacon Board would approve or disapprove accepting public funds for tuition purposes, although, all things being equal, accepting public funds for tuition purposes is something BCS would consider. SR, Ex. 8 (Doc. No. 24-8, PageID# 387 – 388 (Benjamin 46:1 – 47:1)).

129. It would be futile for BCS to seek from the State approval to accept public funds for tuition purposes because BSC is a sectarian school for purposes of 20-A M.R.S.A. 2951(2). SR, Ex. 4 (Doc. No. 24-4, PageID# 228 (RFA 4)).

### *Facts Relating to Temple Academy*

130. Temple Academy is a sectarian school for purposes of 20-A M.R.S.A. § 2951(2) and thus cannot be approved for tuition purposes. SR, Ex. 4 (Doc. No. 24-4, PageID# 228 (RFA 5)).

131. Temple Academy is accredited by the NEASC. SR, Ex. 24 (Doc. No. 24-24, PageID# 746 – 747 (LaFountain 60:19 – 61:10)).

132. The Department of Education considers Temple Academy to be a "private school recognized by the department as providing equivalent instruction" pursuant to 20-A M.R.S.A. § 5001-A(3)(A)(1)(b). Doc. No. 8, PageID# 43 (Ans. ¶ 39).

133. Temple Academy is affiliated with Centerpoint Community Church. SR, Ex. 24 (Doc. No. 24-24, PageID# 699 (LaFountain 13:17 – 20)).

134.   Temple Academy is an "integral ministry" and essentially an "extension" of Centerpoint Community Church.  SR, Ex. 24 (Doc. No. 24-24, PageID# 735 – 736 (LaFountain 49:24 – 50:13)); SR, Ex. 28 (Doc. No. 24-28, PageID# 792 (TA000016)).

135.   The governing body for Temple Academy is Centerpoint Community Church's Board of Deacons.  SR, Ex. 24 (Doc. No. 24-24, PageID# 700 – 701; 702 (LaFountain 14:22 – 15:1; 16:17 – 21)).

136.   All members of Centerpoint Community Church's Board of Deacons are members of Centerpoint Community Church.  SR, Ex. 24 (Doc. No. 24-24, PageID# 706 (LaFountain 20:22 – 25)).

137.   While Temple Academy has a school board, it is only advisory – it has no authority over the curriculum.  SR, Ex. 24 (Doc. No. 24-24, PageID# 701 (LaFountain 15:2 – 12)).

138.   Temple Academy's school board operates entirely under the authority of Centerpoint Community Church's Board of Deacons.  SR, Ex. 28 (Doc. No. 24-28, PageID# 794 (TA000018)).

139.   The superintendent of Temple Academy is the lead pastor of Centerpoint Community Church.  SR, Ex. 24 (Doc. No. 24-24, PageID# 702 – 703; 704 (LaFountain 16:22 – 17:6; 18:1 – 4)).

140.   Centerpoint Community Church's Board of Deacons has the authority to dictate the curriculum for the school.  SR, Ex. 24 (Doc. No. 24-24, PageID# 704 (LaFountain 18:16 – 25)).

141.   Temple Academy agrees that there is a "big difference" between private schools and private Christian schools.  SR, Ex. 24 (Doc. No. 24-24, PageID# 715 (LaFountain 29:4 – 10)).

142.   Exhibit 28 to the Stipulated Record (Doc. No. 24-28) is a true and accurate copy of

Temple Academy's Student/Parent Handbook.

143.   Temple Academy's mission is "to know the Lord Jesus Christ and to make Him known

through accredited academic excellence and programs presented through [Temple

Academy's] thoroughly Christian Biblical world view."  SR, Ex. 28 (Doc. No. 24-28,

PageID# 791 (TA000015)).

144.   Temple Academy's educational philosophy "is based on a thoroughly Christian and

Biblical world view," and a "world view" "is a set of assumptions that one holds about the

basic makeup of his world and forms the basis for all that one does and thinks."  SR, Ex.

