UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

DAVID and AMY CARSON, et al.,          )
                                        )
Plaintiffs,                            )
                                        )
         v.                            )          Civil Action No. 18-cv-00327 DBH
                                        )
A. PENDER MAKIN, in her                )
official capacity as Commissioner of   )
the Maine Department of Education,     )
                                        )
Defendant.                             )

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
WITH INCORPORATED MEMORANDUM OF LAW**

**INTRODUCTION**

Sixty-five years ago, the United States Supreme Court declared that "education is perhaps the most important function of state and local governments."  *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954).  This case represents the third time in the past 20 years that a handful of Maine parents who wish to receive public funding for the pervasively sectarian education they have chosen for their children seek to transform Maine's public education system by requiring the State to include sectarian schools in a program designed to provide a public education to students whose local school administrative unit neither operates a secondary school nor contracts for secondary schooling privileges.  In the first challenge, both Maine's Law Court and the Court of Appeals for the First Circuit held that the Establishment Clause prevented Maine from allowing payments to sectarian schools.  A few years later, both Maine's Law Court and the Court of Appeals held that while the intervening Supreme Court decision in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), created the possibility that Maine *could* design a program that would allow parents to direct public dollars to sectarian schools without violating the Establishment Clause, a

1

second intervening Supreme Court case, *Locke v. Davey*, 540 U.S. 712 (2004), made clear that nothing in the Constitution *requires* Maine to do so.

The current challenge is the direct result of the Supreme Court's recent decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012 (2017), which held that a government program that categorically disqualified an otherwise fully qualified applicant from consideration for a generally available public benefit merely because it was a religious institution violated the Free Exercise Clause.  Before plaintiffs reach *Trinity Lutheran*, they face two procedural roadblocks.  First, they lack standing to bring their claims because they cannot demonstrate that it is likely that the injury they allege would be redressed by a favorable ruling: no sectarian school has indicated that it would accept public tuition funds.  Second, this Court is bound by the precedent established in the First Circuit's ruling in *Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344 (2004)  Even if this Court were to reach the merits, nothing in *Trinity Lutheran* points to the conclusion that because Maine operates a secular public education system, it is compelled by the Free Exercise Clause, or any other provision of the Constitution, to fund schools whose purpose and practice is to deliver pervasively sectarian education:  instruction directly aimed at promoting a particular faith to the exclusion of all others.  Maine's exclusion of sectarian schools from its system of public education is fully constitutional and should again be upheld.

### FACTUAL AND LEGAL BACKGROUND

The Constitution of Maine states:

A general diffusion of the advantages of education being essential to the rights and liberties of the people; to promote this important object, the Legislature are authorized, and it shall be their duty to require, the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools; . . .

Me. Const. art. VIII, pt. 1, § 1.  Pursuant to 20-A M.R.S. § 2(1), "[i]t is the intent of the Legislature that every person within the age limitations prescribed by state statues shall be provided an opportunity to receive the benefits of a free public education."  Joint Stipulated Facts (Doc. No. 25), ¶ 1 (cited throughout as "JSF, ¶ __" or "¶ __").

## I.      Maine's Public Education System.

In Maine, there are currently 260 local school administrative units (SAUs), defined by statute as the state-approved unit of school administration, serving nearly 180,000 students in grades K-12 at public expense.  JSF, ¶¶ 3, 4, 20.  Each SAU "shall either operate programs in kindergarten and grades one to 12 or otherwise provide for students to participate in those grades as authorized elsewhere [by statute]."  20-A M.R.S. § 1001(8); ¶ 5.  Of the 260 SAUs, 143 do not operate a secondary school.  ¶ 6.  Maine law provides two alternatives for an SAU to provide a public education to its resident students when it does not operate a public school for one or more grades.  First, an SAU may contract with another public or approved private school for schooling privileges for some or all of its resident students in those grades.  20-A M.R.S. §§ 2701, 2702.  Second, an SAU "that neither maintains a secondary school nor contracts for secondary school privileges pursuant to chapter 115 shall pay the tuition, in accordance with chapter 219, at the public school or the approved private school of the parent's choice at which the student is accepted."  20-A M.R.S. § 5204(4); ¶ 7.

20-A M.R.S. § 2951 contains the requirements for a private school to be approved to receive public funds for tuition purposes.  ¶ 13.  Those schools must, *inter alia*, meet the requirements for basic school approval contained in the statute, agree to comply with reporting and auditing requirements, and, at the center of the current dispute, be "a nonsectarian school in

accordance with the First Amendment of the United States Constitution." 20-A M.R.S. § 2951(1), (2), (5); ¶ 14.

## II.    The Attorney General's Opinion, the Legislature, and two prior legal challenges.

Prior to 1980, some sectarian schools received public funds for tuition purposes. ¶ 18. In January of 1980, in response to a request from a legislator, the Attorney General issued an opinion that thoroughly reviewed the existing First Amendment jurisprudence and concluded that the public funding of religious schools would violate the Establishment Clause. ¶ 187; Joint Exh. ("J.E.") 1 at 18. Subsequently, the Legislature enacted the provision currently codified at Section 2951(2). ¶ 188. More than 15 years later, two separate groups of parents filed lawsuits challenging the constitutionality of Section 2951(2). Both the Maine Law Court and the Court of Appeals for the First Circuit agreed with the reasoning of the Attorney General and held that the Establishment Clause prevented Maine from allowing payments to sectarian schools. *Bagley v. Raymond Sch. Dep't*, 1999 ME 60 (1999), 728 A.2d 127; *Strout v. Albanese*, 178 F.3d 57 (1999).

