UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DAVID CARSON, et al.,                )
                                     )
            Plaintiffs,              )
                                     )
            v.                       )
                                     )
A. PENDER MAKIN,                     )        Civil Action 1:18-cv-00327-DBH
                                     )
            Defendant.               )
                                     )


**BRIEF OF *AMICI CURIAE* SUSAN MARCUS, JAMES TORBERT, THETA TORBERT, AMERICAN CIVIL LIBERTIES UNION OF MAINE FOUNDATION, AMERICAN CIVIL LIBERTIES UNION, AND AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE IN SUPPORT OF DEFENDANT**

Zachary L. Heiden
Emma E. Bond
American Civil Liberties
Union of Maine Foundation
121 Middle Street, Suite
200
Portland, Maine 04101
(207) 619-6224
(207) 619-8687
*zheiden@aclumaine.org*
*ebond@aclumaine.org*

Daniel Mach*
Heather L. Weaver*
ACLU Program on Freedom
of Religion and Belief
915 15th Street, NW, Suite
600
Washington, D.C. 20005
(202) 675-2314
*dmach@aclu.org*
*hweaver@aclu.org*

Richard B. Katskee*
Alex J. Luchenitser*
Sarah Goetz*
Americans United for the
Separation of Church and
State
1310 L Street NW, Suite
200
Washington, D.C. 20005
(202) 466-7306
*katskee@au.org*
*luchenitser@au.org*
*goetz@au.org*

* appearing pro hac vice

### Corporate Disclosure Statement

In accordance with Local Rule 7.1, *amici*, American Civil Liberties Union of Maine Foundation, American Civil Liberties Union, and Americans United for Separation of Church and State, state that they are not publicly held corporations, do not issue stock, do not have any entity owning an interest in them of 10% or more, and do not have parent corporations.

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES .................................................................................................... ii

STATEMENT OF INTEREST ................................................................................................. 1

INTRODUCTION ..................................................................................................................... 2

I. THE SUPREME COURT HAS ALREADY REJECTED THE ARGUMENTS PLAINTIFFS MAKE HERE ........................................................................................................................... 3

    A. A State's Decision to Respect Anti-Establishment Interests by Not Funding Religious Education and Training Does Not Violate the Free Exercise Clause ................................. 4

    B. A State's Choice Not to Fund Religious Education and Training Does Not Violate the Free Speech Clause or the Equal Protection Clause .................................................................... 7

II. *LOCKE* CONTROLS THIS CASE, NOT THE SUPREME COURT'S RULING IN *TRINITY LUTHERAN* ............................................................................................................................ 8

III. THE FIRST CIRCUIT'S RULING IN *EULITT* FAITHFULLY AND CORRECTLY APPLIED *LOCKE* TO UPHOLD MAINE'S TUITIONING STATUTE, AND REMAINS GOOD LAW ............................................................................................................................ 13

IV. MAINE HAS STRONG STATE INTERESTS IN DECLINING TO FUND RELIGIOUS EDUCATION AND TRAINING ........................................................................................... 16

    A. States Have Longstanding Antiestablishment Interests .................................................... 16

    B. Maine's Choice Not to Fund Religious Education and Training Is Also Supported By Its Interest in Protecting Access to Publicly Funded Schools and Preventing State Financial Support for Discriminatory Practices. .............................................................................. 19

CONCLUSION ....................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

*Cases*

*Ams. United for Separation of Church & State v. Prison Fellowship Ministries*, 509 F.3d 406 (8th Cir. 2007).20

*Anderson v. Town of Durham*, 895 A.2d 944 (Me. 2006) ..........................................................2

*Anderson v. Town of Durham*, No. CIV.A. CV-02-480, 2003 WL 21386768 (Me. Super. May 14, 2003)..................................................................................................................................2

*Bagley v. Raymond Sch. Dep't*, 728 A.2d 127 (Me. 1999)..............................………2, 7

*Bowman v. United States*, 564 F.3d 765, 775 (6th Cir. 2008) ..................................................12

*Brusca v. State Bd. of Educ.*, 405 U.S. 1050 (1972)..................................................................12

*Bush v. Holmes*, 886 So. 2d 340 (Fla. Dist. Ct. App. 2004) ....................................................12

*Caplan v. Town of Acton*, 92 N.E.3d 691, 704 (Mass. 2018) ..................................................12

*Chittenden Town School District v. Department of Education*, 738 A.2d 539 (Vt. 1999) .......17

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) ......................5, 9, 10, 11

*Doe v. Regional Sch. Unit 26*, 2014 ME 11, 86 A.3d 600......................................................20

*Espinoza v. Mont. Dep't of Revenue*, 435 P.3d 603 (Mont. 2018) ...........................................20

*Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004)....................*passim*

*Eulitt v. Maine Dep't of Educ.*, 307 F. Supp. 2d 158 (D. Me. 2004)..........................................2

*Everson v. Bd. of Educ.*, 330 U.S. 1 (1947) ...............................................................................9

*Freedom From Religion Found. v. Morris Cty. Bd. of Chosen Freeholders*, 181 A.3d 992 (N.J. 2018) ...................................................................................................................................9

*Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15 (1st Cir. 2004)................................................12

*Harvest Family Church v. Fed. Emerg. Mgmt. Agency*, No. CV H-17-2662, 2017 WL 6060107 (S.D. Tex. Dec. 7, 2017) ...........................................................................................12

*Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136 (1987) ...........................................5

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ...............................................................................20

*Locke v. Davey*, 540 U.S. 712 (2004) ...............................................................*passim*

*Marks v. United States*, 430 U.S. 188 (1977) ..........................................11

*McDaniel v. Paty,* 435 U.S. 618 (1978).......................................................5, 10, 11

*Norwood v. Harrison*, 413 U.S. 455, 462 (1973) ...........................................11, 20

*Reynolds v. United States*, 98 U.S. 145 (1878).............................................16

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477 (1989) ......................8

*Sherbert v. Verner*, 374 U.S. 398 (1963) .................................................5

*Sloan v. Lemon*, 413 U.S. 825 (1973) ......................................................12

*Strout v. Albanese*, 178 F.3d 57 (1st Cir. 1999).........................................*passim*

*Swart v. S. Burlington Twn. Sch. Dist.,* 167 A.2d 514 (Vt. 1961) ...........................7

