# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| DAVID and AMY CARSON, on their own behalf and as next friends of their child, O.C.; ALAN and JUDITH GILLIS, on their own behalf and as next friends of their child, I.G.; and TROY and ANGELA NELSON, on their own behalf and as next friends of their children, A.N. and R.N., | Civil Action No. 1:18-cv-00327-DBH |
| Plaintiffs, | (Oral Argument Requested) |
| v. | |
| A. PENDER MAKIN, in her official capacity as Commissioner of the Maine Department of Education, | |
| Defendant. | |

---

### Plaintiffs' Motion for Summary Judgment and Memorandum in Support Thereof

---

Plaintiffs are parents who live in towns that do not operate their own public secondary schools. To fulfill Maine's statutory mandate to provide residents the benefits of a free public education, their towns pay resident children's tuition to attend public and nonsectarian private schools of the parents' choice. Plaintiffs, however, are excluded from receiving the benefits of tuition because they have chosen, or would like to choose, religious schools for their children. State law prohibits towns from extending tuition benefits to families unless they choose "a nonsectarian school in accordance with the First Amendment of the United States Constitution." 20-A M.R.S.A. § 2951(2) (the "Sectarian Exclusion"). This civil rights lawsuit challenges the Sectarian Exclusion as a violation of their federal constitutional rights. They now, by and through counsel, respectfully move for Summary Judgment pursuant to Fed. R. Civ. P. 56(a).

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

FACTS MATERIAL TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT..................1

  I.    The Basics of Elementary and Secondary Education in Maine ...........................1

  II.   Plaintiffs Live in Tuitioning Towns that Do Not Operate Their Own Secondary Schools......................................................................................................2

  III.  Maine Prohibits Tuitioning Towns from Paying Tuition on Behalf of Parents Who Choose Sectarian Schools ....................................................................3

  IV.  As a Result of the Sectarian Exclusion, Plaintiffs Cannot Receive Tuition Payments to the Religious Schools Where They Send, or Would Enroll, Their High School-Aged Students......................................................................................4

  V.   But for Maine's Sectarian Exclusion, the Religious Private Schools Where Plaintiffs Enroll Their Children, or Would Enroll Their Children, Would Meet the Statutory Requirements to be Approved for Tuition Purposes...........................................5

  VI.  If the Sectarian Exclusion were Eliminated, the Schools Where Plaintiffs Enroll Their Children, or Want to Enroll Their Children, Could Seek Approval for Tuition Purposes ...................................................................................................7

LEGAL ARGUMENT ...............................................................................................7

  I.    The Supreme Court's Recent Decision in *Trinity Lutheran* Supersedes Prior Lower Court Precedent.......................................................................................9

  II.   Excluding Families Who Choose Religious Schools from the Benefits of Receiving Tuition Assistance Violates the Free Exercise Clause.......................................11

      A.  Denying Aid to Families Based on Religion Penalizes the Free Exercise of Religion and Triggers Strict Scrutiny .......................................................12

      B.  Maine's Anti-Establishment Interest is Not Even Legitimate, Much Less Compelling, and Thus Cannot Justify Excluding Families Desiring a Religious Education from the Opportunity to Receive Tuition Benefits ....................15

      C.  Because the State's Rationale for Adopting the Sectarian Exclusion is Known, This Court May Not Consider *Post Hoc* Rationalizations...........................17

      D.  *Trinity Lutheran* Cabins *Locke v. Davey* to its Peculiar Facts ....................18

  III.  Favoring Families Who Choose Secular Schools While Disadvantaging Families Who Choose Religious Schools Violates the Establishment Clause ................................20

  IV.  Maine's Sectarian Exclusion Constitutes Viewpoint Discrimination in Violation of the First Amendment's Free Speech Clause ...................................................22

V.      Treating Families Differently Based on Religion Violates the Fourteenth
        Amendment's Equal Protection Clause ..........................................................................23

CONCLUSION..................................................................................................................24

## TABLE OF AUTHORITIES

<u>Cases</u>

*Agostini v. Felton*,
    521 U.S. 203 (1997) ................................................................................. 20

*Anderson v. Town of Durham*,
    895 A.2d 944 (Me. 2006) ................................................................ 9, 16, 24

*Bagley v. Raymond Sch. Dep't*,
    728 A.2d 127 (Me. 1999) ................................................................ 9, 16, 24

*Bd. of Educ. v. Allen*,
    392 U.S. 236 (1968) ................................................................................. 20

*Bd. of Educ. v. Grumet*,
    512 U.S. 687 (1994) ................................................................................. 20

*Cantwell v. Connecticut*,
    310 U.S. 296 (1940) ................................................................................... 7

*Church of Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993) ....................................................................... 12, 15, 20

*City of New Orleans v. Dukes*,
    427 U.S. 297 (1976) ................................................................................. 23

*Eisenstadt v. Baird*,
    405 U.S. 438 (1972) ................................................................................. 17

*Emp't Div., Dep't of Human Res. v. Smith*,
    494 U.S. 872 (1990) ............................................................................ 12, 13

*Engel v. Vitale*,
    370 U.S. 421 (1962) ............................................................................ 21, 23

*Eulitt v. Me. Dep't of Educ.*,
    386 F.3d 344 (1st Cir. 2004) ............................................................. *passim*

*Everson v. Bd. of Educ.*,
    330 U.S. 1 (1947) ........................................................................ 7, 13, 20, 21

iii

*Gitlow v. New York*,
    268 U.S. 652 (1925) ............................................................................................ 7, 8

*Hobbie v. Unemployment Appeals Comm'n of Fla.*,
    480 U.S. 136 (1987) ................................................................................................ 11

*Igartúa v. United States*,
    626 F.3d 592 (1st Cir. 2010) .................................................................................... 9

*Jimenez v. Weinberger*,
    417 U.S. 628 (1974) ................................................................................................ 17

*Kennedy v. Bremerton Sch. Dist.*,
    139 S. Ct. 634 (Statement of Alito, J., concurring in denial of certiorari) .............. 13

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993) ................................................................................................ 11

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) .......................................................................................... 20, 21

*Locke v. Davey*,
    540 U.S. 712 (2004) ....................................................................................... *passim*

*McDaniel v. Paty*,
    435 U.S. 618 (1978) .................................................................................. 8, 10, 13, 15

*Mitchell v. Helms*,
    530 U.S. 793 (2000) ................................................................................. 3, 11, 17, 22

*Nampa Classical Acad. v. Goesling*,
    714 F. Supp. 2d 1079 (D. Idaho 2010) .................................................................... 23

*New York v. Cathedral Acad.*,
    434 U.S. 125 (1977) ................................................................................................ 21

*Ne. Fla. Chapter Associated Gen. Contractors of Am. v. Jacksonville*,
    508 U.S. 656 (1993) ................................................................................................ 14

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925) ........................................................................................... 8, 22

*Romer v. Evans*,
　517 U.S. 620 (1996) ................................................................................. 23, 24

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
　515 U.S. 819 (1995) ......................................................................... 11, 18, 23

*Sch. Dist. of Abington Twp. v. Schempp*,
　374 U.S. 203 (1963) ......................................................................... 20, 21, 23

