UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
BANGOR DIVISION

| | | |
|---|---|---|
| DAVID CARSON, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.:      1:18-CV-00327-DBH |
| | ) | |
| A. PENDER MAKIN, COMMISSIONER OF | ) | |
| THE MAINE DEPARTMENT OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Brief *Amicus Curiae* of Public Funds Public Schools, National Education Association, and Maine Education Association in Support of Defendant Makin's Motion for Summary Judgment**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Eric Harrington\*
Kristen Hollar\*
National Education Association
1201 16th Street, NW
Washington, D.C. 20036
202-822-7035
eharrington@nea.org
khollar@nea.org
*Attorneys for* Amicus *National Education Association*

Andrew T. Mason
Maine Education Association
35 Community Drive
Augusta Maine 04330
(207) 622-5866
amason@maineea.org
*Attorney for* Amicus *Maine Education Association*

Zoe M. Savitsky\*
Jasmine Bolton\*
David G. Sciarra\*
Jessica Levin\*
Public Funds Public Schools
60 Park Place, Suite 300
Newark, NJ 07102
973-624-1815
zoe.savitsky@splcenter.org
jasmine.bolton@splcenter.org
dsciarra@edlawcenter.org
jlevin@edlawcenter.org
*Attorneys for* Amicus *Public Funds Public Schools*

*\*Motions for Admission Pro Hac Vice*
Pending

## <u>TABLE OF CONTENTS</u>

Table of Authorities ............................................................................................... i

Statement of Interest of *Amici* ............................................................................. 1

Introduction ........................................................................................................... 3

      I.     The State has a Compelling Interest in Preserving the MTP as a Limited and Carefully Designed Means to Fulfill the State's Constitutional Obligation Under the Maine Education Article ................................................................. 5

      II.    The State has a Compelling Interest in Safeguarding Public Funds for Public Schools ............................................................................................................ 10

      III.   The State Has a Compelling Interest in Ensuring Public Schools are Accountable, Inclusive and Free from Discrimination ................................... 14

Conclusion ........................................................................................................... 20

Appendix A………………………………………………………………………… 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Town of Durham*,
    No. CIV.A. CV-02-480, 2003 WL 21386768 (Me. Super. May 14, 2003),
    *aff'd*, 895 A.2d 944 (Me. 2006) ......................................................................3

*Bagley v Me. Dep't. of Educ.*,
    No. CV-97-484, 1998 WL 35550607 (Me. Super. Apr. 20, 1998), *aff'd sub*
    *nom. Bagley v. Raymond Sch. Dep't.*, 728 A.2d 127 (Me. 1999) .............................3

*Bob Jones Univ. v. United States*,
    461 U.S. 574 (1983) ......................................................................................15

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) ...........................................................................17, 19

*Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518  (3d Cir. 2018) .................................18

*Doe v. Reg'l Sch. Unit 26*,
    86 A.3d 600 (Me. 2014) .................................................................................9

*Eulitt v. Me. Dep't of Educ.*,
    307 F. Supp. 2d 158 (D. Me. 2004), *aff'd on other grounds sub nom. Eulitt ex*
    *rel. Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004) ...............................3, 4, 10, 14

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
    565 U.S. 171 (2012) ......................................................................................20

*Lawrence v. Texas*,
    539 U.S. 558 (2003) ......................................................................................19

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018) .................................................................................15

*State ex rel. Nagle v. Olin*,
    415 N.E.2d 279 (Ohio 1980) ..........................................................................20

*Olmstead v. L.C.*,
    527 U.S. 581 (1999) ......................................................................................16

*People v. DeJonge*,
    442 Mich. 266, 501 N.W.2d 127 (1993) ............................................................20

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Plyler v. Doe,*
    457 U.S. 202 (1982)..................................................................................18

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984)..................................................................................15

*Strout v. Comm'r, Me. Dep't of Educ.,*
    13 F. Supp. 2d 112 (D. Me. 1998), *aff'd sub nom. Strout v. Albanese*, 178 F.3d
    57 (1st Cir. 1999).......................................................................................3

*Surinach v. Pesquera De Busquets,*
    604 F.2d 73 (1st Cir. 1979).......................................................................20

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. ___, 137 S. Ct. 2012 (2017)...................................................3, 4

*United States v. Windsor,*
    133 S. Ct. 2675 (2013).............................................................................19

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
    858 F.3d 1034 (7th Cir. 2017)..................................................................18

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972)....................................................................................9

**Statutes**

Fla. Stat. §§ 1002.385, 1002.39, 1002.395, 1002.40 ....................................12

Ind. Code Ann. § 20-51-4-1 ..........................................................................13

Me. Const. art. VIII, Pt. 1, § 1 ...............................................................3, 5, 9

Me. Rev. Stat. tit. 5, § 4552 ..........................................................................14

Me. Rev. Stat. tit. 5, § 4553(2-A) ...................................................................9

Me. Rev. Stat. tit. 5, § 4601 ............................................................................9

Me. Rev. Stat. tit. 20-A, § 2 ............................................................................5

Me. Rev. Stat. tit. 20-A, § 2701 ......................................................................6

Me. Rev. Stat. tit. 20-A, § 2901 ......................................................................7

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

Me. Rev. Stat. tit. 20-A, § 2902 ..........................................................................7, 8

Me. Rev. Stat. tit. 20-A, § 2906 ...............................................................................8

Me. Rev. Stat. tit. 20-A, § 2951 ........................................................................passim

Me. Rev. Stat. tit. 20-A, § 2952 ...............................................................................8

Me. Rev. Stat. tit. 20-A, § 2954 ...............................................................................9

Me. Rev. Stat. tit. 20-A, § 4701 ...............................................................................6

Me. Rev. Stat. tit. 20-A, § 4706 ...............................................................................8

Me. Rev. Stat. tit. 20-A, § 4711 ...............................................................................8

Me. Rev. Stat. tit. 20-A, § 4722 ...............................................................................8

Me. Rev. Stat. tit. 20-A, § 4723 ...............................................................................8

Me. Rev. Stat. tit. 20-A, § 5203 ...............................................................................6

