UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| DAVID and AMY CARSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 18-cv-00327 DBH |
| ) | |
| A. PENDER MAKIN, in her ) | |
| official capacity as Commissioner of ) | |
| the Maine Department of Education, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

As anticipated in Defendant's Motion for Summary Judgment with Incorporated Memorandum of Law ("Defendant's Memorandum"), plaintiffs' entire argument hinges on a combination of a misinterpretation of the benefit offered by Maine's tuition program and an unreasonably broad reading of the Supreme Court's *Trinity Lutheran* decision.  Additionally, plaintiffs fail to demonstrate standing to bring their claims, as no sectarian school is likely to accept public funds even if plaintiffs were successful, and they fail to justify bypassing the First Circuit's *Eulitt* decision, which squarely resolves many of the issues presented in their complaint and which has not been overruled, or even cast into doubt, by *Trinity Lutheran*.  This matter continues to be governed by the Supreme Court's decision in *Locke v. Davey*, 540 U.S. 712 (2004), which held that the Free Exercise Clause's protection of religious beliefs and practices from direct government encroachment does not lead to an affirmative requirement that public entities fund religious activity simply because they choose to fund the secular equivalent.  The Defendant's Memorandum, which addresses each of these points in detail, is hereby incorporated

1

by reference as if restated herein.  A few of plaintiffs' arguments, do, however, warrant additional brief responses:

## Lack of Standing

Plaintiffs' assertion that "there is no obvious bar to [BCS' or TA's] willingness to accept public tuition payments" is incorrect.  Plaintiffs' Motion at p. 7 and n. 7.  Plaintiffs focus solely on an exception in the Maine Human Rights Act ("MHRA") that allows sectarian schools to discriminate against *students* based on their sexual orientation.  However, as discussed in Defendant's Memorandum, it is unlawful under the MHRA to refuse to *hire* a person because of his or her sexual orientation.  5 M.R.S. § 4572(1)(A).  While there is an exception that allows religious organizations to discriminate against homosexuals in hiring decisions, it applies only to religious organizations "that do[] not receive public funds."  5 M.R.S. § 4553(10)(G).  BCS testified that it would consider accepting public funds only if it did not have to make "any changes in how it operates."  Joint Statement of Facts ("JSF"), ¶ 127.  Currently, it will not hire homosexual teachers.  ¶ 126.  TA was clear that it would refuse to accept public money if it meant that it could no longer exclude homosexuals from teaching positions.  ¶ 184.

## Rationale for Exemption of Secular Schools

Plaintiffs argue that the State's only rationale for Section 2951(2) is concern about violating the Establishment Clause and any other reason is an impermissible post-hoc justification.  Plaintiffs' Motion at pp. 15-18.  As an initial matter, it would not matter whether there was evidence of the Legislature's actual reasons for excluding sectarian schools from the public tuition program.  *See, e.g., F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the

challenged distinction actually motivated the legislature."); *see also Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 214 (1st Cir. 2002).[1] In any event, though, there is evidence of the Legislature's rationale, in the form of statements made by legislators while considering (and rejecting) a repeal of the exclusion. JSF, ¶¶ 189-202. There is no reason to treat these statements differently simply because they were offered as reasons not to repeal the exclusion as opposed to reasons for implementing the exclusion in the first place.

Further, the plaintiffs impermissibly seek to relitigate the issue at the heart of *Eulitt*, which was decided fully in the State's favor. As detailed in the Defendant's Memorandum, the *Eulitt* case, and its state court counterpart *Anderson*, centered on the impact of the Supreme Court's decision in *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002). *Zelman* held, for the first time, that it was possible for a state to develop a so-called "voucher" program that would allow parents to use public money to pay for sectarian schools without violating the Establishment Clause. 536 U.S. at 662-63. The *Eulitt* and *Anderson* plaintiffs challenged the constitutionality of Section 2951(2), contending that since the State's defense in *Bagley* and *Strout* focused on its concern about violating the Establishment Clause and that concern had been addressed by *Zelman*, there was now no justification for the continued exclusion of sectarian schools. Both the First Circuit and Maine's Law Court disagreed, pointing to the legislative record that reflected the Maine Legislature's careful consideration of whether Maine should maintain a secular public education program. The Court of Appeals concluded:

> [T]he legislative history clearly indicates Maine's reasons for excluding religious schools from education plans that extend public funding to private schools for the

---

[1] The case relied upon by the plaintiffs -- *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) – is not to the contrary. There, the Supreme Court held that it would not "accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose *could not have been a goal* of the legislation." *Id*. at 648 n.16 (emphasis added). Here, there is no evidence that the proffered reasons could not have been the Legislature's goals. To the contrary, as will be discussed below, there is affirmative evidence that these reasons actually did motivate the Legislature, and both the First Circuit and Law Court have recognized as much.

> provision of secular education to Maine students. These reasons include Maine's interests in concentrating limited state funds on its goal of providing secular education, avoiding entanglement, and allaying concerns about accountability that undoubtedly would accompany state oversight of parochial school's curricula and policies (especially those pertaining to admission, religious tolerance, and participation in religious activities).

*Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344, 356 (2004).

The Law Court stated:

> Thus, we are not bound by the justification proffered by the State in support of the statute in *Bagley*, or offered in support of the legislation in 1981. The justifications for the statute asserted by the State now are not inconsistent with or contradictory to prior stated goals. Avoiding excessive entanglement between religion and state, a component of compliance with the Establishment Clause, was an original justification for the statute, and is asserted by the State in this litigation.

*Anderson v. Town of Durham*, 895 A.2d 944, 960, 2006 ME 39 (2006). In sum, the rationale for the State's continued commitment to a secular public education program has been fully established.

