## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| DAVID and AMY CARSON, on their own behalf and as next friends of their child, O.C.; ALAN and JUDITH GILLIS, on their own behalf and as next friends of their child, I.G.; and TROY and ANGELA NELSON, on their own behalf and as next friends of their children, A.N. and R.N., <br><br> Plaintiffs, <br><br> v. <br><br> A. PENDER MAKIN, in her official capacity as Commissioner of the Maine Department of Education, <br><br> Defendant. | Civil Action No. 1:18-cv-00327-DBH |

---

### Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment

---

The Court should deny Defendant's Motion for Summary Judgment because the U.S. Supreme Court's recent decision in *Trinity Lutheran Church of Columbia v. Comer*, 137 S. Ct. 2012 (2017), makes it clear that denying citizens a generally available benefit based on religion, without a compelling interest, violates the Free Exercise Clause. The tuition benefit at issue in this case excludes otherwise eligible parents, like Plaintiffs, from receiving the benefit when they choose religious schools; for no valid reason. *See* 20-A M.R.S.A. § 2951(2) (the "Sectarian Exclusion"). As explained below, the Sectarian Exclusion violates not only the Free Exercise Clause, but also the Establishment Clause's command that government remain neutral regarding religion. And, by discriminating against religion, it violates the Equal Protection and Free Speech Clauses. Defendant is thus not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .......................................................................... iii

ARGUMENT ............................................................................................2

I.  Plaintiffs Have Standing Because Eliminating the Sectarian Exclusion Will Remove the Barrier to Their Participation in the Tuitioning System and Provide Them the Opportunity to Have Their Children's Tuition Paid at a Religious School ........................3

    A.  Plaintiffs Need Not Show with Absolute Certainty that the Religious Schools Will Accept Public Funds to Maintain Their Lawsuit. They Need Only Show They Are Denied Equal Access to the Town Tuitioning System ...................................4

        1.  Plaintiffs Have Standing Under *Eulitt* ...................................4

        2.  Plaintiffs Have Standing Under U.S. Supreme Court Precedent ............................5

    B.  Defendant's Argument that Plaintiffs Lack Standing Because Their Chosen Religious Schools Will Not Accept Publicly Funded Tuition Fails Because Rather than Requiring Changes to the Religious Schools' Hiring Practices, the MHRA Fully Protects the Schools' Current Hiring Practices ...................................8

II.  *Eulitt* Cannot Control on the Merits Because *Trinity Lutheran* Makes Clear that the Wholesale Exclusion of Religion from a Public Benefit Program Violates the Free Exercise Clause ...........................................................................10

III.  The Sectarian Exclusion Denies Plaintiffs the Benefits of Tuition Based on Religion in Violation of the Free Exercise Clause .................................................13

    A.  The Benefit at Issue Is Tuition to the School of the Parents' Choice ..........................14

    B.  The Sectarian Exclusion Discriminates Against Parents Based on Both "Status" and "Use" in Violation of the Free Exercise Clause ...................................15

        1.  *Trinity Lutheran*'s Unqualified Rejection of Status-Based Discrimination Is Not an Approval of Discrimination Based on Use .................................16

        2.  Defendant's Focus on the System "Writ Large" Is Wrong. Both *Locke* and *Trinity Lutheran* Require the Court to Focus on the Challenged Program and Its (Complete) Religious Exclusion .................................19

    C.  The State Lacks a Compelling Interest to Justify Its Denial of Tuition Benefits to Families Who Choose Religious Schools .................................20

IV.   The Sectarian Exclusion Violates the Establishment Clause's Command that
      Government Remain Neutral Regarding Religion................................................22

 V.   Under the Equal Protection Clause, the Sectarian Exclusion Cannot Survive Even
      Rational Basis Review—Much Less Strict Scrutiny—Because It Does Not Further
      the Purpose for Which It Was Adopted .............................................................22

VI.   The Sectarian Exclusion Unconstitutionally Burdens Plaintiffs' Free Speech Rights
      by Discriminating Against Religious Points of View.........................................25

CONCLUSION.....................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Allen v. Wright*,
   468 U.S. 737 (1984 ........................................................................................................ 7

*Anderson v. Town of Durham*,
   895 A.2d 944 (Me. 2006) ............................................................................................ 20

*Bagley v. Raymond Sch. Dep't*,
   728 A.2d 127 (Me. 1999) .................................................................................. 8, 20, 23

*Cantwell v. Connecticut*,
   310 U.S. 296 (1940) .................................................................................................... 18

*Christian Science Reading Room Jointly Maintained v. San Francisco*,
   784 F.2d 1010 (9th Cir. 1986) .............................................................................. 23, 24

*City of New Orleans v. Dukes*,
   427 U.S. 297 (1976) .................................................................................................... 22

*Corp. of the Presiding Bishop of Church of Jesus Christ Latter-Day Saints v. Amos*,
   483 U.S. 327 (1987) ...................................................................................................... 9

*Czyzewski v. Jevic Holding Corp.*,
   137 S. Ct. 973 (2017) .................................................................................................... 6

*Emp't Div., Dep't of Human Res. v. Smith*,
   494 U.S. 872 .............................................................................................................. 18

*Eulitt v. Me. Dep't of Educ.*,
   386 F.3d 344 (1st Cir. 2004) ............................................................................. *passim*

*Everson v. Board of Educ.*,
   330 U.S. 1 (1947) ....................................................................................................... 22

*Fleet Nat'l Bank v. Liberty*,
   845 A.2d 1183 (Me. 2004) ........................................................................................... 9

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ....................................................................................................... 25

*Hosanna-Tabor Evangelical v. EEOC*,
   132 S. Ct. 694 (2011) .................................................................................................... 9

*Linda R. S. v. Richard D.*,
   410 U.S. 614 (1973) ................................................................................................ 7

*Locke v. Davey*,
   540 U.S. 712 (2004) ....................................................................................... *passim*

*Lynch v. Donnelly*,
   465 U.S. 668 (1984) .............................................................................................. 22

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
   138 S. Ct. 1719 (2018) ......................................................................................... 21

*McDaniel v. Paty*,
   435 U.S. 618 (1978) .............................................................................................. 18

*Mitchell v. Helms*,
   530 U.S. 793 (2000) .............................................................................................. 19

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ................................................................................................ 9

*Ne. Fla. Ch. of the Associated Gen. Contractors v. City of Jacksonville*,
   508 U.S. 656 (1993) ......................................................................................... 3, 6, 7

*Obergefell v. Hodges*,
   135 S. Ct. 2584 (2015) ........................................................................................... 8

*Pierce v. Soc'y of Sisters*,
   268 U.S. 510 (1925) .............................................................................................. 19

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012) ................................................................................................ 9

*Sherbert v. Verner*,
   374 U.S. 398 (1963) .............................................................................................. 18

*Simon v. Eastern Kentucky Welfare Rights Org.*,
   426 U.S. 26 (1976) .................................................................................................. 7

*Strout v. Albanese*,
   178 F.3d 57 (1st Cir. 1999) ................................................................................... 11

*Thomas v. Review Bd.*,
   450 U.S. 707 (1981) .............................................................................................. 18

*Trinity Lutheran Church of Columbia v. Comer*,
  137 S. Ct. 2012 (2017) ......................................................................... *passim*

*Turner Broad. Sys. v. FCC*,
  512 U.S. 622 (1994) .................................................................................. 25

