UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| DAVID and AMY CARSON, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 18-cv-00327 DBH |
| | ) |
| A. PENDER MAKIN, in her | ) |
| official capacity as Commissioner of | ) |
| the Maine Department of Education, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
<u>HER MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiffs' Opposition Brief fails to show that they have standing to bring the claims in their Complaint, fails to justify ignoring the First Circuit precedent established by *Eulitt*, and ultimately fails to demonstrate that this matter is governed by *Trinity Lutheran* at all. Rather, as explained in Defendant's Motion for Summary Judgment with Incorporated Memorandum of Law ("Defendant's Memorandum"), this case falls squarely within *Locke v. Davey*, which "confirms that the Free Exercise Clause's protection of religious beliefs and practices from direct government encroachment does not translate into an affirmative requirement that public entities fund religious activity simply because they choose to fund the secular equivalents of such activity." *Eulitt v. Maine Dep't of Educ.*, 386 F.3d 344, 354 (1st Cir. 2004).

  **I.   Plaintiffs fail to demonstrate standing to bring their claims.**

In her summary judgment motion, defendant argued that the plaintiffs do not have standing because they cannot establish a substantial likelihood that their alleged injury would redressed by a favorable ruling. Defendant's Memorandum, at 10-14. The Supreme Court has repeatedly held that when a plaintiff's injury arises from the government's allegedly unlawful

1

regulation of a third party, redressability turns on how the third party would respond if the regulation were removed or modified. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *Allen v. Wright*, 468 U.S. 737 (1984); *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976); *Warth v. Seldin*, 422 U.S. 490 (1975); *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973); *see also Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1274 (D.C. Cir. 2007) (referring to "*Lujan* as well as several other Supreme Court decisions holding that standing to challenge a government policy cannot be founded merely on speculation as to what third parties will do in response to a favorable ruling"). Here, Maine is not regulating the plaintiffs. Rather, it is regulating schools by setting forth the requirements they must satisfy to be approved by Maine for the receipt of public funds. 20-A M.R.S. § 2951. One of these requirements is that a school be nonsectarian, 20-A M.R.S. § 2951(2), and there is no evidence in the record that any sectarian school – much less the two sectarian schools to which the plaintiffs send (or wish to send) their children – would apply for approval for receipt of public funds if this requirement were removed. To the contrary, the evidence is that the schools would <u>not</u> seek public funds because they would then no longer be permitted to refuse to hire homosexuals.

Plaintiffs first respond by claiming that defendant's argument is "directly contradicted" by *Eulitt v. Maine, Dep't of Educ.*, 386 F.3d 344 (1st Cir. 2004). Opposition Brief, at 4-5. In fact, the *Eulitt* court never addressed the argument that defendant is making here. In *Eulitt*, the issue was whether the plaintiff parents – as opposed to the school to which they wanted to send their children – had standing. The First Circuit held that the parents did not have standing to raise constitutional claims on behalf of the school but did have standing in their own right based on their "allegation of injury in fact to their interest in securing tuition funding." *Id.*, at 353. *Eulitt* addressed the first element of standing – whether there is an injury – and not the third

element – whether it is likely that the injury would be redressed by a favorable decision.  *See Lujan*, 504 U.S. at 560-61.  Nothing in the *Eulitt* decision suggests that the First Circuit considered whether the injury would be redressed by a favorable ruling.  Quite simply, *Eulitt* is silent on the redressability argument the defendant makes here.

      Citing just two cases, the plaintiffs next argue that the Supreme Court has found that plaintiffs had standing even when they could not prove they would necessarily receive a tangible benefit if they prevailed.  Opposition Brief, at 5-8.  The cases they cite, though, are inapposite because they do not involve situations in which the plaintiffs' ability to obtain redress depended wholly on the discretionary actions of third parties not before the court.  In *Northeastern Florida Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656 (1993), the plaintiffs challenged a city ordinance giving preference to minority-owned businesses in the award of city contracts.  The Supreme Court held that to have standing, a plaintiff did not need to prove that it would receive a contract if the ordinance were struck down but instead "need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis."  *Id*., at 666.  The plaintiffs' ability to obtain relief did not depend on the purely discretionary actions of a third-party.  The plaintiffs were the objects of the regulation, and, in such cases, there is "ordinarily little question" that a favorable judgment will redress the injury.  *Lujan*, 504 U.S. at 561-62. [1]  Here, on the other hand, it is the schools that are the objects of the regulation, and plaintiffs must thus demonstrate a likelihood

