## UNITED STATES DISTRICT COURT
## FOR THE DISRICT OF MAINE

DAVID and AMY CARSON, et al.,     )
                                              )
              Plaintiffs,     )
                                              )
                                              )
              v.              )
                                              )        CASE NO. 1:18-cv-00327 DBH
                                              )
A. PENDER MAKIN, in her official     )
capacity as Commissioner of the Maine     )
Department of Education,     )
                                              )
              Defendant.     )
                                              )
                                              )

## UNITED STATES' STATEMENT OF INTEREST IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The State of Maine's own concessions demonstrate that its policy of excluding students who attend religious private schools from its tuition program violates the Free Exercise Clause under the Supreme Court's recent landmark decision in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017).  The State concedes that, for residents of a school administrative unit (SAU) that does not operate or contract for a secondary school, its tuition program is open to students who choose to attend "a public or non-sectarian private school." Def.'s Mot. Summ. J. ("Def.'s Mot.") 20, ECF No. 29.  The State further concedes that its tuition program is closed to one group—and only one group—of students who reside in such SAUs: those who choose to attend "sectarian" schools.  *Id.* at 21; *see also* 20-A M.R.S. § 2951(2) (2018).  In other words, by its own admission, the State categorically bars students who are

otherwise "fully qualified" from participating in its "generally available" tuition program because of their religious exercise. *Trinity Lutheran*, 137 S. Ct. at 2024.

The State thus "imposes a penalty on the free exercise of religion": it forces students who are otherwise eligible for the tuition program to choose between "participat[ing] in [the] program or remain[ing] [enrolled at] a religious institution." *Id.* at 2021-22, 2024. The State may engage in this religious discrimination against students only if it satisfies "the most exacting scrutiny." *Id.* at 2021. But the State has failed to identify an interest "of the highest order" to justify its discrimination, much less to explain how this discrimination is narrowly tailored to achieve that interest. *Id.* at 2019 (citation omitted). Accordingly, the State's exclusion of students who attend religious private schools from the generally available tuition program violates the Free Exercise Clause.[1]

## INTEREST OF THE UNITED STATES

The United States respectfully submits this Statement of Interest under 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States."

This case involves the right of individuals under the Free Exercise Clause of the First Amendment to be free from discrimination based on religion and raises important questions about the scope of the United States Supreme Court's decisions in *Locke* v. *Davey*, 540 U.S. 712 (2004), and *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 137 S. Ct. 2012 (2017). The United States has an interest in the proper interpretation of the Free Exercise Clause, and more generally in enforcing the various protections for religious freedom under the Constitution and

---

[1] The United States addresses only Plaintiffs' Free Exercise claim. It takes no position on any other issue in the case.

federal civil rights laws.  The Attorney General issued comprehensive guidance on these

protections in 2017.  *Memorandum from the Attorney General, Re: Federal Law Protections for

Religious Liberty* 2-3 (Oct. 6, 2017), available at https://www.justice.gov/opa/press-

release/file/1001891/download.


## FACTUAL BACKGROUND

Maine has created 260 local SAUs, defined by statute as the state-approved unit of school

administration, which serve nearly 180,000 students across the State.  Joint Stipulated Facts

("JSF") ¶¶ 3, 4, 20, ECF No. 25.  Each SAU "shall either operate programs in kindergarten and

grades one to 12 or otherwise provide for students to participate in those grades as authorized

elsewhere [by statute]."  20-A M.R.S. § 1001(8); JSF ¶ 5.  Of Maine's 260 SAUs, 143 do not

operate a secondary school.  JSF ¶ 6.  Those SAUs have two options to provide secondary

education to their students.  First, those SAUs may contract with another public school or an

approved private school for schooling privileges for some or all of its resident students.  20-A

M.R.S. §§ 2701–2702.  Second, those SAUs alternatively "shall pay the tuition, in accordance

with chapter 219, at the public school or the approved private school of the parent's choice at

which the student is accepted."  *Id.* § 5204(4); JSF ¶ 7.

