UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DAVID AND AMY CARSON, *on their own behalf and as next friends of their child, O.C.;* ALAN AND JUDITH GILLIS, *on their own behalf and as next friends of their child, I.G.;* AND TROY AND ANGELA NELSON, *on their own behalf and as next friends of their children, A.N. and R.N.*, | ) ) ) ) ) ) ) ) ) ) | |
| PLAINTIFFS | ) ) | CIVIL NO. 1:18-CV-327-DBH |
| v. | ) ) | |
| A. PENDER MAKIN, *in his official capacity as Commissioner of the Maine Department of Education,* | ) ) ) ) ) ) | |
| DEFENDANT | ) | |

## DECISION AND ORDER ON CROSS-MOTIONS FOR JUDGMENT ON A STIPULATED RECORD

This case concerns the application of the First Amendment religion clauses to Maine's funding of secondary education—namely its exclusion of sectarian schools from its program of paying tuition to parent-chosen private schools when local government does not provide a public school. A number of *amici curiae* have demonstrated their interest in the issue by filing legal memoranda on both sides, and the United States has filed a statement of interest supporting the plaintiffs. The parties initially filed cross-motions for summary judgment but at

oral argument on June 24, 2019, agreed to submit the case as cross-motions for judgment on a stipulated record.[1]

**UNDERLYING FACTS**

The parties have stipulated that Maine school administrative units must "either operate programs in kindergarten and grades one to 12 or otherwise provide for students to participate in those grades as authorized elsewhere in this Title."[2] Of the 260 school administrative units in Maine, 143 do not operate a secondary school, including those that serve the plaintiffs' towns of residence—Glenburn, Orrington, and Palermo.[3] Any school administrative unit like these "that neither maintains a secondary school nor contracts for secondary school privileges pursuant to chapter 115 shall pay the tuition, in accordance with chapter 219, at the public school or the approved private school of the parent's choice at which the student is accepted."[4] The school administrative units that serve the plaintiffs' towns "do not contract for secondary school privileges with any particular public or private secondary school for the education of their resident secondary students."[5] Those school administrative units therefore "are obligated to pay up to the legal tuition rate . . . to the public or private school approved for tuition purposes selected by the resident secondary student's

---

[1] Boston Five Cents Sav. Bank v. Sec'y of Dep't of Hous. & Urban Dev., 768 F.2d 5, 11-12 (1st Cir. 1985) ("to stipulate a record for decision allows a judge to decide any significant issues of material fact that he discovers; to file cross-motions for summary judgment does *not* allow him to do so") (emphasis in original). As it turns out, I do not find any issues of material fact to decide, but judgment on a stipulated record is a cleaner approach than cross-motions for summary judgment.
[2] Joint Stipulated Facts ¶ 5 (quoting 20-A M.R.S.A. § 1001(8)) (ECF No. 25).
[3] Id. ¶ 6.
[4] Id. ¶ 7 (quoting 20-A M.R.S.A. § 5204(4)).
[5] Id. ¶ 9.

2

parents."[6] But a "private school may be approved for the receipt of funds for tuition purposes only if it . . . [i]s a nonsectarian school in accordance with the First Amendment of the United States Constitution."[7]

It is this last requirement—that the parent-selected private school be nonsectarian—that provokes this lawsuit.[8]

**ANALYSIS**

Over the past many years, several court cases have upheld the Maine approach to school choice when the school administrative unit does not provide public secondary education. See Strout v. Albanese, 178 F.3d 57 (1st Cir. 1999); Bagley v. Raymond Sch. Dep't, 728 A.2d 127 (Me. 1999); Anderson v. Town of Durham, 895 A.2d 944 (Me. 2006); Joyce v. State, 951 A.2d 69 (Me. 2008). The latest federal case to do so is Eulitt ex. rel. Eulitt v. Maine, Dep't of Educ., 386 F.3d 344 (1st Cir. 2004), aff'g 307 F. Supp. 2d 158 (D. Me. 2004). All those cases ruled in favor of the state against First Amendment or Equal Protection

---

[6] Id. ¶ 10.
[7] Id. ¶ 14 (quoting 20-A M.R.S.A. § 2951(2)).
[8] Maine's educational approach has not changed materially since this court and the First Circuit grappled with the same issue in 2004. Eulitt ex rel. Eulitt v. Maine, Dep't of Educ., 386 F.3d 344 (1st Cir. 2004), aff'g 307 F. Supp. 2d 158 (D. Me. 2004). According to Eulitt, 386 F.3d at 346:

> By statute, Maine commits to providing all school-aged persons with "an opportunity to receive the benefits of a free public education," Me. Rev. Stat. Ann. tit. 20-A, § 2(1) (West 2004), and vests authority in local school districts to fulfill that undertaking by maintaining and supporting elementary and secondary education, id. §§ 2(2), 4501. School districts, known in Maine's bureaucratic argot as school administrative units, enjoy some flexibility in administering this guarantee. They may satisfy the state mandate in any of three ways: by operating their own public schools, see id. § 1258(1), by contracting with outside public schools to accept their students, see id. §§ 1258(2), 2701; or by paying private schools to provide such an education, see id. §§ 2951, 5204(4). State law bars a school district that exercises the third option from paying tuition to any private sectarian school. Id. § 2951(2).