28 (Doc. No. 24-28, PageID# 791 (TA000015)).

145.   Among Temple Academy's objectives are to 1) "foster within each student an attitude of

love and reverence of the Bible as the infallible, inerrant, and authoritative Word of God;"

2) "teach the fundamental doctrines of the historic Christian faith;" 3) "develop within

each student a biblically-based morality;" and 4) "aid families in making their homes

Christ-centered."  SR, Ex. 28 (Doc. No. 24-28, PageID# 792 – 793 (TA000016 – 17)).

146.   Temple Academy's "academic growth" objectives are to 1) "provide a sound academic

education in which the subjects areas are taught from a Christian point of view"; 2) "help

every student develop a truly Christian world view by integrating studies with the truths of

Scripture"; and 3) "promote excellence and competence in communication and

computational skills."  SR, Ex. 28 (Doc. No. 24-28, PageID# 792 – 793 (TA000016 –

17)).

147.   Temple Academy seeks "to lead every student to a personal, saving knowledge of Christ."

SR, Ex. 28 (Doc. No. 24-28, PageID# 796 (TA000020)).

148. Exhibit 26 to the Stipulated Record (Doc. No. 24-26) is a true and accurate copy of Temple Academy's Admissions Policy.

149. Exhibit 32 to the Stipulated Record (Doc. No. 24-32) is a true and accurate copy of a brochure Temple Academy provides to prospective students and their parents.

150. Exhibit 33 to the Stipulated Record (Doc. No. 24-33) is a true and accurate copy of a letter Temple Academy sends to parents enclosing an application packet.

151. Temple Academy's admission policy states that it does not discriminate on the basis of race, color, or national or ethnic origin, but it is silent with respect to whether it discriminates on the basis of gender, gender-identity, sexual orientation, or religion.  SR, Ex. 26 (Doc. No. 24-26, PageID# 776 (TA00003)); SR, Ex. 28 (Doc. No. 24-28, PageID# 796 (TA000020)); SR, Ex. 32 (Doc. No. 24-32, PageID# 898 (TA000061)).

152. Under Temple Academy's admission policy, a student would most likely not be accepted if he or she comes from a family that does not believe that the Bible is the word of God. SR, Ex. 24 (Doc. No. 24-24, PageID# 721 – 722 (LaFountain 35:20 – 36:8)).

153. Temple Academy has a "pretty hard lined" written policy that states that only Christians will be admitted as students, though exceptions have been made, and might be made in the future, to admit students of different faiths.  SR, Ex. 24 (Doc. No. 24-24, PageID# 749; 748 (LaFountain 63:9 – 23; 62:14 – 17)).

154. There are currently, and have been in the past, students who attend Temple Academy who are not necessarily Christians but who have said they support the school's Statement of Faith.  SR, Ex. 24 (Doc. No. 24-24, PageID# 715; 717; 719 (LaFountain 29:18 – 21; 31:11 – 16; 33:11 – 22)).

155. Under Temple Academy's written admission policy, "students from homes with serious differences with the school's biblical basis and/or its doctrines will not be accepted." SR, Ex. 24 (Doc. No. 24-24, PageID# 723 (LaFountain 37:9 – 14)); SR, Ex. 26 (Doc. No. 24-26, PageID# 776 (TA000003)).

156. Temple Academy believes that a Muslim family would have serious differences with Temple Academy's biblical basis and its doctrines. SR, Ex. 24 (Doc. No. 24-24, PageID# 723 (LaFountain 37:20 – 24)).

157. Temple Academy will not admit a student who is homosexual, though there are students presently enrolled who "struggle" with homosexuality. SR, Ex. 24 (Doc. No. 24-24, PageID# 725 (LaFountain 39:6 – 14)).