That was not the end of the Legislature's consideration of the use of public tuition dollars for sectarian education. In 2002, the Supreme Court decided *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002). *Zelman* held, for the first time, that it was possible for a state to develop a so-called "voucher" program that would allow parents to use public money to pay for sectarian schools without violating the Establishment Clause. 536 U.S. at 662-63. Presented with the opportunity to consider public tuition payments for sectarian education anew, in 2003, a bill was introduced to repeal Section § 2951(2). ¶ 189. As will be discussed below, several legislators articulated the important rationales for continuing the exclusion of sectarian schools from the public tuition program. ¶¶ 191-196; 199-201. The bill was rejected and did not become law. ¶ 202.

4

At around the same time, two sets of parents again challenged the constitutionality of Section 2951(2), contending that since the State's defense in *Bagley* and *Strout* focused on its concern about violating the Establishment Clause and that concern had been addressed by *Zelman*, there was now no justification for the continued exclusion of sectarian schools. Again the parents were unsuccessful: both Maine's Law Court and the Court of Appeals held that while *Zelman* created the possibility that Maine could design a program that would allow parents to direct public dollars to sectarian schools without violating the Establishment Clause, a second intervening Supreme Court case, *Locke v. Davey*, 540 U.S. 712 (2004), made clear that nothing in the Constitution required Maine to do so. *Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344 (2004), *Anderson v. Town of Durham*, 895 A.2d 944, 2006 ME 39 (2006).

### III.    The Plaintiffs.

David and Amy Carson are a married couple residing in Glenburn, Maine. ¶ 26. Glenburn neither operates a secondary school nor contracts for secondary school privileges. ¶¶ 6, 9. The Carsons' daughter, O.C., is a high-school sophomore at Bangor Christian Schools ("BCS"). ¶ 27. The Carsons send O.C. to BCS because the school's Christian worldview aligns with their sincerely held religious beliefs and because of the school's high academic standards. ¶ 29. The Carsons see as a benefit that BCS teaches Christian values and believe that BCS is helping O.C. become a better Christian. ¶¶ 39-40. The Carsons' religion neither requires them to send their daughter to a Christian school nor prevents them from sending her to a public school. ¶ 36.

Alan and Judith Gillis are a married couple residing in Orrington, Maine. ¶ 42. Orrington neither operates a public secondary school nor contracts for secondary school privileges. ¶¶ 6, 9. The Gillises' youngest daughter, I.G., is a high-school junior at BCS. ¶ 43.

I.G. did not begin attending BCS until the 4th quarter of her freshman year; prior to that time, she attended public schools.  ¶¶ 48-49.  The Gillises' three other children all attended public high schools.   ¶ 51.  The Gillises send I.G. to BCS because the school's Christian worldview aligns with their sincerely held religious beliefs and because of the school's high academic standards. ¶ 44.  The Gillises believe that BCS provides instruction on how to live one's life as a Christian, and in their opinion that is an underlying part of the school.  ¶ 53.  Nothing in the Gillises' religion requires them to send their children to a religious school.  ¶ 52.

Troy and Angela Nelson are a married couple residing in Palermo, Maine.  ¶ 58.  Palermo neither operates a public secondary school nor contracts for secondary school privileges.  ¶¶ 6, 9. The Nelsons' daughter, A.N., is currently a high-school sophomore at Erskine Academy.  ¶ 60. The Nelsons do not dispute the quality of secular education their daughter receives at Erskine. ¶ 61.  The Nelsons send their seventh-grade son, R.N., to Temple Academy ("TA") because they believe it offers him a great education that aligns with their sincerely held religious beliefs.  ¶ 62. The Nelsons would like to send their daughter, A.N., to TA, because of the quality of education and the discipline, but cannot afford the cost of tuition for both of their children.  ¶ 65.

**IV.    Bangor Christian Schools.**

BCS is a pervasively sectarian school.  It was founded in 1970 as a ministry of the Bangor Baptist Church (now Crosspoint Church), and "is now into its fifth decade of training young men and women to serve the Lord."  ¶¶ 69-70.  The Head of School's employment agreement is with Crosspoint Church and he also serves as the Connections Pastor for the church.  ¶¶ 80-81.  He reports to Crosspoint's Senior Pastor and Deacon Board. ¶ 76.[1]

---

[1] Only men are eligible to serve on the Deacon Board.  ¶ 78.  BCS believes that God has ordained distinct and separate spiritual functions for men and women, and the husband is to be the leader of the home and men are to be the leaders of the church.  ¶ 79.

6

Prior to admitting any student, BCS officials meet with the student and his or her family to explain BCS's mission and goal of instilling a Biblical worldview in BCS' students in order to try to determine if the school is a good fit for the student.  ¶ 86.  BCS believes that a student who is homosexual or identifies as a gender other than on his or her original birth certificate would not be able to sign the agreement governing codes of conduct that BCS requires as a condition of admission.  ¶ 89.