*Teen Ranch, Inc. v. Udow*, 479 F.3d 403 (6th Cir. 2007) ....................................12

*Thomas v. Review Bd.*, 450 U.S. 707 (1981) ...............................................5

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017)...............*passim*

*Zelman v. Simmons-Harris,* 536 U.S. 639 (2002).........................................2, 13, 22

**Statutes and Constitutional Provisions**

20-A M.R.S. § 2951(2) ......................................................................2

5 M.R.S. § 4552 ...........................................................................20

5 M.R.S. § 4553(2-A) .......................................................................20

5 M.R.S. §  4601 ..........................................................................20

5 M.R.S. § 4602 ...........................................................................20

Vt. Const. Ch. I, Art. 3 (1793) ........................................................7, 17

**Other Authorities**

Complaint, *Davey v. Locke*, No. C00-61R, 2000 WL 35505408 (Oct. 5, 2000).......................7

2 T. Cooley, *Constitutional Limitations* 966-67 (8th ed. 1927) ...............................18

Patrick Henry, *A Bill Establishing A Provision for Teachers of the Christian Religion* (1784), http://bit.ly/2ssSCRw ................................................................................................16

Douglas Laycock, *"Nonpreferential" Aid to Religion: A False Claim About Original Intent*, 27 Wm. & Mary L. Rev. 875, 923 (1986) ..............................................................................16

James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785), http://bit.ly/2pPvjz5 ...............................................................................................17

Op. Me. Att'y Gen. 80-2 ..........................................................................................7

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| DAVID CARSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| A. PENDER MAKIN, | ) | Civil Action 1:18-cv-00327-DBH |
| | ) | |
| Defendant. | ) | |

**BRIEF OF *AMICI CURIAE* SUSAN MARCUS, JAMES TORBERT, THETA TORBERT, AMERICAN CIVIL LIBERTIES UNION OF MAINE FOUNDATION, AMERICAN CIVIL LIBERTIES UNION, AND AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE IN SUPPORT OF DEFENDANT**

## STATEMENT OF INTEREST

Susan Marcus, James Torbert, and Theta Torbert are taxpayers residing in communities served by Regional School Unit 12. They oppose the use of their tax dollars for quintessential religious activity, such as teaching religious doctrine and training children in religious observance. James and Theta Torbert are retired public schoolteachers who remain committed to the success of Maine's public schools, which serve all children, regardless of race, sex, sexual orientation, physical or mental disability, or national origin. Susan Marcus is an active advocate in her community for civil liberties, including taxpayers' right to be free from coerced financial support for religion.

The American Civil Liberties Union of Maine Foundation and the American Civil Liberties Union have long worked on their members' behalf in Maine's legislature and courts to oppose public funding of religious education, including in the four previous lawsuits challenging the statute at issue in this case. The primary interest of the ACLU and the ACLU of Maine is to preserve, protect, and vigorously enforce the fundamental principles in the Bill of Rights.

1

Americans United for Separation of Church and State works to ensure that government does not interfere with citizens' personal decisions about what to believe and how to practice their faith, and that discrimination is not sanctioned on religious grounds.[1]

## INTRODUCTION

Maine has consistently, despite years of litigation, decided to fund secular elementary and secondary education but not to fund religious education. Plaintiffs have challenged the constitutionality of this decision, codified in statute at 20-A M.R.S. § 2951(2).[2] Their challenge is not novel. The constitutionality of this statute has previously been contested four times—by counsel for plaintiffs and by others. In each instance, the law has been held to be constitutional, including by this Court,[3] the U.S. Court of Appeals for the First Circuit,[4] the Maine Superior Court,[5] and the Maine Supreme Judicial Court.[6] Nothing about this statute, or the operation of Maine's school-tuition program, has changed since those rulings.

The question presented by this case is not whether Maine would have violated the Establishment Clause if it had decided instead to provide for tuition payments to religious schools

---

[1] Pursuant to this Court's December 6, 2018 order, the above-listed amici curiae offer this brief with the hope that it will assist the Court in deciding this case. Decision and Order on Motion to Intervene at 4, ECF No. 19 (Dec. 6, 2018).

[2] After *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), a bill was introduced in the Maine legislature that would have amended section 2951 to provide for tuition payments to elementary and secondary religious schools, but that bill was defeated. Stipulated Facts ¶¶ 189, 202, ECF No. 25 (Mar. 15, 2019).

[3] *Eulitt v. Maine Dep't of Educ.*, 307 F. Supp. 2d 158 (D. Me. 2004).

[4] *Eulitt ex rel. Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004); *Strout v. Albanese*, 178 F.3d 57 (1st Cir. 1999).

[5] *Anderson v. Town of Durham*, No. CIV.A. CV-02-480, 2003 WL 21386768 (Me. Super. May 14, 2003).

[6] *Anderson v. Town of Durham*, 895 A.2d 944 (Me. 2006), *cert. denied*, 549 U.S. 1051 (2006); *Bagley v. Raymond Sch. Dep't*, 728 A.2d 127 (Me. 1999).

on the same terms as to secular schools. Rather, the question here is whether—despite the State's legitimate anti-establishment interests—Maine is obligated to fund religious education because it funds secular education. In other words, the question is whether the U.S. Constitution imposes *an affirmative requirement* that Maine make tuition payments to religious elementary and secondary schools to fund education and training in religious practice and religious doctrine when the state makes tuition payments to secular elementary and secondary schools.

The answer to that question is no. In Part I below, we show that the Supreme Court rejected an analogous argument in *Locke v. Davey*, 540 U.S. 712 (2004). In Part II below, we explain why— contrary to Plaintiffs' interpretation—the Supreme Court's decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), had no effect on *Locke*'s reasoning or outcome, and we establish that *Locke* remains controlling law when it comes to state funding of religious education and training. In Part III below, we demonstrate that the U.S. Court of Appeals for the First Circuit, in previously upholding the Maine tuition law in *Eulitt ex rel. Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004), faithfully and correctly applied *Locke's* reasoning, and that its ruling (like *Locke*) remains good law that this Court should follow. Finally, in Part IV below, we elaborate on the compelling state interests supporting Maine's tuition payment law, which provide further reason for this Court to reach the same ruling as the First Circuit in *Eulitt* and the Supreme Court in *Locke*.