*Sherbert v. Verner*,
　374 U.S. 398 (1963) ........................................................................................ 12

*Strout v. Albanese*,
　178 F.3d 57 (1999) .................................................................................. 9, 10, 11

*Thomas v. Review Bd*,
　450 U.S. 707 (1981) ................................................................................. 12, 22

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
　137 S. Ct. 2012 (2017) ........................................................................... *passim*

*U.S. Dep't of Agriculture v. Moreno*,
　413 U.S. 528 (1973) ........................................................................................ 17

*United States v. Batchelder*,
　442 U.S. 114 n.9 (1979) .................................................................................. 23

*Walz v. Tax Comm'n of the City of N.Y.*,
　397 U.S. 664 (1970) .......................................................................................... 8

*Weinberger v. Wiesenfeld*,
　420 U.S. 636 (1975) ........................................................................................ 17

*Widmar v. Vincent*,
　454 U.S. 263 (1981) .................................................................... 11, 15, 18, 22

*Zelman v. Simmons-Harris*,
　536 U.S. 639 (2002) ............................................................................... *passim*

<u>Statutes</u>

5 M.R.S. § 4602 ................................................................................................... 7

5 M.R.S. § 4602(4)(E) ................................................................................................. 7

5 M.R.S. § 4604 ........................................................................................................... 7

5 M.R.S.A. § 4553 ....................................................................................................... 7

20-A M.R.S.A. § 2901 .............................................................................................. 5, 6

20-A M.R.S.A. § 2901(2)(A) ....................................................................................... 6

20-A M.R.SA. § 2951(1) .............................................................................................. 6

20-A M.R.S.A. § 2951 .............................................................................................. 2, 5

20-A M.R.S.A. § 2951(2) .................................................................................... *passim*

20-A M.R.S.A. § 5001-A(3)(A)(1)(a) ...................................................................... 5, 6

20-A M.R.S.A. § 5001-A(3)(A)(1)(b) .......................................................................... 6

Rules

Fed. R. Civ. P. 56(a)  .................................................................................. cover page

Fed. R. Civ. P. 56(c)  ................................................................................................... 8

Other Authorities

5 Writings of James Madison 288 (G. Hunt ed. 1904) .................................................. 8

## MEMORANDUM OF POINTS AND AUTHORITIES[1]

This lawsuit asks whether the federal Constitution's Free Exercise, Establishment, Free Speech, and Equal Protection Clauses permit Maine to refuse to provide families with generally available tuition benefits just because they choose religious private schools, when the State pays tuition benefits on behalf of families who choose nonreligious schools. Although the First Circuit has previously held that the answer is "yes" under the Supreme Court's decision in *Locke v. Davey*, 540 U.S. 712 (2004) (upholding Washington State's decision not to fund the training of ministers under a post-secondary scholarship program that otherwise broadly included religious options), *see Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004), that answer can no longer stand in light of the U.S. Supreme Court's recent decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2025 (2017) (holding that "the exclusion of Trinity Lutheran [Church] from a public benefit for which it is otherwise qualified, solely because it is a church, is odious to our Constitution . . . and cannot stand").

## FACTS MATERIAL TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT[2]

### I.    The Basics of Elementary and Secondary Education in Maine.

Under State law, every elementary and secondary school-aged child "shall be provided an opportunity to receive the benefits of a free public education." Jt. Stip. Fact 1 (Doc. 25, PageID# 901). The Legislature has delegated to "local school administrative units" (SAUs) (that is, school districts) the responsibility of ensuring that students will have that opportunity. Jt. Stip. Facts 2 – 3 (Doc. 25, PageID# 901). SAUs must "either operate programs in kindergarten and grades one

---

[1] In this memorandum, Plaintiffs use the terms "sectarian" and "religious" interchangeably.

[2] The parties filed a statement of Joint Stipulated Facts, which are undisputed, but the parties did not concede the relevance or materiality of those facts. Jt. Stip. Facts n.1 (Doc. 25, PageID# 901). Plaintiffs do, however, allege the materiality of facts cited in this Memorandum of Points and Authorities in Support of their Motion for Summary Judgment.

to 12 *or otherwise provide* for students to participate in those grades as authorized" by State law. Jt. Stip. Fact 5 (Doc. 25, PageID# 902) (emphasis added). If an SAU neither operates its own secondary school nor contracts with a secondary school, then it must "pay the tuition . . . at the public school or approved private school of the parent's choice at which the student is accepted." Jt. Stip. Fact 7 (Doc. 25, PageID# 902). Parents residing within such an SAU may select a private school, and, if the school meets the requirements established in 20-A M.R.S.A. § 2951, the State approves the school to receive public funds for tuition purposes.[3] Jt. Stip. Fact 13 (Doc. 25, PageID# 903).

**II.     Plaintiffs Live in Tuitioning Towns that Do Not Operate Their Own Secondary Schools.**

The SAUs serving the towns in which Plaintiffs reside (Glenburn, Orrington, and Palermo) do not operate secondary schools of their own. Jt. Stip. Fact 6 (Doc. 25, PageID# 902). Those SAUs also do not contract for secondary school privileges with a public or private school to educate their resident secondary students. Jt. Stip. Fact 9 (Doc. 25, PageID# 902). Therefore, the towns in which Plaintiffs reside are "tuitioning towns" obligated to pay tuition for each

---

[3] 20-A M.R.S.A. § 2951 provides that: "A private school may be approved for the receipt of public funds for tuition purposes only if it:

1. Basic approval. Meets the requirements for basic school approval under subchapter I;
2. Nonsectarian. Is a nonsectarian school in accordance with the First Amendment of the United States Constitution;
3. Incorporated. Is incorporated under the laws of the State of Maine or of the United States;
4. [Repealed]
5. Additional requirements. Complies with the reporting and auditing requirements in sections 2952 and 2953 and the requirements adopted pursuant to section 2954;
6. Student assessment. Meets the following requirements:
    A. It participates in the statewide assessment program to measure and evaluate the academic achievements of students; and
    B. It meets the applicable requirements of the system of learning results established in section 6209.
    The requirements of this subsection apply only to a school that enrolls 60% or more publicly funded students, as determined by the previous year's October and April average enrollment; and
7. Release of student records. Upon the request of a school unit, releases copies of all student records for students transferring from the private school to the school unit."

resident secondary student (up to the statutorily authorized rate) to the tuition-approved public or private school of their parents' choice. Jt. Stip. Fact 10 (Doc. 25, PageID# 902).

**III.   Maine Prohibits Tuitioning Towns from Paying Tuition on Behalf of Parents Who Choose Sectarian Schools.**

Prior to 1980, parents in tuitioning towns who chose religious private schools for their children received tuition benefits. Jt. Stip. Fact 18 (Doc. 25, PageID# 903). Indeed, for the 1979-1980 school year, 211 students received public funding for tuition to parent-selected private sectarian secondary schools. Jt. Stip. Fact 19 (Doc. 25, PageID# 904). However, in 1980, Maine's Attorney General authored an opinion, Jt. Stip. Fact 186 (Doc. 25, PageID# 926), concluding "that the practice of paying the tuition of students attending sectarian elementary and secondary schools violates the Establishment Clause of the First Amendment to the United States Constitution." Stip. Record Ex. 1 (Doc. 24-1, PageID# 155). As a result, legislation was passed that ultimately became the Sectarian Exclusion currently codified at 20-A M.R.S.A. § 2951(2). This provision provides that "[a] private school may be approved for tuition purposes only if it: . . . [i]s a nonsectarian school in accordance with the First Amendment of the United States constitution."[4] Jt. Stip. Facts 14, 188 (Doc. 25, PageID# 903, 926). The Defendant is responsible for enforcing, and does enforce, the prohibition against SAUs paying tuition on behalf of parents and students who choose sectarian schools. Jt. Stip. Facts 14, 16 – 17 (Doc. 25, PageID# 903).