Me. Rev. Stat. tit. 20-A, § 5204 ...............................................................................6

Me. Rev. Stat. tit. 20-A, § 6209 ...............................................................................8

Me. Rev. Stat. tit. 20-A §§ 6352-6358 ......................................................................7

Me. Rev. Stat. tit. 20-A, § 15670 .............................................................................5

**Other Authorities**

Anne M. Hocutt, *Effectiveness of Special Education: Is Placement the Critical
    Factor?*, 6 Future Child. 77 (1996)......................................................................16

Bangor Christian Schools, *Student Handbook* (Aug. 2, 2018),
    https://bit.ly/2XMix64 ......................................................................................15

Bruce D. Baker, Danielle Farrie & David Sciarra, *Is School Funding Fair?* A
    National Report Card (Education Law Center, 7th ed. 2018),
    https://bit.ly/2mw4qQU ...............................................................................11, 13

## TABLE OF AUTHORITIES
### (continued)

Page(s)

C. Kirabo Jackson et al., *The Effect of School Finance Reforms on the
Distribution of Spending, Academic Achievement, and Adult Outcome* (Nat'l
Bureau of Econ. Research, NBER Working Paper No. 20118, 2014),
https://www.nber.org/papers/w20118.pdf ...........................................................................11

C. Kirabo Jackson, et al., *The Effects of School Spending on Educational and
Economic Outcomes: Evidence from School Finance Reforms*, Nat'l Bureau of
Econ. Research, NBER Working Paper Series (Jan. 2015),
https://bit.ly/2TfiwUH ...........................................................................................................10

Calvary Christian Academy, *School Handbook 2018-2019*, https://bit.ly/2W9C5ji....................14

Centers for Disease Control and Prevention, Lesbian, Gay, Bisexual, and
Transgender Health, available at http://www.cdc.gov/lgbthealth/youth.htm ..........................17

Christopher Cousins, *Study of Maine School Funding Recommends Additional
$260 million*, Bangor Daily News (Oct. 29, 2013) ..................................................................11

Dan Carden, *Public Schools Still Receive Most Indiana Education Funding*,
Times of N.W. Ind. (Jan 1, 2017), https://bit.ly/2HvnVpq.......................................................13

Fla. Dep't. of Educ., *Florida Education Finance Program 2018-19 Third
Calculation* 1 (Jan. 11, 2019), https://bit.ly/2JnmKtS ...........................................................13

Ind. Dep't. of Educ. Office of Sch. Fin., *Choice Scholarship Program Annual
Report: Participation and Payment Data* (Feb. 2015) https://bit.ly/2FgoqzP........................13

Kathleen Whitbread, *What Does the Research Say About Inclusive Education?*,
Wrightslaw (1998-2019), https://goo.gl/K6TzL6 ....................................................................16

Leslie Postal, et al., *Schools Without Rules: An Orlando Sentinel Investigation*,
Orlando Sentinel (Oct. 17, 2017), https://bit.ly/2CqdeQP......................................................13

Mark L. Hatzenbuehler et al., *Stigma As a Fundamental Cause of Population
Health Inequalities*, 103:5 Am. J. Pub. Health 813 (2013)...............................................18, 19

## TABLE OF AUTHORITIES
### (continued)

Page(s)

Me. Dep't. of Educ., *2018-2019 Tuition Rates for Private Schools*,
https://bit.ly/2W3kJEu ...........................................................................................................12

Me. Dep't of Educ., *Student Enrollment Data, Private School Data October 1
Counts* 2017/18, https://bit.ly/2CsDxpl ............................................................6

Me. Dep't of Educ., *Student Enrollment Data, Public School Data October 1
Counts* 2018/19, https://bit.ly/2CsDxpl ...........................................................6

Me. Dep't. of Educ., *Private School Approval*, https://bit.ly/2Crl3p4 .......................6

Me. Dep't of Educ., Search for Maine Schools, https://bit.ly/2Oc1PZm ....................11

Me. Dep't of Educ., *Student Enrollment Data, Private School Data October 1
Counts* 2017/18, https://bit.ly/2CsDxpl ...........................................................11

Me. Dep't. of Educ., *Private School Approval, Annual School Approval Report*,
https://bit.ly/2Crl3p4............................................................................................7

Me. State Legislature Office of Policy and Legal Analysis, *Independent Review
the Essential Programs and Services Funding Act*, https://bit.ly/2Fm1f8J ..........11

Michael Leachman, et al., Center on Budget and Policy Priorities, *A Punishing
Decade for School Funding* (Nov. 2017), https://bit.ly/2Jns0gS..............................10

Nat'l Ass'n of Sch. Psychologists & Gender Spectrum, *Gender Inclusive Schools:
Policy, Law, and Practice* (2016) .........................................................................17

Nat'l Ctr. for Educ. Statistics, Private School Universe Survey data for 2015-16,
https://bit.ly/2HENK5r...................................................................................11, 12

Orly Rachmilovitz, *No Queer Child Left Behind*, 51 U.S.F. L. Rev. 203 (2016)...........16

Stephen T. Russell et al., *Safe Schools Policy for LGBTQ Students*, 24 Social
Policy Report, no. 4 (2010)..................................................................................17

Temple Academy, *Parent/Student Handbook 2018-2019,* https://bit.ly/2H8JziO .................14, 15

## *AMICI'S* STATEMENT OF INTEREST

Public Funds Public Schools ("PFPS") is a national campaign to ensure that public funds for education are used to maintain and support public schools. PFPS is a collaboration of the Southern Poverty Law Center, a nonprofit civil rights organization dedicated to seeking justice for the most vulnerable members of society, and Education Law Center, a nonprofit organization serving as one of the most effective advocates for equal educational opportunity and public education rights in the United States.

The National Education Association ("NEA") is a national association of over three million educators who serve our nation's students in public school districts, colleges, and universities.   Since its founding over a century and a half ago, NEA has worked to create, expand and strengthen the quality of public education available to all children including by way of defending in several prior cases the Maine program at issue in this case.