## Standard of Review

Plaintiffs are incorrect that *Trinity Lutheran* establishes a different standard of review for their free exercise claim than that applied by the First Circuit in *Eulitt*. Plaintiffs' Motion at pp. 12-15. *Trinity Lutheran* and *Locke*, which the Court did not disturb, contain two different situations which lead to two different levels of judicial scrutiny. Public benefit programs such as the Scrap Tire Program in *Trinity Lutheran*, which categorically excluded churches solely because they are churches from the same benefit available to non-churches (and which did not implicate the church's "religious endeavors") fall into the category of discrimination on the basis of religious status and are subject to strict scrutiny. *Trinity Lutheran*,137 S. Ct. at 2019. In contrast, the scholarship program upheld in *Locke* and Maine's tuition program do not discriminate based on religious *status*, but rather restrict the permissible *uses* of public funding to

avoid paying for religious education and training – activities described by *Locke* as an "essentially religious endeavor." *Locke*, 540 U.S. at 721. These cases implicate traditional state antiestablishment interests which the *Locke* Court viewed as remaining relevant even after *Zelman*, and the *Trinity Lutheran* Court left alone. 540 U.S. at 719; *Trinity Lutheran*, 137 S. Ct. at 2024 n.3 ("We do not address religious uses of funding . . .").[2]

### The Establishment Clause

Plaintiffs argue that Section 2951(2) violates the Establishment Clause because, according to them, it has the "primary effect" of "inhibiting religion." Plaintiffs' Motion at pp. 20-21. Plaintiffs cite no precedent supporting the novel proposition that refusing to fund sectarian schools somehow inhibits religion. Nor does such a proposition make any sense. Plaintiffs are free to practice their religion however they see fit. There is no evidence in the record suggesting that the plaintiffs' religion requires them to send their children to religious schools. To the contrary, the Carsons and the Gilleses testified that their religion does not require them to send their children to religious schools, and one of the Nelsons' children attends a secular private school. JSF, ¶¶ 36, 52, 60. But even if attending a religious school were a necessary part of a person's religion, that would not mean that the State would be inhibiting religion if it failed to subsidize it. Excluding sectarian schools from a public tuition program is a far cry from denying welfare benefits to persons who practice a particular religious faith. *See* Plaintiffs' Motion at p. 21.

Nor does Section 2951(2) violate the Establishment Clause by "excessively entangling the State with religion." Plaintiffs' Motion at pp. 21-22. Maine does not examine the religious beliefs or practices of a school seeking public funds, and plaintiffs point to no evidence to the

---

[2] In other words, a statute does not lose its neutrality, and thus become subject to strict scrutiny, simply because it precludes state funding of a religious educational choice. *Locke*, 540 U.S. at 720; *Eulitt,* 386 F.3d at 356.

contrary.³  Rather, Maine simply looks at whether the school promotes a particular faith and/or teaches through the lens of that faith.  See Def.'s Answers to Ints., ¶ 7 (Docket Item 24-3, PageID 222).  Schools generally self-identify themselves, and, if there is ever a question, the determination of whether a school is secular could readily be made by looking at objective factors such as mandatory attendance at religious services and course curricula.

### Free Speech Clause

Citing *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995), plaintiffs argue that the tuition program violates the First Amendment's Free Speech Clause because it "enables [Maine parents] to exercise their right to choose teachers they want their children to hear speak – but Maine discriminates against religious speakers."  Plaintiffs' Motion at pp. 22-23.  The First Circuit rejected this argument in *Eulitt*, stating that the Section 2951(2) "does not implicate the [plaintiffs'] speech rights at all," and that *Rosenberger* and the other cases relied upon by plaintiffs "are not relevant."  386 F.3d at 357-58.  Inasmuch as *Trinity Lutheran* did not even involve a free speech claim, there is no basis for relitigating this issue.⁴

### Conclusion

For the reasons set forth above and in Defendant's Memorandum, the plaintiffs' Motion for Summary Judgment should be denied.

---

³ The only evidence of "entanglement" plaintiffs cite is an instance in which a Department of Education official asked a school whether students were allowed to "opt out" of attending chapel services.  Plaintiffs' Motion at p. 21.  After a school representative explained that chapel services were mandatory but that the services were not religious, the school was approved.  See Docket Item 24-2, PageID 175-182.  State officials never asserted, as plaintiffs claim, that the school "must be sectarian" because it held chapel services.

⁴ Plaintiffs did not brief their due process claim and appear to have abandoned it.

DATED: May 1, 2019         A. PENDER MAKIN
By her attorneys:

AARON M. FREY
Attorney General

/s/Sarah A. Forster
SARAH A. FORSTER
CHRISTOPHER C. TAUB
Assistant Attorneys General
Office of the Attorney General
Six State House Station
Augusta, Maine 04333-0006
Tel. (207) 626-8866
sarah.forster@maine.gov
christopher.c.taub@maine.gov

CERTIFICATE OF SERVICE

I hereby certify that on this, the 1st day of May 2019, I electronically filed the above document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

BENJAMIN BULL
bbull@firstliberty.org

JEFFREY T. EDWARDS
jedwards@preti.com

TIMOTHY D. KELLER
tkeller@ij.org

ARIF PANJU
apanju@ij.org

LEA PATTERSON
lepatterson@firstliberty.org

JONATHAN R. WHITEHEAD
jon@whiteheadlawllc.com

MICHAEL K. WHITEHEAD
mike@thewhiteheadfirm.com

To my knowledge, there are no non-registered parties or attorneys participating in this case.

Dated:  May 1, 2019

/s/ Christopher C. Taub
CHRISTOPHER C. TAUB
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8866
sarah.forster@maine.gov