*United States v. One Parcel of Real Prop. (Great Harbor Neck, New Shoreham, R.I.)*,
  960 F.2d 200 (1st Cir. 1992) ................................................................... 10

*Warth v. Seldin*,
  422 U.S. 490 (1975) .................................................................................... 7

*Weinberger v. Wiesenfelder*,
  420 U.S. 636 n.16 (1975) ......................................................................... 21

*Zelman v. Simmons-Harris*,
  536 US 639 (2002) ............................................................................. 21, 22

Statutes

5 M.R.S.A. § 4553(10)(G) ................................................................................ 9

5 M.R.S.A. § 4553(10)(G)(1) ........................................................................... 9

5 M.R.S.A. § 4553(4) ...................................................................................... 9

5 M.R.S.A. § 4573-A(2) ............................................................................... 3, 9

20-A M.R.S.A. § 2951(2) ..................................................................... 1, 17, 20

20-A M.R.S.A. § 5204(4) ................................................................................ 14

20-A M.R.S.A. § 5806(2) ................................................................................ 14

Me. Const. art. VIII, § 1 ................................................................................. 15

Rules

Fed. R. Civ. P. 56(c) ................................................................................... 1, 25

Other Authorities

Ava Harriet Chadbourne, *History of Education in Maine* (1936) ................. 15

Michael J. Garcia, Caitlain Devereaux Lewis, Andrew Nolan, Attorney Editors, and Meghan Totten, Ashley Tyson, Legal Editors, *Constitution of the United States of America: Analysis and Interpretation*, 741, n.461, Congressional Research Service (Library of Congress 2017)....................................................................................................................................... 7

William Stetson, *A Study of the History of Education in Maine*, 86 (1902)................................ 15

# ARGUMENT

Defendant raises two "procedural roadblocks" to evade *Trinity Lutheran*'s holding and its implications for the Sectarian Exclusion. Def.'s Mot. Sum J. 2 (Doc. 29, PageID# 951). First, Defendant asserts that Plaintiffs lack standing. However, under the First Circuit's decision in *Eulitt v. Maine Department of Education*, 386 F.3d 344, 353 (1st Cir. 2004), and controlling U.S. Supreme Court precedent, Plaintiffs undoubtedly possess Article III standing. Second, Defendant claims that this Court is bound by *Eulitt* on the merits. However, *Eulitt* itself teaches that when a lower court precedent "has unmistakably been cast into disrepute by supervening authority" (i.e., *Trinity Lutheran*), the doctrine of stare decisis does not bar re-litigation of issues previously decided. *Id*. at 349. Thus, far from presenting a bar to Plaintiffs' case, *Eulitt* itself confirms that Plaintiffs' case must proceed on the merits.

On the merits, Defendant argues first that the tuition benefit that Plaintiffs are being denied is not the same type of generally available public benefit that was at issue in *Trinity Lutheran*. And second, Defendant argues that even if it was a generally available benefit, that Plaintiffs are not being denied tuition because of "who they are" but rather "what they seek to do" with the benefit (citing *Locke v. Davey*, 540 U.S. 712 (2004), which upheld Washington State's decision to deny postsecondary scholarships to students training for the ministry but not to students pursuing secular degrees at religious schools). Plaintiffs will show, however, that Maine's Sectarian Exclusion must be struck down under the Free Exercise Clause because it denies Plaintiffs a generally available benefit (tuition to the school of the parents' choice) based on religion without any compelling reason for the denial. Defendant devotes very little space to addressing Plaintiffs' other claims. But, as Plaintiffs will demonstrate, the Sectarian Exclusion also contravenes the Establishment Clause's requirement that the government neither favor nor

disfavor religion and that it also fails under the Fourteenth Amendment's Equal Protection

Clause and the First Amendment's Free Speech Clause.

**I.      Plaintiffs Have Standing Because Eliminating the Sectarian Exclusion Will Remove the Barrier to Their Participation in the Tuitioning System and Provide Them the Opportunity to Have Their Children's Tuition Paid at a Religious School.**

Defendant argues that Plaintiffs do not have standing because they cannot show with

absolute certainty that the sectarian schools their children currently attend (or want their children

to attend) will accept publicly funded tuition payments. But, as shown below in Part A, under the

First Circuit's decision in *Eulitt* and under U.S. Supreme Court precedent, no such certainty is

needed. All Plaintiffs must show is that they are denied equal participation in Maine's town

tuitioning system based on religion. *See Ne. Fla. Ch. of the Associated Gen. Contractors v. City

of Jacksonville*, 508 U.S. 656, 666-69 (1993) (holding that the denial of equal participation in

municipal bidding process was enough to confer standing even if plaintiffs could not prove they

would be awarded contracts). Thus, all Plaintiffs need show is that a victory would remove a

discriminatory government barrier to their ability to use those benefits.

Defendant further argues (in an effort to show lack of certainty) that Plaintiffs do not

have standing because Maine's Human Rights Act ("MHRA") would require the religious

schools to change their hiring practices. The schools did indeed testify that they would not accept

public tuition funds if doing so would require them to alter their hiring criteria. But, as explained

below in Part B, Defendant's argument misunderstands the Human Rights Act. The MHRA

protects the religious schools' right to give "preference in employment to individuals of its same

religion" and to "require that all applicants and employees conform to the religious tenets of that

organization." 5 M.R.S.A. § 4573-A(2). Because the MHRA shields the religious schools from

any need to alter their hiring practices, Defendant's argument fails as a matter of law.

### A. Plaintiffs Need Not Show with Absolute Certainty that the Religious Schools Will Accept Public Funds to Maintain Their Lawsuit. They Need Only Show They Are Denied Equal Access to the Town Tuitioning System.

Defendant argues that Plaintiffs do not have standing because they cannot show with absolute certainty that the religious schools where they currently send (or desire to send) their children will accept public funds. But that argument is directly contradicted by the First Circuit's standing decision in *Eulitt* and cannot be squared with the U.S. Supreme Court's recent standing decisions. Plaintiffs do not need to show that it is certain their current religious schools will accept publicly funded tuition payments. All Plaintiffs need to show is that they are denied equal participation in the tuitioning system because of their decision, or desire, to enroll their children in religious schools.

### 1. Plaintiffs Have Standing Under *Eulitt*.

Defendant's motion ignores the First Circuit's standing discussion in *Eulitt*. The court there expressed no hesitation in concluding that parents had standing "to seek global relief . . . against the enforcement of section 2951(2) [the Sectarian Exclusion] and a declaration of the statute's unconstitutionality." 386 F.3d at 353. And there, the plaintiffs' circumstances were far less certain as to whether they would be able to use their tuition benefits at sectarian schools.

Rather than living in towns that tuition all secondary students, as Plaintiffs here do, the *Eulitt* plaintiffs resided in the town of Minot, which contracted with the town of Poland's public high school "to educate at least 90% of [Minot's] eligible [secondary] students." *Id.* at 346. That contract, however, permitted Minot to send up to 10% of its resident high schoolers "to other approved nonsectarian schools"—private or public—"so long as those students c[ould] demonstrate that they have educational needs" that Poland's public high school could not satisfy. *Id.* at 346-47. Applications for such placements were reviewed "on a case-by-case basis." *Id.* The

4

*Eulitt* plaintiffs had "not submitted formal applications" for alternative placements. And they presented neither evidence that Minot's superintendent would grant such an application, nor evidence that the sectarian school where plaintiffs desired to enroll their students was interested in receiving tuition payments. *Id*. at 352 (" . . . it is entirely possible that the school has refrained from litigation precisely because it is not interested in participating in Maine's tuition program").