---

[1] The case could be relevant if the schools themselves were plaintiffs here.  Under the reasoning of *Northeastern Florida Chapter*, the schools might not have to prove that they necessarily would be approved for the receipt of public funds if they applied, and instead would arguably have to show only that they were "able and ready" to apply but that Section 2951(2) prevents them from applying for an allegedly unlawful discriminatory reason.  Of course, the schools are not the plaintiffs here, and in the absence of any evidence that the schools would seek public funds if plaintiffs prevail, plaintiffs cannot establish redressability.

that schools will apply for receipt of public funds if Section 2951(2) were struck down. They have failed to do so.[2]

Plaintiffs attempt to make a factual distinction between the cases relied upon by defendant and the present case by arguing that in the other cases, the plaintiffs were not being "denied a benefit to which they were otherwise entitled." Opposition Brief, at 7. But two of the cases relied upon by defendant did involve denial of a governmental benefit. In *Warth v. Seldin*, 422 U.S. 490 (1975), it was a zoning ordinance that was at issue, and the Supreme Court held that plaintiffs did not have standing because there was no evidence that striking down the ordinance would result in third parties building affordable housing. In *Lujan*, 504 U.S. at 555, it was the Secretary of the Interior's failure to require federal agencies to engage in a consultation process before funding projects abroad that was at issue, and the Supreme Court held that the redressability was not established because even if the Secretary were ordered to require consultation, it was unlikely that federal agencies would terminate funding projects until consultation. Finally, even if there are factual distinctions between the present case and the ones relied upon by defendant, it does not matter. The basic point is that to establish standing, a plaintiff must demonstrate redressability, and when redress depends on the actions of a third party, the Supreme Court has plainly held that a plaintiff must demonstrate a likelihood that the third party will act as the plaintiff hopes.

Plaintiffs' final argument is that defendant is misreading the Maine Human Rights Act ("MHRA") and is wrong in claiming that the schools to which the plaintiffs send their children

---

[2] The other case cited by plaintiffs -- *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) – involved a challenge to a "structured dismissal" of a bankruptcy case that violated priority rules by paying general unsecured creditors over creditors with higher priority. The Supreme Court held that even though the higher priority creditors ultimately might not receive any money, they nevertheless had standing to challenge the dismissal because there was a "reasonable possibility" that they could obtain money through a settlement and/or through a fraudulent conveyance lawsuit. *Id*., at 983. There is nothing in the opinion suggesting that the creditors' ability to obtain effective relief turned wholly on purely discretionary decisions by third parties.

4

will not apply for the receipt of public funds because they would then be prohibited from refusing to hire homosexuals. Opposition Brief, at 8-10. It is not, though, defendant's burden to establish that plaintiffs' injuries will not be redressed by a favorable ruling. Rather, it is plaintiffs' burden to show a "substantial likelihood" that their injuries will be redressed. *See, e.g., Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 44-46 (1976). The best plaintiffs can muster is testimony from the schools that they would "consider" accepting public funds. Opposition Brief, at 10. This does not satisfy their burden.[3]

In any event, it is the plaintiffs who are misreading the MHRA. The MHRA makes it unlawful to refuse to a hire a person on the basis of sexual orientation, and the exception for religious organizations applies only to those that "do[] not receive public funds." 5 M.R.S. §§ 4572(1)(A), 4553(10)(G). Plaintiffs correctly note that under other provisions, a religious organization, regardless of whether it receives public funds, may refuse to hire a person who does not share the religion or who does not "conform to the religious tenets of that organization." 5 M.R.S. §§ 4553(4), 4573-A(2). These provisions, though, do not allow a religious organization to refuse to hire homosexuals, which is precisely what TA and BCS do now and want to continue doing in the future. Because both schools testified that they would not seek public funds if it meant that they could no longer refuse to hire homosexuals, JSF, ¶¶ 127, 184, it is unlikely that, even if plaintiffs prevailed, they would then be able to send their children to TA and BCS at public expense.