Under 20-A M.R.S. § 2951, "[a] private school may be approved for the receipt of public

funds for tuition purposes only if it" meets several requirements.  20-A M.R.S. § 2951.  In the

first place, a private school must satisfy "the requirements for basic school approval" under

Maine law.  *Id.* § 2951(1).  The "basic school approval" requirements touch on such matters as

"[h]ygiene, health, safety," *id.* § 2901(1), required curriculum, *id.* § 2902(3)-(4), and "student-

teacher ratio[s]," *id.* § 2902(6)(C).  Among other requirements, "basic school approval" requires

a private secondary school either to be "accredited by a New England association of schools and colleges" or "provide a comprehensive program of instruction leading to a high school diploma" in the form of "a minimum 4-year program that meets the curriculum requirements" of Maine law. *Id.* §§ 2901(2)(A), 4722–4722(1); *see id.* § 2902(3). Those curriculum requirements include instruction in "English — 4 years," "Social studies and history, including American history, government, civics and personal finance — 2 years," "Mathematics — 2 years," "Science, including at least one year of laboratory study — 2 years," and "Fine arts, which may include art, music, forensics, or drama — one year." *Id.* § 4722(2); *see id.* § 2902(3).

The provision Plaintiffs challenge in this case, 20-A M.R.S. § 2951(2), also mandates that, in order to receive approval for the tuition program, a private school must be "a nonsectarian school in accordance with the First Amendment of the United States Constitution." *Id.* § 2951(2). This "nonsectarian" mandate codifies an opinion issued by the Maine Attorney General in 1980. JSF ¶ 187.

Plaintiffs David and Amy Carson, Alan and Judith Gillis, and Troy and Angela Nelson all reside in SAUs that neither "operate a [public] secondary school" nor "contract for secondary school privileges." *Id.* ¶¶ 6, 9. The Carsons' daughter, O.C., and the Gillises' daughter, I.G., attend Bangor Christian Schools ("BCS"). *Id.* ¶¶ 27, 43. The Nelsons' daughter, A.N., attends Erskine Academy, but would prefer to attend the religious private school, Temple Academy, that her brother attends. *Id.* ¶¶ 60, 62, 65. The Nelsons, however, cannot afford the cost of tuition for both of their children to attend Temple Academy. *Id.* ¶ 65.

The State acknowledges that it has "approved" BCS "for purposes of [Maine's] compulsory attendance law." Def.'s Mot. 23. BCS therefore satisfies the State's "basic school approval" requirements. JSF ¶ 73; Pls.' Mot. Summ. J. ("Pls.' Mot.") 5-6, ECF No. 31; 20-A

4

M.R.S. §§ 2951(1), 5001-A(3)(A)(1)(a).  Temple Academy has not met those particular

requirements, but the State has "recognized" that Temple Academy satisfies the compulsory

attendance law because it "provid[es] equivalent instruction" to Maine's public schools.  Def.'s

Mot. 23; Pls.' Mot. 5-6; JSF ¶ 132; 20-A M.R.S. §§ 2951(1), 5001-A(3)(A)(1)(b).


## ARGUMENT

The Free Exercise Clause, as incorporated through the Fourteenth Amendment, prevents

states from "prohibiting the free exercise" of religion.  U.S. Const. amend. I.  "The Free Exercise

Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest

scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'"

*Trinity Lutheran*, 137 S. Ct. at 2019 (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508

U.S. 520, 533, 542 (1993)).  "Applying that basic principle," the Supreme Court "has repeatedly

confirmed that denying a generally available benefit solely on account of religious identity

imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of

the highest order.'"  *Id.* (citations omitted).

The State's own admissions establish that its exclusion of students who attend religious

private schools from its tuition program violates the Free Exercise Clause.  The State admits that

it singles out otherwise eligible students who choose to attend "sectarian" schools from this

generally available program.  Def.'s Mot. 20-21.  The State, moreover, has failed to justify this

exclusion on "the 'most rigorous' scrutiny."  *Trinity Lutheran*, 137 S. Ct. at 2024 (citation

omitted).  As explained more fully below, the State's discrimination against such students

violates the First Amendment.

**A. The State's Exclusion Of Students Who Attend Religious Private Schools From The Tuition Program Discriminates Against Religious Exercise**

The Free Exercise Clause prohibits the government from imposing, without sufficient justification, "special disabilities on the basis of religious views or religious status." *Trinity Lutheran*, 137 S. Ct. at 2021 (citation omitted). The Free Exercise Clause further "protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Id.* at 2022 (citation omitted). Thus, as the Supreme Court announced more than fifty years ago, "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." *Id.* (alteration in original) (quoting *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)). After all, the "imposition of such a condition upon even a gratuitous benefit inevitably deter[s] or discourage[s] the exercise of First Amendment rights." *Id.* (alteration in original) (quoting *Sherbert*, 374 U.S. at 405).