3

challenges. What provokes renewal of the dispute now, in the face of those many past decisions, is a 2017 United States Supreme Court decision, Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012 (2017). In Trinity Lutheran, the Supreme Court held that it is a violation of the First Amendment's free exercise clause to deny a generally available subsidy for rubberized playground surfaces at preschool and daycare facilities solely on the ground that a church operates the facilities. According to the plaintiffs, some of the *amici*, and the United States, Trinity Lutheran has radically changed the constitutional landscape of First Amendment free exercise challenges and finally makes Maine's approach unconstitutional.

But Maine's Attorney General says that, notwithstanding Trinity Lutheran, these plaintiffs (the parents of secondary school students) have no standing to challenge the Maine law because there is no substantial likelihood that the sectarian schools to which they want to send their children—Bangor Christian Schools and Temple Academy—will even apply for state approval under section 2951(2). The Attorney General gives two reasons: first, the schools have not said they will apply, only that they might "consider" doing so, Def.'s Mot. For Summ. J. at 13 (ECF No. 29), citing Joint Stipulated Facts ¶¶ 128, 182; second, that if they receive public funds, the Maine Human Rights Act will prohibit them from considering sexual orientation in their employment decisions, and they have said they are unwilling to alter their employment practices, id., citing Joint Stipulated Facts ¶¶ 127, 184.

The Attorney General's arguments about the schools pursuing state approval are plausible. I am doubtful, for example, of the plaintiffs' interpretation of the Maine Human Rights Act. They argue that because section 4554(4) defines employer to exclude nonprofit religious organizations (except in cases of disability discrimination) and section 4573-A(2) allows religious entities to give preference in employment to people of their own religion and to require applicants and employees to conform to their religious tenets—neither provision refers to receipt of public funds—religious schools are altogether exempt from the prohibition on considering sexual orientation in employment. But the 2005 law, Public Law of 2005 chapter 10, that added sexual orientation as a prohibited form of discrimination, stated that "a religious corporation, association or organization *that does not receive public funds* is exempt from this provision with respect to . . . [e]mployment" (codified as 5 M.R.S.A. § 4553(10)(G) (emphasis added)).[9] It is certainly arguable that this is a narrower exemption and exempts only religious organizations that do not receive public funds when it comes to sexual orientation discrimination. If that is the correct interpretation of state law and if the schools are firm in their desire not to change their employment criteria, their willingness to "consider" applying for approval for public funding may not go far.

---

[9] I recognize that, as the plaintiffs point out, Pls.' Opp'n at 9 (ECF No.46), that employment section goes on to say "as is more fully set forth in section 4553, subsection 4, and section 4573-A," the provisions the plaintiffs rely upon, arguably thereby supporting their position. But that seems to read out of the statute the phrase "does not receive public funds." At the very least, the statute is ambiguous and might well deter the schools from proceeding to take public funds so as to avoid the risk.

5

But even if the plaintiffs cannot show that if I find the statute unconstitutional the two religious schools to which they would like to send their children will in fact seek approval under section 2951(2), I conclude that the Attorney General's standing argument fails under the First Circuit's decision in Eulitt. In Eulitt, the court held that parents do not have standing to raise the sectarian schools' constitutional rights, only their own. But Eulitt said that the parents "do have standing in their own right to seek global relief in the form of an injunction against the enforcement of section 2951(2) and a declaration of the statute's unconstitutionality":

> The [parents] have established standing directly based on their allegation that section 2951(2) effectively deprives them of the opportunity to have their children's tuition at [the sectarian school they chose] paid by public funding. Even though it is the educational institution, not the parent, that would receive the tuition payments for a student whose "educational requirements" application was approved, it is the parent who must submit such an application and who ultimately will benefit from the approval. Because section 2951(2) imposes restrictions on that approval, the parents' allegation of injury in fact to their interest in securing tuition funding provides a satisfactory predicate for standing.

Eulitt, 386 F.3d at 353 (internal citation omitted). There was no guarantee in Eulitt that the students would in fact gain access to the sectarian school there.[10] That is the plaintiffs' position in this case: they seek the *opportunity* to find

---

[10] In Eulitt, the school administrative unit sent 90% of its students to a neighboring public high school, but sent up to 10% to other private or public schools "so long as those students can demonstrate that they have educational needs that [the neighboring public school] cannot satisfy." 386 F.3d at 346-47. The Eulitts had not demonstrated that their daughters would qualify.