158. A child who identifies with a gender that is different than what is listed on the child's original birth certificate would not be eligible for admission to Temple Academy. SR, Ex. 24 (Doc. No. 24-24, PageID# 726 (LaFountain 40:4 – 8)).

159. Temple Academy will not admit a child who lives in a two-father or a two-mother family. SR, Ex. 24 (Doc. No. 24-24, PageID# 727 (LaFountain 41:16 – 20)).

160. Exhibit 30 to the Stipulated Record (Doc. No. 24-30) is a true and accurate copy of Temple Academy's Family Covenant.

161. As a condition of enrollment to Temple Academy, the student's parents must sign a Family Covenant in which they affirm that they are in agreement with Temple Academy's views on abortion, the sanctity of marriage, and homosexuality and in which they acknowledge that Temple Academy may request that the student withdraw if "the student does not fit into the spirit of the institution regardless of whether or not he/she conforms to

the specific rules and regulations."  SR, Ex. 24 (Doc. No. 24-24, PageID# 743 (LaFountain 57:19 – 22)); SR, Ex. 30 (Doc. No. 24-30, PageID# 872 (TA000068)).

162.  As a condition of enrollment to Temple Academy, students in grades 7 to 12 must sign a covenant in which the student affirms that he or she "will seek at all times, with the help of the Holy Spirit, to live a godly life in and out of school in order that Jesus Christ will be glorified."  SR, Ex. 24 (Doc. No. 24-24, PageID# 745 – 746 (LaFountain 59:21 – 60:16)); SR, Ex. 30 (Doc. No. 24-30, PageID# 872 (TA000068)).

163.  Students at Temple Academy are required to attend a religious service once a week.  SR, Ex. 24 (Doc. No. 24-24, PageID# 727 – 728 (LaFountain 41:25 – 42:4)).

164.  Temple Academy provides a "biblically-integrated education," which means that the Bible is used in every subject that is taught.  SR, Ex. 24 (Doc. No. 24-24, PageID# 728 (LaFountain 42:14 – 20)).

165.  The Bible is integrated into subjects like math because Temple Academy believes a creator designed the universe such that "one plus one is always going to be two."  SR, Ex. 24 (Doc. No. 24-24, PageID# 728 – 729 (LaFountain 42:19 – 25; 43:6 – 8)).

166.  Bible verses are not integrated into subjects like math.  Rather, "it's algebra, it's pre-cal, calculus, just like you'd see in any high school across America."  SR, Ex. 24 (Doc. No. 24-24, PageID# 729 (LaFountain 43:1 – 11)).

167.  Exhibit 29 to the Stipulated Record (Doc. No. 24-29) is a true and accurate copy of Temple Academy's Faculty Handbook.

168.  Temple Academy teachers "are expected to integrate Biblical principles with their teaching in every subject taught at Temple Academy."  SR, Ex. 29 (Doc. No. 24-29, PageID# 862 (TA000130)).

169. Temple Academy teaches children that the Bible is the Word of God, that it is infallible, and that it should be obeyed in every aspect of life.  SR, Ex. 24 (Doc. No. 24-24, PageID# 721 (LaFountain 35:1 – 9)).

170. Temple Academy teaches students that they should obey the Bible in their daily lives.  SR, Ex. 24 (Doc. No. 24-24, PageID# 729 (LaFountain 43:23 – 25)).

171. Temple Academy teaches students that they should attempt to spread the word of Christianity.  SR, Ex. 24 (Doc. No. 24-24, PageID# 730 (LaFountain 44:1 – 3)).

172. Temple Academy teaches students that a "proper marriage" is between a man and a woman.  SR, Ex. 24 (Doc. No. 24-24, PageID# 735 (LaFountain 49:10 – 18)).

173. Temple Academy strives to "mold" students to be "Christlike."  SR, Ex. 24 (Doc. No. 24-24, PageID# 736 – 737 (LaFountain 50:18 – 51:2)).