At BCS, presenting oneself as a gender other than what is listed on one's original birth certificate, whether done on or off school grounds, "may lead to immediate suspension and probable expulsion."  ¶ 90.  If a student presented himself or herself as a gender other than that on his or her original birth certificate and refused to stop presenting himself or herself as a different gender after conversations and counseling with school staff, the student would not be allowed to continue attending BCS – just as a student who insisted on drinking every weekend would not be allowed to continue attending the school.  ¶ 91.  If a student was openly gay and regularly communicated that fact to his or her classmates, "that would fall under an immoral activity" under BCS' Statement of Faith and if "there was no change in the student's position" after counseling, the student would not be allowed to continue attending BCS.  ¶ 92.  An openly gay student who regularly communicated that fact in the school environment to his or her classmates would receive counseling, but if the student was "entrenched in this is who I am, I think it is right and good" the student would not be allowed to continue attending BCS because "it clearly goes against [BCS'] Biblical beliefs" – even if the student was celibate and did not engage in homosexual acts.  ¶ 93.

Among BCS's other educational objectives are to 1) "lead each unsaved student to trust Christ as his/her personal savior and then to follow Christ as Lord of his/her life;" 2) "develop

within each student a Christian world view and Christian philosophy of life;" and 3) "prepare each student for the important position in life of spiritual leadership in school, home, church, community, state, nation, and the world." ¶ 96.  Students at BCS are placed on academic probation if they receive an F in any course, unless the course is Bible, in which case a grade below 75% results in probation.[2]  ¶ 97.  Bible is singled out because "that is the primary thing in our school."  ¶ 98.

BCS believes that the main reason parents send their children to BCS is to develop a biblical worldview.  ¶ 99.  BCS does not believe there is any way to separate the religious instruction from the academic instruction – religious instruction is "completely intertwined and there is no way for a student to succeed if he or she is resistant to the sectarian instruction." ¶ 101.  For example, one of the objectives in the fifth-grade social studies class is to "[r]ecognize God as creator of the world."  ¶ 114.  One of the objectives in the ninth-grade social studies class is to "[r]efute the teachings of the Islamic religion with the truth of God's Word."  ¶ 116. Attending chapel is mandatory.  ¶ 103.

To be a teacher at BCS, one must affirm that "he/she is a 'Born Again' Christian who knows the Lord Jesus Christ as Savior."  ¶ 123. Moreover, *every* employee of BCS "[m]ust be born again" and "[m]ust be an active, tithing member of a Bible believing church."  ¶ 124.  BCS will not hire teachers who identify as a gender other than on their birth certificates, nor will it hire homosexual teachers.  ¶¶ 125-26.

### V.    Temple Academy.

TA is a pervasively sectarian school.  It is an "integral ministry" and essentially an "extension" of Centerpoint Community Church.  ¶ 134.  Its governing body is Centerpoint's

---

[2] An overall grade average of below 75% also results in academic probation.  ¶ 97.

Board of Deacons.  ¶ 135.  The superintendent of TA is Centerpoint's lead pastor.  ¶ 139. While

TA has a school board, it is only advisory and operates entirely under the authority of

Centerpoint's Board of Deacons.  ¶¶ 137-38.  The Board of Deacons has the authority to dictate

the curriculum for the school.  ¶ 140.

Under TA's admission policy, a student would most likely not be accepted if he or she

comes from a family that does not believe that the Bible is the word of God.  ¶ 152.  TA has a

"pretty hard lined" written policy that states that only Christians will be admitted as students,

though exceptions have been made, and might be made in the future, to admit students of

different faiths.  ¶ 153.  Under TA's written admission policy, "students from homes with serious

differences with the school's biblical basis and/or its doctrines will not be accepted."  ¶ 155.  A

Muslim family would have serious differences with TA's biblical basis and its doctrines.  ¶ 156.

TA will not admit a child who lives in a two-father or a two-mother family.  ¶ 159.  TA will not

admit a student who is homosexual, though there are students presently enrolled who "struggle"

with homosexuality.  ¶ 157.  A child who identifies with a gender that is different than what is

listed on the child's original birth certificate would not be eligible for admission.  ¶ 158.

As a condition of enrollment, the student's parents must sign a Family Covenant in which

they affirm that they are in agreement with TA's views on abortion, the sanctity of marriage, and

homosexuality and in which they acknowledge that TA may request that the student withdraw if

"the student does not fit into the spirit of the institution regardless of whether or not he/she

conforms to the specific rules and regulations."  ¶ 161.  Students in grades 7 to 12 must sign a

covenant in which the student affirms that he or she "will seek at all times, with the help of the

Holy Spirit, to live a godly life in and out of school in order that Jesus Chris will be glorified."

¶ 162.

9

TA's educational philosophy "is based on a thoroughly Christian and Biblical world view," and a "world view" "is a set of assumptions that one holds about the basic makeup of his world and forms the basis for all that one does and thinks." ¶ 144.  TA's "academic growth" objectives include "provid[ing] a sound academic education in which the subject areas are taught from a Christian point of view" and "help[ing] every student develop a truly Christian world view by integrating studies with the truth of Scripture." ¶ 146.

TA provides a "biblically-integrated education," which means that the Bible is used in every subject that is taught. ¶ 164.  Teachers "are expected to integrate Biblical principles with their teaching in every subject taught at Temple Academy." ¶ 168.  TA promotes to students that they should obey the Bible and to accept Christ as their personal savior.  ¶ 174.  Students are required to attend a religious service once a week.  ¶ 163.