## I.    THE SUPREME COURT HAS ALREADY REJECTED THE ARGUMENTS PLAINTIFFS MAKE HERE.

*Locke* decided a First Amendment and Equal Protection Clause challenge to the "Promise Scholarship Program" established by the State of Washington "to assist academically gifted students with postsecondary education expenses." 540 U.S. at 715. The program provided scholarships to "high-achieving students" pursuing a college degree who met a statutorily

prescribed means test, *id.* at 715-16, with the limitation that, "[i]n accordance with [Washington's] Constitution, students may not use the scholarship at an institution where they are pursuing a degree in devotional theology," *id.* at 715. Although the Ninth Circuit held that Washington's determination not to fund the pursuit of a devotional-theology degree "singled out religion for unfavorable treatment" in violation of the Free Exercise Clause, *id.* at 718 (citation omitted), the Supreme Court disagreed and reversed. In so holding, the Court rejected each of the arguments made by Plaintiffs here.

A.   **A State's Decision to Respect Anti-Establishment Interests by Not Funding Religious Education and Training Does Not Violate the Free Exercise Clause.**

Whatever tension may exist between the Free Exercise Clause and the Establishment Clause, the Supreme Court has "long said that there is room for play in the joints between them." *Id.* at 718 (internal quotation marks and citation omitted). As then-Chief Justice William Rehnquist explained in setting the framework for the Court's analysis in *Locke*, this means that "some state actions [are] permitted by the Establishment Clause but not required by the Free Exercise Clause." *Id.* at 719.

Thus, Washington could have chosen, consistent with the Establishment Clause, to allow recipients of Promise Scholars funding to pursue religious education and training to become clergy members. *Id.* at 719. But that was not the question before the Court. *Id.* Rather, the Court was tasked with deciding whether Washington could make the opposite choice—the choice "not to fund" (even indirectly) "religious instruction that will prepare students for the ministry"—without running afoul of the Free Exercise Clause. *Id.* at 720-21.

It could: The Court held that Washington's "cho[ice] not to fund" was entirely permissible. *Id.* at 721. In reaching this conclusion, the Court flatly rejected Davey's argument that, "under the rule . . . enunciated in *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, [508 U.S. 520 (1993)], the

4

[Washington] [P]rogram is presumptively unconstitutional because it is not facially neutral with respect to religion." *Locke*, 540 U.S. at 720. This argument, the Court concluded, "would extend the *Lukumi* line of cases well beyond not only their facts but their reasoning." *Id.* at 720.

In *Lukumi*, the city of Hialeah enacted a law that "sought to suppress"—through criminalization—the religious practices of adherents of one particular faith (Santeria). *Id.* (citing *Lukumi*, 508 U.S. at 535). In *Locke*, by contrast, "the State's disfavor of religion (if it can be called that) [was] of a far milder kind." *Id.* Washington had done nothing like (1) "impos[ing] . . . criminal [or] civil sanctions on any type of religious service or rite," as in *Lukumi*; (2) "deny[ing] to ministers the right to participate in the political affairs of the community," as in *McDaniel v. Paty,* 435 U.S. 618 (1978); or (3) "requir[ing] [religious adherents] to choose between their religious beliefs and receiving a government benefit," as in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Sherbert*'s progeny. *Locke*, 540 U.S. at 720-21 (other citations omitted).[7]

Instead, Washington "ha[d] *merely chosen not to fund a distinct category of instruction*"— religious instruction. 540 U.S. at 721 (emphasis added). And, unlike the strong state actions disfavoring religion that were condemned in *Lukumi*, *McDaniel*, and *Sherbert*, et al., the Court determined that the choice not to fund religious education and training placed a relatively minor burden on religious adherents and is *not* presumptively unconstitutional. *See Locke*, 540 U.S. at 725.

---

[7] In *Sherbert*, the State of South Carolina denied unemployment-compensation benefits to a Seventh-day Adventist who was discharged for refusing to work on her Sabbath, and that denial was found to violate the Free Exercise Clause.  374 U.S. at 399-401. The two other cases cited by the *Locke* Court—*Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136 (1987), and *Thomas v. Review Bd.*, 450 U.S. 707 (1981)—also involved the denial of unemployment-compensation benefits to religious adherents, and were decided the same way on *Sherbert*'s authority.

In declining to adopt Davey's "presumptive unconstitutionality" standard, the Court also took issue with Justice Scalia's dissenting argument that, "[b]ecause the Promise Scholarship Program funds training for all secular professions[,] . . . the State must also fund training for religious professions." *Id.* at 721 (citing *id.* at 727, Scalia, J., dissenting). The fatal flaw in Justice Scalia's reasoning, the Court said, was that "training for religious professions and training for secular professions are not fungible." *Id.*

> Training someone to lead a congregation is an essentially religious endeavor. . . . And the subject of religion is one in which both the United States and state constitutions embody distinct views—in favor of free exercise, but opposed to establishment—that find no counterpart with respect to other callings or professions. *That a State would deal differently with religious education for the ministry than with education for other callings is a product of these views, not evidence of hostility towards religion.*

*Id.* (emphasis added).

In this regard, the Court observed, the "antiestablishment interests" supporting Washington's determination to "draw[] a more stringent line [of separation between church and state] than that drawn by the United States Constitution" are "scarcely novel." *Id.* at 722. Indeed, as the Court noted, "[s]ince the founding of our country, there have been popular uprisings against procuring taxpayer funds to support church leaders, which was one of the hallmarks of an 'established' religion." *Id.* at 722 & n.6 (pointing to the "public backlash" and defeat of a Virginia bill to fund "Teachers of the Christian Religion" and the enactment instead of the Virginia Bill for Religious Liberty, which prohibited compelled support for "any religious worship, place, or ministry whatsoever").

Moreover, many States—including Vermont, whose school financing system was a model for Maine's[8]—"sought to avoid an establishment of religion around the time of the founding" by "plac[ing] in their constitutions formal prohibitions against using tax funds to support the ministry." *Id.* at 723 (citing, e.g., Vt. Const. Ch. I, Art. 3 (1793)). These protections do not evince any "animus towards religion." *See id.* at 723-25. Rather, they speak to the states' "historic and substantial" antiestablishment interests. *Id.* As the Supreme Court has recognized, "religious instruction is of a different ilk" than other forms of educational or professional instruction and training, *id.*, and a State's determination not to fund "religious instruction alone" is constitutional under the Free Exercise Clause. *Id.* at 725.