---

[4] According to the Attorney General's opinion, "the term 'sectarian' refers to those institutions which are characterized by a pervasively religious atmosphere and whose dominant purpose is the promotion of religious beliefs." Jt. Stip. Record (Doc. 24-1, PageID# 158). The "pervasively sectarian" doctrine, however, "has a shameful pedigree" that a plurality of the U.S. Supreme Court did "not hesitate to disavow" in *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality op.) (outlining the history of the "pervasively sectarian" doctrine in detail). The plurality ultimately concluded that, "[t]his doctrine, born of bigotry, should be buried now." *Id*. at 829.

3

**IV.    As a Result of the Sectarian Exclusion, Plaintiffs Cannot Receive Tuition Payments to the Religious Schools Where They Send, or Would Enroll, Their High School-Aged Students.**

The Plaintiffs are three married couples who live in tuitioning towns that pay resident students' tuition to attend the tuition-approved public or private school of the parents' choice instead of operating a public high school. Jt. Stip. Facts 6, 10 (Doc. 25, PageID# 902). Plaintiffs David and Amy Carson and Alan and Judith Gillis both send their high school-aged daughters to Bangor Christian Schools (BCS). Jt. Stip. Facts 27, 43 (Doc. 25, PageID# 905 – 906). While not required by their religion to do so, the Carsons and Gillises send their daughters to BCS because the school's Christian worldview aligns with their own sincerely held religious beliefs and because of the school's high academic standards. Jt. Stip. Facts 29, 36, 44, 52 (Doc. 25, PageId# 905 – 907). Both the Carsons and Gillises pay tuition to BCS out of their own pocket, because BCS is considered a sectarian school under 20-A M.R.S.A. § 2951(2), and thus cannot be approved for tuition purposes. Jt. Stip. Facts 30, 45, 68 (Doc. 25, PageID# 905, 907, 909); Jt. Stip. Record Ex. 4 (Doc. 24-4, PageID# 228) (RFA #4). But for the Sectarian Exclusion, both the Carsons and Gillises would have asked their respective SAUs to pay the tuition to BCS. Jt. Stip. Fact 66 (Doc. 25, PageID# 909). However, because the Department of Education considers BCS to be a sectarian school for purposes of 20-A M.R.S.A. § 2951(2), it would be futile for them to request tuition. Jt. Stip. Fact 67 (Doc. 25, PageID# 909).

Plaintiffs Troy and Angela Nelson send their high school-aged daughter to the private, and secular, Erskine Academy. Jt. Stip. Fact 60 (Doc. 25, PageID# 908). They send their seventh-grade son to Temple Academy, considered a sectarian school under 20-A M.R.S.A. § 2951(2), because they believe it offers him a great education that aligns with their sincerely held religious beliefs. Jt. Stip. Facts 62, 130 (Doc. 25, PageID# 908, 918); Jt. Stip. Record Ex. #4

4

(Doc. 24-4, PageID# 228) (RFA #5). Most families with secondary students who live within the boundaries of the SAU that serves the Nelsons' town opt to send their children to Erskine Academy—at public expense. Jt. Stip. Facts 20 – 21, 25 (Doc. 25, PageID# 904). The Nelsons would like to send their daughter to Temple Academy, as they do their son, in accordance with their sincerely held religious beliefs, but they cannot afford to pay tuition for both children. Jt. Stip. Fact 65 (Doc. 25, PageID# 909). But for the Sectarian Exclusion, the Nelsons would have asked their SAU to pay the tuition to Temple Academy for their daughter. Jt. Stip. Fact 66 (Doc. 25, PageID# 909). However, because the Department of Education considers Temple Academy to be a sectarian school for purposes of 20-A M.R.S.A. § 2951(2), it would be futile for them to request tuition. Jt. Stip. Fact 67 (Doc. 25, PageID# 909).

V.  **But for Maine's Sectarian Exclusion, the Religious Private Schools Where Plaintiffs Enroll Their Children, or Would Enroll Their Children, Would Meet the Statutory Requirements to be Approved for Tuition Purposes.**

20-A M.R.S.A. § 2951 (*see supra* n.3) lays out the requirements for a private school to be approved to receive public funds for tuition purposes. These requirements include, *inter alia*, (1) "basic school approval" under subsection 1; and (2) not being sectarian under subsection 2.[5] BCS and Temple Academy can't satisfy subsection 2, which is the subject of this lawsuit. But, as explained below, BCS already satisfies subsection 1 and Temple Academy can easily do so.

Private schools that meet the requirements for "basic school approval" satisfy the State's compulsory education requirements under 20-A M.R.S.A. § 5001-A(3)(A)(1)(a). Under 20-A M.R.S.A. § 2901, a private school may seek "basic school approval" if it meets the following criteria:

---

[5] The remaining requirements in 20-A M.R.S.A. § 2951, such as being incorporated in the United States, complying with reporting and testing requirements, and releasing records upon transfer are more ministerial in nature and easily satisfied.

5

A private school may operate as an approved private school for meeting the requirement of compulsory school attendance under section 5001-A if it:

1. Hygiene, health, safety. Meets the standards for hygiene, health and safety established by applicable law and rule; and

2. Is either:

A. Currently accredited by a New England association of schools and colleges; or

B. Meets applicable requirements of this Title pertaining to private schools and the department's requirements for approval for attendance purposes adopted under section 2902.

BCS already operates as a "private school approved for attendance purposes pursuant to 20-A M.R.S.A. §§ 2901 and 5001-A(3)(A)(1)(a)." Jt. Stip. Fact 73 (Doc. 25, PageID# 910). BCS thus already satisfies the requirement under 20-A M.R.S.A. § 2951(1) that it have "basic school approval" under 20-A M.R.S.A. § 2901. Temple Academy, on the other hand, does not have "basic school approval" under 20-A M.R.S.A. § 2901. Temple Academy still satisfies the State's compulsory education requirements, though, because it is recognized "as providing equivalent instruction." 20-A M.R.S.A. § 5001-A(3)(A)(1)(b). Jt. Stip. Fact 132 (Doc. 25, Page ID# 918)). It could, however, meet the State's requirements for "basic school approval" under 20-A M.R.S.A. § 2901 if it chose to seek approval from the Department. This is because it is currently accredited by the New England Association of Schools and Colleges. Jt. Stip. Fact 131 (Doc. 25, PageID# 918). As such, Temple Academy could meet the State's requirements for "basic school approval" under 20-A M.R.S.A. § 2901(2)(A) if it chose to seek such approval from the Department.