The Maine Education Association ("MEA") is NEA's national affiliate in Maine, which represents over 25,000 educators who teach and support the education of students in Maine school administrative units, colleges, and universities.

*Amici* are committed to ensuring that public education remains the cornerstone of our nation's social, economic and political structure, and that children of all backgrounds have the right to a public education that affords them a meaningful opportunity to succeed in school and in life. *Amici* also respect the decision of individuals, at their own expense, to educate their children in privately supported, non-segregated, non-public schools.  At the same time, *amici* oppose using public tax monies to subsidize private sectarian schools — as the plaintiffs advocate in this case — because doing so undermines funding for public education and causes irreconcilable conflicts between religious freedom and the State's compelling interest in ensuring that all students can access adequately funded public schools, free from discrimination.

-1-

A*mici* submit this brief in support of Defendant Makin to explain the limited role the Maine Tuition Program plays in the State's public education system, and to present argument as to why the State has compelling constitutional interests in limiting participation in the program to non-sectarian private schools.

## INTRODUCTION

The Maine Constitution, like other state constitutions, contains an education article that affirmatively obligates the Maine Legislature (or "State") to ensure "suitable provision . . . for the support and maintenance of public schools" across the state.  Me. Const. art. VIII, Pt. 1, § 1. In Maine, most school administrative units ("SAUs") maintain their own public schools.  But to address the limited circumstance where SAUs do not maintain public schools for all grade levels due to geographic remoteness or historical reasons, the State has fulfilled its constitutional duty by enacting a carefully constructed and regulated system to allow SAUs without their own schools to utilize certain approved non-sectarian private schools to deliver public education to Maine students.

In eight separate rulings on the Maine Tuition Program ("MTP"), Me. Rev. Stat. tit. 20-A, § 2951 *et seq.*, the state and federal courts of Maine have consistently upheld the State's determination, codified at Me. Rev. Stat. tit. 20-A, § 2951(2), to exclude sectarian private schools from the program.[1]  Those cases remain good law and wholly dispose of the challenge here.  Nothing in the Supreme Court's narrowly-worded decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. ___, 137 S. Ct. 2012 (2017), undermines those prior rulings. *Trinity Lutheran* recognizes the "play in the joints between what the Establishment Clause permits and the Free Exercise Clause compels," *id.* at 2019 (quoting *Locke v. Davey*, 540 U.S. 712, 718 (2004) (cleaned up), and left intact *Locke*'s recognition "that state entities, in choosing

---

[1] *Strout v. Comm'r, Me. Dep't of Educ.*, 13 F. Supp. 2d 112 (D. Me. 1998), *aff'd sub nom. Strout v. Albanese*, 178 F.3d 57 (1st Cir. 1999); *Bagley v Me. Dep't. of Educ.*, No. CV-97-484, 1998 WL 35550607, at *1 (Me. Super. Apr. 20, 1998), *aff'd sub nom. Bagley v. Raymond Sch. Dep't.*, 728 A.2d 127 (Me. 1999); *Eulitt v. Me. Dep't of Educ.*, 307 F. Supp. 2d 158 (D. Me. 2004), *aff'd on other grounds sub nom. Eulitt ex rel. Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004); *Anderson v. Town of Durham*, No. CIV.A. CV-02-480, 2003 WL 21386768, at *1 (Me. Super. May 14, 2003), *aff'd*, 895 A.2d 944 (Me. 2006).

how to provide education, may act upon their legitimate concerns about excessive entanglement with religion, even though the Establishment Clause may not require them to do so," *Eulitt ex rel. Eulitt v. Me., Dep't of Educ.*, 386 F.3d 344, 355  (1st Cir. 2004). *Amici* leave to the Defendants the full development of these dispositive arguments.

*Amici* submit this brief to explain how the MTP as presently constituted both continues to address the State's "legitimate concerns," *Eulitt*, 386 F.3d at 355, and advances compelling state interests "of the highest order," *Trinity Lutheran*, 137 S. Ct. at 2019 (internal quotations omitted).  The State has a bedrock constitutional obligation to provide an adequately funded, well-resourced public education to all school-age children, which includes robust oversight of the delivery of public education in schools funded by Maine's taxpayers. The State also has a core, fundamental interest in only funding schools that serve all children equally and do not discriminate based on prohibited characteristics including religion, disability or sexual orientation.

The State has carefully designed the MTP to advance these compelling constitutional interests.  Invalidating section 2951(2) would force the State to provide and fund public education in private schools established solely to advance a sectarian mission.  Doing so would undermine the State's careful construction of a limited program to fulfill its constitutional duty to provide publicly funded education in the narrow circumstances where a traditional public school is not available.  Invalidating section 2951(2) would also divert the limited funding provided by the State in furtherance of its constitutional obligation to maintain and support its public schools. And it would deeply enmesh the State in regulating matters of religion, as the State must fulfill its overarching, constitutional obligation to ensure every Maine child has access to, and receives, a public education free from discrimination.  What is more, because private religious schools –

including those identified by Plaintiffs in this case – often utilize policies for student admissions, employment, or other matters that discriminate on the basis of religion, sexual orientation, and/or disability, invalidating section 2951(2) would be tantamount to forcing the State to fund discrimination.  The State has wisely determined, through the MTP, to avoid this entanglement by allowing, on a limited basis, only regulated, nonsectarian, nondiscriminatory private schools to be eligible to provide publicly funded education, a judgment that survives any level of judicial scrutiny.

I.     **The State has a Compelling Interest in Preserving the MTP as a Limited and Carefully Designed Means to Fulfill the State's Constitutional Obligation Under the Maine Education Article**

The MTP, established by the State in furtherance of an affirmative obligation under the Maine Constitution, is a carefully regulated means to allow SAUs to fund education in nonsectarian private schools in the limited circumstances where public schools are not available.