Here, by contrast, Plaintiffs reside in towns that tuition *all* secondary students to the school of their parents' choice—except those students who attend sectarian schools. In other words, unlike the plaintiffs in *Eulitt*, Plaintiffs here do not have to worry about convincing a government official that their assigned public school cannot satisfy their educational needs. Plus, the two sectarian schools where Plaintiffs currently enroll, or want to enroll, their children testified that they would, in fact, consider participating, so long as they did not have to alter their hiring criteria, Jt. Stip. Facts 127, 182 (Doc. 25, PageID# 918, 925), which, as explained below in Part B, they will not have to do because of the MHRA's protections for religious employers. Plaintiffs here, like those in *Eulitt* before them, "have established standing directly based on their allegation that section 2951(2) effectively deprives them of *the opportunity* to have their children's tuition at [a religious school] paid by public funding." 386 F.3d at 353 (emphasis added). Defendant's argument also fails under the U.S. Supreme Court's standing doctrine.

## 2.  Plaintiffs Have Standing Under U.S. Supreme Court Precedent.

Defendant invokes four Supreme Court cases to support her argument that Plaintiffs must demonstrate with absolute certainty that the religious schools will accept public tuition payments to maintain their standing. To the contrary, the U.S. Supreme Court has had no trouble concluding that plaintiffs who are denied equal participation in government programs have standing to challenge the restrictions—even when the plaintiffs could not prove they would

benefit from a victory. *Associated Gen. Contractors*, 508 U.S. at 666 (permitting a contractors' association to challenge racial set asides in municipal bidding process even though there was no guarantee its members would be awarded contracts). The Court has explained that:

> "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier *need not allege that he would have obtained the benefit but for the barrier in order to establish standing*."

*Id*. (emphasis added). The fact that the association could not prove that any of its members would definitely win any bids in the future did not deprive the plaintiff of standing. "The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id*.

Even more recently, the U.S. Supreme Court has held that the "mere possibility" that a plaintiff's injury will not be remedied by a favorable decision is insufficient to conclude the plaintiff lacks standing. In *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017), creditor-plaintiffs were found to have standing to challenge a bankruptcy court's "structured dismissal" of a Chapter 11 bankruptcy because, as a result of the dismissal, the plaintiffs lost their chance to obtain a negotiated settlement of the bankruptcy that respected their priorities. The plaintiffs did not have to guarantee they would ultimately obtain the settlement they desired.[1] Removing a government barrier (the structured dismissal) that would then give them the opportunity to do something (negotiate a settlement) was enough to establish standing. This case is no different. Eliminating the Sectarian Exclusion will give Plaintiffs the opportunity to participate in the tuitioning system on equal terms with their neighbors.

---

[1] *See Czyzewski* at 983 ("[T]he lawsuit—like any lawsuit—*might* prove fruitless, but the mere *possibility* of failure does not eliminate the value of the claim or petitioners' injury in being unable to bring it.").

Defendant's "absolute certainty" argument is plainly wrong.[2] In the four cases upon which Defendant relies, the plaintiffs were not suffering the injury of being denied a benefit to which they were otherwise entitled. Rather, in three of the cases, the plaintiffs were challenging a governmental benefit supplied to others in the hope that eliminating another's benefit *might* result in changed behavior that would, in turn, inure to the plaintiffs' own benefit. *See Allen v. Wright*, 468 U.S. 737 (1984) (standing denied to black parents of students in public school districts undergoing desegregation who sought to challenge tax exemptions provided to private schools with racially discriminatory policies in hopes the schools might change their policies); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976) (denying standing to indigents who sought to challenge an IRS rule granting favorable tax treatment to hospitals that provided "only" emergency room services to indigents in effort to coerce hospitals to serve indigents more broadly); *Warth v. Seldin*, 422 U.S. 490 (1975) (refusing to grant standing to low-income individuals seeking to challenge a zoning ordinance that allegedly prevented non-specified third-parties from constructing affordable housing in effort to spur new construction). In the fourth case, the plaintiff was suing to try to create a new government benefit, not to protect an existing one to which she would otherwise have been entitled but for the challenged law. *Linda R. S. v. Richard D.*, 410 U.S. 614 (1973) (standing denied to mother in case seeking to extend child support benefits to illegitimate children). There is a significant difference between suing over the denial of a government benefit to which one is entitled but for the challenged law (as in this case) and challenging either (1) another person's government benefit; or (2) trying to

---

[2] *See* Michael J. Garcia, Caitlain Devereaux Lewis, Andrew Nolan, Meghan Totten, and Ashley Tyson, *Constitution of the United States of America: Analysis and Interpretation*, 741, n.461, Congressional Research Service (Library of Congress 2017) (noting that the four cases Defendant cites would likely have come out differently under the test laid out in the Supreme Court's *Associated General Contractors* case, discussed above).

create a new government benefit, in the hopes that the plaintiff(s) might reap some reward based on behavior changes resulting from another's loss of, or the creation of, a government benefit.

Finally, depriving Plaintiffs of standing here would be particularly perverse because the Sectarian Exclusion *itself* has limited the number of schools where Plaintiffs could conceivably use the tuition benefit.[3] And, as shown next, the religious schools are quite likely to accept publicly funded tuition payments.

### B. Defendant's Argument that Plaintiffs Lack Standing Because Their Chosen Religious Schools Will Not Accept Publicly Funded Tuition Fails Because Rather than Requiring Changes to the Religious Schools' Hiring Practices, the MHRA Fully Protects the Schools' Current Hiring Practices.

Defendant next argues that the MHRA would require the religious schools to change their hiring practices if they accepted publicly funded tuition payments. Defendant does so because both schools testified that the ability to retain their current, religiously motivated hiring criteria would be an important factor in deciding whether to accept public tuition dollars if the Sectarian Exclusion was eliminated. Jt. Stip. Facts 127, 182 (Doc. 25, PageID# 918, 925). And Defendant believes that if she can show the schools likely will not participate, Plaintiffs will be deprived of standing because they will have failed to show with absolute certainty that they will be able to use the tuition benefit at their schools of choice. However, far from requiring any changes, the MHRA protects the religious schools' right to use religious criteria in their hiring practices.[4]

---

[3] The Sectarian Exclusion has caused at least one religious school to close its doors. *See Bagley v. Raymond Sch. Dep't*, 728 A.2d 127, 138 n.19 (Me. 1999) ("One of Maine's four Roman Catholic high schools, John Bapst High School, in Bangor, closed as a result of being excluded from the education tuition program. *See Bangor Catholic School to Shut Down.* PORTLAND PRESS HERALD, April 30, 1980, at 13. When the Attorney General released his opinion, '124 of Bapst's 308 students were receiving state tuition subsidies.' David Himmeistein, *Only $ 2 Million Miracle Could Keep Bapst Going,* MAINE SUNDAY TELEGRAM, May 4, 1980, at A14."). A secular school opened in its place and now enrolls students in Plaintiffs' towns. Jt. Stip. Facts 23 – 24 (Doc. 25, PageID# 904).