---

[3] The fact that plaintiffs offered no affidavits from the schools attesting to their intent to apply for public funds is telling inasmuch as the plaintiffs and the schools are not strangers to each other. Beyond that the plaintiffs' children attend the schools, one of the schools – BCS – assisted plaintiffs' counsel in recruiting families to serve as plaintiffs. *See* Document 24-6, PageID 304-05. Presumably, if BCS could, in good faith, have provided an affidavit to plaintiffs to assist them in establishing standing, it would have done so.

## II.  Nothing in *Trinity Lutheran* affects the First Circuit's holding in *Eulitt.*

Plaintiffs boldly proclaim that *Trinity Lutheran* "supplants the First Circuit's merits decision in *Eulitt*."  Opposition Brief, at 11.  But nothing about the *Trinity Lutheran* decision supports the argument that this Court should overlook First Circuit precedent.  *Eulitt*, 386 F.3d at 349 ("Until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by a supervening authority." ); *Sarzen v. Gaughan*, 489 F.2d 1076, 1082 (1st Cir. 1973) (stare decisis requires lower courts to take binding pronouncements "at face value until formally altered").

First, plaintiffs all but ignore the explicit limitation contained in the *Trinity Lutheran* decision itself:  footnote three of the opinion (adopted by four members of the majority) states that "[t]his case involves express discrimination based on religious identity with respect to playground resurfacing.  *We do not address religious uses of funding* or other forms of discrimination." *Trinity Lutheran*, 137 S.Ct. at 2024, n.3 (emphasis added).  Justice Breyer's opinion specifically limits his concurrence to the facts at issue.  *Id.,* at 2026-27.  Plaintiffs' suggestion in a footnote that the Court's footnote (and presumably the Breyer concurrence) have no relevance is simply wrong.  Opposition Brief at 16, n.11.  As noted in the brief of *Amici Curiae* Susan Marcus *et als*., Document 30 at 11, n.9, the footnote is controlling because it sets forth narrower grounds for the judgment than the analysis of the two Justices who joined the body of the majority opinion, but not the footnote.  *Marks v. United States,* 430 U.S. 188, 193 (1977) (in a fragmented decision "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds").

Second, plaintiffs ignore the subsequent treatment of *Trinity Lutheran*.  As pointed out in Defendant's Memorandum, in *Freedom From Religion Found. v. Morris Cty. Bd. of Chosen*

6

*Freeholders*, 181 A.3d 992 (N.J. 2018), *cert. denied*, 139 S. Ct. 909 (2019), the Supreme Court recently let stand the New Jersey Supreme Court's conclusion that a state program that awarded public funds for the repair of churches violated a provision in the state's constitution declaring that no person could be obliged to pay taxes for the building or repairing of churches. *Id*. at 1006. The NJ court noted that *Trinity Lutheran* did not address whether its holding – that an otherwise qualified religious entity cannot be denied public funds solely because of its religious character – "extends to religious uses of funding." *Id*. at 1008. As "[t]he holding of *Trinity Lutheran* does not encompass the direct use of taxpayer funds to repair churches and thereby sustain religious worship activities," the NJ court held that the constitutional provision prohibiting the use of public funds to build or repair churches did not violate the Free Exercise Clause. *Id*. at 1012.

Third, plaintiffs completely mischaracterize *Trinity Lutheran's* impact on *Locke v. Davey*. Far from "erect[ing] a fence" around *Locke*, or concluding that *Locke* only applies to a state's interest in not funding the training of ministers, *Trinity Lutheran* continues to recognize the distinction between a state program that discriminates based on the status of a would-be participant and a state program that restricts all participants from using public funds for a particular activity. *See* below at 10-12. As *Eulitt* applied exactly that analysis to the Maine tuition program, there is no reason for this Court to ignore the Court of Appeals' decision.