A state places a condition on religious exercise—and triggers its strict scrutiny burden—when it requires a person or religious entity "to renounce [her] religious character" or belief "in order to participate in an otherwise generally available public benefit program" for which the person or entity otherwise "is fully qualified." *Trinity Lutheran*, 137 S. Ct. at 2024. The Supreme Court's decision in *Trinity Lutheran* is directly on point. There, the State of Missouri "offer[ed] state grants to help public and private schools, nonprofit daycare centers, and other nonprofit entities purchase rubber playground surfaces made from recycled tires." *Id.* at 2017. The Trinity Lutheran Church Child Learning Center was a church-affiliated nonprofit preschool and daycare center that was otherwise eligible to participate in the program and scored highly on

the state's criteria for grants under the program.  *Id.* at 2017-18.  The state, however, deemed

Trinity Lutheran "categorically ineligible to receive a grant" due to its religious status.  *Id.* at

2018.  In particular, the state reasoned that awarding Trinity Lutheran a grant would violate a

provision of the Missouri Constitution that prohibited the state from "provid[ing] financial

assistance directly to a church."  *Id.*

 The Supreme Court held that the state's treatment of Trinity Lutheran violated the Free

Exercise Clause.  *Id.* at 2024-25.  The Supreme Court concluded that the state's policy

"discriminates against otherwise eligible recipients by disqualifying them from a public benefit

solely because of their religious character."  *Id.* at 2021.  Indeed, the state's policy "puts Trinity

Lutheran to a choice: It may participate in an otherwise available benefit program or remain a

religious institution."  *Id.* at 2021-22.  "[S]uch a policy imposes a penalty on the free exercise of

religion that triggers the most exacting scrutiny."  *Id.* at 2021; *see also id.* at 2024.  Thus,

because the state failed to justify its "discriminatory policy" with "a state interest 'of the highest

order,'" it violated the First Amendment.  *Id.* at 2024 (citation omitted).

 Here as well, the State requires students "to renounce [their] religious character" or belief

"in order to participate in an otherwise generally available public benefit program, for which

[they otherwise are] fully qualified."  *Id.*  The State itself concedes that students such as

Plaintiffs, who reside in an SAU that does not operate or contract for a secondary school, may

participate in the tuition program "so long as they choose a public or non-sectarian private

school"—but not if they choose to attend a "sectarian" school.  Def.'s Mot. 20-21.  By putting

students to a "choice" between participating in the "otherwise available" tuition program and

remaining enrolled at a religious institution, the State has "impose[d] a penalty on the free

exercise of religion."  *Trinity Lutheran*, 137 S. Ct. at 2021-22, 2024.  Accordingly, the State

bears the burden to justify this religious discrimination against Plaintiffs with "a state interest 'of the highest order.'"  *Id.* at 2024 (citation omitted).

### B.  The State Has Failed To Carry Its Strict Scrutiny Burden

The State's discriminatory exclusion of students who attend religious private schools from the tuition program "must be subjected to the 'most rigorous' scrutiny."  *Trinity Lutheran*, 137 S. Ct. at 2024 (citation omitted).  "Under that stringent standard, only a state interest 'of the highest order' can justify the [State's] discriminatory policy."  *Id.* (citation omitted).

At various times, the State has identified two interests that purportedly justify its discriminatory policy, but neither satisfies strict scrutiny.  Neither purported interest is "of the highest order," *id.*, and the State has not even attempted to demonstrate that its discrimination is narrowly tailored to achieve either interest, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (explaining that, in Free Exercise cases, the "Court look[s] beyond broadly formulated interests" supporting infringements on religious exercise and instead scrutinizes reasons for infringing the religious exercise of "particular religious claimants").

First, the State's original justification for banning religious private schools from the tuition program was that including them would violate the Establishment Clause.  *See* Def.'s Mot. 4-5 (recounting 1980 Maine Attorney General opinion and enactment of § 2951(2)); 20-A M.R.S. § 2951(2) (requiring that a school be "a nonsectarian school in accordance with the First Amendment").  The State has now wisely abandoned that justification, as it must:  as the State acknowledges, under intervening Supreme Court precedent, "Maine *could* design a program that would allow parents to direct public dollars to sectarian schools without violating the Establishment Clause."  Def.'s Mot. 1 (citing *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002)); *see also Locke v. Davey*, 540 U.S. 712, 719 (2004).