6

religious secondary education for their children that would qualify for public funding.[11] I conclude that under Eulitt these parents/plaintiffs have standing.[12]

I turn therefore to the issue whether Trinity Lutheran has effectively overruled the latest First Circuit decision to uphold Maine's educational funding approach, namely Eulitt. In that connection, it is necessary to consider my role as a federal trial judge. As a federal trial judge, I must follow any decision from the Court of Appeals for the First Circuit directly on point, except in limited circumstances: "Until a court of appeals *revokes* a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has *unmistakably been cast into disrepute* by supervening authority." Eulitt, 386 F.3d at 349 (internal citations omitted) (emphasis added). Eulitt has certainly not been revoked. Has Trinity Lutheran unmistakably cast Eulitt into disrepute? The answer is no. Trinity Lutheran may well have given good grounds to the plaintiffs to argue to the First Circuit that *that* court should reconsider its Eulitt holding, but it has not unmistakably cast the decision into disrepute such that I as a trial judge can ignore Eulitt. Here is why. Eulitt based its decision on all the relevant United States Supreme Court decisions up until then, including

---

[11] I see no reason to limit them to the willingness of the two schools they have identified; there may be other schools in existence or schools that will arise if funding is available. Until 1980, such schools did exist before the legislature enacted the ban on tuition to parent-selected sectarian schools. Joint Stipulated Facts ¶¶ 18-19. Maine's Law Court has said that "[o]ne of Maine's four Roman Catholic high schools, John Bapst High School, in Bangor, closed as a result of being excluded from the education tuition program." Bagley v. Raymond Sch. Dep't, 728 A.2d 127, 138 n. 19 (Me. 1999). It later reopened as a nonsectarian school, John Bapst Memorial High School. Joint Stipulated Facts ¶¶ 23-24.

[12] The defendant says that the argument it makes was not presented to the First Circuit in Eulitt. If that is so, it may be a basis for persuading the First Circuit to abandon its standing decision in Eulitt. But I take the Eulitt precedent and language as they are.

Zelman v. Simmons-Harris, 536 U.S. 630 (2002), and Locke v. Davey, 540 U.S. 712 (2004). Trinity Lutheran is the only later Supreme Court decision that bears on the analysis.[13] In Trinity Lutheran, while holding that Missouri could not disqualify pre-school programs from a subsidy for shredded tires on their playgrounds solely because they were operated by a church, four members of the Court (Justices Roberts, Kennedy, Alito, and Kagan) said in footnote 3: "This case involves express discrimination based on religious identity with respect to playground resurfacing. *We do not address religious uses of funding* or other forms of discrimination." (emphasis added). Justice Breyer (who did not concur in the opinion but only in the judgment) focused on "the particular nature of the 'public benefit' here at issue," and "would leave the application of the Free Exercise Clause to other kinds of public benefits for another day." 137 S. Ct. at 2027. That totals a majority of justices (five) who have said that Trinity Lutheran was not deciding such other issues.[14] I cannot, as a trial judge, say that Eulitt therefore has unmistakably been cast into disrepute. It is certainly open to the First Circuit to conclude that, after Trinity Lutheran, it should alter its Eulitt holding that sustained Maine's educational funding law,[15] but it is not my role

---

[13] Trinity Lutheran, 137 S. Ct. at 2021 n. 2 (2017), does cite a 2012 decision in a footnote, namely, Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC, 565 U.S. 171 (2012), for this proposition: "This is not to say that any application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause." The Hosanna-Tabor case applied a ministerial exception to the Americans with Disabilities Act prohibition on employment retaliation because of the free exercise clause. No one has argued that the case has implications for this controversy.

[14] Justices Thomas and Gorsuch, who otherwise concurred in the Court's opinion, rejected footnote 3, Trinity Lutheran, 137 S. Ct. at 2025. It is doubtful that the two dissenters (Justices Sotomayor and Ginsburg) would agree that Trinity Lutheran decided the broader question.

[15] In Eulitt, the plaintiffs tried to focus their case on the constitutional equal protection clause, but the First Circuit made clear that it had to consider the free exercise clause of the First Amendment first. 386 F.3d at 352-54.

8

to make that decision. I therefore apply Eulitt to this controversy and do not decide the post-Trinity Lutheran merits, nor the standard of review that should apply in reaching the merits.[16] Based upon the Eulitt decision, I conclude that Maine's educational funding program is constitutional.

My decision not to decide the ultimate question the parties and *amici* pose—whether Trinity Lutheran has changed the outcome in Eulitt—is no great loss for either the parties or the *amici*. It has always been apparent that, whatever my decision, this case is destined to go to the First Circuit on appeal, maybe even to the Supreme Court. In the First Circuit, the parties can argue their positions about how Trinity Lutheran affects Eulitt. I congratulate them on their written and oral arguments in this court. I hope that the rehearsal has given them good preparation for their argument in the First Circuit (and maybe even higher). My prompt decision allows them to proceed to the next level expeditiously.

Based upon Eulitt, I **GRANT** judgment on the stipulated record to the defendant and **DENY** it to the plaintiffs. The Clerk shall enter judgment accordingly.

**SO ORDERED.**

**DATED THIS 26TH DAY OF JUNE, 2019**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[16] The plaintiffs say that an exacting standard applies; the defendant disagrees.

9