174. Temple Academy promotes to students that they should obey the Bible, accept that the Bible is the Word of God, and to accept Christ as their personal savior.  SR, Ex. 24 (Doc. No. 24-24, PageID# 737 (LaFountain 51:3 – 23)).

175. Exhibit 27 to the Stipulated Record (Doc. No. 24-27) is a true and accurate copy of Temple Academy's Teacher Employment Agreement.

176. Affirming that "he/she is a born-again Christian who knows the Lord Jesus Christ as Savior" is a necessary qualification to be a teacher at Temple Academy.  SR, Ex. 24 (Doc. No. 24-24, PageID# 731 (LaFountain 45:3 – 11)); SR, Ex. 27 (Doc. No. 24-27, PageID# 782 (TA000092)).

177. Homosexuals are not eligible for employment as teachers at Temple Academy.  SR, Ex. 24 (Doc. No. 24-24, PageID# 732 (LaFountain 46:7 – 9)); SR, Ex. 27 (Doc. No. 24-27, PageID# 783 (TA000093)).

178.   Temple Academy's Teacher Employment Agreement states that the Bible says that "God recognize[s] homosexuals and other deviants as perverted" and that "[s]uch deviation from Scriptural standards is grounds for termination."  SR, Ex. 27 (Doc. No. 24-27, PageID# 783 (TA000093)).

179.   A person must be a born-again Christian to be eligible for all staff positions at Temple Academy, including custodial positions.  SR, Ex. 24 (Doc. No. 24-24, PageID# 748 – 749 (LaFountain 62:21 – 63:1)).

180.   Temple Academy does not know whether it would accept public funding for tuition purposes – it would have to see whether there were strings attached and it does not know enough now to say yes.  SR, Ex. 24 (Doc. No. 24-24, PageID# 710 (LaFountain 24:4 – 22)).

181.   If Temple Academy could become eligible to accept public funding for tuition purposes with no strings attached, Temple School would have to see it in writing.  SR, Ex. 24 (Doc. No. 24-24, PageID# 711 (LaFountain 25:7 – 12)).

182.   Before accepting public funds for tuition purposes, Temple Academy would want to have in writing that the school would not have to alter its admissions standards, hiring standards, or curriculum, and if it had that in writing, Temple Academy would consider accepting public funds for tuition purposes.  SR, Ex. 24 (Doc. No. 24-24, PageID# 751 (LaFountain 65:4 – 25)).

183.   If in order to receive public funds for tuition purposes Temple Academy could no longer require that teachers be born-again Christians, Temple Academy would refuse to accept public money.  SR, Ex. 24 (Doc. No. 24-24, PageID# 732 (LaFountain 46:1 – 6)).

184. Temple Academy would not take public money for tuition purposes if it was conditioned on Temple Academy no longer being able to exclude homosexuals from employment as teachers.  SR, Ex. 24 (Doc. No. 24-24, PageID# 732 (LaFountain 46:7 – 14)).

185. It would be futile for Temple Academy to seek from the State approval for tuition purposes because Temple Academy is a sectarian school for purposes of 20-A M.R.S.A. 2951(2).  SR, Ex. 4 (Doc. No. 24-4, PageID# 228 (RFA 5)).

### *Facts Regarding Attorney General Opinion 80-2*

186. Maine's Attorney General authored opinion 80-2.

187. Exhibit 1 to the Stipulated Record (Doc. No. 24-1) is a true and accurate copy of the Maine Attorney General's opinion 80-2.

188. After the date of the Attorney General's opinion, legislation was passed that ultimately became the provision currently codified at 20-A M.R.S.A. § 2951(2).

### *Facts Regarding Bill to Allow Sectarian Schools to be Approved for the Receipt of Public Funds*

189. In 2003, a bill – LD 182 ("An Act to Eliminate Discrimination Against Parents Who Want to Send Their Children to Religious Private Schools," 121st Legis. (2003)) – was introduced to repeal 20-A M.R.S. § 2951(2), the provision that allows only nonsectarian schools to be approved for the receipt of public funds for tuition purposes.