A person must be a born-again Christian to be eligible for all staff positions at TA, including custodial positions. ¶ 179.  Affirming that "he/she is a born-again Christian who knows the Lord Jesus Christ as Savior" is a necessary qualification to be a teacher.  ¶ 176. Homosexuals are not eligible for employment as teachers at TA.  ¶ 177.  TA's Teacher Employment Agreement states that the Bible says that "God recognize[s] homosexuals and other deviants as perverted" and that "[s]uch deviation from Scriptural standards is grounds for termination." ¶ 178.

## ARGUMENT

**I.    Plaintiffs lack standing because a favorable ruling would not redress plaintiffs' alleged injury since no private sectarian school has stated that it would accept public tuition funds.**

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984).  "[T]he core component of

standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

> "[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"   Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id*. at 560-61 (citations omitted).  The plaintiff bears the burden of proving these elements.  *Id*. at 561.  When responding to a summary judgment motion, a plaintiff cannot rest on allegations set forth in the complaint but must instead set forth sufficient evidence to establish standing.  *Id*.

When the plaintiff is himself the subject of the challenged governmental action, there is usually "little question" that the action has caused him injury and that a judgment preventing the action will redress the injury.  *Id*. at 561-62.

> When, however . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed.  In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.  The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," . . . and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. . . . Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish.

*Id*. at 562 (citations omitted) (emphasis in original).  "[T]he Supreme Court has consistently said that a plaintiff . . . lacks standing if, notwithstanding the relief sought, the third parties would retain discretion to continue their harmful behavior or, alternatively, if it is too speculative to

conclude that they would modify their behavior in the way the plaintiff desires."). *Desert Water Agency v. United States Dep't of the Interior*, 849 F.3d 1250, 1257 (9th Cir. 2017). For example, in *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976), indigents and representative organizations sought to challenge an Internal Revenue Service rule giving favorable tax treatment to a nonprofit hospital that offered only emergency room services to indigents. They argued that the IRS rule was unlawful and that hospitals are not entitled to favorable tax treatment unless they broadly serve the indigent. *Id*. at 33. The "injury" that plaintiffs alleged was that the tax rule encouraged hospitals to deny services to indigents, and they argued that striking down the ruling would discourage the denial of services. *Id*. at 42. The Court held that this was insufficient to establish standing:

> It is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' "encouragement" or instead result from decisions made by the hospitals without regard to the tax implications. It is equally speculative whether the desired exercise of the court's remedial powers in this suit would result in the availability to respondents of such services. So far as the complaint sheds light, it is just as plausible that the hospitals to which respondents may apply for service would elect to forgo favorable tax treatment to avoid the undetermined financial drain of an increase in the level of uncompensated services.

*Id*. at 42-43. Because the plaintiffs' complaint did not allege facts suggesting a "substantial likelihood" that a favorable judgment would provide them with the medical care they sought, the Court held that the complaint should be dismissed for lack of standing. *Id*. at 44-46; *see also Allen*, 468 U.S. at 737 (plaintiffs lacked standing where it was "entirely speculative" whether withdrawal of tax exemption would cause racially discriminatory private schools to change their policies); *Warth v. Seldin*, 422 U.S. 490 (1975) (plaintiffs did not have standing to challenge town zoning ordinance that allegedly prevented the construction of affordable housing because there was no evidence that striking down the ordinance would cause builders and developers to

construct such housing); *Linda R.S. v. Richard D*., 410 U.S. 614 (1973) (mother lacked standing to bring action challenging constitutionality of child support statute because even if mother were granted the requested relief and father was subject to prosecution, it was speculative whether this would result in the father paying child support).

Here, the plaintiffs lack standing because even if the Court were to rule in their favor and hold that Maine cannot refuse to approve sectarian schools for the receipt of public funds, it is unlikely that the schools to which the plaintiffs wish to send their children would then agree to accept public funds. BCS would consider accepting public funds only if it did not have to make "any changes in how it operates." JSF, ¶ 127. Even then, there is "no way to predict" whether BCS' governing body – the Deacon Board of Crosspoint Church – would approve accepting public funds. ¶ 128. Similarly, TA would refuse to accept public money if it meant that it could no longer exclude homosexuals from teaching positions. ¶ 184. And even if TA had "in writing" that it would not have to alter its admission standards, hiring criteria, or curriculum, it would then only *consider* whether to accept public money. ¶ 182.

Accepting public funds would result in a significant change to how BCS and TA operate – at the very least, they likely would no longer be free to refuse to hire homosexuals. Under the Maine Human Rights Act ("MHRA"), it is unlawful to refuse to hire a person because of his or her sexual orientation. 5 M.R.S. § 4572(1)(A). While there is an exception that allows religious organizations to discriminate against homosexuals, it applies only to religious organizations "that do[] not receive public funds." 5 M.R.S. § 4553(10)(G).[3] Given BCS' and TA's firm stances against hiring homosexuals, it is unlikely that either school would agree to accept public funds. And even BCS and TA could still somehow discriminate against homosexuals despite taking

---

[3] Regardless of whether a religious organization accepts public funds, it may require that all employees conform to its religious tenets. 5 M.R.S. § 4573-A(2).

public funds and did not have to change any of their other practices, they still would only "consider" accepting public funds. Because it is, at best, entirely speculative as to whether a favorable ruling would result in the State making tuition payments on behalf of the plaintiffs' children, plaintiffs lack standing.