**B.    A State's Choice Not to Fund Religious Education and Training Does Not Violate the Free Speech Clause or the Equal Protection Clause.**

In addition to his free-exercise claim, Davey, as have the Plaintiffs here, brought claims under the Free Speech and Equal Protection Clauses. *See id.* at 718; *see also* Complaint ¶¶ 75-92, *Davey v. Locke*, No. C00-61R, 2000 WL 35505408 (Oct. 5, 2000). The Court ruled that both claims were without merit.

In this context, a valid free-speech claim does not arise, because educational funding programs like the one in *Locke* do not qualify as forums for speech. *See id.* at 720 n.3. The purpose of the Promise Scholarship Program, for example, was "to assist students from low- and middle-income families with the cost of postsecondary education, not to encourage a diversity of views from private speakers." *Id.* As a result, the Court held, "[o]ur cases dealing with speech forums are simply inapplicable." *Id.* (citations omitted).

---

[8] *See, e.g.*, Op. Me. Att'y Gen. 80-2 at *13 (citing *Swart v. S. Burlington Twn. Sch. Dist.,* 167 A.2d 514 (Vt. 1961)); *Bagley*, 728 A.2d at 130-31 (citing Op. Me. Att'y Gen. 80-2).

The Court also easily dispensed with Davey's equal-protection claim: "Because we hold that the program is not a violation of the Free Exercise Clause, however, we apply rational-basis scrutiny to his equal protection claims. . . . For the reasons stated herein, the program passes such review." *Id.* (citations omitted).

## II.   *LOCKE* CONTROLS THIS CASE, NOT THE SUPREME COURT'S RULING IN *TRINITY LUTHERAN*.

Almost two years ago, the Supreme Court held in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), that the Missouri Department of Natural Resources had impermissibly discriminated against a church by denying it the opportunity to compete for a state grant designed to enable nonprofit entities to purchase rubber playground surfaces made from recycled tires. Plaintiffs and their attorneys have placed a great deal of hope on the back of that decision. But *Trinity Lutheran* did not do what Plaintiffs contend.

*Trinity Lutheran* did not overrule *Locke*. The U.S. Supreme Court does not overturn its own precedent by implication, and if the Court had meant to overrule *Locke*, it would have said so. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Instead, it said the opposite. The majority cited *Locke* approvingly (while distinguishing it from the case under consideration). *See Trinity Lutheran*, 137 S. Ct. at 2019, 2023 (citing *Locke*, 520 U.S. at 716, 720-22). Indeed, two concurring justices specifically took issue with the Court's *refusal* to overrule *Locke*. *See Trinity Lutheran*, 137 S. Ct. at 2025 (Thomas J., concurring in part, but remaining troubled by the Court's continued endorsement of *Locke*), 2026 (Gorsuch, J., concurring in part, but skeptical of whether there ought to be a constitutional distinction between refusing to fund religious entities and refusing to fund religious education). When it comes to state funding of religious education and training, then, *Locke* remains controlling.

The state program at issue in *Trinity Lutheran* did not fund religious education; it offered competitive grants to nonprofit organizations that wished to provide a more cushioned playground experience for young people in their care. 137 S. Ct. at 2017. But Missouri refused to award funding to any applicant "owned or controlled by a church, sect, or other religious entity." *Id.* Though the plaintiff in *Trinity Lutheran* was a religious entity, the Court determined that the funds would not be put to religious uses. *See id.* at 2024 n.3 (noting that this case does "not address religious uses of funding"). Rather, the Center's proposed use of the funds was aimed at, among other ends, increasing access to the playground for all children, including those with disabilities and neighborhood children who "often use[d] the playground during non-school hours"; providing a surface compliant with the Americans with Disabilities Act of 1990; providing a safe, long-lasting, and resilient surface under the play areas; and improving Missouri's environment by putting recycled tires to positive use. *Id.* at 2018. Although the Missouri State Department of Resources scored the Center's application fifth out of forty-four, it denied the grant award, deeming the Center "categorically ineligible" based on a "strict and express policy of denying grants to any applicant owned or controlled by a church, sect, or other religious entity." *Id.* at 2017. Trinity Lutheran sued the Department, alleging that its free-exercise rights had been violated. *Id.* at 2018.

In holding for the church, the Supreme Court explained that the Free Exercise Clause "'protect[s] religious observers against unequal treatment'" and "subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *See id.* at 2019 (quoting *Lukumi*, 508 U.S. at 533, 542). Affirming that laws should neither exclude people "because of their faith, or lack of it, from receiving the benefits of public welfare legislation," *see id.* at 2019-20 (quoting *Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947)) (emphasis omitted), nor

"regulate or outlaw conduct because it is religiously motivated," *id.* at 2021 (citing *Lukumi*, 508 U.S. at 532), the Court analogized the case to *McDaniel*, 435 U.S. at 628, in which a Tennessee statute disqualifying ministers from serving as delegates to the state's constitutional convention was overturned. *See id.* at 2022. In *McDaniel*, according to the Court, the challenged statute discriminated "by denying [the minister] a benefit solely because of his '*status* as a minister'" and thereby "'effectively penalize[d]'" the free exercise of his religion. *Trinity Lutheran*, 137 S. Ct. at 2020 (emphasis in original) (quoting *McDaniel*, 435 U.S. at 626-27).

The Court distinguished those cases from *Locke*, emphasizing, for example, that Davey "was not denied a scholarship because of who he was; he was denied a scholarship because of what he proposed to do—use the funds to prepare for the ministry." *Id.* at 2023 (noting that, by contrast, "Trinity Lutheran was denied a grant simply because of what it is—a church"). The Court also pointed out that the Washington statute at issue in *Locke* was "in keeping with the State's antiestablishment interest in not using taxpayer funds to pay for the training of clergy." *Id.* (citing *Locke*, 540 U.S. at 722). While the plaintiff in *Locke* had been seeking to use government funds for this "essentially religious endeavor"—opposition to which "lay at the historic core of the Religion Clauses"—"nothing of the sort [could] be said about a program to use recycled tires to resurface playgrounds." *Trinity Lutheran*, 137 S. Ct. at 2023 (citing *Locke*, 540 U.S. at 721-22).