Thus, only 20-A M.R.S.A. § 2951(2)'s Sectarian Exclusion prevents Plaintiffs' schools from becoming tuition-approved.

**VI.  If the Sectarian Exclusion were Eliminated, the Schools Where Plaintiffs Enroll Their Children, or Want to Enroll Their Children, Could Seek Approval for Tuition Purposes.**[6]

If the Sectarian Exclusion were eliminated, both BCS and Temple Academy would consider seeking approval for tuition purposes. BCS testified that it would be willing to apply, depending on whether the State would require it to make changes to how it operates.[7] Jt. Stip. Fact 127 (Doc. 25, PageID# 918). All things being equal, BCS's governing board would be willing to consider accepting public funds for tuition purposes. Jt. Stip. Fact 128 (Doc. 25, PageID# 918). Similarly, Temple Academy, so long as it did not have to alter its admissions standards, hiring practices, or curriculum, would be willing to consider accepting public funds for tuition purposes. Jt. Stip. Fact 182 (Doc. 25, PageID# 925). To date, there has been no reason for either school to consider seeking approval because the Sectarian Exclusion, which is the only legal bar to their ability to seek approval, would make any application futile. *See* Jt. Stip. Facts 129, 185 (Doc. 25, PageID# 918, 926).

## LEGAL ARGUMENT

The First Amendment to the U.S. Constitution, applicable to the State by and through the Fourteenth Amendment, does not permit government to discriminate against religion and in favor of non-religion.[8] Indeed, religion ought to be exempt "from the cognizance of [c]ivil

---

[6] Plaintiffs do not seek to raise any claims on behalf of either BCS or Temple Academy.

[7] While private schools approved for tuition purposes are prohibited from unlawful educational discrimination based on sex, physical or mental disability, national origin or race, or sexual orientation, 5 M.R.S.A. §§ 4553, 4602, 4604, the provisions "relating to sexual orientation do not apply to any education facility owned, controlled or operated by a bona fide religious corporation, association or society." 5 M.R.S.A. § 4602(4)(E). Given that the provisions related to discrimination based on sexual orientation do not apply to BCS or Temple Academy, there is no obvious bar to their willingness to accept public tuition payments on behalf of students.

[8] The First Amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech." The Free Exercise, Establishment, and Free Speech Clauses bind the states through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296 (1940) (Free Exercise Clause); *Everson v. Bd. of Educ.*, 330 U.S. 1 (1947) (Establishment Clause); *Gitlow v. New York*, 268 U.S. 652 (1925) (Free Speech

7

power." *McDaniel v. Paty*, 435 U.S. 618, 624 (1978) (holding that a statute disqualifying ministers from holding public office unconstitutionally burdened the free exercise of religion) (plurality opinion) (quoting 5 Writings of James Madison 288 (G. Hunt ed. 1904)). Far from non-cognizance, however, Maine's statute governing town tuitioning takes explicit aim at religion and discriminates against it. Maine denies families who desire a religious education for their children the opportunity to obtain the benefits of tuition on equal terms with their fellow taxpayers who desire a secular education. Religion is the sole disqualifier.

Excluding families who desire a religious education from a student aid program, on the sole basis of religion, unconstitutionally interferes with both parental liberty and religious liberty. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925) (government cannot "unreasonably interfere[] with the liberty of parents and guardians to direct the upbringing and education of children under their control"); *see also Walz v. Tax Comm'n of the City of N.Y.*, 397 U.S. 664, 669 (1970) (explaining that the First Amendment "will not tolerate . . . governmental interference with religion"). As shown below, Maine's decision to prohibit SAUs from paying families' tuition to the sectarian schools of their independent choice is a real and significant violation of the Free Exercise, Establishment, Free Speech, and Equal Protection Clauses of the First and Fourteenth Amendments to the U.S. Constitution. Accordingly, and because there are no genuine issues of material fact, this Court should grant summary judgment to the Plaintiffs on all of their claims. Fed. R. Civ. P. 56(c). However, before getting to the merits in Parts II – V below, Plaintiffs explain why existing First Circuit precedent does not bar their case.

---

Clause). The Fourteenth Amendment's Equal Protection Clause states that, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

## I.     The Supreme Court's Recent Decision in *Trinity Lutheran* Supersedes Prior Lower Court Precedent.

This is the third federal court challenge to Maine's Sectarian Exclusion prohibiting

families who live in tuitioning towns and who choose to send their children to religious schools

from receiving tuition benefits on the same basis that families who choose secular schools

receive tuition benefits.[9] The first two federal cases upheld the sectarian exclusion. *Eulitt*, 386

F.3d 344 (holding that neither the Religion Clauses of the First Amendment nor the Equal

Protection Clause of the Fourteenth Amendment requires "Maine to extend tuition payments to

private sectarian secondary schools on behalf of students who reside in a school district that

makes such payments available on a limited basis to private nonsectarian secondary schools");

*Strout v. Albanese*, 178 F.3d 57 (1999) (same). Thus, the initial question presented here is

whether the decisions in *Eulitt* or *Strout* present a bar to litigating this case. They do not because

"recent Supreme Court precedent calls into legitimate question" the First Circuit's opinions in

those cases. *Eulitt*, 386 F.3d at 350.

While, "[a]s a general matter, the doctrine of stare decisis precludes the relitigation of

legal issues that have previously been heard and authoritatively determined," *id*. at 348, an

"exception exists when recent Supreme Court precedent calls into legitimate question a prior

opinion of an inferior court." *Id*. at 350; *see also Igartúa v. United States*, 626 F.3d 592, 604 (1st

Cir. 2010) (noting that in "relatively rare instances . . . authority that postdates the original

decision, although not directly controlling, nevertheless offers a sound reason for believing that

the former panel, in light of fresh developments, would change its collective mind") (citation

omitted). Indeed, the *Eulitt* panel accepted the applicability of precisely this exception, in light of

---

[9] There have also been two state court cases rejecting legal challenges to the sectarian exclusion contained in 20-A M.R.S.A. § 2951(2). *See Anderson v. Town of Durham*, 895 A.2d 944 (Me. 2006); *Bagley v. Raymond Sch. Dep't*, 728 A.2d 127 (Me. 1999).

the First Circuit's previous decision in *Strout*, because the panel recognized that the Supreme

Court's opinions in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), and *Locke v. Davey*, 540

U.S. 712, "obviously constitute[d] significant developments in the pertinent jurisprudence and

shed new light on the case law upon which the *Strout* decision hinged." *Id.* at 350.