The State has an affirmative constitutional duty to provide all Maine children with a publicly funded education.  Specifically, the Maine Constitution's Education Article imposes on the Legislature a "duty to require, the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools."  Me. Const. art. VIII, Pt. 1, § 1 (emphasis added).  In furtherance of this constitutional obligation, the Legislature has imposed upon itself the mandatory duty to "enact the laws that are necessary to assure that all school administrative units make suitable provisions for the support and maintenance of the public schools" such that every school-aged person residing in the state "shall be provided an opportunity to receive the benefits of a free public education."  Me. Rev. Stat. tit. 20-A, § 2(1) (emphasis added).  And it has enacted a statutory framework governing numerous aspects of the provision of public education pursuant to that constitutional mandate.  *See, e.g.*, *id.* § 15670 *et seq.* (setting forth the "Essential Programs and Services Funding" formula to ensure school

funding that is "adequate to fully provide for all of the staffing and other material resource needs of the essential programs and services identified by the Legislature"); *id.* § 4701 *et seq.* (setting forth detailed requirements for instruction and for earning a high school diploma).

In most Maine towns, the State fulfills its constitutional mandate to make "suitable provision" for the education of Maine children in traditional public schools, operated by SAUs.[2] Some SAUs, however, due to geography or historical circumstance, do not maintain schools at every grade level. These SAUs use the MTP, which allows them to provide publicly funded education to their resident children in qualifying schools outside their home district using the per-pupil funds allotted under the State's public school finance formula.

In most cases, students in the MTP attend other public schools or private non-sectarian schools that operate under an exclusive contract with the sending SAU. *Id.* §§ 5203(3) (elementary), 5204(3) (secondary); *see also id.* § 2701. SAUs, however, are also authorized to fund other public education at a public or private school selected by the parent, provided the private schools are approved by the State. *Id.* §§ 5203(4) (elementary); § 5204(4) (secondary).[3] The requirements established by the State for a private school to be approved to participate in the MTP include baseline standards of education quality, transparency, and accountability, as well as nondiscrimination.

Private schools "may be approved for the receipt of public funds for tuition purposes only if" they meet certain accreditation and other requirements. *Id.* at § 2951. The private schools

---

[2] Publicly funded private school students make up less than 3% of Maine's public school enrollment: 5,091 of 182,496 students statewide. *Compare* Me. Dep't of Educ., *Student Enrollment Data, Private School Data October 1 Counts* 2017/18 (see tab 3, "AttendCts by SchFiscalType"), *with* Me. Dep't of Educ., *Student Enrollment Data, Public School Data October 1 Counts* 2018/19 (see tab 2, "Attending Counts bySAU"), https://bit.ly/2CsDxpl.

[3] For a current list of "private school[s] approved for attendance purposes," see Me. Dep't. of Educ., *Private School Approval*, https://bit.ly/2Crl3p4.

must be nonsectarian.  *Id.* § 2951(2).  And the schools must "meet[] the requirements for basic school approval" under subchapter I of the statute, *id.* § 2951(1); be incorporated under state and federal law, *id.* § 2591(3); comply with statutory reporting and auditing requirements, *id.* § 2951(5); and release records for students transferring to another school unit, *id.* § 2951(7). Private schools that enroll 60% or more publicly funded students must administer state assessments and meet applicable requirements of the state system of learning results.  *Id.* § 2951(6).  To participate in the Program, schools must also work with the district to ensure that publicly-funded students take assessments required by the federal Every Student Succeeds Act.[4]

The State's requirements for nonsectarian private schools to provide publicly funded education through the MTP under subchapter I are extensive and substantive. Regardless of accreditation method, all participating private schools must abide by "standards for hygiene, health and safety established by applicable law and rule." *Id.* § 2901(1).  The Maine Department of Education, by regulation, requires the private schools to certify compliance with health, safety and fire codes; immunization requirements in Me. Rev. Stat. tit. 20-A §§ 6352-6358; as well as other statutes.[5]

Additionally, the private schools must satisfy one of two accreditation pathways: either secure accreditation from the New England Association of Schools and Colleges or from the Maine Department of Education after meeting the extensive requirements specified in Me. Rev. Stat. tit. 20-A, § 2902.  *Id.* § 2901(2).  Schools using the first pathway must "make available to the commissioner on a timely basis all accreditation reports on the school and shall notify the

---

[4] Me. Dep't. of Educ., *Private School Approval, Annual School Approval Report* at 3, https://bit.ly/2Crl3p4.
[5] *Id.* at 2.

(*continued . . .*)

commissioner promptly upon a determination that the school is not accredited or is on probation." *Id.* § 2906.[6]  For schools using the second pathway, section 2902 imposes requirements for curriculum and instruction, accountability standards, teacher certification, length of school years and days, class size, and other standards governing the substance and quality of education for Maine students. *Id.* § 2902.[7]

The Maine Commissioner of Education closely monitors all approved private schools participating in the MTP through reporting and auditing requirements.  Participating schools must annually "report to the commissioner the information the commissioner may require."  *Id.* §

---

[6] The New England Association of Schools and Colleges' detailed accreditation standards are available on their website: https://www.neasc.org/.

[7] The basic course of study in private elementary schools approved under section 2902, as in public elementary schools, must include "instruction of all students in career and education development, English language arts, world languages, health education and physical education, mathematics, science and technology, social studies and visual and performing arts, as described in the parameters for essential instruction and graduation requirements subject to the schedule specified in section 6209." Me. Rev. Stat. tit. 20-A §§ 2902(3), 4711.  For private secondary schools, approved under section 2902, the statutory high school diploma standards apply.  *Id.* §§ 2902(3), 4722.  These specify "a minimum 4-year program that meets the curriculum requirements established by this chapter and any other instructional requirements established by the commissioner and the school board," *id.* § 4722(1), and required courses in a range of subjects, *id.* § 4722(2).  High schools must also include "instruction in health, safety and physical education, as prescribed by the commissioner, and physiology and hygiene, with special reference to the effects of alcoholic drinks, stimulants and narcotics upon the human system." *Id.* §§ 2902(3), 4723.  Students in all grades must receive instruction in American history, "Maine studies," and Maine Native American history, as prescribed by statute.  *Id.* §§ 2902(3), 4706.