[4] The MHRA thus accords with the fact that the ability to practice one's religion is widely regarded as one of the most basic, and important, human rights. *See, e.g., Obergefell v. Hodges*, 135 S. Ct. 2584, 2607 (2015) ("The First Amendment ensures that religious organizations and persons are given proper

Defendant argues that the MHRA's definition of "unlawful discrimination" only exempts "religious corporation[s], association[s] or organization[s] *that do[] not receive public funds*." 5 M.R.S.A. § 4553(10)(G) (emphasis added). However, 5 M.R.S.A. § 4553(10)(G)(1) clarifies that this exemption is "more fully set forth in section 4553, subsection 4, which defines "Employer"; and section 4573-A, which sets forth legal defenses to charges of unlawful discrimination—a provision Defendant concedes applies even to religious organizations that accept public funds, *see* Def.'s Mot. Summ. J. 13 n.3. These specific statutes control over the general statute.[5]

Under 5 M.R.S.A. § 4553(4), the definition of "'Employer' does not include a religious or fraternal organization or association . . . with respect to employment of its members of the same religion." Both sectarian schools deposed by Defendant require all their employees to affirm they are "born again" Christians. Jt. Stip. Facts 124, 179 (Doc. 25, PAGE ID# 917, 925). Thus, under subsection 4, the religious schools do not qualify as employers subject to the MHRA. But, even if the schools were employers subject to the MHRA, the State acknowledges that under 5 M.R.S.A. § 4573-A(2), religious entities that receive public funds may give "preference in employment to individuals of its same religion" and "may require that all applicants and employees conform to the religious tenets of that organization."[6]

---

protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered.").

[5] "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). "The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Maine's Supreme Judicial Court recognizes this principle of statutory construction. *Fleet Nat'l Bank v. Liberty*, 845 A.2d 1183 (Me. 2004) (specific statutes prevail over general ones when there are inconsistencies).

[6] The MHRA thus conforms to U.S. Supreme Court precedent acknowledging that the Religion Clauses of the U.S. Constitution give religious organizations wide latitude in their hiring practices. *See Hosanna-Tabor Evangelical v. EEOC*, 132 S. Ct. 694 (2011) (holding that a "ministerial exception" exempts religious employers from otherwise generally applicable antidiscrimination laws); *Corp. of the Presiding Bishop of Church of Jesus Christ Latter-Day Saints v. Amos*, 483 U.S. 327, 335 (1987) (unanimously upholding broad exemptions for "secular" employees—including janitors—at religious organizations from § 702 of Title VII of the 1964 Civil Rights Act and condemning "a searching case-by-case analysis"

9

Absent restrictions on their hiring practices, both schools testified they would consider accepting public funds for tuition purposes. Jt. Stip. Fact 128 (Doc. 25, PageID# 918) ("all things being equal, accepting public funds is something BCS would consider"); Jt. Stip. Fact 182 (Doc. 25, PageID# 925) (if Temple Academy had in writing that it "would not have to alter its . . . hiring standards" it "would consider accepting public funds for tuition purposes").[7] There is no question that the MHRA fully protects the right of sectarian schools to condition employment on an affirmation that an employee or applicant is a "born again" Christian who will refrain from contradicting the schools' religious tenets. As such, Defendant's argument that Plaintiffs lack standing to challenge the Sectarian Exclusion fails as a matter of law.[8]

## II. *Eulitt* Cannot Control on the Merits Because *Trinity Lutheran* Makes Clear that the Wholesale Exclusion of Religion from a Public Benefit Program Violates the Free Exercise Clause.

*Trinity Lutheran* controls the analysis of Plaintiffs' Free Exercise Clause claim. To escape this recent U.S. Supreme Court ruling, however, Defendant attempts to erect a second roadblock by invoking the First Circuit's decision on the merits in *Eulitt*, which upheld the Sectarian Exclusion. However, an exception exists to the general rule that stare decisis precludes re-litigation of legal issues that have previously been decided—even at the district court level—

to "determine[] whether an activity is religious or secular" because it would "result[] in considerable ongoing government entanglement in religious affairs").

[7] While the parties agreed upon a stipulated statement of undisputed facts, they reserved the right to dispute the materiality of those facts. Jt. Stip. Facts 1 n.1 (Doc. 25, PageID# 901). A fact is immaterial if it does not have the potential to affect the outcome of the case. *See United States v. One Parcel of Real Prop. (Great Harbor Neck, New Shoreham, R.I.)*, 960 F.2d 200, 204 (1st Cir. 1992). Under that definition, the facts regarding the hiring criteria at the religious schools where Plaintiffs enroll, or want to enroll, their children are immaterial because they will not affect the outcome of this case. *See* Jt. Stip. Facts 89 – 126; 151 – 166; 169 – 174; 176 – 179 (Doc. 25, PageID# 912 – 917; 921 – 923; 924; 924 – 925). Plaintiffs do not concede the materiality of other facts not cited.

[8] Even if Defendant's argument were right—and it is not—Plaintiffs would still have standing because, as explained in Part A, they will have eliminated the barrier to their participation in the tuitioning system. And that elimination could give them an opportunity to use those benefits. If not at their current schools, then elsewhere. After all, the private market is, by its very nature, dynamic and elastic. If the Sectarian Exclusion were eliminated, other religious schools might seek to be approved for tuition purposes.

when a new U.S. Supreme Court decision "unmistakably [] cast[s] into disrepute" a prior precedent. *Eulitt*, 386 F.3d at 349. The First Circuit based its holding in *Eulitt* on a broad reading of the U.S. Supreme Court's decision in *Locke v. Davey*, 540 U.S. 712, which permitted the State of Washington to exclude scholarships for students pursuing a degree in ministerial training from its otherwise religiously neutral postsecondary scholarship program. *Eulitt* at 355 ("We read *Davey* more broadly . . . ."). The First Circuit's broad reading of *Locke* extended that decision to encompass the blanket exclusion of all religious options from Maine's town tuitioning system. As explained below, *Trinity Lutheran* forecloses any reading of *Locke* that would countenance the wholesale exclusion of religion from a generally available public benefit. This court should, therefore, "reject a rote application of stare decisis" and "undertake a fresh analysis." *Id*. at 350.

    *Trinity Lutheran* supplants the First Circuit's merits decision in *Eulitt*, 386 F.3d 344 (as well as its decision in *Strout v. Albanese*, 178 F.3d 57 (1st Cir. 1999), which also previously upheld the Sectarian Exclusion). In *Eulitt*, the First Circuit relied heavily on the "play in the joints" identified by the U.S. Supreme Court in *Locke* to uphold the Sectarian Exclusion. 386 F.3d at 355. The First Circuit explained it could find "no authority that suggests that the 'room for play in the joints' identified by the *Davey* Court is applicable to certain education funding decisions but not others." *Id*. But an authority now exists that does just that: *Trinity Lutheran*.

    In *Trinity Lutheran*, the Supreme Court refused to extend *Locke* to funding decisions that deny generally available benefits based on religion absent a state interest of "the highest order." 137 S. Ct. at 2024. Just as Defendant does here, the State of Missouri in *Trinity Lutheran* sought shelter under *Locke* to justify its exclusion of Trinity Lutheran Church from the publicly funded playground resurfacing program at issue in that case. 137 S. Ct. at 2023-24. The lower courts had also sought *Locke*'s refuge by likening the denial of the resurfacing grant to the denial of funding

for ministerial training. *Id*. But the Supreme Court was clear in *Trinity Lutheran* that *Locke* does not permit the comprehensive exclusion of religion from public benefit programs. *Id*. at 2023.