Finally, plaintiffs provide no explanation as to how *Trinity Lutheran* could have supplanted *Eulitt* with respect to plaintiffs' equal protection or free speech claims given that the *Trinity Lutheran* decision addressed only a free exercise claim. With respect to equal protection, such a claim continues to be governed by the rational basis standard outlined in *Locke* and *Eulitt*,

7

which the prior plaintiffs conceded that the State met. Concession aside, the Court of Appeals explained:

> This concession is understandable: the legislative history clearly indicates Maine's reasons for excluding religious schools from education plans that extend public funding to private schools for the provision of secular education to Maine students. These reasons include Maine's interests in concentrating limited state funds on its goal of providing secular education, avoiding entanglement, and allaying concerns about accountability that undoubtedly would accompany state oversight of parochial school's curricula and policies (especially those pertaining to admission, religious tolerance, and participation in religious activities).

*Eulitt*, 386 F.3d at 356. As to speech, *Eulitt* held that the Maine tuition program does not implicate the free speech provision of the First Amendment at all, as it is not providing a forum to encourage diverse views from private speakers; rather, it is ensuring the provision of a secular public education from speakers who are willing to deliver it through compliance with Section 2951. *Id*.

### III. This case continues to be governed by *Locke*, not by *Trinity Lutheran*.

Plaintiffs' opposition spends much of its argument trying to force the Maine tuition program into the narrow opening of *Trinity Lutheran*. It fails for the reasons described below.

<u>The benefit at issue</u>. The First Circuit has already defined the "benefit offered by the state" by the tuition program as "a secular education." *Eulitt*, 386 F.3d at 355. In her summary judgment motion, defendant further explained the Maine tuition program, through both the relevant statutes requiring each school administrative unit to provide a free, public education to every resident student – 20-A M.R.S. §§ 2(1), 1001(8), 5204(4) – and the description of the limited nature of the tuition program by Maine's Law Court, which found that "[t]he Legislature endeavors to ensure that each child will be entitled to an *opportunity* to receive a free public education, not to guarantee children a free education at any public or private school of their choice." *Hallissey v. Sch. Admin. Dist. No. 77*, 2000 ME 143, 755 A.2d 1068, 1073 (Me. 2000).

Without addressing the statutes cited by defendant, *Eulitt,* or *Hallissey*, plaintiffs' opposition brief repeatedly states that the benefit of the Maine tuition program is "tuition at the school of the parents' choice." Opposition Brief at 14-15. Their only effort to support that conclusion consists of two brief arguments, neither of which has merit. Their first argument, that the benefit cannot be a free, public education as the defendant describes it because the private schools in the tuition program do not have to accept every student who applies, displays a basic lack of knowledge of Maine's public education system. Maine has two *public* magnet schools where students apply to go to receive their free, public education, each of which can select a class from the students who apply. *See* 20-A M.R.S. §§ 8201, 8205(11) (Maine School of Science and Mathematics); §§ 8231, 8235(11) (Maine School for Marine Science, Technology, Transportation, and Engineering). In addition, Maine has nine *public* charter schools: schools of choice which can cap enrollment at a predetermined number. 20-A M.R.S. §§ 2401(9), 2402, 2404(2). In short, a free, public education clearly incorporates schools that do not have to accept every student who applies.

Their second argument that the benefit cannot be a free, public education because the private schools that participate in the tuition program can charge parents the difference between the statutory tuition rate and their full, actual tuition is a red herring. Nothing about the tuition program forces a participating private school to charge a parent more than the statutory tuition rate, and many private schools (including Erskine Academy, the school attended by the Nelsons' daughter at public expense) do not. Nor does the tuition program force a parent to choose a school that would charge them the excess tuition above the statutory tuition rate, as opposed to either another private school that does not or a nearby public school. And if a parent cannot find a school that will accept their child, Maine statute gives the Commissioner of Education the

9

authority to assign a student to a school administrative unit that operates public schools to ensure the provision of a free, public education. 20-A M.R.S. § 254(19).