8

The State nonetheless attempts a variation on this antiestablishment theme, arguing that its discriminatory policy is necessary to avoid "compel[ling] Maine to fund explicitly religious activity" in a manner that might establish religion. Def.'s Mot. 21. But any state interest "in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution . . . is limited by the Free Exercise Clause." *Trinity Lutheran*, 137 S. Ct. at 2024 (citing *Widmar v. Vincent*, 454 U.S. 263, 276 (1981)). In fact, the State's "policy preference for skating as far as possible from religious establishment concerns . . . [i]n the face of the clear infringement on free exercise before us . . . cannot qualify as compelling." *Id.* (citation omitted).

Moreover, the entire reason that the Establishment Clause does not prohibit public funds from flowing through a state tuition program to a religious private school is that the funds are "direct[ed] . . . to religious schools wholly as a result of [the] genuine and independent private choice" of the recipient student. *Zelman*, 536 U.S. at 652; *see also Locke*, 540 U.S. at 719 ("Under our Establishment Clause precedent, the link between government funds and religious training is broken by the independent and private choice of recipients."); *see also Moss v. Spartanburg County Sch. Dist. Seven*, 683 F.3d 599, 610 (4th Cir. 2012) (recognizing that "private religious education is an integral part of the American school system" and that public schools accepting credits for religious courses "sensibly *accommodates* the 'genuine choice among options private and public, secular and religious'" (quoting *Zelman*, 536 U.S. at 662)); *see also Freedom from Religion Found. v. McCallum*, 324 F.3d 880 (7th Cir. 2003) (holding that reimbursing a religious substance abuse program based on the number of beneficiaries choosing that program involved a system of genuine and independent private choice under *Zelman*). Thus, far from being "compel[led]" to directly fund religious activity, Def.'s Mot. 21, the State is

9

merely being held to its Free Exercise obligation to allow "parents to direct public dollars to

sectarian schools" on equal terms as parents who direct such funds to non-religious private

schools, *id.* at 1; *see also Trinity Lutheran*, 137 S. Ct. at 2021-22, 2024.

Second, the State now principally argues that § 2951(2)'s exclusion of "sectarian"

schools from the tuition program is necessary to achieve the State's interest in maintaining "a

secular public education system." Def.'s Mot. 2, 17-18, 20-21. The State thus tautologically

argues that its discrimination against non-secular schools is justified because it has an interest in

discriminating against non-secular schools. *See, e.g.*, *id.* A state, however, may not "pursue[] its

preferred policy to the point of expressly denying a qualified religious entity a public benefit

solely because of its religious character." *Trinity Lutheran*, 137 S. Ct. at 2024. This makes

perfect sense: the Free Exercise Clause and *Trinity Lutheran* would be a dead letter if, as the

State suggests, a state could exclude "sectarian" individuals and institutions from a public

program, 20-A M.R.S. § 2951(2), simply by labeling that program "secular."

Moreover, the State's assertion that including religious private schools in the tuition

program would jeopardize its "secular public education system," Def.'s Mot. 2, 17-18, 20-21, is

dubious at best. After all, the State itself has endorsed attendance at religious private schools "as

an alternative to attending a public school for purposes of compulsory attendance." *Id.* at 23. As

the State acknowledges, it has "approved" religious private schools, including BCS, under the

compulsory attendance law, and has "recognized" that other religious private schools such as

Temple Academy provide "equivalent instruction" to the State's public schools. *Id.*; Pls.' Mot.

5-6; JSF ¶¶ 73, 132. The State provides no explanation as to how it can embrace religious

private schools as places for students to learn English, social studies, history, mathematics,

science, and fine arts, 20-A M.R.S. § 4722(2), but simultaneously shun those schools in the

tuition program out of a concern that they are fundamentally incompatible with the State's "secular public education system," Def.'s Mot. 2, 17-18, 20-21.

Instead, the State falls back on its repeated characterization of BCS and Temple Academy as "pervasively sectarian," *id.* at 1, 6, 8, 20, but that characterization only underscores the constitutional violation in the State's discrimination against religious private schools.  Of course, if the State were truly convinced that these schools—whether "pervasively sectarian" or otherwise—provide a deficient education, it would never have "approved" them or "recognized" their "equivalent instruction" to public schools.  *Id.* at 23.