190. Exhibit 2 to the Stipulated Record (Doc. No. 24-2) contains a true and accurate copy of LD 182 at PageID# 183 – 184.

191. On May 13, 2003, the Maine House of Representatives debated LD 182.  Legis. Rec., May 13, 2003, at H-582 to H-589.  SR, Ex. 2 (Doc. No. 24-2, PageID# 185 – 201).

192.   Exhibit 2 to the Stipulated Record (Doc. No. 24-2) contains a true and accurate copy of

the Legislative Record of the House debate that occurred on May 13, 2003 at PageID# 185

– 201.

193.   The Legislative Record from the May 13, 2003 debate on LD 182 attributes the following

statement to Representative Fischer in opposition to the bill:

Mr. Speaker, I submit to you and to this body that there are a number of reasons
why this bill should be rejected. These reasons are compelling and have at their
root the sovereign prerogative of the people of the State of Maine regarding how
public funds can and should be used in supporting public education for the children
of this state.

\* \* \*

Mr. Speaker, I submit it is fundamentally wrong for us to fund discrimination, but
that is exactly what this bill calls for. Private religious schools freely admit that
they do not hire individuals whose beliefs are not consistent with the school's
religious teachings.

\* \* \*

Ladies and gentlemen of the House, I ask you to consider this question, can private
religious schools discriminate against citizens of the State of Maine, including
even members of this body, because of their religious beliefs? Yes, they can. Is it
right for them to do this with our tax money? No, it is not.

Ladies and gentlemen of the House, do you want to take our preciously limited
resources and promote discrimination?

H-582-83. SR, Ex. 2 (Doc. No. 24-2, PageID# 186 – 187 (D000023 – D000024)).

194.   The Legislative Record from the May 13, 2003 debate on LD 182 also attributes the

following statement to Representative Fischer in opposition to the bill:

Entanglement would mean that if we were to give money to private religious
schools, we would have a responsibility to them, to make them accountable in
some way.  How are we going to make private religious schools who teach religion
in the classroom accountable to standards in the State of Maine that do not include
any sort of religion in them? How do we reconcile that? There is no answer for
that. You can't reconcile. Our public schools are not allowed to teach religion.

Private religious schools can. You can't get from one to the other. That is the first thing, entanglement.

The second one is something that I am sure there are members of this body who would be very concerned about. It is about hiring policies. My father, for instance, is a professor. He has his doctorate. He has taught for 40 years now. He cannot get a job at St. Doms Academy. You know why? He is not a Christian. That is fine, but I am telling you if you can discriminate against people on that basis, what does that say. If you receive public money, you are going to be accountable to public laws. I am a Christian. I could get a job at St. Doms. Go figure. The point is you are going to have a firewall there, as the good Representative from Portland said. You are suddenly going to have to open yourself up to the laws of the State of Maine if you receive public money. I don't think from the testimony that we received from directors of Christian schools across the State of Maine that that is something that they are willing to accept. They said that they hire based on whether a person's beliefs are the same as ours. That is a direct quote. You ask any member of the Education Committee, even folks on the Minority Report.  They will tell you that that is the truth.

How do you explain to my father that he is a professor and he is the most qualified person for a job that you are not going to hire him because he is not a Christian? That is not what we believe in in this state. We had a big discussion yesterday, if you remember, about our terms of employment. Our terms of employment in this state are at will. We are a state that believes and we say every single day when you get a job that we don't discriminate on the basis of, and you put the list right through.  That is our state. It is in our Human Rights Act. It is in the US Civil Rights Act. If someone can explain to me how we aren't going to make private religious schools accountable for their hiring practices, then I will vote against this bill too.