## II.      This Court is bound by the First Circuit's decision in *Eulitt*.

A second barrier to plaintiffs' claims is the circuit precedent in *Eulitt* with respect to the constitutionality of Section 2951(2). *Eulitt*, 386 F.3d at 349 (explaining that the district court's decision not to consider two recent Supreme Court decisions on the continuing vitality of the First Circuit's prior *Strout* decision was appropriate). "Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by a supervening authority." *Id.* (citing *Sarzen v. Gaughan*, 489 F.2d 1076, 1082 (1st Cir. 1973) (stare decisis requires lower courts to take binding pronouncements "at face value until formally altered")); *see also U.S. v. Jimenez-Banegas,* 790 F.3d 253, 259 (1st Cir. 2015) ("[T]he Supreme Court has clearly stated that [lower courts] should not conclude that its more recent cases have, by implication, overruled an earlier precedent.") (citing *Agostini v. Felton,* 521 U.S. 203, 237 (1997)); *Crowe v. Bolduc*, 365 F.3d 86, 94 (1st Cir. 2004) (district court correctly regarded circuit precedent as "good law" even though subsequent Supreme Court dictum had "presaged the demise" of the rule stated therein).

*Eulitt* directly addressed the claims that the plaintiffs present in their complaint: alleged violations of the Free Exercise Clause, the Equal Protection Clause and the rights to free speech and due process of law. While the *Eulitt* plaintiffs sought to avoid the Free Exercise Clause, the Court of Appeals recognized that the Supreme Court, in *Locke v. Davey*, had rejected a similar attempt to erect a separate framework for analyzing claims of religious discrimination under the

Equal Protection Clause, and "confirm[ed] that the Free Exercise Clause provides the primary framework for assessing religious discrimination claims." *Eulitt*, 386 F.3d at 353-54 (citing *Locke v. Davey*, 540 U.S. 712, 720 at n. 3 (2004)).  As such, the *Eulitt* Court concluded that it was required to start by inquiring whether the statute violates the Free Exercise Clause, and if it does not, that conclusion "wraps up the religious discrimination analysis" and rational basis scrutiny would apply to the equal protection claim.  *Id.* at 354.

With respect to the free exercise claim, the *Eulitt* Court found that *Locke* "confirms that the Free Exercise Clause's protection of religious beliefs and practices from direct government encroachment does not translate into an affirmative requirement that public entities fund religious activity simply because they choose to fund the secular equivalents of such activity." *Id. (*citing *Locke* at 721).  The *Eulitt* Court read *Locke* "more broadly" than a just single education funding decision, explaining that "state entities, in choosing to provide education, may act upon their legitimate concerns about excessive entanglement with religion, even though the Establishment Clause may not require them to do so."  *Id.* at 355.  The Court flatly rejected any religious animus behind Maine's statute, and noted that the statute "does not require residents to forgo religious convictions in order to receive the benefit offered by the state – a secular education."  *Id.*  In sum, Section 2951(2) "perpetrates no free exercise violation." *Id.* at 356.

With the free exercise claim rejected, the *Eulitt* Court easily dispensed with the equal protection claim.  *Id.* at 356.  Even though the *Eulitt* plaintiffs had conceded at oral argument that if the rational basis test applies, their equal protection claim fails, the Court of Appeals concluded:

> This concession is understandable:  the legislative history clearly indicates Maine's reasons for excluding religious schools from education plans that extend public funding to private schools for the provision of secular education to Maine students.  These reasons include Maine's interests in concentrating limited state

15

funds on its goal of providing secular education, avoiding entanglement, and allaying concerns about accountability that undoubtedly would accompany state oversight of parochial school's curricula and policies (especially those pertaining to admission, religious tolerance, and participation in religious activities).

*Id.* As to speech, the *Eulitt* Court concluded:

The statute at issue here does not implicate the appellants' speech rights at all. As the Supreme Court made clear in *Davey*, state programs to fund general tuition costs are not fora for speech. The Maine education plan deals with the provision of secular secondary educational instruction to its residents; it does not commit to providing any open forum to encourage diverse views from private speakers.

*Id.* at 356 (internal citation omitted). And with respect to a due process claim "[t]he fact that the state cannot interfere with a parent's fundamental right to choose religious education for his or her child does not mean that the state must fund that choice." *Id.* at 354 (citing *Maher v. Roe*, 432 U.S. 464, 475-77 (1977) (fundamental right to abortion does not equate to a right to a state-financed abortion)).

Nothing in *Trinity Lutheran* has "cast into disrepute" – "unmistakably" or otherwise – the *Eulitt* decision. *Id.* at 349. To the contrary, the *Trinity Lutheran* decision is explicitly limited: footnote three of the opinion (adopted by four members of the majority) states that "[t]his case involves express discrimination based on religious identity with respect to playground resurfacing. We do not address religious uses of funding or other forms of discrimination." 137 S.Ct. at 2024, n.3. Justice Breyer's concurring opinion begins by stating that "I find relevant, and would emphasize, the particular nature of the 'public benefit' here at issue" and concludes that "[p]ublic benefits come in many shapes and sizes. I would leave the application of the Free Exercise Clause to other kinds of public benefits for another day." *Id.* at 2026-27. In sum, five of the seven justices who agreed that it violated the Free Exercise Clause to exclude religious entities from a playground resurfacing program plainly stated that their holding was limited to

16

that specific program.  In light of this express limitation, there is no basis for concluding that *Trinity Lutheran* implicitly overruled *Eulitt*.