*Trinity Lutheran* also reaffirmed *Locke*'s ruling that "there is 'play in the joints' between what the Establishment Clause permits and the Free Exercise Clause compels." *Id.* at 2019 (quoting *Locke*, 540 U.S. at 718). The Court thus left undisturbed *Locke*'s holding that states can constitutionally restrict public funding of religious activity to a greater extent than the federal Establishment Clause does. *See Locke*, 540 U.S. at 719, 725. Recognizing the differences between the case before it and *Locke*, the *Trinity Lutheran* Court strictly limited the scope of its holding:

10

"This case involves express discrimination based on religious identity with respect to playground resurfacing. We do not address religious uses of funding or other forms of discrimination." *Trinity Lutheran*, 137 S. Ct. at 2024 n.3.[9]

*Trinity Lutheran* and *Locke*, then, concern different scenarios that are subject to correspondingly different levels of judicial scrutiny. On the one hand are programs such as the one at issue in *Trinity Lutheran*, which categorically exclude churches *qua* churches, promote public safety, do not support "essentially religious endeavors" like the religious education of students, and therefore do not implicate state antiestablishment interests. As *Trinity Lutheran* explains, such programs—like other laws that expressly discriminate among people on the basis of religious status, and laws that target particular religious beliefs—are subject to the "strictest scrutiny." *Id.* at 2019; *see also, e.g.*, *Lukumi*, 508 U.S. at 533; *McDaniel*, 435 U.S. at 626, 628.

On the other hand are programs like the one in *Locke*, in which eligibility for funding is limited not on the basis of status but based on the use to which the money is put, and where the proposed use—religious education and training—is an "essentially religious endeavor" that must be supported solely with private funds to vindicate traditional state antiestablishment interests. *Locke*, 540 U.S. at 721. Indeed, the rule that a state's decision to fund secular education does not require the state to fund religious education was adopted by the Supreme Court long before *Locke*. *See Norwood v. Harrison*, 413 U.S. 455, 462, 469 (1973) (rejecting "any supposed right of private

---

[9] Though this footnote was joined by only four Justices, it is controlling because it set forth narrower grounds for the judgment than did the two Justices who joined the body of the majority opinion but not the footnote. *See Trinity Lutheran*, 137 S. Ct. at 2025-26 (concurring opinions of Thomas, J., and Gorsuch, J.); *Marks v. United States*, 430 U.S. 188, 193 (1977) (stating that, in fragmented decisions, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds"). In addition, Justice Breyer, who did not join any of the majority opinion, wrote a concurrence expressing views similar to those in the footnote. *See Trinity Lutheran*, 137 S. Ct. at 2026-27 (Breyer, J., concurring).

or parochial schools to share with public schools in state largesse, on an equal basis or otherwise," and refuting the proposition "that a State is constitutionally obligated to provide even 'neutral' services to sectarian schools"); *Sloan v. Lemon*, 413 U.S. 825, 834-35 (1973) (holding that "valid aid to nonpublic, nonsectarian schools [provides] no lever for aid to their sectarian counterparts"); *accord Brusca v. State Bd. of Educ.*, 405 U.S. 1050 (1972), *aff'g mem.*, 332 F. Supp. 275 (E.D. Mo. 1971).

In addition to *Eulitt*, which we discuss at length in Section III below, numerous post-*Locke* federal and state appellate decisions have recognized the same principle. *See, e.g., Teen Ranch, Inc. v. Udow*, 479 F.3d 403, 409-10 (6th Cir. 2007) (rejecting arguments that state was constitutionally required to fund religious programming in childcare services); *Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 21 (1st Cir. 2004) (stating "the mere non-funding of private secular and religious school programs does not 'burden' a person's religion or the free exercise thereof"); *Bush v. Holmes*, 886 So. 2d 340, 343-44, 357-66 (Fla. Dist. Ct. App. 2004) (rejecting arguments that U.S. Constitution required state to fund religious education equally with secular education), *aff'd on other grounds*, 919 So. 2d 392 (Fla. 2006); *see also Bowman v. United States*, 564 F.3d 765, 775 (6th Cir. 2008) (upholding a federal regulation that provided former military service-members with credit toward retirement for secular but not religious public-service work).

Indeed, a good number of post-*Trinity Lutheran* decisions recognize that governmental bodies continue to retain the right to deny funding to religious institutions when the funds would go to religious uses. *See Caplan v. Town of Acton*, 92 N.E.3d 691, 704, 711 (Mass. 2018) (plurality opinion) (holding that application of state constitution to enjoin state from funding restoration of church's stained-glass windows did not violate federal Free Exercise Clause); *accord id.* at 717-18 (Kafker, J., concurring); *Espinoza v. Mont. Dep't of Revenue*, 435 P.3d 603 ¶ 40 (Mont. 2018)

(holding that application of state constitution to strike down tax-credit program that principally funded religious education did not violate federal Free Exercise Clause), *petition for cert. docketed*, No. 18-1195 (Mar. 14, 2019); *Freedom From Religion Found. v. Morris Cty. Bd. of Chosen Freeholders*, 181 A.3d 992, 1010 (N.J. 2018) (holding that application of state constitution to bar county from funding repairs to churches that would support religious functions or imagery did not violate federal Free Exercise Clause), *cert. denied,* 139 S. Ct. 909 (2019); *see also Harvest Family Church v. Fed. Emerg. Mgmt. Agency*, No. CV H-17-2662, 2017 WL 6060107, at *4 (S.D. Tex. Dec. 7, 2017) (holding that federal policy that prohibited disaster-relief funding from being paid to repair facilities used for religious activities did not violate Free Exercise Clause), *vacated as moot,* No. 17-20768, 2018 WL 386192 (5th Cir. Jan. 10, 2018).

## III.   THE FIRST CIRCUIT'S RULING IN *EULITT* FAITHFULLY AND CORRECTLY APPLIED *LOCKE* TO UPHOLD MAINE'S TUITIONING STATUTE, AND REMAINS GOOD LAW.