The U.S. Supreme Court's recent decision in *Trinity Lutheran Church of Columbia, Inc.

v. Comer*, 137 S. Ct. 2012 (2017) undermines both *Eulitt*'s and *Strout*'s reasons for rejecting

previous Free Exercise Clause claims. It does so by clarifying that religion-based exclusions

from public programs cause real, remediable harm. *Compare Trinity Lutheran*, 137 S. Ct. at

2022 (holding that conditioning the availability of government benefits on religion "penalizes"

and "punishe[s] the free exercise of religion") (citing *McDaniel*, 435 U.S. at 626 (plurality

opinion)) *with Eulitt*, 386 F.3d at 356 (determining the sectarian exclusion did not penalize

parents and that "free exercise rights [we]re not implicated"). The First Circuit in *Eulitt* thus

applied rational basis scrutiny to the Sectarian Exclusion. 386 F.3d at 356. But under *Trinity

Lutheran*, the appropriate standard of review is strict scrutiny. 137 S. Ct. at 2024 (holding that

conditioning the ability to participate in a generally available public benefit program on religion

"imposes a penalty on the free exercise of religion that must be subjected to the 'most rigorous'

scrutiny") (citation omitted); *see also id.* at 2022 ("the State's decision to exclude [Trinity

Lutheran Church] for purposes of this public program must withstand the strictest scrutiny").

The *Trinity Lutheran* decision also cabins *Locke v. Davey*, 540 U.S. 712 (2004), to its

peculiar and unique historical justification for permitting a state to deny public funding for the

training of ministers. *Trinity Lutheran*, 137 S. Ct. at 2023 (stressing that "using taxpayer funds to

pay for the training of clergy" was one of the "'few areas'" where a state's anti-establishment

interests could "'come more into play'") (quoting *Locke* at 722). *Trinity Lutheran* thus

10

undermines the expansive reading given to *Locke* by the First Circuit in *Eulitt*. *See* 386 F.3d at

355 ("We read *Davey* more broadly."). Because "recent Supreme Court precedent calls into

legitimate question" the First Circuit's opinions in both *Eulitt* and *Strout*, the doctrine of stare

decisis does not preclude a decision on the merits in this case. *Eulitt*, 386 F.3d at 350.

## II.    Excluding Families Who Choose Religious Schools from the Benefits of Receiving Tuition Assistance Violates the Free Exercise Clause.

The U.S. Supreme Court's recent *Trinity Lutheran* decision clearly establishes that

categorical religious exclusions from government benefit programs burden the free exercise of

religion and thus trigger strict scrutiny. "The Free Exercise Clause protects religious observers

against unequal treatment and subjects to the strictest scrutiny laws that target the religious for

special disabilities based on their religious status." *Trinity Lutheran*, 137 S. Ct. at 2019

(quotations and citations omitted). *See also Mitchell v. Helms*, 530 U.S. 793, 828 (2000)

(plurality opinion) (explain that "our decisions have prohibited governments from discriminating

in the distribution of public benefits based upon religious status or sincerity") (citing

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995); *Lamb's Chapel v. Ctr.

Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993); *Widmar v. Vincent*, 454 U.S. 263 (1981)).

In order to justify Maine's Sectarian Exclusion, the Defendant carries the burden of

demonstrating a compelling interest in excluding families who desire to enroll their children in

religious schools from receiving the benefits of tuition. *Hobbie v. Unemployment Appeals

Comm'n of Fla.*, 480 U.S. 136, 141 (1987) (explaining that government burdens on the free

exercise of religion "must be subjected to strict scrutiny and c[an] be justified only by proof *by

the State* of a compelling interest") (emphasis added).

Below, Plaintiffs first show how, under *Trinity Lutheran*, denying families who choose

religious schools the opportunity to receive the benefits of tuition is a real burden on their free

11

exercise rights and that this burden triggers strict scrutiny. Plaintiffs then demonstrate that the

only justification Maine had for excluding families who choose religious schools from receiving

tuition benefits, at the time the Legislature adopted the Sectarian Exclusion (that is, a belief the

Sectarian Exclusion was required by the Establishment Clause), is not even legitimate, much less

compelling. Plaintiffs then explain why it is improper to consider the Defendant's proffered *post

hoc* rationalizations and why, even if those rationalizations were considered, they are unavailing.

Finally, Plaintiffs show that *Locke v. Davey* cannot save the Sectarian Exclusion.

### A.  Denying Aid to Families Based on Religion Penalizes the Free Exercise of Religion and Triggers Strict Scrutiny.

"A law," the U.S. Supreme Court said in *Trinity Lutheran*, "may not discriminate against

'some or all religious beliefs.'" 137 S. Ct. at 2021 (quoting *Church of Lukumi Babalu Aye v. City

of Hialeah*, 508 U.S. 520, 532 (1993)). "The Free Exercise Clause 'protect[s] religious observers

against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for

'special disabilities' based on their 'religious status.'" *Id*. at 2019 (quoting *Lukumi* at 533, 542).

Applying this foundational principle to overturn a restriction on a church's ability to compete for

a state playground-resurfacing grant, the Court in *Trinity Lutheran* stressed that it "has

repeatedly confirmed that denying a generally available benefit solely on account of religious

identity imposes a penalty on the free exercise of religion." *Id*. (quotations and citations omitted).

*See, e.g.*, *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877 (emphasizing that the

Free Exercise Clause guards against the government's imposition of "special disabilities on the

basis of religious views or religious status"); *Thomas v. Review Board*, 450 U.S. 707, 716 (1981)

(holding that "a person may not be compelled to choose between the exercise of a First

Amendment right and participation in an otherwise available program."); *Sherbert v. Verner*, 374

U.S. 398, 403 – 05 (1963) (holding that "conditions upon public benefits cannot be sustained if

they so operate, whatever their purpose, as to inhibit or deter the exercise of First Amendment

freedoms"); *Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947) (emphasizing that government

"*cannot exclude* individual[s] . . . *because of their faith, or lack of it*, from receiving the benefits

of public welfare legislation").[10]

At the same time, the U.S. Supreme Court has "been careful to distinguish [neutral] laws

from those that single out the religious for disfavored treatment." *Trinity Lutheran*, 137 S. Ct. at

2020. Indeed, "[i]n recent years, when th[e] Court has rejected free exercise challenges, the laws

in question have been neutral and generally applicable without regard to religion." *Id*. Maine's

statute laying out the requirements for approval to receive publicly funded tuition payments on

behalf of students whose parents have the right to select from an array of schools—unless the

schools are religious—is anything but neutral. This type of facial discrimination burdens the free

exercise of religion. (Even if the statute was neutral—which it is not—the Supreme Court has

indicated a willingness to revisit its holding in *Smith* that the Free Exercise Clause does not

necessarily require that a state exempt religious individuals from neutral and generally applicable

criminal laws. *See Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 637 (Statement of Alito, J.,

concurring in denial of certiorari)).