    In addition to instructional requirements, private schools approved under section 2902 must only employ certified teachers.  *Id.* § 2902(5).  Secondary schools approved under section 2902 must meet the statutory requirements of a minimum school year, *id.* § 2902(6)(A), and "a school day of sufficient length to allow for the operation of [their] approved education program," *id.* § 2902(6)(B).  They must have a student-teacher ratio not exceeding thirty to one, *id.* § 2902(6)(C), include not less than two consecutive grades from 9 to 12, § 2902(6)(D), and maintain adequate, safely protected records, *id.* § 2902(6)(E).  Moreover, any private school approved under section 2902 must meet the requirements "for administering reintegration planning" under Maine statute.  *Id.* § 2902(10).

*(continued . . .)*

2952.  Additionally, the Commissioner "may adopt rules regarding tuition charges, accounting, audits, contracts and other aspects of schooling privileges arranged between a private school and school administrative units."  *Id.* § 2954.

Finally, the State's anti-discrimination law, the Human Rights Act ("HRA"), applies to "any private school or educational program approved for tuition purposes." Me. Rev. Stat. tit. 5, § 4553(2-A).  The HRA proscribes, *inter alia*, discrimination in educational programs "because of sex, sexual orientation, a physical or mental disability, national origin or race."  *Id.* § 4601.[8]

Plaintiffs' challenge to the MTP must be evaluated against the role it fulfills within the State's constitutionally-prescribed system of public schools.  Maine not only has a constitutional duty to provide public education under Article VIII of its constitution, it has a fundamental interest in ensuring an educated populace.  Me. Const. art. VIII, Pt. 1, § 1 (recognizing that "[a] general diffusion of the advantages of education" is "essential to the preservation of the rights and liberties of the people"); *see also Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972) (affirming that "some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence").  The MTP allows the State to provide public education in those limited circumstances where students do not have reasonable access to a SAU-operated public school.  The State has imposed an extensive and carefully constructed statutory and regulatory framework to ensure the nonsectarian private schools participating in the MTP provide students with education consistent with the State's public education standards and requirements, and in a school environment free

---

[8] The Maine Supreme Court has found that the Human Rights Act's prohibition on sexual orientation in education also prohibits discrimination on the basis of gender identity. *Doe v. Reg'l Sch. Unit 26*, 86 A.3d 600 (Me. 2014).

from discrimination.  The State has a compelling interest in maintaining the MTP in its limited, carefully constructed form.

## II.    The State has a Compelling Interest in Safeguarding Public Funds for Public Schools

As the First Circuit observed in its 2004 ruling on the MTP, "the legislative history [of Section 2951(2)] clearly indicates" that a key reason for excluding religious schools from the program was the State's "interest[] in concentrating limited state funds on its goal of providing secular education."  *Eulitt*, 386 F.3d at 356. The State's determination to restrict private school participation in the MTP to nonsectarian private schools furthers the State's compelling interest in ensuring adequate funding for its public school system.[9]  Conversely, expanding the MTP to sectarian private schools, as Plaintiffs seek, would undermine the State's core obligation to adequately fund its public schools and thereby "maintain" and "support" those schools as mandated by the Education Article of the Maine Constitution.

It is well established that current funding of the State's public schools is not adequate. Maine public school funding levels have not recovered from the 2008 recession.  As of late 2017, public school funding remained 9 percent below pre-recession levels.[10]  In 2013, a State-commissioned study found that, to satisfy an evidence based funding formula, the Legislature needed to increase funding for public education by $260 million per year, which it has not

---

[9] A growing body of research evidence demonstrates the correlation of increases in public school funding with improved outcomes for students. *See, e.g.,* C. Kirabo Jackson, et al., *The Effects of School Spending on Educational and Economic Outcomes: Evidence from School Finance Reforms*, Nat'l Bureau of Econ. Research, NBER Working Paper Series (Jan. 2015), https://bit.ly/2TfiwUH (finding that funding increases led to more completed years of education, higher wages, and reduced poverty).

[10] Michael Leachman, et al., Center on Budget and Policy Priorities, *A Punishing Decade for School Funding* (Nov. 2017), https://bit.ly/2Jns0gS.

(*continued . . .*)

-10-

done.[11]  Further, another study shows a lack of funding in the State's public schools serving high concentrations of students in poverty: the report found that the State devotes only about $0.84 in education funding to high-poverty students for every dollar that it spends on low-poverty students,[12] even though research overwhelmingly shows that low income students need additional programs and services to have the same opportunity to succeed in school as high income students.[13]  Maine also ranks second to last in the nation in providing access to early childhood education, even for low-income students.[14]

This backdrop of chronic and significant shortfalls in public school funding provides a crucial context for evaluating the current restrictions on sectarian private school participation in the MTP.  Reasonable estimates of such participation show that the likely fiscal impact would not be de minimis, but consequential.  According to the most recent available data,[15] 5,091 students currently attend private schools using public funds provided under the MTP.[16]  There

---

[11] Christopher Cousins, *Study of Maine School Funding Recommends Additional $260 million*, Bangor Daily News (Oct. 29, 2013), https://bit.ly/2CqPyLT, citing Lawrence O. Picus and Associates, *An Independent Review of Maine's Essential Programs and Services Funding Act* (April 1, 2013), https://bit.ly/2WcYtIz. *See also* Me. State Legislature Office of Policy and Legal Analysis, *Independent Review the Essential Programs and Services Funding Act*, https://bit.ly/2Fm1f8J.

[12] Bruce D. Baker, Danielle Farrie & David Sciarra, *Is School Funding Fair?* A National Report Card at 11 (Education Law Center, 7th ed. 2018), https://bit.ly/2mw4qQU.

[13] *See, e.g.*, C. Kirabo Jackson et al., *The Effect of School Finance Reforms on the Distribution of Spending, Academic Achievement, and Adult Outcomes* at 35, 44 (Nat'l Bureau of Econ. Research, NBER Working Paper No. 20118, 2014), https://www.nber.org/papers/w20118.pdf.

[14] Baker, *supra* note 12 at 25.