As the Supreme Court explained in *Trinity Lutheran*, *Locke* examined "Washington's antiestablishment interest [in not funding ministerial training] only after determining . . . that the scholarship program did not 'require students to choose between their religious beliefs and receiving a government benefit.'" 137 S. Ct. at 2023 (quoting *Locke*, 540 U. S. at 720-21). Students were not put to such a choice in Washington because "Washington's scholarship program went 'a long way toward including religion in its benefits.'" *Id*. (quoting *Locke* at 724). Indeed, the exclusion in *Locke* was exceedingly narrow. "Students in the [Washington] program were free to use their scholarships at "pervasively religious schools." *Id*. Davey "could also [have] use[d] his scholarship money to attend a religious college and take devotional theology courses there. The *only* thing he could not do was use the scholarship to pursue a degree" to become a minister. *Id*. at 2023-24 (emphasis added). Any attempt by Defendant to analogize a high school education to the ministerial training at issue in *Locke* simply does not pass muster.

*Trinity Lutheran* leaves no room for the general principle that the First Court, in *Eulitt*, derived from *Locke*; namely, the notion that the Constitution permits the wholesale exclusion of religion from public benefit programs. Rather, *Trinity Lutheran* erects a fence around *Locke*, hemming it in by at least two limiting principles found in *Locke* itself. First, government benefit programs should go a long way to *include* religious options. 540 U.S. at 724-25. And second, only narrowly drawn laws that are justified by a "historic and substantial state interest" can survive judicial scrutiny. *Id.* at 725. The Sectarian Exclusion violates both principles.

There is no escaping that *Trinity Lutheran* does not permit the government to broadly discriminate against religion in the distribution of public benefits. For this reason, the Supreme

Court was able to conclude its opinion in *Trinity Lutheran* with such exceedingly strong language, declaring that "the exclusion of Trinity Lutheran [Church] from a public benefit for which it is otherwise qualified, solely because it is a church, is odious to our Constitution . . . and cannot stand." 137 S. Ct. at 2025. As demonstrated in more detail below, because the Sectarian Exclusion "expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character," it violates the Free Exercise Clause. *Id*. at 2021.

### III.   The Sectarian Exclusion Denies Plaintiffs the Benefits of Tuition Based on Religion in Violation of the Free Exercise Clause.

*Trinity Lutheran* holds that "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order.'" 137 S. Ct. at 2019 (citation omitted). Defendant argues that *Trinity Lutheran* is unavailing for two reasons. First, Defendant argues that the tuition benefit at issue here is a narrowly circumscribed benefit that does not fall into the same category as the benefit at issue in *Trinity Lutheran*. Specifically, Defendant contends the tuition benefit is intended to provide a free, public education as opposed to an education at the approved public or private school of the parents' choice. Def.'s Mot. Summ. J. 18 (Doc. 29, PageID# 967). Second, Defendant argues that Plaintiffs are not denied because of "who they are" but rather "what they seek to do" with the tuition benefit should they prevail here. Def.'s Mot. Summ. J. 20 (Doc. 29, PageID# 969). As Plaintiffs will show, the Sectarian Exclusion is: (1) precisely the type of generally available public benefit that was involved in *Trinity Lutheran*; that (2) is inappropriately denied to Plaintiffs based on both who they are (i.e., their religious status) and what they would do with the tuition benefit if it was not denied to them (i.e., pay for tuition at

religious schools);[9] and, finally, that (3) Defendant cannot carry her burden to justify the denial

of that benefit with a compelling governmental interest.

**A.  The Benefit at Issue Is Tuition to the School of the Parents' Choice.**

Defendant asserts that Plaintiffs are not seeking the same "benefit [that is] bestowed by

the tuition program[]," which Defendant claims is "a free, public education." Def.'s Mot. Summ.

J. 18 (Doc. 29, PageID# 967). Defendant seeks to evade *Trinity Lutheran* by arguing that

Plaintiffs are not seeking the same benefit that other families in their towns are eligible to

receive, but something completely different. That is incorrect. This case is precisely like *Trinity

Lutheran* because Plaintiffs seek the same benefit as their neighbors: tuition at the school of the

parents' choice. But Plaintiffs are denied that benefit because the schools they have chosen (or

want to choose) are religious schools.

Defendant is wrong about the benefit at issue here being a free, public education for at

least two reasons: (1) the private schools that participate in the tuitioning system can require

parents to pay the difference between the legal tuition rate and the school's actual tuition; and (2)

the private schools do not have to grant admission to every student who applies. 20-A M.R.S.A.

§ 5806(2) (setting the maximum tuition rate for towns); 20-A M.R.S.A. § 5204(4) (a town "that

neither maintains a secondary school nor contracts for secondary school privileges . . . shall pay

the tuition . . . at the . . . approved private school of the parent's choice *at which the student is

accepted*.") (emphasis added); Jt. Stip. Fact 7 (Doc. 25, PageID# 902).

If Maine's legislature desired only to ensure that every student had the opportunity to

receive a free, public education it could have eliminated the tuitioning option altogether.

However, instead, the State provides families that live in towns too small to operate their own

---

[9] *See infra* n.10 for an explanation why Defendant's argument about *Trinity Lutheran*'s footnote three is unpersuasive and legally incorrect.

secondary schools with the benefit of exercising a free and genuine choice between public and private schools.

Moreover, the Sectarian Exclusion is a recent aberration from the historic educational norm. Maine's education system has included the ability of certain towns (those without their own public schools) to pay tuition to private schools for over 200 years. *See* Ava Harriet Chadbourne, *History of Education in Maine*, 31-39 (1936); *see also* Jt. Stip. Fact 18 – 19 (Doc. 25, PageID# 903 – 904). And for most of those two centuries, parents could choose religious schools. Indeed, many of the private academies that serve students today were originally religious institutions. *See* Chadbourne at 281-84. The framers of Maine's Constitution considered these academies so integral to Maine's system of education that they mandated that the State support and encourage them. Me. Const. art. VIII, § 1 (". . . and it shall further be their duty to encourage and suitably endow, from time to time, as the circumstances of the people may authorize, all academies . . .").[10] The Sectarian Exclusion was a stark and constitutionally unnecessary deviation, *see infra* Part III.C., from the centuries-old tuition system.

The benefit at issue in this case is tuition to the school of the parents' choice. But Plaintiffs are denied that benefit because they want to use the tuition at religious schools. When citizens are denied a generally available benefit based on religion, *Trinity Lutheran* teaches that the State may not deny access to that benefit absent a compelling governmental interest.

## B. The Sectarian Exclusion Discriminates Against Parents Based on Both "Status" and "Use" in Violation of the Free Exercise Clause.

The Sectarian Exclusion discriminates against Plaintiffs *both* because of who they are and what they want to do with the tuition benefit. Per *Trinity Lutheran*, the Free Exercise Clause

---

[10] Most, if not all, of Maine's older academies were founded with the help of direct endowments of state lands, pursuant to this constitutional provision. *See* William Stetson, *A Study of the History of Education in Maine*, 85-87 (1902). These grants occurred despite the religious nature of the institutions assisted.

protects them from both kinds of discrimination. Defendant rejects the notion that the Sectarian

Exclusion discriminates based on status and asserts that Plaintiffs are denied the ability to use

public funds only "because of what they would like to do" with those funds. Def.'s Mot. Summ.