Having failed to establish that the benefit is "any school of the parent's choice," plaintiffs are unable to show that they are seeking a generally available public benefit akin to the benefit at issue in *Trinity Lutheran*. Unlike Trinity Lutheran Church, which sought the same benefit as the non-church applicants – funds to upgrade their playground surface from the Scrap Tire Program – plaintiffs seek a different benefit than the benefit offered by Maine's tuition program. The tuition program offers a secular education, and the plaintiffs seek a sectarian one. This places the case squarely within *Locke's* teaching that the Free Exercise Clause's protection of religious beliefs and practices from direct government encroachment does not translate into an affirmative requirement that public entities fund religious activity simply because they choose to fund the secular equivalents of such activity. 540 U.S. at 721.

<u>The status of the plaintiffs versus the use of the funds</u>. Despite plaintiffs' efforts to complicate the issue, the difference between "status" and "use" can be explained simply. If Maine's statute prevented Christians from receiving a publicly funded secondary education, but allowed non-Christians to receive one, that would be discrimination based on an individual's religious status. On the other hand, if Maine's statute allows everyone, religious or not, to receive a publicly funded secular education, and prevents everyone, religious or not, from receiving a publicly funded sectarian education, it not an issue of "status" but rather an issue of "use."

The first example was the situation addressed by the Supreme Court in *Trinity Lutheran*. The Missouri Scrap Tire Program provided state grants to replace old playground surfaces with scrap tire. Trinity Lutheran church wanted to replace its old playground surface with scrap tire

10

but was disqualified from receiving a grant through the Scrap Tire Program solely because it was a church. Simply put, Trinity Lutheran was rejected because of who they were (*i.e.* their status as a church), and not because of what they wanted to do, which was exactly the same thing that the non-church applicants wanted to do.

The second example was the situation addressed by the Supreme Court in *Locke v. Davey*. The Promise Scholarship Program helped academically gifted students working toward undergraduate degrees but excluded degrees in devotional theology. Davey was a religious person who wanted to apply his scholarship to a degree in devotional theology. He was denied, not because he was a religious person, but because under the terms of the program, no undergraduate student in Washington was able to apply their Promise Scholarship to a degree in devotional theology. In other words, he was denied not because of who he was, but because of what he wanted to do. The second example also exactly describes Maine's tuition program. Plaintiffs' reasoning that because the "Sectarian Exclusion" (their term) is triggered by their desire to have their children educated in schools whose worldviews align with their sincerely held religious beliefs, and their beliefs are part of their religious status, it must necessarily discriminate based on status is both circular and wrong. Opposition Brief at 17. Whether plaintiffs are religious or whether their desire to choose a sectarian school for their children is motivated by their sincere religious beliefs is wholly immaterial with respect to the tuition program. While plaintiffs testified that they would like to choose a sectarian school because it provides a high quality education and is consistent with their religious beliefs, a non-religious parent who wishes to send her son to a nearby Catholic high school because she believes it has strong disciplinary policies and her son wants to play on the hockey team would also be

prevented from doing so.  Maine's tuition program hinges not on who a parent is, but on what they wish to purchase with public funds.[4]

      The State's interest.  As the tuition program does not discriminate based on religious status, *Trinity Lutheran*'s heightened standard of review for claims based on status does not apply.  Defendant notes, however, that plaintiffs' arguments about the state's rationale for maintaining a secular public education system misstate both the law and the facts and ignores First Circuit precedent.  Legally, it does not matter whether there was evidence of the Legislature's actual reasons for excluding sectarian schools from the public tuition program.  *See, e.g., F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."); *see also Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 214 (1st Cir. 2002).[5]  As a matter of fact, there is evidence of the Legislature's rationale, in the form of statements made by legislators while considering (and rejecting) a repeal of the exclusion.  JSF, ¶¶ 189-202.  There is no reason to treat these statements differently simply because they were offered as reasons not to repeal the exclusion as opposed to reasons for implementing the exclusion in the first place.  And there is no basis for ignoring the First Circuit's findings that "[t]here is not a shred of evidence than any . . . animus fueled the

---

[4] Plaintiffs' attempt to first equate faith and action and then distinguish *Locke* from the instant case lacks credulity. None of the cases cited by plaintiffs come close to the unity of faith and action described in *Locke*.  Surely an aspiring minister such as Davey is the gold standard for the unity of faith and action – the Supreme Court referred to it as "akin to a religious calling" – but that still did not entitle him to use his Promise Scholarship for a degree in devotional theology because nobody, religious or not, could use their scholarship to pursue a degree in devotional theology.