Moreover, the "pervasively sectarian" concept does not even appear in § 2951(2), which bans *all* "sectarian" schools from the tuition program.  20-A M.R.S. § 2951(2).  Rather, the State appears to be attempting to resurrect a repudiated legal concept that a plurality of the Supreme Court has "disavow[ed]" as "offensive," "regret[table]," "born of bigotry," and as having a "shameful pedigree."  *Mitchell v. Helms*, 530 U.S. 793, 826-29 (2000) (plurality opinion). Unlike the State's tuition program, which involves "genuine and independent private choice," *Zelman*, 536 U.S. at 652; *see Locke*, 540 U.S. at 719, *Mitchell* involved a government program of direct aid that lent computers to schools, including parochial schools, 530 U.S. at 802-03 (plurality opinion).  Invoking the Establishment Clause, a lower court struck down the direct aid program as applied to what it viewed as "pervasively sectarian" schools.  *Id.* at 804.  The Supreme Court reversed and upheld the program because the aid was secular in nature and was distributed through neutral criteria.  *See id.* at 829 (plurality opinion); *id.* at 867 (O'Connor & Breyer, JJ., concurring) (adding third requirement that directly provided equipment not be diverted to religious purposes).

11

The *Mitchell* plurality expressly rejected the dissent's argument that whether the recipient of direct public aid is "pervasively sectarian" should be a factor in the First Amendment analysis. *See id.* at 826-29 (plurality opinion); *see also id.* at 867 (O'Connor & Breyer, JJ., concurring) (omitting "pervasively sectarian" from the list of factors).  The plurality noted that the "pervasively sectarian" concept already had been deemphasized in the Supreme Court's jurisprudence. *Id.* at 826-27 (plurality opinion).  The plurality also reasoned that "the religious nature of a recipient should not matter to the constitutional analysis, so long as the recipient adequately furthers the government's secular purpose." *Id.* at 827.  Where the government provides direct aid in a religion-neutral manner, "[t]he pervasively sectarian recipient has not received any special favor, and it is most bizarre that the Court would, as the dissent seemingly does, reserve special hostility for those who take their religion seriously, who think that their religion should affect the whole of their lives, or who make the mistake of being effective in transmitting their views to children." *Id.* at 827-28.

The plurality further pointed out that "a focus on whether a school is pervasively sectarian is not only unnecessary but also offensive" because it would require courts to engage in the "profoundly troubling" exercise of "trolling through a person's or institution's religious beliefs." *Id.* at 828.  Additionally, the plurality noted that the pervasively sectarian concept "collides with our decisions that have prohibited governments from discriminating in the distribution of public benefits based upon religious status or sincerity." *Id.*; *see also Locke*, 540 U.S. at 724-25 (holding that state scholarship program was consistent with Free Exercise Clause because it was available to students who "attend[ed] pervasively religious schools" and enrolled in "devotional theology courses").

12

Finally, the plurality noted that the "pervasively sectarian" concept was "born of bigotry" and "has a shameful pedigree" of discriminating against disfavored groups "that we do not hesitate to disavow." *Mitchell*, 530 U.S. at 828-29 (plurality opinion); *see also id.* at 826 (the pervasively sectarian concept reflects a "period . . . that the Court should regret, and . . . is thankfully long past"). As the plurality recounted:

> Opposition to aid to "sectarian" schools acquired prominence in the 1870's with Congress's consideration (and near passage) of the Blaine Amendment, which would have amended the Constitution to bar any aid to sectarian institutions. Consideration of the amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that "sectarian" was code for "Catholic."

*Id.* at 828.

The State's suggestion that it can exclude from its tuition program "pervasively sectarian" private schools that it otherwise has "approved" or "'recognized' . . . as providing equivalent instruction" to its public schools, Def.'s Mot. 1, 6, 8, 20, 23, dramatically illustrates the fatal flaw in the State's position. Nothing in the "offensive" and "disavow[ed]" "pervasively sectarian" concept allows the State to "troll[] through" or exhibit "special hostility" to the religious beliefs of *any* individual or institution, much less to avoid the First Amendment prohibition on "discriminating in the distribution of public benefits based upon religious status or sincerity." *Mitchell*, 530 U.S. at 826-28 (plurality opinion). Yet § 2951(2) *does* "discriminat[e] in the distribution of public benefits based upon religious status," *id.*, by forcing eligible students to choose between participating in the tuition program and "remain[ing] [enrolled at] a religious institution," *Trinity Lutheran*, 137 S. Ct. at 2021-22, 2024; *see also supra* Part A. The "pervasively sectarian" concept provides no escape from the conclusion that the State's