H-586-87.  SR, Ex. 2 (Doc. No. 24-2, PageID# 195 – 196 (D000032 – D000033)).

195.   The Legislative Record from the May 13, 2003 debate on LD 182 attributes the following

statement to Representative Cummings in opposition to the bill:

If we were to move in the direction of religious vouchers at this time in our history, we would effectively be giving up the rights for the education of our children to entities whose overwhelming mission is religious. You do not have to be opposed to religious entities having that kind of control. In our decision today, we have to believe that children are better supported by the public schools with public money. If you choose to do otherwise, then let it be with private money.

H-584.  SR, Ex. 2 (Doc. No. 24-2, PageID# 190 (D000027)).

196. The Legislative Record from the May 13, 2003 debate on LD 182 attributes the following

statement from Representative Cummings in opposition to the bill:

From a public policy position, we must believe that a religiously neutral classroom
is the best if funded by public dollars. It is the foundation of our religious
agreements to expect diversity in a situation.

* * *

Our purpose here today is as policy makers we provide an opportunity for the
people of Maine to continue their religious avocations and their religious pursuits,
but not with public money for the many reasons you have heard today. Yes, in fact,
there is, of course, discrimination in religious institutions. I defend their right to do
so, but not with my dollar.

H-587.  SR, Ex. 2 (Doc. No. 24-2, PageID# 197 – 198 (D000034 – D000035)).

197. The Legislative Record from the May 13, 2003 debate on LD 182 attributes the following

statement from Representative Glynn in support of the bill: "This bill is a step toward

ending discrimination against parents who wish to send their children to religious or

private schools." SR, Ex. 2 (Doc. No. 24-2, PageID# 185 (D000022)).

198. The Legislative Record from the May 13, 2003 debate on LD 182 attributes the following

statement from Representative Snowe-Mello: "Many of our religious schools do an

excellent job a[t] teaching our young people."  SR, Ex. 2 (Doc. No. 24-2, PageID# 194

(D000031)).

199. On May 14, 2003, the Maine Senate debated LD 182.  Legis. Rec., May 14, 2003, at S-

629, 640-41.

200. Exhibit 2 to the Stipulated Record (Doc. No. 24-2) contains a true and accurate copy of

the Legislative Record of the Senate debate that occurred on May 14, 2003 at PageID#

202 – 205.

201.   The Legislative Record from the May 14, 2003 debate on LD 182 attributes the following

statement to Senator Martin in opposition to the bill:

Because we retain a responsibility of a publicly funded education, we must look
carefully at what we believe is an appropriate form of education for our children. I
submit that our publicly funded education system works best when the education is
one of diversity and assimilation. An educational system that promotes tolerance
and assimilation by educating all of our children together, without regard to
religious affiliation and without promoting religious view points, is preferred.
Non-religious publicly funded education has been the norm in Maine and
elsewhere in our country, and the 'melting pot' effect of this, on our children is
what makes this state and this country great. Religious neutrality in the classroom
is best.

Bringing all of our children together, no matter what their religious affiliation or
background, promotes democracy, tolerance, and what is best in all of us.

The alternative offered by this bill, I submit, is contrary to that preferred approach.
The bill could create and promote 'separate and sectarian' educational systems.

Fifty years ago, the Supreme Court rejected as unconstitutional publicly funded
'separate but equal schools,' where the education system funded separate schools
based on race. The bill would have us fund 'separate and sectarian' schools where
the educational system funds separate schools based on religion.

While citizens most certainly have the right to attend those schools, I do not
believe that we should spend our tax dollars to fund the schools. Rather, we should
use our limited dollars for schools, whether the public or private under our tuition
programs, that are non-religious and that are neutral on religion.

Not only is this bill bad public policy, it is bad governmental policy. Government
and religion should be separate.  Separation of church and state is firmly
established in this state and country.  It is appropriate and necessary for the
Department of Education and local education officials to ensure that what is being
taught at publicly funded elementary and secondary schools is in keeping with the
appropriate cultural morals and values of America. That can be done at public
schools and private non-religious schools that receive public funding.