### III.   Maine's decision to maintain a secular public education system by excluding sectarian schools from receiving public funds for tuition purposes does not violate the Free Exercise Clause.

If the Court were to reach the merits, the plaintiffs' claims fail.  The sole development in the law that has caused Plaintiffs to revisit the constitutionality of Section 2951(2) is the Supreme Court's recent decision in *Trinity Lutheran*.  Yet nothing in *Trinity Lutheran* suggests that Maine no longer has the authority to develop and implement a secular system of public education that relies, in limited circumstances, on secular private schools in lieu of building public secondary schools, without simultaneously funding private sectarian schools.  The ongoing vitality of the Court's decision in *Locke v. Davey* evidences a continued judicial respect for a state's decision to elect not to financially support what is an essentially religious endeavor – a form of education aimed at inculcating students in a particular faith to the exclusion of all others and where a single faith is integrated into every subject taught – while supporting and maintaining a statewide system of secular public education.

*Trinity Lutheran* involved the Missouri Department of Natural Resources' Scrap Tire Program.  This government program gave competitive grants to "help public and private schools, nonprofit daycare centers, and other nonprofit entities purchase rubber playground surfaces made from recycled tires."  137 S.Ct. at 2017.  The program had a policy that categorically disqualified churches and other religious organizations from receiving grants to resurface their playgrounds. *Id.*  The Department believed such a policy was compelled by a provision in the Missouri constitution that prohibited any public money from being taken from the public treasury "in aid of any church."  *Id.*

The parties in *Trinity Lutheran* agreed that the Establishment Clause did not prevent the Department from including the church's preschool in the Scrap Tire Program, leaving the Court to decide whether Trinity Lutheran's exclusion violated the Free Exercise Clause, or whether it fell within the "'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." *Id.* at 2019 (citing *Locke* at 718). It is this "play in the joints" that caused the Court in *Locke* to uphold a Washington state scholarship program for low income students that prohibited recipients from using the scholarship to pursue a degree in devotional theology. *Locke*, 540 U.S. at 718-21.

The *Trinity Lutheran* Court held that the church's exclusion from the Scrap Tire Program violated the Free Exercise Clause because it disqualified an otherwise fully qualified applicant from consideration for a generally available public benefit merely because it was a religious institution. 136 S.Ct. at 2024. It distinguished the exclusion from the Scrap Tire Program from the scholarship restriction upheld in *Locke v. Davey* by noting that nothing in the scholarship program required Davey to choose between his religious beliefs and receiving a scholarship; instead he was denied a scholarship because of what he proposed to do with the money, *i.e.* prepare for the ministry. *Id.* at 2023-24.

> ### A.  Unlike Trinity Lutheran, plaintiffs and their chosen schools are not "otherwise fully qualified" for a "generally available public benefit."

In order to properly analyze plaintiffs' claim, it is essential to identify the benefit bestowed by the tuition program: a free, public education. 20-A M.R.S. § 2(1). A free, public education has been defined by Maine as a secular education. *See Eulitt*, 386 F.3d at 355 (the "benefit offered by the state" is "a secular education"). Each school administrative unit is charged with providing a public education in one of three ways: operating a public school, contracting with a public or approved private school for schooling privileges, or paying tuition to

the public or approved private school of the parent's choice.  20-A M.R.S. §§ 1001(8), 5204(4).

There is no dispute that students who receive a public education from a public secondary school

receive a non-sectarian education, and that if plaintiffs resided in an SAU that operated a public

high school they would not be entitled to a sectarian education at public expense.  Nor is there

any dispute that students who receive a public education pursuant to a contract between their

SAU and a public or approved private school receive a non-sectarian education, and that if

plaintiffs resided in an SAU that had a contract for secondary school privileges they would not

be entitled to a sectarian education at public expense.  With respect to the third option, Maine's

Law Court has explained:

> The Legislature endeavors to ensure that each child will be entitled to an
> *opportunity* to receive a free public education, not to guarantee children a free
> education at any public or private school of their choice.  Within the statutory
> scheme, section 5204(4)'s function is limited to authorizing the provision of
> tuition subsidies to the parents of children who live within school administrative
> units that simply do not have the resources to operate a public school system, and
> whose children would otherwise not be given an opportunity to receive a free
> public education.

*Hallissey v. Sch. Admin. Dist. No. 77*, 2000 ME 143, 755 A.2d 1068, 1073 (Me. 2000) (emphasis

in original).  Thus, the tuition program is simply a vehicle for students in this third category to

receive a free, public education that is consistent with, and no broader than, the benefit provided

by the first two options.

No case has ever held, or even suggested, that a state's decision to define a public

education to mean a secular education raises any constitutional concerns.  This is unsurprising

given the considerable state interest in public education as well as the primary role of the state in

this area.  *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) ("providing public schools ranks at the

very apex of the function of a State"); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 39

(1973) (with respect to public education, a state's efforts "shall be scrutinized under judicial

principles sensitive to the nature of the State's efforts and to the rights reserved to the States under the Constitution"). A free, public education has long been equated with a secular instruction. *See West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) ("Free public education, if faithful to the ideal of secular instruction . . . will not be partisan or enemy of any . . . creed").