The First Circuit has previously applied the Supreme Court's reasoning in *Locke* to Maine's school-tuitioning statute, holding that the law and resulting tuitioning program are constitutional. *See Eulitt*, 386 F.3d at 357. Because *Locke*, and not *Trinity Lutheran*, controls this case, *Eulitt* remains good law, and there is no reason for this Court to depart from it.

Like in *Locke*, the First Circuit was not presented with the question of whether Maine may fund religious education through its tuitioning statute without violating the Establishment Clause.[10] Rather, the question before the court was whether Maine was *constitutionally required*

---

[10] Unlike the Promise Scholarship Program in *Locke*, whether Maine could permissibly fund religious education under its school-tuitioning program remains an open question given the differences between the statutory scheme here and the voucher program upheld in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002). *See Eulitt*, 386 F.3d at 349 & n.1 ("[T]he newly emergent Supreme Court case law does not necessarily undercut the *Strout* panel's premise . . . that Maine could not extend funding to sectarian schools under its program without violating the Establishment Clause.").

to provide such funding under the Equal Protection Clause, the Free Speech Clause, and the Free Exercise Clause. And like in *Locke*, the answer was no.

As an initial matter, in *Eulitt*, the court of appeals rebuffed the plaintiffs' attempt to distinguish themselves from Davey by characterizing their objection to Maine's program in the language of equal protection rather than free exercise. *See id.* at 353-54. Pointing to the Supreme Court's conclusion in *Locke* that alleged discrimination against religious activity does not trigger heightened scrutiny under the Equal Protection Clause if it does not violate the Free Exercise Clause, the First Circuit stated that the plaintiffs' "crabbed approach will not wash." *Id.* at 353-54. "[I]f a challenged program comports with the Free Exercise Clause, that conclusion wraps up the religious discrimination analysis." *Id.* at 354 (citing *Locke*, 540 U.S. at 720 n.3).[11]

Moving on to the plaintiffs' free-exercise claim, the *Eulitt* court described as "futile" the plaintiffs' "effort to characterize Maine's decision not to deploy limited tuition dollars toward the funding of religious education as an impermissible burden on their prerogative to send their children to Catholic school[.]" *Id.* As the court noted, a previous ruling in another case already determined that Maine's tuitioning statute "imposes no substantial burden on religious beliefs or practices—and therefore does not implicate the Free Exercise Clause[.]" *Id.* (citing *Strout*, 178 F.3d at 65). This conclusion was consistent with the Supreme Court's determination in *Locke* that any burden on Davey was "mild" at most and not analogous to the types of burdens that

---

[11] Echoing the Supreme Court's holding in *Locke*, the First Circuit also rejected the *Eulitt* plaintiffs' free speech claim: "The Maine education plan deals with the provision of secular secondary educational instruction to its residents; it does not commit to providing any open forum to encourage diverse views from private speakers. Consequently, cases dealing with speech fora . . . are not relevant." 386 F.3d at 356-57 (citations omitted).

traditionally trigger free-exercise concerns. *See id.; supra* p. 5. Thus, the First Circuit held, "[t]he fact that the state cannot interfere with a parent's fundamental right to choose religious education for his or her child does not mean that the state must fund that choice." *Eulitt*, 386 F.3d at 354 (citation omitted).

Likewise, the First Circuit rejected the *Eulitt* plaintiffs' argument that "exclud[ing] sectarian institutions as potential recipients of education funds necessarily indicates an animus against religion." *Id.* at 355. Despite a previous finding in *Strout* that there was "no indication that substantial animus against religion had motivated the passage of [the] law," *id.* (citing *Strout*, 178 F.3d at 65), the court of appeals nevertheless reviewed each of "the principal factors [identified in *Locke*] to be considered in determining whether a particular law is motivated by religious animus." *Id.* First, the court acknowledged, "Maine's decision not to extend tuition funding to religious schools does not threaten any civil or criminal penalty." *Id.* Second, the law "does not in any way inhibit political participation." *Id.* Finally, the court observed, the law "does not require residents to forgo religious convictions in order to receive the benefit offered by the state—a secular education." *Id.* That secular education is offered to all who are interested, whether or not they are members of any religious community, practice any particular religion, or follow any particularly religious teachings. *See id.* ("To the extent that these factors articulate a test for smoking out an anti-religious animus, the statute here passes that test with flying colors.").

In sum, the *Eulitt* court faithfully applied the Supreme Court's reasoning in *Locke*. Maine, like Washington, "has merely chosen not to fund" religious instruction. *See Locke*, 504 U.S. at 721. As the Supreme Court held in *Locke*, that choice is entirely permissible. *See supra* pp. 4-7. Accordingly, this Court should uphold Maine's tuitioning program, just as the First Circuit did in *Eulitt*.

## IV.   MAINE HAS STRONG STATE INTERESTS IN DECLINING TO FUND RELIGIOUS EDUCATION AND TRAINING.

### A.   States Have Longstanding Antiestablishment Interests.

Maine's decision not to fund religious education and training, like Washington's, is supported by legitimate "antiestablishment interests" in "draw[ing] a more stringent line [of separation between church and state] than that drawn by the United States Constitution." *See Locke*, 540 U.S. at 722. As the Supreme Court highlighted in *Locke*, this interest dates back to the Founders. *See id.* at 722 & n.6. The Virginia Bill for Religious Liberty, for example, enacted a sweeping prohibition on the use of tax dollars to support "*any*" form of religious ministry "*whatsoever.*" *See id.* (emphasis added). And as has been widely recognized, the "antiestablishment interests" underlying this sweeping prohibition were equally broad. The Virginia bill was grounded in the philosophical view of its author, Thomas Jefferson, that respect for "the rights of conscience" in religious matters demanded a total ban on all government exactions for the benefit of religion, *see Reynolds v. United States*, 98 U.S. 145, 164 (1878), so that "[w]ith respect to money, religion would be wholly voluntary," *see* Douglas Laycock, *"Nonpreferential" Aid to Religion: A False Claim About Original Intent*, 27 Wm. & Mary L. Rev. 875, 923 (1986).