The Court in *Trinity Lutheran* made it clear that a policy discriminating against otherwise

eligible recipients "solely because of their religious character . . . imposes a penalty on the free

exercise of religion." 137 S. Ct. at 2021. The Court found irrelevant that the church was "free to

continue operating as a church." *Id*. at 2022 (also noting that in the landmark *McDaniel v. Paty*

---

[10] Maine's Sectarian Exclusion should also be subject to strict scrutiny because it burdens the hybrid
rights of parental freedom and religious liberty, as well as free speech and equal protection. Under *Smith*,
the First Amendment bars application of even neutral and generally applicable laws where religiously
motivated actions involve "not the Free Exercise Clause alone, but the Free Exercise Clause in
conjunction with other constitutional protections." 494 U.S. at 881 (collecting cases).

case "McDaniel was free to continue being a minister"). The fact that the harm was "merely declining to extend funds to Trinity Lutheran" and that there was no direct prohibition against "engaging in religious conduct or otherwise exercising rights" did not persuade the Court that there was no burden on free exercise rights. *Id.*

The Court was, however, persuaded by the fact that Trinity Lutheran Church was asserting "a right to participate in a government benefit program without having to disavow its religious character," rather than "claiming entitlement to a subsidy." *Id*. (citing *Ne. Fla. Chapter Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993) ("[T]he 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract"). The Court clarified that imposing religious conditions "upon even a gratuitous benefit" deters and discourages free exercise rights. *Id*. Here, the Sectarian Exclusion imposes a real burden on Plaintiffs' free exercise rights. They are forced to either shoulder the cost of tuition or relinquish their right to educate their children consistent with their sincerely held religious beliefs. This is what the Nelsons face—the Hobson's choice of deciding which child they will educate at a religious school because they can only afford tuition for one.[11] Jt. Stip. Facts 30, 45, 65 (Doc. 25, PageID# 905, 907, 909). Nonreligious parents do not face a similar choice.

In this way, the Defendant's enforcement of the Sectarian Exclusion disqualifies families who enroll their students in religious schools from receiving tuition benefits. Disqualifying otherwise eligible recipients from a generally available public benefit solely because of religion

---

[11] The Defendant will no doubt cite *Trinity Lutheran*'s footnote 3, which states, "This case involves express discrimination based on religious identity with respect to playground resurfacing. We do not address religious uses of funding or other forms of discrimination." 137 S. Ct. at 2024. This footnote only garnered four votes, making it dicta from a plurality of the Court. But more important is that the principles articulated in both the majority opinion *and* the footnote regarding identity discrimination against religion *as such* apply with full force to the facts of this case.

14

"imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Trinity Lutheran* at 2021. And, as demonstrated below, Maine's Sectarian Exclusion cannot survive strict scrutiny because the law does not advance even a legitimate, much less compelling, government interest.

### B. Maine's Anti-Establishment Interest is Not Even Legitimate, Much Less Compelling, and Thus Cannot Justify Excluding Families Desiring a Religious Education from the Opportunity to Receive Tuition Benefits.

A law that is not neutral regarding religion must be justified by a compelling government interest if it impairs the exercise of religious beliefs. *Lukumi*, 508 U.S. at 531 – 32. Here, there can be no argument that the challenged statute discriminates, on its face, against religion. As *Trinity Lutheran* explains, only a state interest "of the highest order" can justify a policy that discriminates, on its face, against religion. 137 S. Ct. at 2024 (citing *McDaniel*, 435 U.S. at 628); *see also Widmar*, 454 U.S. at 276 (holding that whatever interest a state may have "in achieving greater separation of church and State than is already ensured under the Establishment Clause . . . is limited by the Free Exercise Clause"). Absent a compelling governmental interest, the Free Exercise Clause precludes Maine from excluding individuals desiring to give their children an education consistent with their sincerely held religious beliefs from receiving tuition benefits when those same benefits are afforded to individuals who choose a secular education for their children.

In this case, we know precisely why Maine's Legislature adopted the Sectarian Exclusion—an opinion by the State's Attorney General concluding that the Establishment Clause required it. Jt. Stip. Record, Ex. 1 (Doc. 24-1, PageID# 140 – 158). Indeed, the Establishment Clause justification is embedded in the text of 20-A M.R.S.A. § 2951(2) itself. The statute provides that "A private school may be approved for the receipt of public funds for tuition

15

purposes only if it . . . [i]s a nonsectarian school *in accordance with the First Amendment of the United States Constitution*." 20-A M.R.S.A. § 2951(2) (emphasis added). The prior Maine Supreme Court cases confirm this fact. "The State does not dispute that its *only justification* for excluding religious schools from the tuition program was compliance with the Establishment Clause." *Bagley*, 728 A.2d at 131 (emphasis added); *see also id* at 133 ("[T]he *only* basis asserted by the State for its disparate treatment of religious schools is its understanding that the statute in existence prior to the exclusion violated the Establishment Clause.") (emphasis added). *Compare Anderson*, 895 A.2d at 958 ("The actions of the Attorney General and the Legislature were not motivated by any religious animus and were motivated by a desire to respect and comply with the requirements of the Establishment Clause as then interpreted and applied by the United States Supreme Court.").

It is too late in the day to maintain any illusion that permitting families to use their tuition benefits at religious schools violates the Establishment Clause. *See Locke*, 540 U.S. at 719 ("there is no doubt that the State could, consistent with the Federal Constitution, permit Promise Scholars to pursue a degree in devotional theology, and the State does not contend otherwise") (citation omitted); *Zelman*, 536 U.S. at 652 ("*Mueller*, *Witters*, and *Zobrest* thus make clear that where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause."); *see also id*. at 652-53 ("'If numerous private choices, rather than the single choice of a government, determine the distribution of aid, pursuant to neutral eligibility criteria, then a government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment.'") (quoting

*Mitchell*, 530 U.S. at 810). Because Maine's only justification for the Sectarian Exclusion is a legally erroneous Attorney General's opinion, that justification cannot rise even to the level of a "legitimate" justification, much less a compelling justification. The only remaining questions are, thus, whether this Court may entertain *post hoc* rationalizations for the Sectarian Exclusion and, if it could, whether any of those justifications rise to the level of a compelling interest.

### C.  Because the State's Rationale for Adopting the Sectarian Exclusion is Known, This Court May Not Consider *Post Hoc* Rationalizations.

This Court may not consider rationalizations that did not motivate Maine's Legislature to adopt the sectarian exclusion. The U.S. Supreme Court's decision in *Weinberger v. Wiesenfeld,* 420 U.S. 636 (1975), teaches that when the government's true reason for treating citizens unequally is known, courts should not accept *post hoc* justifications that were not the goal of the challenged legislation. "This Court need not . . . accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the [later] asserted purpose could not have been a goal of the legislation." *Id*. at 648 n.16 (citing *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Jimenez v. Weinberger*, 417 U.S. 628, 634 (1974); *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 536-537 (1973)). In light of *Weinberger,* the Defendant cannot justify the unequal treatment of religion on grounds that plainly were not an actual goal of the legislative enactment.

However, even if this Court could consider *post hoc* rationalizations, the newly identified governmental interests the Defendant contends are advanced by the Sectarian Exclusion do not rise to the level of compelling governmental interests:

> The State has an interest in ensuring that public funds are not used to maintain or support sectarian/religious instruction, including, in particular, instruction that promotes or advances a particular religion. The State has an interest in avoiding the religious fractionalization of its publicly-funded education system. The State

17

> has an interest in preventing public funds from being used to support
> institutions which, unlike public and nonsectarian private schools,
> are legally permitted to engage in discriminatory practices.