[15] Because private schools are not required to report to the State, the best and most recent available data about their enrollment is spread across three sources. *See* Me. Dep't of Educ., *Student Enrollment Data, Private School Data October 1 Counts* 2017/18, https://bit.ly/2CsDxpl; Me. Dep't of Educ., Search for Maine Schools, https://bit.ly/2Oc1PZm (sort by Public/Private: Private); *and* Nat'l Ctr. for Educ. Statistics, Private School Universe Survey data for 2015-16, https://bit.ly/2HENK5r (search by State: Maine). We have summarized the relevant enrollment data and attached it to this Brief as Appendix A.

[16] Appendix A.

(*continued . . .*)

are roughly 4,532 private sectarian school students in Maine.[17]  The total private school

enrollment in the State, including both MTP-funded students and non-MTP-funded students, is

14,235 students.[18] This means that the MTP now funds approximately 36% of private school

students at the current state set rate of  $9,272 for elementary school and $11,759 for secondary

school.[19]

Assuming that ending the restriction on sectarian schools would result in just 36% of

private sectarian school students (or roughly 1,632 students) obtaining MTP funding, the cost to

Maine public schools would be between $15,131,904 and $19,190,688 per year, depending on

the students' grade levels.[20] And if one makes the realistic assumption that the State will fund

sectarian private school students at the same overall rate at which it funds non-sectarian private

school students—namely, 52%,[21] the fiscal impact will be far greater, ranging between

$21,854,104 and $27,715,963 per year.[22]

Another way to gauge the fiscal impact of allowing sectarian private schools to

participate in the MTP can be gleaned from other states that provide public funding to attend

such schools.  In Florida, for instance, a panoply of private school voucher programs with a

variety of funding mechanisms, Fla. Stat. §§ 1002.385, 1002.39, 1002.395, 1002.40, draws

---

[17] *Id.*

[18] *Id*.

[19] Me. Dep't. of Educ., *2018-2019 Tuition Rates for Private Schools*, https://bit.ly/2W3kJEu, citing Me. Rev. Stat. tit. 20-A, § 5804(2).

[20] The number likely skews to the higher end of this range given that many Tuition districts run their own primary schools and send their students elsewhere once they reach high school.

[21] Appendix A.

[22] Of course, the financial impact would be even greater if more private sectarian schools opened in Maine as a result of the Court's ruling and/or if a greater proportion of students enrolled in the now funded private sectarian schools.

(*continued . . .*)

approximately $1 billion per year in public funding away from traditional public schools[23] —
costing roughly 5% of the state's annual education budget.[24]  Florida's funding for exclusively
public schools is, at this point, among the lowest in the nation.[25]  As another example, Indiana
has a statewide private school voucher program funded directly with per pupil revenue.  Ind.
Code Ann. § 20-51-4-1, *et seq*.  Despite a cap on family incomes for participating students — a
restriction that does not exist in Maine's program and is not included in Plaintiffs' requests for
relief — the program had, by 2015, created a $40 million deficit in the state's budget.[26] This
year, Indiana will spend $174 million on private school vouchers,[27] over half to students who
have never attended, or might never attend, a public school.[28]

The funding impacts that underlie the current construction of the MTP are neither
abstract nor irrelevant: they strike at the core of the Legislature's constitutional duty to maintain
and support public schools through the provision of adequate funding and essential education
resources to meet the needs of Maine public school students.  Thus, the State has a heightened
and substantial interest in safeguarding taxpayer dollars for exclusive use in the delivery of
public education.  This interest is compelling and strongly militates against forcing the State to
divert limited public monies from an already inadequately funded public school system to private
schools whose core mission and purpose is not public education but private religious education.

---

[23] Leslie Postal, et al., *Schools Without Rules: An Orlando Sentinel Investigation*, Orlando
Sentinel (Oct. 17, 2017), https://bit.ly/2CqdeQP. (last visited April 4, 2019)
[24] Fla. Dep't. of Educ., *Florida Education Finance Program 2018-19 Third Calculation* 1 (Jan.
11, 2019) (reflecting total funding of $21,093,968,372), https://bit.ly/2JnmKtS.
[25] Baker, *supra* note 12 at 21.
[26] Ind. Dep't. of Educ. Office of Sch. Fin., *Choice Scholarship Program Annual Report:
Participation and Payment Data* at 23 (Feb. 2015) https://bit.ly/2FgoqzP.
[27] Dan Carden, *Public Schools Still Receive Most Indiana Education Funding*, Times of N.W.
Ind. (Jan 1, 2017), https://bit.ly/2HvnVpq. (last visited April 4, 2019)
[28] *Id*. at 15.

### III.    The State Has a Compelling Interest in Ensuring Public Schools are Accountable, Inclusive and Free from Discrimination

The *Eulitt* Court identified additional legitimate motivations for Section 2951(2)'s exclusion of sectarian schools: specifically, the State's interest in "avoiding entanglement, and allaying concerns about accountability that undoubtedly would accompany state oversight of parochial schools' curricula and policies."  386 F.3d at 356.

Maine's antidiscrimination law seeks to eradicate the underlying causes of discrimination and halt discriminatory practices—in education and elsewhere—that stigmatize and make second-class citizens of certain Mainers. Me. Rev. Stat. tit. 5, § 4552 (public policy "to prevent discrimination in … access to public accommodations on account of race, color, sex, sexual orientation, physical or mental disability, religion, ancestry or national origin" requires the State to "review all practices infringing on the basic human right to a life with dignity" in order to "protect the public health, safety and welfare.").

Yet the private sectarian schools plaintiffs seek to allow to participate in the MTP explicitly discriminate based on religion and disability. Calvary Christian Academy has a strict policy requiring all students to attend services at the school's affiliated church or at another church "of like faith and doctrine."[29] At Temple, only Christian families are permitted to enroll children, given its requirement that "at least one parent must be born-again and in regular attendance at a Bible-believing church."[30]  Temple's handbook also states that it will not accept any child with "substantial learning problems or disabilities. All students MUST be able to function in a normal classroom setting."[31]

---

[29] Calvary Christian Academy, *School Handbook 2018-2019* 2, 4, https://bit.ly/2W9C5ji.
[30] *Id*.
[31] Temple Academy, Handbook, *supra* note 34 at 9 (emphasis in original).