J. 21 (Doc. 29 PageID# 970). Obviously, Plaintiffs would like to use the tuition benefit to pay the

tuition at religious schools. Defendant argues thusly because she asserts that *Trinity Lutheran*

does not extend to religious "uses" of public benefits, which is logically and legally incorrect.[11]

Defendant also claims that the Sectarian Exclusion passes muster under *Locke* because

Maine's education system "writ large" allegedly does not discriminate against religion (pointing

out that attendance at religious schools may satisfy the State's compulsory education laws). But

Defendant's focus is all wrong. Both *Locke* and *Trinity Lutheran* teach that public benefit

programs should go a long way toward including religion and not be hostile to religion. But it is

not the education system "writ large" that courts have been instructed to look at—it is the

specific program at issue that must go a long way toward including religion.

Plaintiffs address both of Defendant's arguments in turn.

### 1. *Trinity Lutheran*'s Unqualified Rejection of Status-Based Discrimination Is Not an Approval of Discrimination Based on Use.

Defendant claims, apparently without irony, that "Plaintiffs have unfettered access to the

tuition program so long as they choose a public or non-sectarian private school." Def.'s Mot.

Summ. J. 20 (Doc. 29 PageID# 969). This, Defendant believes, means that "Plaintiffs are not

being asked to disavow their religious character in order to receive" the tuition benefit, Def.'s

---

[11] Defendant seeks safe harbor in *Trinity Lutheran*'s footnote three, which was only joined by four justices, and which states: "We do not address religious uses of funding or other forms of discrimination." 137 S. Ct. at 2024 n.3. Because it is not part of the majority opinion, footnote three is only *dicta*. However, not addressing "religious uses" is not the same as endorsing discrimination against religious uses. As Plaintiffs will show, because the Free Exercise Clause protects religious *exercise*, it is preposterous to conclude that *Trinity Lutheran* does not extend to the utilization of government benefits by religious persons at religious institutions.

16

Mot. Summ. J. 20 (Doc. 29 PageID# 969), as Trinity Lutheran Church was asked to renounce its religious character in order to receive the playground resurfacing grant in *Trinity Lutheran*. *See* 137 S. Ct. at 2024 (concluding that the State of Missouri was "expressly requir[ing] Trinity Lutheran [Church] to renounce its religious character in order to participate in an otherwise generally available public benefit program, for which it is fully qualified").

The Sectarian Exclusion, though, is triggered by Plaintiffs' desire to educate their children in schools whose worldviews align with their own sincerely held religious beliefs. Jt. Stip. Facts 29, 44, 62 (Doc. 25, PageID# 905, 907, 908). As this desire only derives from Plaintiffs' religious status, the Sectarian Exclusion necessarily discriminates based on that status. Naturally, if the Sectarian Exclusion is eliminated, Plaintiffs intend to use their tuition benefits to pay for tuition at religious schools—schools that provide religious, as well as secular, instruction. And *Trinity Lutheran* did not endorse—indeed, it could not endorse—discrimination based on religious uses of generally available state benefits. This is because the Free Exercise Clause protects religious *exercise* (i.e., religious uses) as well as religious belief. Afterall, it makes little sense to prohibit discrimination against religious people while allowing discrimination against people who put their religion into practice. *Trinity Lutheran*, 137 S. Ct. at 2026 (Gorsuch, J., concurring) ("I don't see why it should matter whether we describe that benefit, say, as closed to Lutherans (status) or closed to people who do Lutheran things (use). It is free exercise either way.").

No matter how you view it—whether discrimination against status, use, or both—Maine's sweeping discrimination against all families who desire a religious education for their children, embodied in 20-A M.R.S.A. § 2951(2)'s Sectarian Exclusion, cannot pass constitutional muster.

17

The Free Exercise Clause encompasses "two concepts, — freedom to believe *and freedom to act*." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (emphasis added); *see also Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 877 ("The 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts . . . ."). A parent's decision, in accordance with his or her sincerely held religious beliefs, to "use" the tuition benefit to pay for his or her student's education at a religious institution is a religious action. The U.S. Supreme Court's decisions under the Free Exercise Clause have long forbid discrimination not only on the basis of religious affiliation, but also against those who live out their religious identity in their actions. *See, e.g.*, *Thomas v. Review Bd.*, 450 U.S. 707 (1981); *McDaniel v. Paty*, 435 U.S. 618 (1978); *Sherbert v. Verner*, 374 U.S. 398 (1963). *Trinity Lutheran* does not undermine or alter those decisions. Thus, the freedom of belief that is protected by the Free Exercise Clause also embraces the freedom to practice that belief.

Plaintiffs here face the same choice as did the church in *Trinity Lutheran*: renounce their religious character (in this case, by renouncing their desire for a religious education) in order to receive a financial benefit for which they qualify, or remain faithful to their religious character and forego that benefit, thus incurring significant personal financial cost.

Though Defendant argues otherwise, the Supreme Court's decision in *Locke v. Davey* is not to the contrary. Rather, *Locke* expressly distinguished its facts from a situation like the one here in Maine—where people have "to choose between their religious beliefs and receiving a government benefit." 540 U.S. at 720-21. Excluding Plaintiffs from the tuition benefit, even when their children will receive instruction in the same categories as those taught in secular schools, constitutes discrimination against Plaintiffs solely because their religious identity in action motivates them to select schools with a religious viewpoint consistent with their own.

Thus, the Sectarian Exclusion imposes a penalty on Plaintiffs because they "take their religion seriously" and "think that their religion should affect the whole of their lives." *Mitchell v. Helms*, 530 U.S. 793, 827-28 (2000) (plurality). For families who choose to enroll their students in schools aligned with their faith, little distinction exists between religious status and use. Surely, one's religious belief does not cease to receive the Free Exercise Clause's protection when it is held with such deep sincerity that it induces one to enroll his or her child in a religious school.

### 2. Defendant's Focus on the System "Writ Large" Is Wrong. Both *Locke* and *Trinity Lutheran* Require the Court to Focus on the Challenged Program and Its (Complete) Religious Exclusion.

Defendant's second contention—that Maine's education system "writ large" goes a long way toward including religion because religious schools satisfy the State's compulsory education law—is made in order to argue that the situation here is exactly like the situation in *Locke*. But this case is nothing like *Locke* because Defendant focuses on the wrong thing. The religious exclusion in *Locke* was not upheld because Washington's higher education system allowed religious colleges and universities to exist; it was upheld because the scholarship program itself went a long way toward including religion. *Trinity Lutheran*, 137 S. Ct. at 2023 ("Washington's *scholarship program* went 'a long way toward including religion in its benefits.'") (emphasis added) (quoting *Locke*, 540 U.S. at 724). Here, religion is entirely excluded from the tuitioning system, which therefore goes a long way toward being hostile to, not inclusive of, religion. Defendant's argument is therefore meritless and can be dispatched quickly.