[5] The case relied upon by the plaintiffs -- *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975) – is not to the contrary. There, the Supreme Court held that it would not "accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose *could not have been a goal* of the legislation." *Id*. at 648 n.16 (emphasis added).  Here, there is no evidence that the proffered reasons could not have been the Legislature's goals.

enactment of the challenged Maine statute" and in reference to *Locke*'s "test for smoking out anti-religious animus . . . the statute here passes . . . with flying colors." 386 F.3d at 355.[6]

### IV. Plaintiffs' remaining claims merit little attention.

Plaintiffs' equal protection and free speech claims were decided in the State's favor in *Eulitt* and not addressed at all by *Trinity Lutheran*. There is no basis for relitigating them here. The Ninth Circuit's decision in *Christian Science Reading Room Jointly Maintained v. San Francisco,* 784 F.2d 1010 (9th Cir. 1986), which plaintiffs' discuss at length, was available to the parties and the First Circuit when *Eulitt* was briefed, argued and decided in 2004. Nevertheless, the *Eulitt* plaintiffs conceded that the tuition program satisfied the rational basis test, and the First Circuit agreed.[7] As for the Establishment Clause, plaintiffs cite no case that even suggests that maintaining a secular public education system is unconstitutionally "hostile" toward religion. Nor does *Zelman v. Simmons-Harris* say anything that suggests that Ohio *had to* include sectarian schools in the Cleveland voucher program, only that it did not violate the Establishment Clause by doing so. 536 U.S. 639, 662-663.[8]

### CONCLUSION

For all the above reasons, as well as the reasons contained in her Motion for Summary Judgment with Incorporated Memorandum of Law, defendant respectfully requests that summary judgment be entered in her favor on all counts.

---

[6] As such, there is no basis for plaintiffs' inflammatory reference to *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n.*, 138 S. Ct. 1719, 1731 (2018).

[7] The reason that *Christian Science Reading Room Jointly Maintained* came out the way it did was that the Ninth Circuit concluded that the airport authority's *only* justification for excluding religious organizations was to avoid violating the Establishment Clause. *Id*., at 1013. The court held that because the Establishment Clause did not require the exclusion of religious organizations, the authority's policy did not rationally further its purpose of avoiding a constitutional violation. *Id*., at 1016. Here, on the other hand, the First Circuit concluded that Section 2951(2) furthers interests wholly apart from avoiding Establishment Clause violations, *Eulitt*, 386 F.3d at 356, and the legislative history supports that conclusion. JSF, ¶¶, 198-202.

[8] To the extent that plaintiffs discussed their Establishment Clause claim in more detail in their own Motion for Summary Judgment, defendant incorporates by reference the arguments made in her opposition brief at pages 5-6.

DATED:  May 10, 2019	A. PENDER MAKIN
	By her attorneys:

	AARON M. FREY
	Attorney General

	/s/Sarah A. Forster
	SARAH A. FORSTER
	CHRISTOPHER C. TAUB
	Assistant Attorneys General
	Office of the Attorney General
	Six State House Station
	Augusta, Maine  04333-0006
	Tel.  (207) 626-8866
	**sarah.forster@maine.gov**
	**christopher.c.taub@maine.gov**

CERTIFICATE OF SERVICE

I hereby certify that on this, the 10th day of May 2019, I electronically filed the above document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

BENJAMIN BULL
bbull@firstliberty.org

JEFFREY T. EDWARDS
jedwards@preti.com

TIMOTHY D. KELLER
tkeller@ij.org

ARIF PANJU
apanju@ij.org

LEA PATTERSON
lepatterson@firstliberty.org

JONATHAN R. WHITEHEAD
jon@whiteheadlawllc.com

MICHAEL K. WHITEHEAD
mike@thewhiteheadfirm.com

To my knowledge, there are no non-registered parties or attorneys participating in this case.

Dated:  May 10, 2019

/s/ Sarah A. Forster
SARAH A. FORSTER
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8866
sarah.forster@maine.gov