13

discrimination against students at religious private schools violates the First Amendment.  *Trinity Lutheran*, 137 S. Ct. at 2021-22, 2024.[2]

### C.  Neither *Locke v. Davey* Nor *Eulitt v. Maine Department of Education* Override *Trinity Lutheran* Or Permit The State's Discrimination Against Students At Religious Private Schools

The State attempts to avoid a straightforward application of *Trinity Lutheran* to invalidate the tuition program, arguing that *Trinity Lutheran* is inapplicable here because a footnote stated that the majority opinion addressed "express discrimination based on religious identity with respect to playground resurfacing [and] not . . . religious uses of funding or other forms of discrimination."  137 S. Ct. at 2024 n.3 (cited at Def.'s Mot. 16).  But the State offers no principled basis to support its suggestion that the First Amendment treats public funding of playground resurfacing differently from other forms of public funding.  *See* Def.'s Mot. 16.  Nor is there any such basis: as the Supreme Court has made clear for more than five decades, "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege" provided by a state.  *Sherbert*, 374 U.S. at 404 (unemployment compensation).  Consistent with that unbroken line of authority, Justice Gorsuch and Justice Thomas noted in *Trinity Lutheran* that "general [First Amendment]

---

[2] In opposing Plaintiffs' Equal Protection claim, the State points to a variety of other interests that, in its view, are advanced by its discrimination against religion in the tuition program.  *See, e.g.*, Def.'s Mot. 14-16, 23-24.  The State argues that these interests satisfy "rational basis review" but never argues that they satisfy strict scrutiny.  *Id.* at 24.  They therefore cannot satisfy the State's burden to prove that an interest "of the highest order" justifies its discrimination in the tuition program.  *Trinity Lutheran*, 137 S. Ct. at 2019 (citation omitted).  Moreover, at least one of those interests appears to be inconsistent with the existence of the tuition program: the State contends that "Maine has a high performing system of public education, and there is no need to add to or change it," Def.'s Mot. 24, but the tuition program "add[s]" the option of attending private school to the State's public education system in SAUs that do not operate a public secondary school.

principles . . . do not permit discrimination against religious exercise—whether on the playground or anywhere else."  137 S. Ct. at 2026 (Thomas & Gorsuch, JJ., concurring in part).

The State also seeks refuge in two prior cases—*Locke v. Davey*, 540 U.S. 712 (2004); *see* Def.'s Mot. 2, 5, 14-15, 17-18, 20-23, and *Eulitt v. Maine Department of Education*, 386 F.3d 344 (1st Cir. 2004); *see* Def.'s Mot. 2, 5, 14-17, 24-25—but neither overrides *Trinity Lutheran* or supports the State's discrimination against religion in the tuition program.  First, the State misconstrues both the holding and the import of *Locke*.  According to the State's reading of *Locke*, the Free Exercise Clause prohibits denial of public funding to otherwise eligible individuals because of religious *status*—"who they are"—but not because of religious *use*—"what they would like to do" with the funding.  Def.'s Mot. 20-21.  The State, however, identifies no clear line between religious status and religious use.  *See id.*  Nor does there appear to be one.  *See, e.g.*, *Trinity Lutheran*, 137 S. Ct. at 2025-26 (Thomas & Gorsuch, JJ., concurring in part).  After all, *Trinity Lutheran* itself could have been characterized as a religious use case: the religious preschool there sought to "use public funds to [facilitate] a sectarian education for [its] children."  Def.'s Mot. 21; *see also Trinity Lutheran*, 137 S. Ct. at 2017 (noting that the preschool had "merged with Trinity Lutheran Church and . . . operates under its auspices on church property").