The proponents of the bill would demand public funds for private religious schools
because, under the tuition program, public funds can be used for private non-
religious schools. But the non-religious schools are just like public schools in that
they are religiously neutral and can be held accountable. Government officials can
review what is being taught in private non-religious schools to make sure what is
taught is appropriate and not anti-American.  Government officials cannot, and
should not, review the religious teachings of religious schools, but that is exactly

what we will be funding, religious teachings. The public funds could be used to teach intolerant religious views, but we could not review those without approving or disapproving of a religion. The government does not approve or disapprove of religious teachings, and everyone must agree that we should not fund anti-American teaching in the classroom. Since we cannot hold religious schools accountable for what they teach, we should not fund them.

S-640.  SR, Ex. 2 (Doc No. 24-2, PageID# 204 – 205 (D000041 – D000042)).

202.   The Legislative Record records that majorities in both the House of Representatives and

the Senate voted against LD 182, and the bill was thus not enacted into law.

Date:  March 15, 2019                    Respectfully submitted,


/s/ Christopher Taub_____            /s/ Timothy D. Keller_____
Christopher C. Taub                      Timothy D. Keller* (AZ Bar No. 019844)
Sarah A. Forster                         Institute for Justice
Assistant Attorneys General              398 S. Mill Avenue, Suite 301
Office of the Attorney General           Tempe, AZ 85281
State House Station 6                     Tel: (480) 557-8300
Augusta, ME 04333                        Fax: (480) 557-8315
Telephone: (207) 626-8800                Email: tkeller@ij.org
Email: christopher.C.Taub@maine.gov
        sarah.forster@maine.gov          Arif Panju* (TX Bar No. 24070380)
                                         Institute for Justice
*Attorneys for Defendant*                816 Congress Avenue, Suite 960
                                         Austin, TX 78701
/s/ Jeffrey T. Edwards_____          Tel: (512) 480-5936
Jeffrey T. Edwards                       Fax: (512) 480-5937
PretiFlaherty                            Email: apanju@ij.org
One City Center
P.O. Box 9546                            Lea Patterson* (TX Bar No. 24102338)
Portland, ME 04112-9546                  First Liberty Institute
Tel: (207) 791-3000                      2001 W. Plano Parkway, Suite 1600
Fax: (207) 791-3111                      Plano, TX 75075
Email: jedwards@preti.com                Tel: (972) 941-4444
                                         Fax: (972) 423-6162
*Local Counsel for Plaintiffs*           Email: lepatterson@firstliberty.org

                                         Michael K. Whitehead* (MO Bar No. 24997)
                                         Jonathan R. Whitehead* (MO Bar No. 54868)
                                         Whitehead Law Firm, LLC
                                         229 SE Douglas St., Suite 210
                                         Lee's Summit, MO 64063
                                         Tel: (816) 398-8967
                                         Fax: (816) 875-3291
                                         Email: mike@thewhiteheadfirm.com
                                         Email: jon@whiteheadlawllc.com

                                         *Attorneys for Plaintiffs*
                                         *Admitted pro hac vice

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 15th day of March, 2019, a true and correct

copy of **JOINT STIPULATED FACTS** was filed and served on the following counsel of record

using the Court's CM/ECF system:

> Aaron M. Frey
> Attorney General
>
> Sarah A. Forster
> Christopher C. Taub
> Assistant Attorneys General
> Office of the Attorney General
> Six State House Station
> Augusta, ME 04333-0006
> Tel: (207) 626-8866, (207) 626-8800
> Email: sarah.forster@maine.gov
>          Christopher.C.Taub@maine.gov
>
> *Attorneys for Defendant*

/s/ Timothy D. Keller_____
Timothy D. Keller
*Attorney for Plaintiffs*

33