With the public benefit clearly defined, the holes in the plaintiffs' free exercise claim become readily apparent. The plaintiffs are not seeking to participate in an "otherwise available benefit program." They are seeking a different public benefit: publicly funded sectarian education. Unlike Trinity Lutheran Church, which wanted to obtain public funds for the same type of safety upgrade for its playground surface as the non-church applicants, these plaintiffs are looking for public funds for a completely different purpose: a pervasively sectarian education as opposed to a public education. The sectarian schools are not seeking to provide the secular educational that the tuition program makes available with public funds. They are committed to providing an education program with objectives that include: teaching students to be good Christians, promoting Christian values, and developing Christian leadership. JSF, ¶ 95. This includes teaching children that the Bible is the word of God, that it is infallible, and that it should be obeyed in every aspect of life. ¶ 169.

> **B. Plaintiffs are not being denied participation in the tuition program because of who they are, but because of what they seek to do with the public funds.**

Plaintiffs are not being asked to disavow their religious character in order to receive the public benefit of a secular education. Plaintiffs have unfettered access to the tuition program so long as they choose a public or non-sectarian private school. The plaintiffs freely acknowledge that their religion does not require them to reject non-sectarian schools. ¶¶ 36-37, 51-52, 60. Like Mr. Davey, plaintiffs are not being denied the ability to use public funds because of who

they are, they are being denied the ability to use public funds because of what they would like to do:  use public funds to purchase a sectarian education for their children.

Nor are the sectarian schools being denied participation in the tuition program because they are operated by churches.  Unlike Trinity Lutheran Church, which intended to use the public money for the same secular purpose as the non-church applicants, this case seeks to compel Maine to fund explicitly religious activity.  This distinguishes *Trinity Lutheran,* and places the case firmly in the wake of *Locke v. Davey*.  For example, in *Freedom From Religion Found. v. Morris Cty. Bd. of Chosen Freeholders*, 181 A.3d 992 (N.J. 2018), *cert. denied*, 139 S. Ct. 909 (2019), the Supreme Court recently let stand the New Jersey's Supreme Court's conclusion that a state program that awarded public funds for the repair of churches violated a provision in the state's constitution declaring that no person could be obliged to pay taxes for the building or repairing of churches.  *Id*. at 1006.  The New Jersey Court had to consider whether the constitutional provision itself violated the Free Exercise Clause in light of *Trinity Lutheran*.  *Id*.  The court noted a critical distinction -- while the program at issue in *Trinity Lutheran* provided funds for the "non-religious" use of playground resurfacing, *id*. at 1010, the New Jersey program "actually went toward 'religious uses.'"  *Id*. at 1009.  Specifically, the funds would allow the churches to continue holding worship services and conducting other religious activities.  *Id*. at 1010.  The court noted that *Trinity Lutheran* did not address whether its holding – that an otherwise qualified religious entity cannot be denied public funds solely because of its religious character – "extends to religious uses of funding."  *Id*. at 1008.  The court found that *Locke* was the more relevant case, where the Supreme Court had held that public funds could be denied if they would be used for the religious purpose of preparing for the ministry.  *Id*. at 1010.  The New Jersey court stated: "The same construct applies here: the Churches are not

being denied grant funds because they are religious institutions; they are being denied public funds because of what they plan to do . . . use public funds to repair church buildings so that religious worship services can be held there." *Id.* In light of *Locke*, and because "[t]he holding of *Trinity Lutheran* does not encompass the direct use of taxpayer funds to repair churches and thereby sustain religious worship activities," the court held that the constitutional provision prohibiting the use of public funds to build or repair churches did not violate the Free Exercise Clause. *Id.* at 1012.

The *Locke* construct applies here just as it did to the New Jersey ban on the use of public funds to repair churches. Sectarian schools are denied funds not because of who they are but because of what they would do with the money – use it to further the religious purpose of proselytization. BCS' mission "is to assist families in educating the whole child by encouraging spiritual maturity and academic excellence in a supportive environment" and the Bible is BCS' "final authority in all matters." ¶ 85. BCS teaches students they should spread Christianity in the world. ¶ 104. TA's mission is "to know the Lord Jesus Christ and to make Him known through accredited academic excellence and programs presented through [TA's] thoroughly Christian Biblical world view." ¶ 143. It seeks "to lead every student to a personal, saving knowledge of Christ." ¶ 147. Among TA's objectives are to: 1) "foster within each student an attitude of love and reverence of the Bible as the infallible, inerrant, and authoritative Word of God;" 2) "teach the fundamental doctrines of the historic Christian faith;" 3) "develop within each student a biblically-based morality;" and 4) "aid families in making their homes Christ-centered." ¶ 145. TA strives to "mold" students to be "Christlike." ¶ 173. TA teaches students that they should attempt to spread the word of Christianity. ¶ 171.

Finally, as in *Locke,* Maine's education system *writ* large demonstrates no hostility to religion or sectarian schools. Attendance at sectarian schools is recognized as an alternative to attending a public school for purposes of compulsory attendance. 20-A M.R.S. § 5001-A (3)(A)(1)(a), (b). Some sectarian schools, such as BCS, elect to provide information to the State so as to be "approved" for purposes of the compulsory attendance law, while other sectarian schools, such as TA, can choose to provide virtually no information at all yet still be "recognized" by the State as providing equivalent instruction. *Id.* In sum, Maine "has merely chosen not to fund a distinct category of instruction" as part of its program of free, public education – sectarian instruction. *Locke*, 540 U.S. at 721.