Indeed, the Virginia "Bill for Religious Liberty" was passed in response to Patrick Henry's proposed "Bill Establishing A Provision for Teachers of the Christian Religion," which would have assessed a tax to support religious education—exactly what Plaintiffs seek tax funding of here. *See Locke*, 540 U.S. at 722 n.6; Patrick Henry, *A Bill Establishing A Provision for Teachers of the Christian Religion* (1784), http://bit.ly/2ssSCRw. Moreover, James Madison's Memorial and Remonstrance Against Religious Assessments—which was instrumental in the defeat of the earlier bill, *see Everson*, 330 U.S. at 12—expressed the same broad opposition as Jefferson to

public funding of religion, opposing any effort to force a citizen to contribute even "three pence only of his property" in support of religious activity. *See* James Madison, *Memorial and Remonstrance Against Religious Assessments* ¶ 3 (1785), http://bit.ly/2pPvjz5; *see also Locke*, 540 U.S. at 722-23.

The history of the State of Vermont—whose school financing system set the model for Maine's, *see supra* p. 7 n.9—further confirms that traditional antiestablishment interests encompass efforts to ensure that religious education is supported solely by private funds. As the *Locke* Court noted, *see* 540 U.S. at 723, the Vermont Constitution includes a provision adopted in 1793 that states, in pertinent part:

> [N]o man ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of his conscience[.]

Vt. Const., ch. I, art. 3 (1793). In *Chittenden Town School District v. Department of Education*, 738 A.2d 539 (Vt. 1999), the Vermont Supreme Court reviewed the history of this constitutional provision at length, *see id.* at 552-59, concluding that its purpose and effect are to prohibit "*any* public financial support of religious activity," *id.* at 555—including, specifically, public financial support for the religious activity occurring in religious elementary and secondary schools, *id.* at 555-58.

The Vermont Court's conclusion was fortified by a lengthy review of the history surrounding the enactment of, and the case law interpreting, an array of similarly worded provisions in other state Constitutions. *See Chittenden*, 738 A.2d at 556-57, 559-62. The review concluded that, almost without exception, each of these many state constitutional provisions embodied a like prohibition. *See id.* And, as noted by the Vermont Court, the review confirmed the accuracy of Thomas Cooley's "early leading treatise," which states, in pertinent part:

> Those things that are not lawful under any of the American constitutions may be stated thus: . . . (2) Compulsory support, by taxation or otherwise, of religious instruction.

*Id.* at 562 (quoting 2 T. Cooley, *Constitutional Limitations* 966-67 (8th ed. 1927)).

Plaintiffs' assertion that Maine does not have historically recognized legitimate "antiestablishment interests" in refusing to fund religious schooling is incorrect and rests on a misunderstanding of what those interests are. Governmental support for religious training and education of impressionable young people in elementary and secondary schools—no less than governmental support for postsecondary religious education and training of prospective clergy members—is official support for perhaps the most critical of all forms of religious training: "[R]eligious education is a rock on which the whole church rests, and to render tax aid to a religious school is indistinguishable from rendering the same aid to the church itself." *Espinoza*, 435 P.3d 603 ¶ 38 (citations, quotation marks, and internal alterations omitted).

Take, for example, the specific schools that Plaintiffs want Maine to subsidize—Bangor Christian Schools and Temple Academy. Bangor Christian is a ministry of Crosspoint Church, and Temple Academy is an "integral ministry" and "extension" of Centerpoint Community Church. Stipulated Facts ¶¶ 69, 134, ECF No. 25 (Mar. 15, 2019). Bangor Christian's objectives are to teach students to be good Christians, to promote Christian values, and to develop Christian leadership, including by "lead[ing] each unsaved student to trust Christ as his/her personal savior and then to follow Christ as Lord of his/her life" and by teaching students to spread Christianity to others. *Id.* ¶¶ 95, 96, 104. Similarly, Temple Academy teaches students to accept Christ as their personal savior, to accept that the Bible is the infallible word of God that must be obeyed in every aspect of life, and to attempt to spread Christianity. *Id.* ¶¶ 145, 169-71, 174. Both schools integrate religious instruction into all of their academic instruction. *Id.* ¶¶ 101, 164-65, 168.

The religious nature of the education that Plaintiffs seek to fund here renders inapplicable *Trinity Lutheran*, which applies only to nonreligious uses of public funds. *See* 137 S. Ct. at 2017-18, 2024 n.3. Unlike in *Trinity Lutheran*, but as in *Locke*, Plaintiffs seek funding for an "'essentially religious endeavor'"—teaching students to accept Christ as their savior, believe in the Christian Bible, and spread Christianity to others. *See id.* at 2023 (quoting *Locke*, 540 U.S. at 721). As Jefferson and Madison recognized, this speaks to quintessential antiestablishment interests.

      **B.**    **Maine's Choice Not to Fund Religious Education and Training Is Also Supported By Its Interest in Protecting Access to Publicly Funded Schools and Preventing State Financial Support for Discriminatory Practices.**

Unlike Missouri's denial of funding in *Trinity Lutheran*, Maine's decision not to fund religious education and training is supported by compelling governmental interests in addition to its antiestablishment interest. Specifically, Maine is obligated to ensure that Maine students have access to publicly funded schools free from discrimination, and more generally, the state has a longstanding interest in preventing public funding of discriminatory practices. *See* Stipulated Facts ¶¶ 193, 194, 196, 201.

Eliminating discrimination—in employment, education, and other contexts—has long been recognized to be a "compelling state interest[] of the highest order." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). That includes discrimination that is based on or motivated by religion. *See, e.g.*, *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983); *Jews for Jesus v. Jewish Cmty. Relations Council of N.Y.*, 968 F.2d 286, 295 (2d Cir. 1992). This compelling interest is particularly powerful when the government is asked to subsidize discriminatory practices, for "the Constitution does not permit the State to aid discrimination" by private entities. *Norwood*, 413 U.S. at 465–66; *see also id.* at 413 U.S. at 464 n.7 (citing with approval conclusion in *Lemon v.*

*Kurtzman*, 403 U.S. 602, 671 n.2 (1971) (opinion of White, J., concurring in the judgments in part and dissenting in part), that "legislation providing assistance to any sectarian school which restricted entry on racial or religious grounds would, to that extent, be unconstitutional")); *Ams. United for Separation of Church & State v. Prison Fellowship Ministries*, 509 F.3d 406, 425 (8th Cir. 2007) (holding that state funding of privately operated prison rehabilitation program was unconstitutional partly because program's operators required prospective participants to meet a religious test to enroll).