Jt. Stip. Record Ex. 3 (Doc. 24-3, PageID# 221). These asserted rationalizations essentially

amount to a single goal: a desire to achieve a greater separation of church and state than is

required by the Establishment Clause. But a desire to stay "as far as possible from religious

establishment concerns" does not qualify as a compelling interest. *Trinity Lutheran* at 2024; *see*

*also Widmar*, 454 U.S. at 276 (holding that "the state interest asserted here—in achieving greater

separation of church and State than is already ensured under the Establishment Clause of the

Federal Constitution—is limited by the Free Exercise Clause"). Moreover, the Defendant's

newly asserted interests utterly fail to understand modern Establishment Clause jurisprudence,

which teaches that "[t]he incidental advancement of a religious mission, or the perceived

endorsement of a religious message, is reasonably attributable to the individual recipient, not to

the government, whose role ends with the disbursement of benefits." *Zelman* at 652. *Cf.*

*Rosenberger*, 515 U.S. at 839 ("[T]he guarantee of neutrality is respected, not offended, when

the government, following neutral criteria and evenhanded policies, extends benefits to recipients

whose ideologies and viewpoints, including religious ones, are broad and diverse.").

### D.  *Trinity Lutheran* Cabins *Locke v. Davey* to its Peculiar Facts.

The Defendant may argue that the Sectarian Exclusion is justified by *Locke v. Davey*, 540

U.S. 712 and the First Circuit's expansive reading of *Locke* in its *Eulitt* decision. 386 F.3d at 355

(reading *Locke* "broadly"). *Trinity Lutheran*, however, rejects the expansive reading the First

Circuit gave *Locke* and instead cabins *Locke* to its historically unique justification for allowing a

narrow exclusion from an otherwise religiously inclusive post-secondary scholarship program.

137 S. Ct. at 2023 (noting that "*Locke* took account of Washington's antiestablishment interest

only after determining . . . that the scholarship program did not 'require students to choose between their religious beliefs and receiving a government benefit.'") (quoting *Locke*, 504 U.S. at 720-21).

*Locke* permitted a targeted exception to the First Amendment's rule of religious non-exclusion by permitting, though not requiring, Washington State to exclude clergy training from an otherwise neutral financial aid program. 540 U.S. at 719. The Court went to great lengths to limit its holding. First, it noted that the "only" governmental interest it was considering was the "State's interest in not funding the religious training of clergy." *Id.* at 722 n.5. Second, it emphasized the many ways in which the challenged scholarship program *included* religious options, despite its exclusion of ministerial training. "Far from evincing . . . hostility toward religion," the Court concluded, "the entirety of the Promise Scholarship Program goes a long way toward including religion in its benefits." *Id.* at 724. And, as the Court emphasized in *Trinity Lutheran*, Davey could have used his scholarship to "attend a religious college and [even] take devotional theology courses there." 137 S. Ct. at 2023. "The only thing he could not do was use the scholarship to pursue a degree in that subject." *Id*. at 2024.

Given these recognized limitations, *id.* at 2023 – 24, *Locke* has no application to this case for at least two reasons. First, the "[s]tate's interest in not funding the religious training of clergy" is not implicated in high school tuition. *Id.* at 722 n.5. Second, unlike the scholarship program in *Locke*, Maine's total exclusion of sectarian options does not "go[] a long way toward including religion in its benefits." *Id.* at 724. Rather, it excludes all religious options—based on nothing more than an erroneous interpretation of the Establishment Clause. While the outer bounds of *Locke* may not be fully known, *Trinity Lutheran*'s holding does not countenance the wholesale exclusion of religious persons or institutions from government benefit programs.

III.     **Favoring Families Who Choose Secular Schools While Disadvantaging Families Who Choose Religious Schools Violates the Establishment Clause.**

The Establishment Clause "prevents a State from enacting laws that have the 'purpose' or 'effect' of advancing *or inhibiting* religion." *Zelman*, 536 U.S. at 648-49 (emphasis added) (quoting *Agostini v. Felton*, 521 U.S. 203, 222 – 223 (1997)). Denying tuition benefits to all families who enroll their students in religious private schools violates the Establishment Clause by having the effect of "discriminating *against* religion." *Bd. of Educ. v. Grumet*, 512 U.S. 687, 717 (1994) (O'Connor, J., concurring); *see also Everson*, 330 U.S. at 18 (The First Amendment "requires the state to be neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary."). The principle that the Establishment Clause does not permit the government to prefer non-religion over religion is enshrined in the second prong of the Court's three prong *Lemon* test, taken from *Lemon v. Kurtzman*, 403 U.S. 602, 612 – 613 (1971) ("First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion.") (citations and quotations omitted). A law must satisfy all three prongs to survive.

Under *Lemon*'s second prong, a program violates the Establishment Clause if its primary effect either advances *or inhibits* religion. *See Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 222 (1963) (if "the primary effect of [an] enactment . . . is . . . inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by" the Establishment Clause); *see also Bd. of Educ. v. Allen*, 392 U.S. 236, 243 (1968) (When a law's purpose is the "inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution." (citation and quotation omitted)). This is true whether the inhibition is of "a particular religion or of religion in general." *Lukumi*, 508 U.S. at 532. A law

20

that allows parents who choose non-religious schools to receive tuition payments but not families

who choose religious schools inhibits religion. While the federal Constitution may not require

states to give families a publicly funded choice between public and private schools, if a state

does enact such a system, it may not, consistent with the federal Constitution, limit parental

choices to non-religious private schools alone.[12] *Everson*, 330 U.S. at 16 (government "*cannot*

*exclude* individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-

believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it*,

from receiving the benefits of public welfare legislation" (emphasis added)). The Sectarian

Exclusion violates *Lemon*'s second prong by inhibiting religion.

Maine's Sectarian Exclusion also violates the third prong of the *Lemon* test by

excessively entangling the State with religion: primarily by permitting state officials to engage in

detailed inquiries of private schools to determine the "religiosity" of those schools that seek

approval for tuition purposes. As the stipulated record makes clear, state officials regularly

inquire into the religiosity of applicant private schools. Stip. Record (Doc. 24-2, PageID# 170 –

182) (state officials asserting that a school that centers its "life on Chapel" must be sectarian

despite school administrator's protestations that the school "is NOT sectarian"; and inquiries into

"what takes place during Chapel" (Doc 24-2, PageID#175)). But these types of inquiries are

verboten. *New York v. Cathedral Academy*, 434 U.S. 125, 133 (1977) ("The prospect of church

---

[12] This equal access requirement is perfectly consistent with the fact that government schools are required by the Establishment Clause to be entirely non-religious. *See Engel v. Vitale*, 370 U.S. 421 (1962) (declaring state-sponsored prayer in public schools unconstitutional); *Schempp*, 374 US 203 (declaring state-sponsored Bible reading in public schools unconstitutional). Government-run schools must be secular because compulsory education laws force students to attend them and the Establishment Clause does not permit the government to compel anyone to receive religious instruction and training. The State does not endorse any religious education received as a result of parental choice. *See Zelman* at 652 ("The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits.").

and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment . . . ."). Determining the religiosity of private schools unconstitutionally entangles the state in religious matters. *See Mitchell*, 530 U.S. at 828-29 (plurality op.) (noting that government "should refrain from trolling through a person's or institution's religious beliefs" because government is "prohibit[ed] … from discriminating in the distribution of public benefits based upon religious status or sincerity"); *Widmar*, 454 U.S. at 272 n.11 (holding that government "risk[s] greater 'entanglement' by attempting to enforce its exclusion of 'religious worship' and 'religious speech'" (citation omitted)); *Thomas*, 450 U.S. at 715 (explaining that government "should not undertake to dissect religious beliefs").