Likewise, the Bangor Christian School teaches its students that "the term 'marriage' has only one, legitimate meaning, and that is marriage sanctioned by God, which joins one man and one woman in a single, covenantal union," and that "any other type of sexual activity...including those that are becoming more accepted in the culture and the courts, are sinful perversions."[32]  It also teaches that "[p]resenting oneself as a gender other than the one included on his or her birth certificate" may be grounds for "immediate suspension and probable expulsion."[33]  At Temple Academy, the antidiscrimination policy covers race and national origin—but does not prohibit discrimination on the basis of sexual orientation, disability, or religion.[34]

Eliminating discrimination in education serves interests of the highest order. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984); *see also Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1728 (2018) (a state "can protect gay persons, just as it can protect other classes of individuals"); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (government's compelling interest in eradicating race discrimination in education overrode burden on religious exercise). Discrimination against students on the bases of, among other things, disability or LGBTQ status, denies them equal educational opportunities and denies them basic respect and dignity. Such discrimination harms not only the students who face discrimination but also other students and the entire school community. The resulting harms spread through society as well, as denials to students of equal educational opportunities, become denials of equal opportunity to contribute to the community at large. And the mere presence of state-sanctioned discrimination harms all Mainers because it tells them that they too—in whatever facet of life they find themselves—are not worthy of equal respect. Allowing state-

---

[32] Bangor Christian Schools, *Student Handbook* at 4 (Aug. 2, 2018), https://bit.ly/2XMix64.
[33] *Id*. at 21.
[34] Temple Academy, *Parent/Student Handbook 2018-2019* at 9 https://bit.ly/2H8JziO.

funded schools to discriminate against children and their families based on a disability or their religion, sexual orientation, or gender identities would cause all these harms and would undermine the state's effort to prevent them.

As one example, discrimination against students with disabilities denies those students equal opportunities and ensures that students who attend those schools will be denied the benefits of attending school with disabled students. Such discrimination, particularly if it results in further segregation of disabled students, has long been prohibited. *Olmstead v. L.C.*, 527 U.S. 581 (1999). When students with disabilities are educated alongside their non-disabled peers, disabled and non-disabled students score higher on literacy measures, perform better on standardized tests, get better grades, and are more likely to master their individualized education program goals. *See* Kathleen Whitbread, *What Does the Research Say About Inclusive Education?*, Wrightslaw (1998-2019), https://goo.gl/K6TzL6; Anne M. Hocutt, *Effectiveness of Special Education: Is Placement the Critical Factor?*, 6 Future Child. 77, 91 (1996).

The anti-LGBTQ policies are also deeply harmful. LGBTQ students, even in the absence of explicit discriminatory policies, face serious hurdles to their educational success. They too often face discrimination and verbal and physical and even sexual assault. These experiences lead to withdrawal, lower academic achievement, depression, and even higher rates of suicide. *See, e.g.*, Orly Rachmilovitz, *No Queer Child Left Behind*, 51 U.S.F. L. Rev. 203, 204-205 (2016) ("Social science research has shown that LGBT youth who face homophobia or transphobia through discrimination or harassment in schools are at higher risk of drug use, risky sexual behavior, suicidality, and other mental health risks than straight youth" and "also more likely to slip in their academic achievements and less likely to graduate high school or go to college.") (citations omitted).

-16-

On the other hand, in schools that protect LGBTQ students from discrimination, students have better relationships with staff and, as a result, feel safer when at school. Nat'l Ass'n of Sch. Psychologists & Gender Spectrum, *Gender Inclusive Schools: Policy, Law, and Practice* at 2 (2016) (citing Jenifer K. McGuire et al., *School Climate for Transgender Youth: A Mixed Method Investigation of Student Experiences and School Responses*, 39 J. Youth & Adolescence 1175 (2010)). And LGBTQ students have more academic success at such schools. Stephen T. Russell et al., *Safe Schools Policy for LGBTQ Students*, 24 Social Policy Report, no. 4, at 6–7 (2010). As the Centers for Disease Control explained, "[f]or youth to thrive in their schools and communities, they need to feel socially, emotionally, and physically safe and supported."[35]

But if the Plaintiffs prevail, the State will be funding schools that either prevent LGBTQ students from attending or schools that discriminate against them and harm them once they arrive. To attend, they would be compelled to live closeted school lives filled with the shame and stigma that such overt discrimination bestows. If Maine funded such schools, it too would be signaling to LGBTQ students and their families that they and their lives are not worthy of society's equal respect; that they are outcasts and pariahs who ought to be feared; and that their classmates must be protected from them. The "necessary consequence" of such an outcome is to demean and stigmatize LGBTQ students. *C.f.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015).

This state-sanctioned discrimination would not only harm LGBTQ students; it would harm all students as well. "[A]ll students' needs are best served when students are treated

---

[35] Centers for Disease Control and Prevention, Lesbian, Gay, Bisexual, and Transgender Health, available at http://www.cdc.gov/lgbthealth/youth.htm

equally." *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1055 (7th

Cir. 2017). As the Third Circuit recognized, LGBTQ protections in schools

> foster[] an environment of inclusivity, acceptance, and tolerance. . . . [T]hese values
> serve an important educational function for both transgender and cisgender students.
> When a school promotes diversity and inclusion, classroom discussion is livelier,
> more spirited, and simply more enlightening and interesting because the students
> have the greatest possible variety of backgrounds. Students in diverse learning
> environments have higher academic achievement leading to better outcomes for all
> students. Public education must prepare pupils for citizenship in the Republic, and
> inclusive classrooms reduce prejudices and promote diverse relationships which later
> benefit students in the workplace and in their communities. Accordingly, the School
> District's policy not only serves the compelling interest of protecting transgender
> students, but it benefits all students by promoting acceptance.

*Doe v. Boyertown Area* School *District*, 897 F.3d 518, 529  (3d Cir. 2018) (footnotes, citations,

brackets, and internal quotation marks omitted).