Even if we did examine the system "writ large," the federal Constitution has required states to permit religious schools to operate and to satisfy the states' compulsory education requirements for almost a century. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925) ("The fundamental theory of liberty upon which all governments in this Union repose excludes any

general power of the State to standardize its children by forcing them to accept instruction from public teachers only."). Maine's compliance with this federal constitutional mandate is hardly evidence of the type of religious inclusion that *Locke* and *Trinity Lutheran* found so important in the context of Washington State's postsecondary education program. That is to say, by complying with a clearly established constitutional requirement the State fulfills a bare minimum; it does not go a long way.

Having shown that the Sectarian Exclusion denies Plaintiffs a generally available benefit based on religion, it can only survive judicial review if the State can prove it is supported by a compelling governmental interest. That, the State cannot do.

### C. The State Lacks a Compelling Interest to Justify Its Denial of Tuition Benefits to Families Who Choose Religious Schools.

Only a state interest "of the highest order" can justify the Sectarian Exclusion. *Trinity Lutheran*, 137 S. Ct. at 2024. Here, it is no secret why the Legislature enacted the Sectarian Exclusion—a 1980 Attorney General Opinion concluded that the Establishment Clause required the exclusion.[12] *See* Stip. Record Ex. 1 (Doc. 51-1, PageID# 141 – 158). The State's justification is plainly discernable from the Sectarian Exclusion's text, which provides that "[a] private school may be approved for the receipt of public funds for tuition purposes only if it . . . [i]s a nonsectarian school *in accordance with the First Amendment of the United States Constitution*." 20-A M.R.S.A. § 2951(2) (emphasis added). Given that "there is no doubt that the State could,

---

[12] *See also Bagley v. Raymond Sch. Dep't*, 728 A.2d 127, 131 (Me. 1999) ("The State does not dispute that its only justification for excluding religious schools from the tuition program was compliance with the Establishment Clause."); *see also id*. at 133 ("[T]he only basis asserted by the State for its disparate treatment of religious schools is its understanding that the statute in existence prior to the exclusion violated the Establishment Clause."). *Cf. Anderson v. Town of Durham*, 895 A.2d 944, 958 (Me. 2006) ("The actions of the Attorney General and the Legislature were not motivated by any religious animus and were motivated by a desire to respect and comply with the requirements of the Establishment Clause as then interpreted and applied by the United States Supreme Court.").

consistent with the Federal Constitution," include religious schools in its town tuitioning system, *see Locke*, 540 U.S. at 719, the State's only justification for the Sectarian Exclusion does not even rise to the level of a "legitimate" concern, much less a compelling one. *See Weinberger v. Wiesenfelder*, 420 U.S. 636, 648 n.16 (1975) ("This Court need not . . . accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the [later] asserted purpose could not have been a goal of the legislation."). The Sectarian Exclusion thus lacks an interest of the "highest order." Accordingly, it must fall.

To try to find a compelling interest, Defendant turns to the legislative debates concerning a 2003 bill, LD 182, which sought to eliminate the Sectarian Exclusion. *See* Jt. Stip. Facts 189 – 202 (Doc. 25, PageID# 926 – 931). It was introduced (and rejected) after the U.S. Supreme Court's decision in *Zelman v. Simmons-Harris*, 536 US 639 (2002), which upheld the inclusion of religious options for parents in an otherwise neutral school choice program. However, far from cleansing the Legislature's original (and mistaken) reason for enacting the Sectarian Exclusion, the debates surrounding LD 182 evince an overt anti-religious animus. *See* Jt. Stip. Record Ex. 2 (Doc. 24-2, PageID# 183 – 205). For example:

- Statement of Representative Fischer condemning LD 182 for seeking to "fund discrimination." Jt. Stip. Record Ex. 2 (Doc. 24-2, PageID# 186).

- Statement of Representative Cummings fearing that LD 182 would mean "giving up the rights for the education of our children to entities whose overwhelming mission is religious." Jt. Stip. Record Ex. 2 (Doc. 24-2, PageID# 190).

- Statement of Senator Martin in opposition to LD 182 because the bill would permit public funds to be used to "teach intolerant religious views." Jt. Stip. Record Ex. 2 (Doc. 24-2, PageID# 205).

The Supreme Court recently condemned precisely this type of anti-religious animus in

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018)

(holding that states have "a duty under the First Amendment not to base laws or regulations on

hostility to a religion or religious viewpoint"). The Sectarian Exclusion must be struck down because it violates the Free Exercise Clause's most basic guarantees—the rights to believe, to act upon those beliefs, and to be free from laws or regulations motivated by anti-religious animus.

## IV.   The Sectarian Exclusion Violates the Establishment Clause's Command that Government Remain Neutral Regarding Religion.

Defendant does not offer any argument on Plaintiffs' Establishment Clause claim, resting instead on a naked assertion that it is "completely baseless." Def.'s Mot. Summ. J. 25. However, with respect to government aid programs, the touchstone of neutrality under the Establishment Clause is whether the program differentiates based on either the religious status of beneficiaries or of the providers of services. *Zelman v. Simmons-Harris*, 536 U.S. 639, 654 n.3 (2002). The Sectarian Exclusion offends the Establishment Clause by differentiating on *both* bases. *See, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984) (the Constitution "forbids hostility" toward "all religions"); *Everson v. Board of Educ.*, 330 U.S. 1, 18 (1947) ("State power is no more to be used so as to handicap religions than it is to favor them."). The Sectarian Exclusion should be struck down under the Establishment Clause for violating its command that government remain neutral regarding religion.

## V.   Under the Equal Protection Clause, the Sectarian Exclusion Cannot Survive Even Rational Basis Review—Much Less Strict Scrutiny—Because It Does Not Further the Purpose for Which It Was Adopted.

Defendant argues that the Sectarian Exclusion survives Plaintiffs' Equal Protection Clause challenge because there is no fundamental right at issue and that Plaintiffs cannot win under rational basis review. While the proper standard of review for discrimination against religion under the Equal Protection Clause is strict scrutiny,[13] *e.g.*, *City of New Orleans v. Dukes*,

---

[13] Plaintiffs' Motion for Summary Judgment explains, in detail, why strict scrutiny is the proper standard of review under the Equal Protection Clause and why the Sectarian Exclusion fails under strict scrutiny. Pls.' Mot. Summ. J. 23-24.

427 U.S. 297, 303 (1976) (per curiam), the reality is that the Sectarian Exclusion does not even survive rational basis review.

As the Ninth Circuit explained in its landmark decision *Christian Science Reading Room Jointly Maintained v. San Francisco*, 784 F.2d 1010 (9th Cir. 1986), even under rational basis review, when a government's policy of religious discrimination does not further the purpose for which the policy was adopted, the policy violates the Equal Protection Clause. *Id*. at 1016. The issue in *Christian Science Reading Room* was "whether the decision of the San Francisco Airports Commission to terminate the tenancy of the Christian Science Reading Room Jointly Maintained because it is a religious organization can stand constitutional muster." *Id*. at 1010. The reason the Commission terminated the tenancy was its "belief that the provisions of the United States and California Constitutions affecting the establishment of religion required it to evict its longtime tenant." *Id*. The Ninth Circuit concluded that, under the facts of the case, it did not have to decide whether strict scrutiny applied because the Commission's actions did "not even meet the rational relationship test." *Id*. at 1013; *compare Bagley*, 728 A.2d at 138 ("If the State's justification [for the Sectarian Exclusion] is based on an erroneous understanding of the Establishment Clause, its justification will not withstand any level of scrutiny.").