Accordingly, the State is simply incorrect when it suggests that *Locke* approved state discrimination based upon religion whenever public aid might be characterized as flowing to a "religious use[]."  Def.'s Mot. 21 (citation omitted).  To the contrary, *Locke* held that a state may constitutionally deny public funds for a *particular* religious use: pursuit of a "devotional theology" degree that is "devotional in nature or designed to induce religious faith."  540 U.S. at 716-17, 720-22 (citation omitted).  In the Supreme Court's view, "[t]raining someone to lead a

15

congregation is an essentially religious endeavor," and "majoring in devotional theology is akin to a religious calling."  *Id.* at 721.  The Supreme Court therefore reasoned that the First Amendment permits a state not to fund pursuit of devotional theology degrees based upon the longstanding and historic "antiestablishment interest[]" against using "taxpayer funds to support church leaders, which was one of the hallmarks of an 'established' religion."  *Id.* at 722.  The Supreme Court thus emphasized that the "only interest at issue here is the State's interest in not funding the religious training of clergy.  Nothing in our opinion suggests that the State may justify any interest that its 'philosophical preference' commands."  *Id.* at 722 n.5.

> The *Trinity Lutheran* majority reiterated the narrow nature of *Locke*:
>
> The Court in *Locke* . . .  stated that Washington's choice was in keeping with the State's antiestablishment interest in not using taxpayer funds to pay for the training of clergy; in fact, the Court could "think of few areas in which a State's antiestablishment interests come more into play."  The claimant in *Locke* sought funding for an "essentially religious endeavor . . . akin to a religious calling as well as an academic pursuit," and opposition to such funding "to support church leaders" lay at the historic core of the Religion Clauses.

137 S. Ct. at 2023 (quoting *Locke*, 540 U.S. at 721-22); *see also Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1255 (10th Cir. 2008) (stating that *Locke* makes clear that a "[s]tate's latitude to discriminate against religion is confined to certain 'historic and substantial state interest[s],' and does not extend to the wholesale exclusion of religious institutions and their students from otherwise neutral and generally available government support") (citation omitted); *Caplan v. Town of Acton*, 479 Mass. 69, 98 (2018) ("Together, *Trinity Lutheran* and *Locke* define a very narrow category of exclusions from generally available public benefit programs that can be required by State anti-aid amendments without violating the free exercise clause of the First Amendment.").

Thus, *Locke* holds only that a state does not violate the Free Exercise Clause when it declines to provide public funding for pursuit of "devotional theology" degrees, 540 U.S. at 715-17, 720-22; it does not grant states license to withhold "generally available" public funds from otherwise "fully qualified" individuals because those individuals' use of the funds might be characterized as "religious," *Trinity Lutheran*, 137 S. Ct. at 2024.  Plaintiffs here do not seek devotional theology degrees, or anything like them.  Rather, they seek to use funds from the State's "generally available" tuition program for which they are otherwise "fully qualified," *id.*, to attend religious private schools that the State otherwise has "approved" or "'recognized' . . . as providing equivalent instruction" to its public schools, Def.'s Mot. 23; *see also* Pls.' Mot. 5-6; JSF ¶¶ 73, 132.  That Plaintiffs have made a "genuine and independent private choice," *Zelman*, 536 U.S. at 652; *see also Locke*, 540 U.S. at 719, to learn English, social studies, history, mathematics, science, and fine art, 20-A M.R.S. § 4722(2), in a religious rather than a non-religious school does not bring this case within the narrow holding of *Locke*.

Rather, the State's imposition of "a penalty on the free exercise of religion" by forcing such students to choose between "participat[ing] in [the] program or remain[ing] [enrolled at] a religious institution" discriminates against religion and triggers "the 'most rigorous' scrutiny" under the First Amendment.  *Trinity Lutheran*, 137 S. Ct. at 2021-22, 2024 (citation omitted). And unlike the state in *Locke*, the State here has not identified an "antiestablishment interest[]" against using "taxpayer funds to support church leaders," *Locke*, 540 U.S. at 722, or any other interest "of the highest order" to justify its religious discrimination, *Trinity Lutheran*, 137 S. Ct. at 2019 (citation omitted); *see also supra* Part B.

If more were somehow needed, the State's reliance upon *Locke* fails for another reason as well.  The state scholarship program at issue in *Locke* excluded only students who sought

17

devotional theology degrees, but was otherwise available to eligible students who attended religious institutions.  *See* 540 U.S. at 724-25.  In fact, "[t]he program permit[ted] students to attend pervasively religious schools, so long as they are accredited," and even permitted students to use public funds "to take devotional theology courses," including where such courses were required to obtain a degree.  *Id.*  By contrast, the State here—in the name of not funding "pervasively sectarian" schools, Def.'s Mot. 1, 6, 8, 20—has categorically excluded students who attend "sectarian" schools from its tuition program, *see* 20-A M.R.S. § 2951(2).  Thus, unlike in *Locke*, the State has done nothing, let alone gone "a long way," to "includ[e] religion in [the] benefits" of its tuition program.  *Locke*, 540 U.S. at 724-25.