## IV. Maine's tuition program does not violate the Equal Protection Clause.

As explained in the free exercise discussion above, the resolution of the equal protection claim hinges on correctly identifying the governmental program or benefit that plaintiffs are claiming is being administered in a discriminatory manner. The benefit is access to a public, secular education, not an education of the parent's choosing. *Hallissey,* 2000 ME at ¶ 16, 755 A.2d at 1073.

Plaintiffs are not being treated differently than other families because they are religious, or because they would prefer a sectarian education to a non-sectarian one for their children. Their children have the same right to a free, public education as any other child who resides in their respective towns. All parents have the same options available to them for obtaining a public education, and conversely, no family in their respective towns, whether they identify as religious or not, or whether they would like to send their children to a sectarian school or not, has the opportunity to obtain a sectarian education at public expense. Simply put, every family has

the same choice:  obtain a secular education for their children at public expense or obtain a sectarian education for their children at private expense.

Moreover, as explained by the Supreme Court in *Locke* and the Court of Appeals in *Eulitt*, the conclusion that the tuition program does not violate the Free Exercise Clause effectively forecloses any religious discrimination claim and leaves the statute subject to rational basis review.   Copies of the official Legislative Record quoted in the Joint Stipulated Facts and attached thereto as Exhibit 2 provide insight into the specific rationales of the Legislature in deciding to retain Section 2951(2), each of which provides a rational policy basis for the decision:

- It is the sovereign prerogative of the people of the State of Maine to determine how public funds can and should be used in supporting public education for the children of this state. JSF, ¶ 193.

- Maine has a high performing system of public education, and there is no need to add to or change it.  JE 2 at 34.

- Bringing all of our children together, no matter what their religious affiliation or background, promotes democracy, tolerance, and what is best in all of us. ¶ 201.

- A publicly funded education system works best when the education is one of diversity and assimilation, religiously neutral, and not a "separate and sectarian" one. ¶¶ 196, 201.

- The government has an important oversight role with respect to what is taught in schools but cannot, and should not, oversee the religious components of any school.  Because of that, public funds should not pay for an education over which the state cannot have oversight. ¶¶ 194, 201.

- Religious schools can, and reserve the right to, discriminate in favor of those of their own religion and the state should not fund discrimination. ¶¶ 193-94.

Section 2951(2) does not violate the Equal Protection Clause.

### V.    Plaintiffs' remaining claims are without merit.

Finally, plaintiffs raise three additional claims that have nothing to do with the *Trinity Lutheran* decision and require only brief mention.  As the First Circuit found in *Eulitt*, the Maine

tuition program does not implicate the free speech provision of the First Amendment at all, as it is not providing a forum to encourage diverse views from private speakers, it is ensuring the provision of a secular public education from speakers who are willing to deliver it through compliance with Section 2951. *Eulitt*, 386 F.3d at 356. The *Eulitt* Court also rejected the notion that a fundamental right was implicated by the tuition program, thus foreclosing the plaintiffs' due process claim. "The fact that the state cannot interfere with a parent's fundamental right to choose religious education for his or her child does not mean that the state must fund that choice." *Id.* at 354 (citing *Maher v. Roe*, 432 U.S. 464, 475-77 (1977)) (fundamental right to abortion does not equate to a right to a state-financed abortion). Lastly, the plaintiffs' inclusion of a count alleging a violation of the Establishment Clause is completely baseless. No court has ever suggested that a state's decision to have a religiously neutral public education system implicates the Establishment Clause.

## CONCLUSION

For all the above reasons and based on the undisputed facts, defendant respectfully requests that summary judgment be entered in her favor on all counts.

DATED:  April 5, 2019                        A. PENDER MAKIN
                                             By her attorneys:

                                             AARON M. FREY
                                             Attorney General

                                             /s/Sarah A. Forster
                                             SARAH A. FORSTER
                                             CHRISTOPHER C. TAUB
                                             Assistant Attorneys General
                                             Office of the Attorney General
                                             Six State House Station
                                             Augusta, Maine  04333-0006
                                             Tel.  (207) 626-8866
                                             sarah.forster@maine.gov
                                             christopher.c.taub@maine.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 5th day of April 2019, I electronically filed the above

document with the Clerk of Court using the CM/ECF system which will send notification of such

filing to the following:

BENJAMIN BULL
bbull@firstliberty.org

JEFFREY T. EDWARDS
jedwards@preti.com

TIMOTHY D. KELLER
tkeller@ij.org

ARIF PANJU
apanju@ij.org

LEA PATTERSON
lepatterson@firstliberty.org

JONATHAN R. WHITEHEAD
jon@whiteheadlawllc.com

MICHAEL K. WHITEHEAD
mike@thewhiteheadfirm.com

To my knowledge, there are no non-registered parties or attorneys participating in this case.


Dated:  April 5, 2019                              /s/ Sarah A. Forster
                                                   SARAH A. FORSTER
                                                   Assistant Attorney General
                                                   Office of the Attorney General
                                                   6 State House Station
                                                   Augusta, ME 04333-0006
                                                   Tel. (207) 626-8866
                                                   sarah.forster@maine.gov