Here, Maine's interest in preventing discrimination, including funding thereof, is expressed in multiple statutes. "[T]he policy of this State" is "to prevent discrimination in employment, housing, or access to public accommodations on account of race, color, sex, sexual orientation, physical or mental disability, religion, ancestry or national origin[.]" 5 M.R.S. § 4552. And Maine law specifically prohibits private schools that are approved to receive state-funded tuition payments from discriminating against any student on the basis of race, national origin, disability, or sex (including pregnancy, marital status, or family status). *See* 5 M.R.S. §§ 4553(2-A), 4601, 4602; *see also Doe v. Regional Sch. Unit 26*, 2014 ME 11, ¶ 22, 86 A.3d 600, 606 (holding that a school's decision to ban a transgender student from the girls' bathroom qualified as forbidden discrimination on the basis of gender).

But both Bangor Christian Schools and Temple Academy—the schools for which Plaintiffs want the state to pay tuition—maintain discriminatory admissions and hiring practices. Both schools restrict admission based on religion, sex, and sexual orientation, for example. Neither school will admit students identifying as a gender different from the one indicated on their birth certificate. Stipulated Facts ¶¶ 89-91, 158. And at Bangor Christian, if existing students present as

a gender different from the one on their birth certificate, expulsion will result, though the students may first be given an opportunity to renounce their affirmed gender after counseling. *Id.* ¶¶ 90-91.

Similarly, both Bangor Christian and Temple Academy will not allow students who identify as lesbian, gay, or bisexual. *Id.* ¶¶ 92, 93, 157, 159. Bangor Christian would expel openly gay students unless they were to disavow their sexual orientation after counseling. *Id.* ¶¶ 92, 93. Temple Academy not only disallows students identifying as homosexual, *id.* ¶ 157, but also prohibits the admission of students who have homosexual parents, *id.* ¶ 159.

Lastly, Bangor Christian and Temple Academy do not serve students of all religions. Though Bangor Christian asserts that it "is willing to consider admitting students from any religious background or faith," the students "must be willing to support BCS' philosophy of Christian education and conduct," and they are subjected to intensive Christian indoctrination. *Id.* ¶¶ 88, 95-96, 98, 101-04. And the standard social-studies curriculum at Bangor Christian includes an objective "to '[r]efute the teachings of the Islamic religion with the truth of God's Word.'" *Id.* ¶ 116. Temple Academy "has a 'pretty hard lined' [sic] written policy . . . that only Christians will be admitted as students." *Id.* ¶ 153. "Students from homes with serious differences with the school's biblical basis and/or its doctrines"—including Muslim students—"will not be accepted." *Id.* ¶¶ 155-56.

Both schools also discriminate on similar grounds in hiring. Bangor Christian would not hire as teachers individuals who are homosexual or "identify as a gender other than [the one] on their original birth certificate." *Id.* ¶¶ 125-26. All the school's teachers must also be "'Born Again Christian[s] who know[] the Lord Jesus Christ as Savior" and "active, tithing member[s] of a Bible believing church." *Id.* ¶¶ 123-24. Moreover, the school is governed by a Deacon Board on which only men are allowed to serve, in accordance with the school's teaching that "God has ordained

distinct and separate spiritual functions for men and women, and the husband is to be the leader of the home and men are to be the leaders of the church." *Id.* ¶¶ 78-79, 102.

Similarly, Temple Academy would not hire as a teacher an individual who is homosexual. *Id.* ¶ 177. Indeed, "Temple Academy's Teacher Employment Agreement states that the Bible says that 'God recognize[s] homosexuals and other deviants as perverted' and that '[s]uch deviation from Scriptural standards is grounds for termination.'" *Id.* ¶ 178. Temple Academy also requires all its teachers to be "born-again Christian[s] who know[] the Lord Jesus Christ as Savior," and all other employees must be "born-again Christian[s]" as well. *Id.* ¶¶ 176, 179.

Maine's compelling state interests in preventing discrimination and state support thereof provide additional, strong justification for the lines drawn in the State's tuition-payment program. By contrast, no state interest in preventing aid to discrimination was at issue in *Trinity Lutheran* because the preschool there did not discriminate based on religion in admissions and even allowed children not enrolled in the school to use its playground. *See* 137 S. Ct. at 2017-18. Similarly, the school-voucher program that survived an Establishment Clause challenge in *Zelman v. Simmons-Harris* prohibited participating schools from discriminating based on religion. *See* 536 U.S. 639, 645 (2002).

## **CONCLUSION**

For the foregoing reasons, summary judgment should be granted to Defendants.

Respectfully submitted, this 5th day of April, 2019.

/s/ Zachary L. Heiden
Zachary L. Heiden
/s/ Emma E. Bond
Emma E. Bond
American Civil Liberties Union of Maine Foundation
121 Middle Street, Suite 200
Portland, Maine 04101
(207) 619-6224
(207) 619-8687
*zheiden@aclumaine.org*
*ebond@aclumaine.org*

Daniel Mach*
Heather L. Weaver*
ACLU Program on Freedom of Religion and Belief
915 15th Street, NW, Suite 600
Washington, D.C. 20005
(202) 675-2314
*dmach@aclu.org*
*hweaver@aclu.org*

Richard B. Katskee*
Alex J. Luchenitser*
Sarah Goetz*
Americans United for the Separation of Church and State
1310 L Street NW, Suite 200
Washington, D.C. 20005
(202) 466-7306
*katskee@au.org*
*luchenitser@au.org*
*goetz@au.org*

* *admitted pro hac vice*.

Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2019, I electronically filed the BRIEF OF AMICI CURIAE with the Clerk of Court using the CM/ECF system, which will send notifications of such filings to the following counsel of record: Arif Panju; Jeffrey T. Edwards; Jonathan R. Whitehead; Lea Patterson; Michael K. Whitehead; Timothy D. Keller; Benjamin Bull; Christopher C. Taub; and Sarah A. Forster.

Dated: April 5, 2019

/s/ Emma E. Bond
Emma E. Bond
American Civil Liberties Union of Maine Foundation
121 Middle Street, Suite 200
Portland, Maine 04101
(207) 619-8687
ebond@aclumaine.org
Counsel for Amici Curiae