Given 20-A M.R.S.A. § 2951(2)'s complete lack of facial neutrality; the fact that it is *not* a program of true private choice; that it skews incentives toward non-religious schools; fails to distribute tuition assistance on religiously neutral terms; and that the intended beneficiaries are not able to direct tuition to the school of their own choosing, the only conclusion is that Maine's Sectarian Exclusion violates the Establishment Clause's demand that the government neither favor *nor disfavor* religion over non-religion.

## IV. Maine's Sectarian Exclusion Constitutes Viewpoint Discrimination in Violation of the First Amendment's Free Speech Clause.

The tuition assistance offered to Maine parents enables them to exercise their right to choose the teachers they want their children to hear speak—but Maine discriminates against religious speakers. *Cf. Pierce*, 268 U.S. at 535 ("The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."). Maine excludes only parents who enroll their students in religious schools from receiving the benefits of the State's tuition system based

22

on "the religious content" of the speech at the schools chosen by the parents. This constitutes viewpoint discrimination and is thus subject to strict scrutiny. *Rosenberger*, 515 U.S. at 832, 828 (holding that "discriminating against religious speech [i]s discriminating on the basis of viewpoint" and is "presumed to be unconstitutional").[13] In *Rosenberger*, a public university tried to deny funding to religious publications even though it subsidized the publication costs of a wide variety of student publications. The Court held that the Free Speech Clause did not allow the government to discriminate against religious viewpoints. Here, there is no compelling justification to discriminate against religious viewpoints based on what religious teachers, selected independently by parents, say in the classroom.

## V.   Treating Families Differently Based on Religion Violates the Fourteenth Amendment's Equal Protection Clause.

The State treats families who send their children to religious schools differently than families who choose public and nonsectarian private schools in violation of the Fourteenth Amendment's Equal Protection Clause. Distinctions based on religion are "inherently suspect" and thus subject to strict scrutiny. *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam); *see also United States v. Batchelder*, 442 U.S. 114, 125 n.9 (1979) ("The Equal Protection Clause prohibits selective enforcement based on an unjustifiable standard such as race [or] *religion* . . . ." (emphasis added) (internal quotation marks omitted)). In *Romer v. Evans*, the U.S. Supreme Court struck down a Colorado constitutional provision that made it "more difficult for one group of citizens than for all others to seek aid from the government." 517 U.S. 620, 633 (1996). "Central . . . to the . . . Constitution's guarantee of equal protection," the Court explained,

---

[13] From a free speech perspective, public schools are government schools. Speech inside of the public schools is therefore government speech. *Nampa Classical Academy v. Goesling*, 714 F. Supp. 2d 1079, 1093 (D. Idaho 2010). And government speech cannot be religious. *See Engel*, 370 U.S. 421; *Schempp*, 374 U.S. 203. But speech at private schools is private speech. And private speech *can* be religious. *Rosenberger*, 515 U.S. at 841 (the Free Speech Clause protects "private speech endorsing religion").

"is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance." *Id*.

The blanket exclusion of all sectarian schools in 20-A M.R.S.A. § 2951(2) presents the same equal protection problems that doomed the challenged provision in *Romer*. Treating families who choose religious schools differently than those who choose non-religious schools makes it "more difficult for one group of citizens than for all others to seek aid from the government." *Romer*, 517 U.S. at 633. The sole basis for the original statutory exclusion of families choosing religious options was the (legally) erroneous belief that such exclusion was required by the Establishment Clause of the First Amendment. *See, supra,* p. 16 (citations to *Anderson*, 895 A.2d at 958; *Bagley*, 728 A.2d at 131, 133). The complete exclusion of religious schools from Maine's statute authorizing those SAUs that serve towns without their own public secondary schools to pay tuition to the public or approved private school of the parents' choice should be struck down because "[a] law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is [] a denial of equal protection of the laws in the most literal sense." *Romer* at 633.

## CONCLUSION

Maine unlawfully disadvantages families for choosing religious private schools by denying them generally available tuition benefits, thereby burdening their free exercise of religion and violating the strict religious neutrality the First Amendment requires. By drawing 20-A M.R.S.A. § 2951(2) along religious lines, without a compelling justification, Maine's Sectarian Exclusion violates the U.S. Constitution. Parents thus respectfully request that summary judgment be granted in their favor.

Dated this 5th day of April, 2019.

Respectfully submitted,

/s/ Jeffrey T. Edwards
Jeffrey T. Edwards
PretiFlaherty
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Tel: (207) 791-3000
Fax: (207) 791-3111
Email: jedwards@preti.com

*Local Counsel for Plaintiffs*

/s/ Timothy D. Keller
Timothy D. Keller* (AZ Bar No. 019844)
Institute for Justice
398 S. Mill Avenue, Suite 301
Tempe, AZ 85281
Tel: (480) 557-8300
Fax: (480) 557-8315
Email: tkeller@ij.org

Arif Panju* (TX Bar No. 24070380)
Institute for Justice
816 Congress Avenue, Suite 960
Austin, TX 78701
Tel: (512) 480-5936
Fax: (512) 480-5937
Email: apanju@ij.org

Lea Patterson* (TX Bar No. 24102338)
First Liberty Institute
2001 W. Plano Parkway, Suite 1600
Plano, TX 75075
Tel: (972) 941-4444
Fax: (972) 423-6162
Email: lepatterson@firstliberty.org

Michael K. Whitehead* (MO Bar No. 24997)
Jonathan R. Whitehead* (MO Bar No. 54868)
Whitehead Law Firm, LLC
229 SE Douglas St., Suite 210
Lee's Summit, MO 64063
Tel: (816) 398-8967
Fax: (816) 875-3291
Email: mike@thewhiteheadfirm.com
Email: jon@whiteheadlawllc.com

*Attorneys for Plaintiffs*
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of April 2019, a true and correct copy of

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN**

**SUPPORT THEREOF** was filed and served on the following counsel of record using the

Court's CM/ECF system:

Janet T. Mills
Attorney General

Sarah A. Forster
Christopher C. Taub
Assistant Attorneys General
Office of the Attorney General
Six State House Station
Augusta, ME 04333-0006
Tel: (207) 626-8866, (207) 626-8800
Email: sarah.forster@maine.gov
        christopher.c.taub@maine.gov

*Attorneys for Defendant*

Emma Eaton Bond
Zachary L. Heiden
American Civil Liberties Union of Maine
121 Middle Street, Suite 200
Portland, ME 04101
Tel: (207) 619-8687, (207) 774-5444
Email: ebond@aclumaine.org
        zheiden@aclumaine.org

Sarah Goetz
Richard B. Katskee
Alex Luchenitser
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Tel: (202) 466-3234, (202) 466-3234, (202) 466-7306
Email: goetz@au.org, katskee@au.org, luchenitser@au.org

Daniel Mach
Heather Weaver
American Civil Liberties Union Foundation DC
915 15th Street NW Suite 600
Washington, DC 20005
Tel: (202) 675-2330
Email: dmach@aclu.org, hweaver@aclu.org

/s/ Timothy D. Keller
*Attorney for Plaintiffs*