     The harm of educational discrimination does not end there. As the Supreme Court has

recognized, depriving educational opportunity to any subset of students necessarily harms

broader society. "[E]ducation provides the basic tools by which individuals might lead

economically productive lives to the benefit of us all. . . ." *Plyler v. Doe*, 457 U.S. 202, 221

(1982). And "significant social costs [are] borne by our Nation when select groups are denied the

means to absorb the values and skills upon which our social order rests." *Id.*

     Finally, state funding of discrimination would harm all Mainers, and particularly

stigmatize LGBTQ Mainers. LGBTQ Americans experience a "fundamental social cause" of

harm when they are among other things, denied admission, or when the state authorizes

discrimination against them. *See* Mark L. Hatzenbuehler et al., *Stigma as a Fundamental Cause

of Population Health Inequalities*, 103:5 Am. J. Pub. Health 813, 813 (2013).  The stigma-related

minority stress experienced by LGBTQ people has been linked to a disproportionately high

prevalence of psychological distress, depression, anxiety, substance-use disorders, and suicidal

ideation and attempts—many of which are two to three times greater among LGBTQ populations.  *See generally*, Brief of Amici Curiae American Public Health Association and Whitman-Walker Health in Support of Petitioners, *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), 2015 WL 1022680 (citing significant research showing that "[s]tigma is associated with a marked gap in health outcomes between LGB and heterosexual individuals. Study after study confirms that LGB individuals suffer from higher rates of depression, physical illness, and disability compared to heterosexuals.").

The "purpose and practical effect" of the discriminatory policies of sectarian schools here would "impose a disadvantage, a separate status, and so a stigma" upon all who are denied enrollment, or expelled, based upon their statuses.  *United States v. Windsor,* 133 S. Ct. 2675, 2693 (2013). Research has shown that in U.S. regions where LGBTQ people have better social and legal conditions, they also have better health and lesser health disparities compared with heterosexuals.  Hatzenbuehler at 813. Allowing schools to receive public funds yet still allowing them to fail to serve all students equally "would undercut the 'equal dignity'" of individuals that governments have the right to protect.  *See Obergefell*, 135 S. Ct. at 2608; *see also Windsor*, 133 S. Ct. 2675, 2692, 2694 (2013); *Lawrence v. Texas*, 539 U.S. 558, 567, 574-75 (2003).

It is not enough to say that the State can respond to these problems by requiring the sectarian schools to comply with Maine's anti-discrimination laws and other education-related laws.  At best, such a response would impose upon the State the heavy, complex, and time-consuming burden of ensuring these schools safeguard student health and safety; serve students with disabilities and other education needs; promote educational quality; and meet the State's education standards and performance goals for its public schools, including its legal obligation to provide an inclusive, non-discriminatory school system.  At worst, the State would be limited in

how it could regulate these schools and ensure nondiscrimination because doing so would entangle the State in the religion-based missions of the sectarian schools.[36]

The State has a compelling interest and unyielding federal and state legal obligation to prevent discrimination in its public school system.  As the record before this Court shows, sectarian schools maintain policies that are plainly discriminatory and clearly impermissible in the public schools.  In the performance of its core constitutional duties, the State must not use public funds to support discriminatory policies and practices, both because doing so is prohibited and because research shows that these practices are harmful to children and their educational outcomes.

## CONCLUSION

For the foregoing reasons, *amici* urge this Court to grant summary judgment for the Defendant.

Respectfully submitted,
Andrew T. Mason  /s/
Andrew T. Mason
Counsel for Amici Maine Education
Association
Maine Education Association
35 Community Drive
Augusta Maine 04330
(207) 622-5866
amason@maineea.org

---

[36] *See, e.g., Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012) (holding that the Constitution's Religion Clauses prevent a sectarian teacher from asserting rights under federal anti-discrimination laws); *People v. DeJonge*, 442 Mich. 266, 501 N.W.2d 127 (1993) (holding that teacher certification requirement for home schooling violated the Free Exercise Clause); *Surinach v. Pesquera De Busquets*, 604 F.2d 73, 74 (1st Cir. 1979) (holding that subpoenaing parochial school financial records as part of an investigation of private school costs, under a consumer protection law designed to address inflationary trends, "constituted an impermissible entanglement of the affairs of church and state."); *State ex rel. Nagle v. Olin*, 415 N.E.2d 279, 286 (Ohio 1980) (striking down minimum standards as applied to an Amish family and noting that "many private parochial elementary schools find it possible to comply with the state's minimum standards and, at the same time, further their religious objectives.").

**Appendix A – Private School Enrollment in Maine for the 2017-18 School Year
as reported by the Maine Department of Education**

| Private School Enrollment in Maine | | |
|---|---|---|
| Religious | 4,532 | |
| Nonreligious | 3,730 | |
| Private 60% Publicly Funded | 5,444 | |
| Private Special Purpose | 529 | |
| **Total Private School Students** | **14,235** | |
| | **All Private Non-Sectarian Publicly Funded School Students** | **5,091** |
| | **Percent Publicly Funded** | **36%** |
| | | |
| | **All Private Non-Sectarian Students** | **9,703** |
| | **All Private Non-Sectarian Publicly Funded School Students** | **5,091** |
| | **Percent Publicly Funded** | **52%** |

Source:  Me. Dep't of Educ., *Student Enrollment Data, Private School Data October 1 Counts*
2017/18,  https://bit.ly/2CsDxpl;  Me. Dep't of Educ., Search for Maine Schools,
https://bit.ly/2Oc1PZm (sort by Public/Private: Private).

-21-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of April, 2019, a copy of the foregoing Brief was filed

electronically. Service of this filing will be made on all ECF-registered counsel by operation of

the court's electronic filing system. Parties may access this filing through the court's system.

<u>Andrew T. Mason /s/</u>
Andrew T. Mason
Counsel for Amici Maine Education Association
Maine Education Association
35 Community Drive
Augusta Maine 04330
(207) 622-5866
amason@maineea.org