"Under the rational relationship test, a classification will be upheld if it rationally furthers a legitimate state purpose." *Christian Science Reading Room*, 784 F.2d at 1013. To determine whether the policy of exclusion could satisfy rational basis review, the Ninth Circuit first sought to determine the Commission's purpose for adopting the policy. *Id*. The Commission argued it had three possible purposes for its policy of not renting to religious organizations: (1) compliance with its obligations under the Establishment Clauses of the United States and California Constitutions; (2) maximization of airport revenue; and (3) serving the desires of the

traveling public. *Id*. The Ninth Circuit refused to consider the latter two purposes because, based on the record before it, the Commission could not reasonably have been understood to have entertained those purposes when it adopted the policy—such post-hoc rationalizations are illegitimate, and described by the Ninth Circuit as "patently make-weight." *Id*.

After determining the Commission's purpose for adopting the anti-religious policy, the Ninth Circuit examined the two Establishment Clauses (federal and state) and concluded neither provision required the Christian Science Reading Room's eviction. *Id*. at 1015, 1016. "Because there were no constitutional violations to remedy, the classification between religious and non-religious entities could not, under any state of facts, serve to further the objective of remedying such violations." *Id* at 1016 ("A fortiori, the classification of tenants into two groups, religious organizations and all others, did not rationally further th[e] purpose" of remedying constitutional violations). The analogy to Plaintiffs' challenge to the Sectarian Exclusion is obvious. Just like in *Christian Science Reading Room*, the motivation for adopting the Sectarian Exclusion was an erroneous belief that it was necessary to remedy an Establishment Clause concern. *See* Section III.C., *supra*. Absent a need to remedy a constitutional concern, discriminating against religious entities cannot rationally serve to further that interest. Moreover, Maine's interest in supporting public schools and bringing children together in the public education system cannot be achieved under the town tuitioning system. *See* Def.'s Mot. Summ. J. 24. The town tuitioning system is *incapable* of accomplishing those interests because it permits parents to choose private schools that do not have to admit all applicants. The only way to accomplish those goals would be to eliminate town tuitioning. The Sectarian Exclusion thus fails even rational basis review.

**VI.    The Sectarian Exclusion Unconstitutionally Burdens Plaintiffs' Free Speech
Rights by Discriminating Against Religious Points of View.**

Defendant argues there is no violation of the Free Speech Clause because the tuitioning
system is not a government-created forum for speech. Plaintiffs do not dispute that the town
tuitioning system does not create a forum for speech. However, the Free Speech Clause protects
individuals from government restraints on speech outside of government-created speech forums.
*Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-28 (2010) (holding that laws that
burden the conveying of information on a particular topic are content-based restrictions on
speech that are subject to strict scrutiny). Here, the Sectarian Exclusion violates Plaintiffs'
speech rights by denying them tuition benefits based on the religious content they want their
children to hear at school. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 643 (1994) ("[L]aws
that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or
views expressed are content-based."). The statutory scheme—and Defendant's enforcement of
it—makes it clear that it is the content of the speech that the students hear that triggers the
Sectarian Exclusion. Content-based restrictions are subject to strict scrutiny, which shifts the
burden to the government to prove that it has a compelling reason to restrict speech. And, as
shown in Sections III.C. and V., *supra*, the Sectarian Exclusion cannot survive strict scrutiny
because it does not advance *any* government interest, let alone a compelling one.

## CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to deny Defendant's Motion for
Summary Judgment as a matter of law pursuant to Fed. R. Civ. P. 56(c).

Dated this 1st day of May, 2019.

Respectfully submitted,

/s/ Jeffrey T. Edwards
Jeffrey T. Edwards
PretiFlaherty
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Tel: (207) 791-3000
Fax: (207) 791-3111
Email: jedwards@preti.com

*Local Counsel for Plaintiffs*

/s/ Timothy D. Keller
Timothy D. Keller* (AZ Bar No. 019844)
Institute for Justice
398 S. Mill Avenue, Suite 301
Tempe, AZ 85281
Tel: (480) 557-8300
Fax: (480) 557-8315
Email: tkeller@ij.org

Arif Panju* (TX Bar No. 24070380)
Institute for Justice
816 Congress Avenue, Suite 960
Austin, TX 78701
Tel: (512) 480-5936
Fax: (512) 480-5937
Email: apanju@ij.org

Lea Patterson* (TX Bar No. 24102338)
First Liberty Institute
2001 W. Plano Parkway, Suite 1600
Plano, TX 75075
Tel: (972) 941-4444
Fax: (972) 423-6162
Email: lepatterson@firstliberty.org

Michael K. Whitehead* (MO Bar No. 24997)
Jonathan R. Whitehead* (MO Bar No. 54868)
Whitehead Law Firm, LLC
229 SE Douglas St., Suite 210
Lee's Summit, MO 64063
Tel: (816) 398-8967
Fax: (816) 875-3291
Email: mike@thewhiteheadfirm.com
Email: jon@whiteheadlawllc.com

*Attorneys for Plaintiffs*
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of May 2019, a true and correct copy of

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR**

**SUMMARY JUDGMENT** was filed and served on the following counsel of record using the

Court's CM/ECF system:

Aaron Frey
Attorney General

Sarah A. Forster
Christopher C. Taub
Assistant Attorneys General
Office of the Attorney General
Six State House Station
Augusta, ME 04333-0006
Tel: (207) 626-8866, (207) 626-8800
Email: sarah.forster@maine.gov
      christopher.c.taub@maine.gov

*Attorneys for Defendant*


Emma Eaton Bond
Zachary L. Heiden
American Civil Liberties Union of Maine
121 Middle Street, Suite 200
Portland, ME 04101
Tel: (207) 619-8687, (207) 774-5444
Email: ebond@aclumaine.org
      zheiden@aclumaine.org

Sarah Goetz
Richard B. Katskee
Alex Luchenitser
Americans United for Separation of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
Tel: (202) 466-3234, (202) 466-3234, (202) 466-7306
Email: goetz@au.org, katskee@au.org, luchenitser@au.org

Daniel Mach
Heather Weaver
American Civil Liberties Union Foundation DC
915 15th Street NW Suite 600
Washington, DC 20005
Tel: (202) 675-2330
Email: dmach@aclu.org, hweaver@aclu.org

Eric A. Harrington
Kristen L. Hollar
National Education Association
1201 16th Street, N.W.
Washington, D.C. 20036
Tel: (202) 822-7034
Email: eharrington@nea.org, khollar@nea.org

Andrew T. Mason
Maine Education Association
35 Community Drive
Augusta, ME 04330
Tel: (207) 622-4418
Email: amason@maineea.org

David G. Sciarra
Jessica Levin
Education Law Center
60 Park Place
Suite 300
Neward, NJ 07102
Email: dsciarra@edlawcenter.org, jlevin@edlawcenter.org

Jasmine Bolton
Zoe M. Savitsky
Southern Poverty Law Center
400 Washington Avenue
Montgomery, AL 36104
Tel: (334) 956-8200
Email: jasmine.bolton@splcenter.org, zoe.savitsky@splcenter.org

Stephen Whiting
The Whiting Law Firm
75 Pearl Street
Suite 207
Portland, ME 04101
Tel: (207) 780-0681
Email: mail@whitinglawfirm.com


/s/ Timothy D. Keller
*Attorney for Plaintiffs*