Second, the State suggests that this Court is "bound" by the First Circuit's prior decision upholding § 2951(2) in *Eulitt*.  Def.'s Mot. 2; *see also id.* 14-17.  But *Eulitt* itself recognized that a district court is not bound by circuit precedent that "has unmistakably been cast into disrepute by supervening authority."  386 F.3d at 349.  As explained above, a straightforward application of the Supreme Court's intervening decision in *Trinity Lutheran* establishes that the State's discriminatory tuition program upheld in *Eulitt* violates the Free Exercise Clause.  *See supra* Parts A-B.

Moreover, in two passages that the State relies upon, *Eulitt* adopted an overly broad reading of *Locke* that also does not survive *Trinity Lutheran*.  In particular, the *Eulitt* court read *Locke* to "confirm[] that the Free Exercise Clause's protection of religious beliefs and practices from direct government encroachment does not translate into an affirmative requirement that public entities fund religious activity simply because they choose to fund the secular equivalents of such activity."  386 F.3d at 354 (cited at Def.'s Mot. 15).  But *Trinity Lutheran* reiterates that states must do *precisely* that and cannot create public funding programs that discriminate against

religious individuals or institutions compared to their non-religious counterparts.  *See Trinity Lutheran*, 137 S. Ct. at 2020-21, 2024.  The *Eulitt* court also read *Locke* to hold that "state entities, in choosing how to provide education, may act upon their legitimate concerns about excessive entanglement with religion, even though the Establishment Clause may not require them to do so."  *Eulitt*, 386 F.3d at 355 (cited at Def.'s Mot. 15).  *Trinity Lutheran*, however, *rejected* that position, holding that a state's interest "in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution . . . is limited by the Free Exercise Clause."  137 S. Ct. at 2024 (citing *Widmar*, 454 U.S. at 276); *see also id.* (a state's "policy preference for skating as far as possible from religious establishment concerns . . . cannot qualify as compelling . . . [i]n the face of [a] clear infringement on free exercise").

19

## CONCLUSION

If the Court reaches the Free Exercise claim, it should apply *Trinity Lutheran* and hold that 20-A M.R.S. § 2951(2) violates the Free Exercise Clause.

Dated:  June 10, 2019

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>HALSEY B. FRANK<br>United States Attorney<br>District of Maine<br>100 Middle Street<br>East Tower, 6th Floor<br>Portland, ME 04101</td><td>ERIC S. DREIBAND<br>Assistant Attorney General<br>Civil Rights Division<br><br>JOHN M. GORE<br>Principal Deputy Assistant Attorney General<br><br>/s/ Eric W. Treene<br>ERIC W. TREENE<br>Special Counsel<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Avenue NW<br>Washington, DC 20530<br>Phone: (202) 514-2228<br>Email: Eric.Treene@usdoj.gov</td></tr>
</table>

**CERTIFICATE OF SERVICE**

I hereby certify that on this, the 10th day of June, 2019, I electronically filed the UNITED STATES' STATEMENT OF INTEREST IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT with the Clerk of Court using the CM/ECF system, which will send notifications of such filings to the following counsel of record: Arif Panju; Jeffrey T. Edwards; Jonathan R. Whitehead; Lea Patterson; Michael K. Whitehead; Timothy D. Keller; Christopher C. Taub; Sarah A. Forster; Stephen C. Whiting; Alex Luchenitser; Daniel Mach; Heather L. Weaver; Richard B. Katskee; Sarah Goetz; Zachary Heiden; Emma Eaton Bond; Erica A. Harrington; Kristen L. Hollar; Andrew Mason; David G. Sciarra; Jasmine Bolton; Jessica Levin; and Zoe M. Savitsky.  To my knowledge, there are no non-registered parties or attorneys participating in this case.

Dated:  June 10, 2019

/s/ Eric W. Treene
ERIC W. TREENE
Special Counsel
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Phone: (202) 514-2228
Email: Eric.Treene@usdoj.gov